Nos. 25-1603 & 25-1659
25-1655 & 25-1657

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

RONALD L. SCHROEDER, et al.

and

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al.,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

MARIO TRETO, JR.,

*Defendant-Appellee-Cross-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of Illinois
Case Nos. 1:17-cv-04663 & 3:16-cv-50310

---

## SEPARATE APPENDIX OF APPELLANTS
## (Volume 1 of 3)

---

Thomas G. Olp
Patrick T. Gillen
THOMAS MORE SOCIETY
309 W. Washington, Suite 1250
Chicago, IL 60606
(312) 782-1680
tolp@thomasmoresociety.org
pgillen@thomasmoresociety.org

*Counsel for Appellant-Cross-Appellee*
*Ronald L. Schroeder,*
*et al.*

Erin M. Hawley
John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
ehawley@ADFlegal.org
jbursch@ADFlegal.org

James A. Campbell
Erik C. Baptist
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@adflegal.org
ebaptist@ADFlegal.org

Kevin H. Theriot
Julia C. Payne
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@ADFlegal.org
jpayne@ADFlegal.org

*Counsel for Appellants-Cross-Appellees*
*National Institute of Family & Life*
*Advocates, et al.*

## APPENDIX TABLE OF CONTENTS

| Document Description | ECF No. | Appendix Page |
|---|---|---|
| **VOLUME 1** | | |
| Parties' Joint Stipulations of Facts (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 245-1 232-1 | SA-1 |
| Excerpts from Trial Transcript – Volume I – Lee Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 260 | SA-7 |
| Excerpts from Trial Transcript – Volume I – Lesnoff Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 260 | SA-70 |
| Excerpts from Trial Transcript – Volume I – Vanderlip Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 260 | SA-124 |
| Excerpts from Trial Transcript – Volume I – Maly Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 260 | SA-153 |
| Excerpts from Trial Transcript – Volume I – Cocks Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 260 | SA-191 |
| **VOLUME 2** | | |
| Excerpts from Trial Transcript – Volume II – Schroeder Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 261 | SA-273 |
| Excerpts from Trial Transcript – Volume II – Bohlen Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 261 | SA-313 |
| Excerpts from Trial Transcript – Volume II – Fernandes Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 261 | SA-376 |

| VOLUME 3 | | |
|---|---|---|
| Excerpts from Trial Transcript – Volume III – Burcher Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 262 | SA-531 |
| Excerpts from Trial Transcript – Volume III – Fernandes Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 262 | SA-669 |
| Excerpts from Trial Transcript – Volume III – Boles Examination (Case Nos. 3:16-cv-50310 and 1:17-cv-04663) | 262 | SA-685 |
| Plaintiffs' Notice of Appeal (Case No. 3:16-cv-50310) | 297 | SA-740 |
| Notice of Cross-Appeal (Case No. 3:16-cv-50310) | 300 | SA-743 |
| Notice of Appeal (Case No. 1:17-cv-04663) | 259 | SA-745 |
| Notice of Cross-Appeal (Case No. 1:17-cv-04663) | 262 | SA-747 |

# Exhibit A

**IN THE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| National Institute of Family and Life Advocates, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-cv-50310 |
| v. | ) ) | Hon. Iain D. Johnston |
| Mario Treto Jr., | ) ) | Magistrate Judge Lisa A. Jensen |
| Defendant. | ) ) | |
| | ) | |
| Ronald Schroeder, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | Case No. 17-cv-4663 |
| v. | ) ) | Hon. Iain D. Johnston |
| Mario Treto Jr., | ) ) | Magistrate Judge Lisa A. Jensen |
| Defendant. | ) ) ) | |

**Exhibit A**

**Parties' Joint Stipulations of Facts**

**Plaintiffs**

1.      Plaintiffs are the National Institute of Family and Life Advocates (NIFLA), a religious organization comprised of member pregnancy centers (PCs ) from across the nation, Tri-County Crisis Pregnancy Center ("Informed Choices"), TLC Pregnancy Services ("TLC"), Mosaic Pregnancy and Health Centers ("Mosaic"), Dr. Ronald Schroeder, who serves as the volunteer Medical Director for Options-Now/Thrive Metro-East, an Illinois Pregnancy Resource Center ("Options Now"), Women's Help Services, a PC d/b/a Focus Women's Center ("Focus")

1

SA-002

and d/b/a/ 1st Way Life Center (1st Way), and Pregnancy Aid South Suburbs, a PC also d/b/a Pregnancy Aid Illinois ("PASS").

2.      Plaintiffs operate PCs or is a physician who volunteers at Plaintiff PCs in Illinois.

3.      The Plaintiff PCs are referred to collectively as PCs in these fact stipulations except where the context indicates otherwise. Plaintiff Dr. Schroeder volunteers as medical director and provides free medical services as set forth in the policies and procedures of Options Now.

4.      The PCs are Illinois nonprofit corporations.

5.      Each PC is governed by a board of directors.

6.      The PCs are religiously inspired faith-based organizations.

**Health Care Right of Conscience Act**

7.      The Health Care Right of Conscience Act, 745 ILCS 70/1 et seq. (the "Conscience Act"), applies to Plaintiffs.

8.      Plaintiffs believe that abortion has no benefits.

9.      The PCs also believe that sex outside of marriage presents risk of harm to the health and well-being (physical, emotional, and spiritual) of the human person and consistent with this view they encourage people who visit them to refrain from sex outside of marriage. For this reason, the PCs do not recommend, counsel, or refer for sterilization or contraception.

10.     Informed Choices, TLC, Mosaic, and NIFLA's Illinois members offering health care services are "health care facilities" under the Act.

11.     Plaintiffs' medical directors are "physicians" under the Act.

SA-003

12.     Plaintiffs' nurses, nurse midwives, physician assistants, and any other person who furnishes, or assists in the furnishing of, health care services for the PCs are "health care personnel" under the Act.

13.     The medical director, licensed medical staff, and other health care personnel of Informed Choices, TLC, and Mosaic share those centers' religiously motivated pro-life beliefs, dispositions of conscience, and motivation for providing their services.

14.     People who agree to collaborate with each of these organizations must agree to abide by the organization's bylaws, policies, and procedures and agree that they will promote, not undermine, their mission.

**Additional Information About Plaintiffs**

15.     All of the pregnancy center plaintiffs provide information, health care services, and material support free of charge.

16.     Plaintiff NIFLA has forty member pregnancy centers in Illinois, including Informed Choices, TLC, and Mosaic.

17.     NIFLA's Illinois members that offer health care services do so under the direction of a licensed Illinois physician serving as medical director of the facility.

18.     Plaintiff Informed Choices is a religious non-profit that operates pregnancy centers in Grayslake and Crystal Lake, Illinois.

19.     Plaintiff TLC is a religious non-profit that operates pregnancy centers in Elgin, Schaumburg, and Palatine, Illinois, and a mobile ultrasound unit.

20.     Plaintiff Mosaic is a religious non-profit that operates pregnancy centers in Granite City and Fairview Heights, Illinois.

SA-004

21.     The PCs sometimes provide women with information about individuals or entities which may be able to provide them with medical care.

**Mission of Plaintiff PCs**

22.     Pregnant patients who visit PCs have pregnancy options, including: parenting, adoption, and abortion.

23.     Some pregnant patients who visit PCs are unsure about whether to carry their pregnancy to term.

24.     Each of the PCs offers extensive written information to its clients about pregnancy itself, pregnancy options, and the consequences of abortion.

25.     Plaintiffs do not provide, refer for, or otherwise facilitate access to, abortion due to their religious beliefs that abortion ends a human life.

26.     NIFLA is a non-profit membership organization of centers providing pro-life information and services to people in unplanned pregnancies.

27.     NIFLA is incorporated as a religious organization.

28.     NIFLA provides pro-life pregnancy center members with legal resources and counsel, with the aim of developing a network of life-affirming ministries in every community across the nation in order to achieve an abortion-free America.

29.     NIFLA's mission is to empower the choice for life by: equipping pregnancy centers with legal counsel and support; enabling pregnancy centers to convert to and maintain medical clinic status; and energizing pregnancy centers with a renewed vision for the future.

**Procedures of PCs**

30.     PCs rely on doctors, nurses, sonographers, and other health care personnel when providing health care services.

4

SA-005

31.     The PCs contact their medical director by telephone for guidance, if necessary.

32.     The doctor serving as the medical director reviews the findings of the sonographer.

33.     The doctors who volunteer to help the PCs deliver health care services to people who wish to receive them only provide those services offered in collaboration with the PC.

34.     PCs sometimes test for and treat STDs. If the PC offers such services, specific protocols govern such services.

35.     When counseling about pregnancy options, PCs provide patients with information about carrying a pregnancy to term, adoption, and medical risks involved with abortion.

36.     PCs do not discuss any benefits contraception might offer.

37.     The PCs do not offer, recommend, or refer for abortion, sterilization, or contraception.

38.     Health care professionals should consider a patient's mental and emotional health when advising about their medical options.

39.     Requiring Plaintiffs to inform their patients of any purported benefits of abortion would violate their religious beliefs.

**Outreach by the PCs**

40.     The PCs inform their intended audience of the assistance they can provide on their website and invite people to visit.

41.     If a patient requires care from an OB/GYN physician, PCs provide information about them or recommend physicians, health care personnel, and/or health care facilities.

SA-006

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              WESTERN DIVISION

 3   NATIONAL INSTITUTE OF FAMILY      )   Docket No. 16 CV 50310
     AND LIFE ADVOCATES, et al.,       )
 4                                     )   Rockford, Illinois
                         Plaintiff,    )   September 20, 2023
 5     v.                              )   9:00 o'clock a.m.
                                       )
 6   MARIO TRETO, JR.,                 )   A.M. SESSION
                                       )
 7                     Defendant.      )
     _____ )   _____
 8   RONALD L. SCHROEDER,              )   Docket No. 17 CV 04663
                                       )
 9                       Plaintiff,    )
                                       )
10     v.                              )   VOLUME I
                                       )   PAGES 1-295
11   MARIO TRETO, JR.,                 )
                                       )
12                     Defendant.      )

13                        TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE IAIN D. JOHNSTON
14
     APPEARANCES:
15
     For the Plaintiffs:        ALLIANCE DEFENDING FREEDOM
16                              (15100 North 90th Street,
                                 Scottsdale, AZ  85260) by
17                              MR. NOEL W. STERETT
                                MR. KEVIN H. THERIOT
18
                                THOMAS MORE SOCIETY
19                              (309 West Washington Street,
                                 Suite 1250,
20                               Chicago, IL  60606) by
                                MR. PETER C. BREEN
21                              MR. THOMAS G. OLP
                                (1581 Oakes Boulevard,
22                               Naples, FL  34119) by
                                MR. PATRICK T. GILLEN
23

24

25
```

```
 1   For the Defendant:          OFFICE OF THE ILLINOIS
                                 ATTORNEY GENERAL
 2                               (100 West Randolph Street,
                                  Chicago, IL  60601) by
 3                               MS. KARYN L. BASS-EHLER
                                 MS. SARAH J. GALLO
 4                               MR. JOHN T. HAZINSKI
                                 MS. HANNAH YEON MEE JUROWICZ
 5                               MS. ELIZABETH A.F. MORRIS
                                 MR. CHRISTOPHER WELLS
 6
     Court Reporter:            Heather M. Perkins-Reiva
 7                              327 South Church Street
                                Rockford, Illinois  61101
 8                              (779) 772-8309
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   certainly some conduct that we are engaging in that violates

2   our religious convictions, but it is also speech.

3           THE COURT:  Okay.  I just want to make sure I have

4   got everybody's positions.

5           Okay.  Thank you.

6           All right.  Call your first witness.

7           MR. THERIOT:  Thank you, Your Honor.  The plaintiffs

8   call Dr. James Lee.

9           THE COURT:  Why don't you step right there.  I want

10  to swear you in.

11    (Witness duly sworn.)

12          THE COURT:  Have a seat and watch your step.

13          There is a screen right there on your left, so if

14  they are going to be using exhibits with you, they will pop up

15  on that screen.  It is also a touchscreen.  So if you need to

16  highlight, circle, something like that, it will take care of

17  that.  There is water right there for you.

18          Have you ever testified in court before?

19          THE WITNESS:  No.

20          THE COURT:  So just some basic ground rules.  Speak

21  slowly and clearly into the microphone that's right there.

22  You are going to get questions from the attorneys.  Wait until

23  they are done with their question before you start to answer.

24  That's important for a couple reasons.  One, the court

25  reporter can only take down one person talking at a time.

1        Secondly, you might think you know what the question

2   is, but maybe it's a little different.  So wait until it's

3   done before you start to answer.  Likewise, counsel is going

4   to wait until you are done with your answer before they ask

5   you another question.

6        If at any point you don't understand a question, you

7   just let us know.  Okay?

8        All right.  Whenever you are ready.

9        DANIEL JAMES LEE, PLAINTIFF'S WITNESS, SWORN

10                    DIRECT EXAMINATION

11  BY MR. THERIOT:

12  Q.  Please state your full name for the record.

13  A.  Daniel James Lee.

14  Q.  And, Dr. Lee, would you just briefly describe your

15  education for the court?

16  A.  Graduated with a Bachelor of Arts in math and economics

17  from Seattle Pacific College in 1977, attended the National

18  College of Chiropractic from 1977 to 1980.  Did two years of

19  radiology residency at the National College of Chiropractic,

20  then attended medical school from 1983 through 1987.  Did a

21  residency in OB/GYN at Blodgett Memorial Medical Center in

22  Grand Rapids, Michigan, from 1987 through 1991.

23  Q.  During that residency, Doctor, did you have any training

24  in ethics?

25  A.  Yes.

SA-010

1  Q.  Just -- was that -- just describe that briefly for the

2  court.

3  A.  Lectures.

4  Q.  Okay.  Have you always been focused on obstetrics and

5  gynecology?

6  A.  In private practice, yes.

7  Q.  Are you board certified?

8  A.  Yes.

9  Q.  When did you become board certified?

10  A.  1993.

11  Q.  And have you maintained that board certification for over

12  30 years with ABOG?

13  A.  Yes.

14        THE COURT:  And you just used an acronym.  Why don't

15  you give us the letters so the court reporter has them for the

16  future.

17        MR. THERIOT:  American Board of Obstetrics and

18  Gynecology.  And I'm getting ready to use another one.

19  BY MR. THERIOT:

20  Q.  Are you a member of the American College of Obstetricians

21  and Gynecology?

22  A.  Yes.

23  Q.  And that's often abbreviated ACOG; is that right?

24  A.  Correct.

25  Q.  Do you agree with all of ACOG's positions?

1    A.   No.

2    Q.   Does ACOG issue opinions and guidelines?

3    A.   Yes.

4    Q.   Does ACOG ever ask you for your opinion on those positions

5    and guidelines?

6    A.   In September 1st of this month, they did.  But prior to

7    that, no.

8    Q.   What did they ask your opinion on?

9    A.   General obstetrics and gynecology.

10   Q.   Did it have anything to do with abortion?

11   A.   No.

12   Q.   Do you know how ACOG develops its guidelines and opinions?

13   A.   They get experts together to try and agree, to get a

14   consensus statement on how to deal with different problems.

15   So that doesn't mean there is a hundred percent agreement when

16   they arrive at their consensus statements.

17   Q.   Do those opinions and guidelines set the standard of care

18   for obstetricians and gynecologists?

19   A.   No.

20   Q.   How do they affect your practice as an OB/GYN?

21   A.   They give us guidelines in how to make decisions.

22   Q.   And do they set the standard of care in Illinois?

23   A.   No.

24   Q.   Have you ever been a member of the American Medical

25   Association?

SA-012

1   A.   Yes.

2   Q.   And are you currently a member of the AMA?

3          THE WITNESS:  I am not sure, Judge.

4          THE COURT:  Okay.

5   BY MR. THERIOT:

6   Q.   Why have you been a member of the AMA in the past and may

7   be a member now?

8   A.   Prior malpractice carriers demanded we be members of the

9   AMA.  Not all malpractice carriers demanded that.

10  Q.   Does the AMA also issue opinions and guidelines for

11  medical ethics?

12  A.   Yes.

13  Q.   Do those set the standard of care?

14  A.   No.

15  Q.   How do those ethics -- medical ethics and guidelines,

16  opinions, how do they affect your practice?

17  A.   They allow you to use discretion, your clinical judgment,

18  your training in making decisions.

19  Q.   If you would just briefly describe in your 30-year career

20  the places you have worked and the type of population that you

21  served.

22  A.   I joined a practice in the western suburbs of Chicago

23  known as the Tri-Cities, which included St. Charles, Batavia,

24  and Geneva.  I joined a practice that had begun in 1967,

25  became incorporated in 1972, I believe.  During those decades,

1   there were 11 physicians who practiced.  I was there 29 years.

2   I was the second-longest physician in that practice.

3   Q.  Was that Dukane Obstetrics & Gynecology?

4   A.  Correct.

5   Q.  And where did you do your deliveries?

6   A.  We did our deliveries at Delnor Community Hospital, or I

7   did.  We also had privileges at Central DuPage, but I never

8   delivered there.

9   Q.  Did you have any positions or hold any positions at Delnor

10  Community Hospital?

11  A.  Yes.  I was vice chairman for eight years and chairman for

12  six years.

13  Q.  Of what department?

14  A.  Obstetrics and gynecology.

15  Q.  As part of your responsibility as vice chairman and

16  chairman, did you serve on any boards?

17  A.  Yes.  As chairman, you were part of the executive board of

18  the hospital.

19  Q.  So after Dukane and Delnor, where did you work next?

20  A.  I worked in Macomb, Illinois, at McDonough District

21  Hospital.

22  Q.  What kind of services did you provide there?

23  A.  I saw patients in the clinic, ER, and labor and delivery.

24  Q.  What sort of population did you serve in McDonough

25  District Hospital?

1    A.   Basically a rural population, much different than the

2    suburbs.

3    Q.   And I believe at, possibly, during that same time period,

4    you were also on staff at another hospital?

5    A.   Yes.  Freeport Health Network in Freeport.

6    Q.   And what was your position then?

7    A.   I am a hospitalist there and currently am a hospitalist

8    there.

9    Q.   And then you also currently serve back at Delnor?

10   A.   Yes.  I'm also working as a hospitalist at Delnor as of

11   June of this year.

12   Q.   Have you ever worked with pregnancy centers?

13   A.   Yes.

14   Q.   Just if you would tell the Judge a little bit about that

15   experience.

16   A.   For, I believe, about a year, year and a half, I would go

17   see ultrasounds being performed on patients, and I would

18   arrive at a diagnosis.

19   Q.   Have --

20         THE COURT:  So you watched the actual ultrasound

21   being performed?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.

24   BY MR. THERIOT:

25   Q.   Have you -- have any of your employers ever expected you

SA-015

 1  to perform or refer for abortion?

 2  A.  No.

 3  Q.  How do you define abortion?

 4  A.  The elective termination of a viable pregnancy is my

 5  definition.

 6  Q.  Are there times when you must induce labor before a baby

 7  can live outside the womb?

 8  A.  Unfortunately, the answer is yes.

 9  Q.  Do you consider those abortion?

10  A.  No.

11          THE COURT:  I'm going to pause you right there so I

12  can read the transcript.

13    (Brief pause.)

14          THE COURT:  I don't have a question for you.

15          Let's go ahead.  No, go ahead.

16          MR. THERIOT:  Are you sure?

17          THE COURT:  Yeah, I'm sure.

18  BY MR. THERIOT:

19  Q.  Dr. Lee, do you ever bring abortion up as an option with a

20  pregnant patient that has no complications?

21  A.  No.

22  Q.  Do you ever perform abortions?

23  A.  No.

24  Q.  Why don't you perform abortions?

25          THE WITNESS:  Judge, when I was in training, it was

1    very clear when we do obstetrics, we are taking care of two

2    patients:  The woman and a fetus.

3    BY MR. THERIOT:

4    Q.  Is that -- so that position for why you don't perform

5    abortions, is that based upon your experience as a medical

6    professional or upon your conscientious convictions?

7    A.  Both.

8    Q.  Have you ever performed an abortion in your 30-year career

9    in Illinois?

10   A.  No.

11   Q.  Have you ever referred or provide information to a woman

12   who wanted an abortion about where she can get one?

13   A.  No.

14   Q.  Have you ever talked to a patient about the benefits of

15   abortion?

16   A.  No.

17   Q.  Have you ever been reported or investigated -- reported to

18   or investigated by the Illinois Department of Professional

19   Regulation for not performing or referring or talking about

20   the benefits of abortion?

21   A.  No.

22   Q.  Have you ever known anyone that you have practiced with

23   that was?

24   A.  No.

25   Q.  Do most OB/GYNs -- is it okay if I use that acronym --

1  OB/GYNs perform abortion?

2  A.  The question is do most perform abortions?

3  Q.  Yes.  Yes.

4  A.  I would say no.

5  Q.  Okay.  And what's your basis for that opinion?

6  A.  I provided a document.  I think it was C.

7  Q.  Actually, if we could bring up Exhibit 36, NIFLA

8  Exhibit 36.

9          THE WITNESS:  And also, Judge, experience.

10          THE COURT:  Okay.

11          THE WITNESS:  With colleagues I have worked with.

12  BY MR. THERIOT:

13  Q.  If you could scroll down a little bit just so we can get

14  this.

15          Is this the document you are referring to, Dr. Lee?

16  A.  Yes, it is.

17  Q.  And your understanding of that document is that most

18  OB/GYNs do not perform abortion?

19  A.  Correct.

20  Q.  And is that consistent with your experience here in

21  Illinois?

22  A.  Correct.

23  Q.  Do you have an opinion about why that phenomenon exists?

24          MS. MORRIS:  Objection, foundation.

25          THE COURT:  All right.  Hold on.  I should have

 1   explained this to you.

 2        When there is an objection, don't answer.  I will

 3   work it out, and I will tell you what to do.

 4        Okay.  Hold on one second.

 5        MS. MORRIS:  Your Honor, we are objecting because he

 6   would have to speculate in order to answer that question.

 7        THE COURT:  He is an expert.  It's an opinion.

 8        So hold on one second.

 9        Objection, foundation.  So is it a foundational

10   objection?

11        MS. MORRIS:  Speculation.  Excuse me.

12        THE COURT:  Okay.  Overruled.

13        You can answer the question.  If you want it read

14   back, I can read it back to you.

15        THE WITNESS:  Please.

16        THE COURT:

17        "Q.  Do you have an opinion about why that phenomenon

18   exists?"

19        THE WITNESS:  Because a majority of people believe

20   that a fetus is a life.

21   BY MR. THERIOT:

22   Q.  Throughout your 30-plus years of practice, Dr. Lee, have

23   you ever encountered a pregnant woman that didn't know

24   abortion is an option?

25   A.  No.

1    Q.  How do you know that?

2    A.  In the privacy of my own office, when they ask for an

3    abortion, and I say I cannot provide that service for them,

4    they have found that service.

5    Q.  And --

6    A.  And then they return for future gynecologic and obstetric

7    care with us -- me.

8    Q.  If one of your patients has wanted an abortion, has she

9    always been the one who brought it up?

10   A.  Yes.

11   Q.  And just to make sure -- I believe you just testified to

12   this, but I want to make sure I got it right:  Have the

13   patients who asked you about abortion all been able to obtain

14   one if they wanted one?

15   A.  Yes.

16   Q.  What do you tell patients who ask you about abortion?

17   A.  That I have a conscientious objection to abortions.

18   Q.  If they ask you about some specific information about

19   abortion, like methodology and procedures, do you talk to them

20   about that?

21   A.  I will answer their specific questions.

22   Q.  Do you think the standard of care requires you to do that?

23   A.  To answer their questions, yes.

24   Q.  Does the standard of care require you to talk about the

25   methodology and procedures of abortion with them?

SA-020

1    A.   That's a general question.  I would say no.

2    Q.   Do you tell women who ask about the benefits of

3    abortion -- I'm sorry.

4           Do you -- strike that, please.

5           Do you tell women who ask about abortion about

6    abortion benefits?

7    A.   No.

8    Q.   Why not?

9    A.   I do not see there being any benefits to abortion.

10   Q.   What do you base that expert opinion upon?

11   A.   My clinical experience, my conversations with women in the

12   privacy of our office.

13   Q.   So you don't tell them about the benefits.  Do you -- is

14   that because -- and I believe you testified there aren't any.

15          Are there complications or downsides to abortion?

16   A.   Complications can exist; medical, emotional, spiritual.

17   Q.   Can you give us some specific medical complications that

18   might exist?

19   A.   Infections, retained products, perforation of the uterus,

20   sterility.  I even had one partner have a patient die.

21   Q.   And what are some of the emotional complications?

22   A.   Regret.

23   Q.   Do you provide patients asking for abortion with a

24   referral to a practitioner who you believe can provide one?

25   A.   No.

SA-021

1  Q.  Why not?

2  A.  That violates my conscientious objection.

3  Q.  Is a referral just a recommendation or is it an implicit

4  endorsement that the physician can completely provide that

5  service -- competently, excuse me -- provide that service?

6  A.  I believe it is a personal endorsement of another

7  physician.

8  Q.  When you do refer patients, do you only refer to a -- to a

9  doctor, do you only refer them to ones that you believe are

10  competent?

11  A.  This is a general question?  We are not talking

12  specifically about abortion?

13  Q.  Correct.

14  A.  Yes.

15  Q.  Do you know any physicians that you believe are competent

16  to provide abortion?

17  A.  No.

18  Q.  What do you tell women who want a referral for abortion?

19  A.  Again, in the privacy of our office, that I do not perform

20  that procedure or provide that service.

21  Q.  And if she asks you, "Can you tell me where I can find

22  that -- find out how to get one," what do you tell her?

23  A.  I tell them I cannot provide that information.

24  Q.  Do you tell them where they might be able to obtain that

25  information?

SA-022

1   A.   Women know the Internet is available.

2   Q.   Have you ever encountered a patient, at least in the last,

3   say, ten years, that doesn't have access to the Internet?

4   A.   No.

5   Q.   What if a patient were to say she doesn't know how to use

6   the Internet to research for abortion providers?

7   A.   The public libraries have resource facilities, people.

8   Q.   Is there a medical ethics opinion that supports you

9   pointing women asking for abortion to the Internet -- strike

10  that question.  Let me rephrase that.

11       Is there a medical ethics opinion that you believe

12  supports your ability to conscientiously refuse to provide or

13  refer for abortion?

14  A.   Yes.

15  Q.   Do you recall what that is?

16  A.   It has got a bunch of 1s in it.

17  Q.   Okay.  Could it be --

18       MR. THERIOT:  Let's put up Plaintiff's Exhibit 32-A,

19  if we could.  And if you could, page down to page 6, which is

20  Bates-stamped 170176 -- oh, I'm sorry -- 01756.

21       Let's go up a little bit.  Is that 1.1.7?  Maybe I'm

22  wrong about that.

23       No, there it is.

24  BY MR. THERIOT:

25  Q.   Is this the AMA Principles of Medical Ethics opinion that

SA-023

1  you are referring to, Dr. Lee?

2  A.  I believe so.

3  Q.  Okay.

4          MR. THERIOT:  And if we would -- if you could scroll

5  down to the next page, subsection (f).

6  BY MR. THERIOT:

7  Q.  And it says -- is that the provision you are referring to,

8  the second sentence there, Dr. Lee, of subsection (f)?  Can

9  you read that?

10  A.  Yes.

11  Q.  Okay.

12          THE COURT:  Do you want him to read it out loud?

13          MR. THERIOT:  Sure.

14          THE COURT:  If you are going to read it out loud,

15  just read it slowly.

16          THE WITNESS:  "When a deeply held, well-considered

17  personal belief leads a physician to also decline to refer,

18  the physician should" -- not must -- "offer impartial guidance

19  to patients about how to inform themselves regarding access to

20  desired services."

21          MS. MORRIS:  Your Honor, I'm going to object because

22  he is adding words to what he is reading.

23          THE COURT:  I recognize it says "the physician

24  should," and he said "not must."  That's his edit to it.  So I

25  understand that.

SA-024

```
 1              MS. MORRIS:  Okay.

 2              MR. THERIOT:  Okay.  Thank you, Dr. Lee.

 3  BY MR. THERIOT:

 4  Q.  Do you -- Dr. Lee, do you ever refer patients to

 5  maternal-fetal medicine specialists?

 6  A.  Yes.

 7  Q.  In what circumstances might you do that?

 8  A.  In conditions where it requires more expertise, training

 9  than I received.

10  Q.  And when you refer someone to a maternal-fetal medicine

11  specialist, do you obtain consent from the patient for the

12  treatment the maternal-fetal medicine specialist will provide?

13  A.  No.

14  Q.  Do you talk about the risks and the benefits of that

15  treatment that that maternal-fetal medicine specialist will

16  provide with the patient?

17  A.  I talk about the benefits.

18  Q.  Okay.  In what aspect?  Do you talk about all the

19  benefits?

20  A.  How it can help in the outcome of their pregnancy.

21              THE COURT:  I don't know what a maternal-fetal

22  medicine specialist is.

23  BY MR. THERIOT:

24  Q.  Dr. Lee, can you describe for the Judge what that is?

25  A.  They are trained in general obstetrics and gynecology, but
```

1   they receive additional training in obstetrics.  Some of these

2   people can put trocars through the abdominal wall into a

3   pregnancy and ablate placental vessels.  They can stick

4   needles in the umbilical cord to draw out blood.  They're --

5   it's amazing what they can do.

6           THE COURT:  Okay.

7           THE WITNESS:  They are much more skilled at reading

8   ultrasounds.  They have a higher level of training.

9           THE COURT:  So it is a subset within --

10          THE WITNESS:  Correct.

11          THE COURT:  -- obstetrics gynecology.  It is a

12  separate maternal fetal -- that will be my next question.

13          Is there a separate board certification?

14          THE WITNESS:  There is a separate board

15  certification.

16          THE COURT:  Okay.  Thank you.  Thank you very much.

17  BY MR. THERIOT:

18  Q.  If a physician has a conscientious objection to a

19  particular treatment and doesn't provide it, are they still

20  required to counsel the patient on the risks and benefits of

21  it?

22          THE WITNESS:  Sorry, Judge, I was thinking about my

23  last answer.  Can I have the last question again.

24          MR. THERIOT:  I will just read it again.

25

1    BY MR. THERIOT:

2    Q.  If a physician has a conscientious objection to a

3    particular treatment and doesn't provide it, are they still

4    required to counsel the patient on the risks and benefits of

5    that treatment?

6    A.  No.

7    Q.  Does a physician with a conscientious objection to a

8    particular treatment have to provide information to the

9    patient about how to obtain the treatment from another

10   provider?

11   A.  I would expect the other provider to provide that.

12   Q.  Well, I think -- let me state the question again.

13          The question is:  If they have a conscientious

14   objection to the treatment the patient is asking for, are they

15   required to provide information to the patient about how to

16   obtain that treatment from another provider?

17   A.  No.

18   Q.  Does the standard of care change depending upon if a

19   provider has a conscientious objection to abortion?

20   A.  Yes.

21   Q.  So in the context of -- well, what do you base that

22   opinion on?

23   A.  I don't provide abortion services, so I don't counsel on

24   the risks that can take place.

25   Q.  And do you believe that that is within the standard of

1  care?

2  A.  Yes.

3  Q.  Is there a provision, an ethical opinion that you think

4  supports your understanding of the standard of care in regard

5  to that?

6  A.  Yes.

7  Q.  Is that also AMA 1.1.7?

8  A.  I believe so.

9  Q.  Okay.

10         MR. THERIOT:  If we could look at Exhibit 32-A,

11  again, on page 5, which is Bates 1755.

12         In the second paragraph, the last sentence.

13  BY MR. THERIOT:

14  Q.  If you could read that, Dr. Lee?  It begins with "Thus."

15         Do you see that?

16  A.  Yes.  "Thus, physicians should have considerable latitude

17  to practice in accord with well-considered, deeply held

18  beliefs that are central to their self-identities."

19  Q.  Is that the provision you were referring to?

20  A.  Yes.

21         THE COURT:  Hold on one second.  I'm going to read

22  the sentence before it.

23         Okay.  Go ahead.

24  BY MR. THERIOT:

25  Q.  Go ahead, Dr. Lee.  Take a drink.  I know you are talking

1   a lot.

2          Dr. Lee, are there standards of care written, written

3   standards of care that govern every aspect of an OB/GYN's

4   practice?

5   A.   No.

6   Q.   So how do you determine what the standard of care is?

7   A.   It depends on the patients' unique situations,

8   requirements, diagnoses.

9   Q.   Does the medical professional have discretion in

10  determining what the standard of care is for each patient?

11  A.   Yes.

12  Q.   Is that standard of care determined on a case-by-case

13  basis?

14  A.   Yes.

15  Q.   And when determining whether -- what standard of care

16  applies in a particular case, how does the medical

17  professional make that determination?

18  A.   Based on their training, clinical experience, knowledge.

19  Q.   Does clinical judgment come into play?

20  A.   Yes.

21  Q.   Okay.  Do you -- let me make sure I get this right.

22          So sometimes you work in emergency rooms of

23  hospitals, Dr. Lee?

24  A.   Correct.

25  Q.   Okay.  And when you see an unassigned patient in that

1   emergency room situation, is it likely that you will be

2   continuing their care or that you only see them once?

3   A.   Likely, I will see them once.

4   Q.   And if a woman in that situation comes in and discovers

5   that she is pregnant, do you talk to her about prenatal

6   vitamins and scheduling an ultrasound even though you aren't

7   likely to provide those services?

8   A.   Do I talk to her about obtaining prenatal care?  Yes.

9   Q.   Would that prenatal care -- would you be taking informed

10  consent for that prenatal care?

11  A.   No.

12  Q.   Is it fair to say that you would just be recommending that

13  she get that prenatal care?

14  A.   Yes.

15  Q.   How do you manage treatment for ectopic pregnancies?

16       THE WITNESS:  Judge, it just depends on when you make

17  the diagnosis.

18       THE COURT:  Give me a second because I had a bunch of

19  questions.  See, what I do is I write down what is being said

20  and I put my questions in red ink on the side, and I have a

21  whole series of questions on ectopic pregnancy.  So I'm going

22  to get to that so I'm prepared for your testimony on that

23  topic because I was very curious and interested on it.

24       So go ahead.

25       THE WITNESS:  When I was in medical school, the idea

1    that a pregnancy could exist outside of the uterus was like

2    how can that be?  Unfortunately, it can be.  It can happen in

3    the tube which cannot support a viable pregnancy.  It can

4    happen on an ovary.  It can happen in the abdominal wall.

5    These are life-threatening conditions to the woman.  That

6    pregnancy is not a viable pregnancy.

7         A heartbeat may exist, but you are not going to get a

8    living baby from it.  I have had patients say, "Can't you just

9    transfer that pregnancy to the uterus?"  No, you can't.

10        Now, the diagnosis of ectopic pregnancy has improved

11   over time.  We use the level of hormones and how they change

12   over time periods and ultrasound.  We know when we should see

13   a viable pregnancy in the uterus based on the level of

14   hormones, and when the level exceeds that, we become

15   suspicious.  And an ultrasound does not confirm that there is

16   a pregnancy inside the uterus.  We become suspicious that the

17   pregnancy is growing in an ectopic location.

18        So depending on the women's symptoms, it depends --

19   that's another factor depending on how we treat it.

20        THE COURT:  So let me see if I follow the thinking on

21   this or the syllogism, because earlier you gave a definition

22   of abortion, and I think you specifically included the word

23   "viable."

24        THE WITNESS:  Yes, Judge.

25        THE COURT:  So if it's an ectopic pregnancy, it is

SA-031

1    obviously not in the uterus, and, therefore, it's not viable.

2    And if it's not viable, it doesn't fall within the definition

3    of abortion?

4              THE WITNESS:  Correct.

5              THE COURT:  Thank you.  I appreciate that.

6    BY MR. THERIOT:

7    Q.  So, Dr. Lee, when that -- when you diagnose an ectopic

8    pregnancy, do you treat that ectopic pregnancy?

9    A.  It depends on the stage.

10   Q.  When you do -- I'm sorry, I interrupted you.  You were

11   going to say something else?

12   A.  Again, we can be suspicious that there is an ectopic

13   pregnancy, and you have to put the whole picture together of

14   what the woman's condition is, is she symptomatic, is she

15   having severe pain, does she look like she is losing blood.

16             I have been doing this for 30 years.  There were

17   times when we had to wait until it manifested itself either

18   via rupture of a blood vessel and the woman becoming

19   endangered of her life.  Now we have the ability to use

20   medications that were designed to treat cancer to stop the

21   rapidly growing tissue.  Sometimes the medication works.

22   Sometimes it doesn't.

23   Q.  So in the situations where you provide that medication,

24   Dr. Lee, do you talk about the risks and benefits of the

25   treatment with the patient?

SA-032

1   A.   Yes.

2   Q.   Are there times when you don't treat the ectopic

3   pregnancy?

4   A.   Yes.

5   Q.   In those situations where you are referring for ectopic

6   pregnancy treatment, do you take informed consent for that

7   treatment that another provider is going to give?

8   A.   No.

9   Q.   Do you describe the risks and benefits of that treatment

10  to your patient?

11  A.   I describe the risks of the ectopic pregnancy.

12  Q.   Okay.

13  A.   Whether she will proceed and require surgery, time tells

14  you that answer.

15  Q.   Okay.  But as far as taking informed consent and giving an

16  informed -- I mean giving a complete list of risks and

17  benefits, do you do that for patients that you refer?

18  A.   Are we talking about ectopic still, or are we --

19  Q.   Yes.  Yeah.

20  A.   Again, it depends on whether I'm going to be performing

21  the surgery or not.

22  Q.   If you are not performing the surgery?

23  A.   No.

24  Q.   Okay.  Do you -- is it -- all right.

25         So just to sum that up, is it fair to say that in an

1  ectopic pregnancy referral, you give them enough information

2  to explain why they should have it done?

3  A.  Why they should continue receiving treatment, yes.

4  Q.  Okay.  Do you tell all of your pregnant patients they

5  could die just from being pregnant?

6  A.  No.

7  Q.  Why not?

8  A.  Death from pregnancy does exist.  There are conditions

9  that can be potentially fatal to the mother.  They are few.

10       The majority of women coming to our office want to

11  have a baby.  They want the eight, seven months from when we

12  see them to be holding a baby in their arms.

13  Q.  How often do those complications and even the risk of

14  death occur in an otherwise healthy pregnant patient?

15  A.  Infrequently.  And then, of course, we will have

16  maternal-fetal medicine involved in their care.  But

17  maternal-fetal medicine does not do the delivery of those

18  pregnancies.

19  Q.  So just to be clear, the maternal-fetal medicine gets

20  involved if there are complications?

21  A.  Of course.

22  Q.  Is there a standard list of information that you give to

23  all your obstetrician and gynecological patients?

24  A.  Can we break that down into just obstetric patients?

25  Q.  Sure.

1    A.  No.

2    Q.  And why is that?

3    A.  I believe each woman is unique in her requirements.

4    Q.  Does the standard of care for obstetricians and

5    gynecologists require conscientious objectors to tell patients

6    where they can obtain an abortion?

7    A.  No.

8    Q.  Does the standard of care for obstetricians and

9    gynecologists require conscientious objectors to provide

10   information about the benefits of abortions even if they don't

11   perform them?

12   A.  No.

13           MR. THERIOT:  I pass the witness, Your Honor.

14           THE COURT:  Okay.  Hold on one second.

15           MR. THERIOT:  Oh --

16           THE COURT:  You can pass.

17           But before you start asking questions, I have got to

18   finish my notes.

19           All right.  Whenever you're ready, Ms. Morris.

20           MS. MORRIS:  Your Honor, this is Elizabeth Morris.

21   We have been going for a little while.  I just wanted to check

22   in and see if Dr. Lee would like to take a break or keep

23   going.

24           THE COURT:  Heather?

25           THE REPORTER:  I'm good.  Thanks, Judge.

```
 1              THE COURT:  Are you good?

 2              THE WITNESS:  I'm good, Judge.

 3              MS. MORRIS:  Counsel told me she needs a break.

 4              THE COURT:  All right.  We'll take a break.

 5              So we are going to take a break.  You are still under

 6  oath.  Don't talk to anybody about your testimony, and we will

 7  take a quick break, and then we will come back.  Okay.

 8              If you want to step off and walk around, that's fine,

 9  too.

10              MR. GILLEN:  How long, Judge?

11              THE COURT:  Do you need five minutes?

12              MS. GALLO:  Yes.

13              THE COURT:  Five minutes.

14    (Recess taken.)

15              THE COURT:  Are you ready, Doctor?

16              Okay.  Ms. Morris, are you ready?

17              MS. MORRIS:  Yes, Your Honor.

18              THE COURT:  Okay.  Go ahead.

19                          CROSS-EXAMINATION

20  BY MS. MORRIS:

21  Q.  Good morning, Dr. Lee.

22  A.  Yes, it's still morning.

23  Q.  Dr. Lee, you recall on direct examination that you said

24  you were a member of ACOG; is that correct?

25  A.  Yes.
```

SA-036

```
 1   Q.  Okay.  ACOG membership is voluntary; is that right?
 2   A.  Correct.
 3   Q.  And is it fair to say you are a member of ACOG because you
 4   share its mission of wanting to further and improve health
 5   care for women?
 6   A.  Yes.
 7   Q.  Okay.  You were a junior fellow of ACOG when you were a
 8   resident; is that right?
 9   A.  Correct.
10   Q.  You have also served on a committee for ACOG involving the
11   reduction of C-sections; is that correct?
12   A.  No.
13   Q.  It's not correct that you previously served on a committee
14   for ACOG involving the reduction of C-sections?
15   A.  I served on the committee at Delnor Community Hospital.
16   Q.  Dr. Lee, do you recall taking a deposition in this case?
17   A.  Yes, Beth.
18   Q.  Okay.
19   A.  Sorry.  Sorry, Counselor.
20   Q.  And you recall that that deposition was on January 27th,
21   2022?
22   A.  Correct.
23   Q.  You swore that your statements were true that day; is that
24   correct?
25   A.  Correct.
```

SA-037

1          MS. MORRIS:  Okay.  I apologize, I'm not as fancy

2     with technology.  But, Your Honor, I have a copy of his

3     deposition if you would like one?

4          THE COURT:  Yeah.  If you want to approach, that's

5     fine.

6          MS. MORRIS:  Counsel, would you like a copy of his

7     deposition?

8          MR. THERIOT:  Sure, if you have one.  If not, I can

9     pull it up on my computer.

10          Thank you.

11          THE COURT:  All right.  And what's the page and line?

12          MS. MORRIS:  We're at page 45, Your Honor.

13          THE COURT:  Okay.  Okay.

14     BY MS. MORRIS:

15     Q.  Dr. Lee, I'm going -- I apologize, this is a little bit of

16     a long excerpt, but I'm going to begin reading on line 7 on

17     page 45.

18          "Q.  Okay.  Can you describe those committees for me.

19          "A.  The ACOG's always has been very concerned about

20     C-sections, the rate of them, so we had a committee to try and

21     reduce the number of C-sections.

22          "Q.  And I'm so sorry, Dr. Lee.  I realized I have

23     one more question" --

24          Strike that.  I'm going to go ahead and skip because

25     that was related to a different question.

SA-038

1          I'm going to go ahead and skip to page 46, starting

2    on line 2.

3          "Q.  So back to the ACOG committee on C-sections.

4    What were the kinds of things you discussed in order to reduce

5    the number of C-sections?

6          "A.  Reasons for choosing to do a C-section.

7          "Q.  And were your recommendations -- or, excuse me,

8    the committee's recommendations adopted anywhere?

9          "A.  Yes.  We adopted them.

10         "Q.  Okay.  And, Dr. Lee, were you asked or did you

11   serve on this committee because you have a particular

12   professional interest in C-sections?

13         "A.  I don't know what you are asking, Beth.  Do I do

14   C-sections?  Yes."

15         Did I read that correctly, Dr. Lee?

16   A.  Yes, you did.

17   Q.  Okay.  Dr. Lee, is it fair to say that you participate in

18   ACOG continuing education courses?

19   A.  Yes.

20   Q.  Okay.  You also testified earlier today that you don't

21   agree with everything that ACOG has in its guidelines; is that

22   accurate?

23   A.  Yes.

24   Q.  But it's fair to say that ACOG is one of the sources that

25   you rely on for guidelines in your own practice; is that

SA-039

1    right?

2    A.  Yes.

3    Q.  And, in fact, of all the sources you rely on, you tend to

4    rely on ACOG the most; is that right?

5    A.  Yes.

6    Q.  Okay.  Now, Dr. Lee, in your opinion, all physicians have

7    certain responsibilities to their patients.  Would you agree

8    with that?

9    A.  Could you say that again.

10   Q.  Sure.

11           Dr. Lee, generally speaking, as pertains to all

12   physicians, physicians have certain responsibilities to their

13   patients; is that correct?

14   A.  Yes.

15   Q.  Okay.  One responsibility is patient counseling about

16   treatment options, correct?

17   A.  Yes.

18   Q.  Okay.  And when you counsel, you consider many things when

19   providing medical advice; is that right?

20   A.  Yes.

21   Q.  Is it fair to say you consider a patient's mental health?

22   A.  Yes.

23   Q.  And is it fair to say you would consider their emotional

24   health?

25   A.  Yes.

SA-040

1  Q.  And you would also consider their social circumstances?

2  A.  Yes.

3  Q.  Is it fair to say that you do that because the needs of

4  patients differ based on their unique situations?

5  A.  Yes.

6  Q.  And that you believe it's important to think of patients

7  holistically?

8  A.  Yes.

9  Q.  And for that reason, Dr. Lee, would you agree that

10  counseling needs to be patient specific?

11  A.  Yes.

12  Q.  Okay.  Now, Dr. Lee, when counseling, is it fair to say

13  that you keep the standard of care in mind because counseling

14  needs to be based on best medical evidence?

15  A.  Yes.

16  Q.  And is it fair to say that the bedrock principle of the

17  standard of care for all medical professionals entails the

18  obligations that a reasonable and competent medical

19  professional would be expected to give in a certain situation?

20  A.  Broadly speaking, yes.

21  Q.  Okay.  Dr. Lee, it's also fair to say that medical

22  counseling serves the patient's needs; is that right?

23  A.  Are you talking gynecology or obstetrics?

24  Q.  Just generally in the medical field for all specialties.

25  A.  Generally, yes.

SA-041

1  Q.  Okay.  And it's accurate that as a general principle,

2  doctors should keep patient preferences in mind while

3  counseling?

4  A.  Yes.

5  Q.  Okay.  Is it also true that a patient and physician should

6  work in a mutually respective alliance?

7  A.  Yes.

8  Q.  And that it's important for a physician to be truthful in

9  order to be collaborative with a patient; is that correct?

10 A.  Yes.

11 Q.  Dr. Lee, in a nutshell, is it fair to say that a doctor

12 uses clinical judgment but ultimately needs to respect patient

13 autonomy as a general principle?

14 A.  Yes.

15 Q.  Now, Dr. Lee, you personally do not have a conscience

16 objection to prescribing contraceptives; is that right?

17 A.  Yes.

18 Q.  And in the course of your practice, you do prescribe

19 contraceptives, correct?

20 A.  I did, yes.

21 Q.  And you also perform sterilizations; is that correct?

22 A.  Yes.

23 Q.  Okay.  I am going to cover what I believe are your opinion

24 on some benefits to contraceptives, so if you could confirm, I

25 would appreciate that.

1          Is it fair to say that a benefit of contraceptives is

2   preventing pregnancy?

3   A.   Yes.

4   Q.   And that a benefit to contraceptives is the treatment of

5   polycystic ovarian cancer?

6   A.   I believe the term is polycystic ovarian disorder.

7   Q.   But it's fair to say that contraceptives would provide a

8   benefit in terms of treatment for that condition?

9   A.   Yes.

10  Q.   Okay.  It also -- contraceptives can provide protection

11  from ovarian cancer?

12  A.   Yes.

13  Q.   And contraceptives can improve skin conditions?

14  A.   Yes.

15  Q.   And you recall earlier today, Dr. Lee, that you testified

16  that there are, in fact, medical conditions where it is not

17  safe for a woman to be pregnant?

18  A.   Yes.

19  Q.   Okay.  Dr. Lee, is it your opinion that a physician

20  without a conscience objection would counsel on the risks and

21  benefits of contraception?

22  A.   Yes.

23  Q.   Now, if a doctor has a conscience objection and that

24  objection prevents objective counseling, you would agree that

25  they would need to disclose that to the patient?

1  A.  What condition are we talking about?

2  Q.  So to rephrase, it's your opinion that if a doctor has a

3  conscience objection and that precludes them from counseling

4  on contraceptives, they would need to let the patient know

5  that; is that correct?

6  A.  Yes.

7  Q.  Okay.  And it's also fair to say that a doctor should not

8  interfere or obstruct a patient that chooses treatment when

9  that doctor has a conscience objection to contraceptives; is

10 that right?

11 A.  Yes.

12 Q.  Dr. Lee, earlier in your direct testimony, you said that

13 there are circumstances where it's medically appropriate to

14 terminate a pregnancy; is that correct?

15 A.  It's unfortunate, yes.

16 Q.  And could you confirm that these are conditions where it

17 would be a -- it would be appropriate to terminate a

18 pregnancy?  Preeclampsia?

19 A.  Yes.

20 Q.  Eclampsia?

21 A.  Yes.

22 Q.  Ectopic pregnancy?

23 A.  It's not a viable pregnancy.

24 Q.  So it would be fair to provide treatment in that instance?

25 A.  Yes.

1  Q.  Okay.  Cervical incompetence?

2  A.  Again, these are conditions that were -- what are we

3  asking?

4  Q.  If a pregnant patient had this condition, terminating a

5  pregnancy could be an appropriate treatment option.

6  A.  It may be the outcome of nontreatment.

7  Q.  Okay.  The premature rupture of membranes?

8  A.  It can be an outcome.

9  Q.  Okay.  Dr. Lee, in these circumstances, ultimately the

10  decision of whether or not to terminate that pregnancy is up

11  to the pregnant patient; is that correct?

12  A.  Correct.

13  Q.  But it's fair to say that part of a doctor's job in this

14  situation is to counsel a pregnant person about their options;

15  is that right?

16  A.  Yes.

17  Q.  Okay.  And that's because the standard of care dictates

18  that a doctor needs to provide relevant information about

19  terminating a pregnancy, so that way the patient can make an

20  informed choice; is that right?

21  A.  With regards to those conditions you have just outlined.

22  Q.  So your answer is yes?

23  A.  Yes.

24  Q.  Okay.  And that also includes explaining why a pregnancy

25  is threatening the patient's life and to make sure she

SA-045

1   understands that?

2   A.  Yes.

3   Q.  Okay.  Dr. Lee, let's say you have a patient, a pregnant

4   patient, excuse me, and that patient does not have what you

5   would consider to be a medical indication for abortion.  If

6   that patient asks for information about an abortion, you would

7   provide that information about the actual mechanics about

8   abortion to her; is that correct?

9   A.  If she asked me what would be involved.

10  Q.  And it's fair to say you would similarly expect medical

11  professionals to provide that information as well?

12  A.  Yes.

13  Q.  Okay.  Now, if a woman was ambivalent about keeping her

14  pregnancy and they did not mention abortion, you would not

15  bring up abortion as an option; is that correct?

16  A.  Correct.

17  Q.  And it's fair to say that your position is that women

18  don't bring up abortion because they already know it's an

19  option; is that right?

20  A.  Correct.

21  Q.  Dr. Lee, in your direct testimony today, it's fair to say

22  that you testified that you are not personally aware of a

23  physician who you believe can competently perform an abortion;

24  is that right?

25  A.  Yes.

1  Q.  And is it fair to say that you have drawn this conclusion

2  based on your medical training and experience?

3  A.  Based on my experience.

4  Q.  Dr. Lee, earlier today, you also testified that you do

5  not -- strike that.

6       Dr. Lee, is it fair to say that it's your opinion

7  that women can find the information they would need about

8  abortion and providers on the Internet?

9  A.  Yes.

10 Q.  Is it fair to say, Dr. Lee, that there is a lot of medical

11 information online?

12 A.  It is fair to say that.

13 Q.  Okay.  Is it also accurate to say that not all of that

14 medical information is correct?

15 A.  It depends on the source.

16 Q.  So, yes, so not all that information is correct?

17 A.  Right.

18 Q.  Okay.  Or even if the information was correct, that

19 information might not be relevant for a patient's particular

20 situation; is that right?

21 A.  Your hypothetical condition, yes.

22 Q.  Okay.  So, Dr. Lee, you testified that as a doctor, you

23 are not aware of another doctor who would competently perform

24 an abortion, correct?

25 A.  I have already answered that question.

SA-047

1   Q.  You did.  But you can confirm that your answer was yes?

2   A.  Yes.

3   Q.  Okay.  But you believe a women would be able to find such

4   a doctor on their own using the Internet?

5   A.  Yes.

6   Q.  Okay.  Dr. Lee, you also in your expert report supported

7   your position that women use the Internet to get information

8   about abortion; is that right?

9   A.  Yes.

10  Q.  And you relied on one study; is that correct?

11  A.  I showed one study, yes.

12  Q.  And do you recall -- excuse me.  Strike that.

13       That study is titled *Abortion Waiting Periods and*

14  *Decision Certainty Among People Searching Online for Abortion*

15  *Care*; is that right?

16  A.  Correct.

17  Q.  And this study examined the effectiveness of abortion

18  regulations like waiting periods.  Do you agree?

19  A.  Agree.

20  Q.  But this study did not ask whether Internet access ensures

21  access to abortion; is that correct?

22  A.  I don't think it does.

23  Q.  Okay.  And the study did not ask about the percent of

24  women in Illinois that have access to the Internet; is that

25  right?

 1  A.   I didn't see that as a condition.

 2  Q.   Okay.

 3  A.   I know they got -- enrolled people from all 50 states.

 4  Q.   So to that, Dr. Lee, the study was not specific to

 5  Illinois residents; is that right?

 6  A.   It included Illinois residents.

 7  Q.   But it was not specific to Illinois residents; is that

 8  correct?

 9  A.   That is correct.

10  Q.   Okay.  And the study did not actually look at the

11  frequency with which individuals use the Internet to find

12  abortion providers; is that correct?

13  A.   Correct.

14  Q.   The study also did not look at whether individuals who

15  performed Internet searches were able to discern truthful

16  information from misleading information about abortion; is

17  that right?

18  A.   Correct.

19  Q.   The study also did not look at whether individuals who

20  were looking for abortions online ended up going to a

21  pregnancy center that does not provide abortions; is that

22  correct?

23  A.   Correct.

24  Q.   The study also did not employ any kind of methodology to

25  determine if people who use the Internet to search for an

1  abortion provider ultimately secure abortion care; is that

2  correct?

3  A.  It listed the people who did not get abortion care who

4  responded.

5  Q.  So it did not cover whether people who wanted care were

6  ultimately able to secure it; is that correct?

7  A.  I don't think that was one of their questions.

8  Q.  Okay.  Nor did the study determine whether someone

9  searching online for an abortion actually had access to

10  treatment; is that correct?

11  A.  That is correct.

12  Q.  The study also did not determine the percentage of people

13  who use the Internet to look for an abortion provider versus

14  other methods; is that correct?

15  A.  Correct.

16  Q.  And the study recruited people searching online for

17  abortions because online searchers may have been considering

18  but ultimately did not or could not access abortion care; is

19  that right?

20  A.  Could you say that again, please?

21  Q.  Sure.

22      The study recruited people searching online for

23  abortions because online searchers may have been considering

24  but ultimately did not or could not access abortion care; is

25  that correct?

1    A.   It had a statement in there of how many people who did not

2    end up having abortions.

3    Q.   Okay.  And, Dr. Lee, in your expert report, you did not

4    cite any other research or studies regarding access to

5    reproductive health care in Illinois; is that right?

6    A.   Correct.

7    Q.   Okay.  Dr. Lee, earlier today, you talked a little bit

8    about your work with the crisis pregnancy center.

9            Do you recall that?

10   A.   Yes.

11   Q.   And it's fair to say that that organization was a pro-life

12   organization?

13   A.   Yes.

14   Q.   And is it fair to say that you support the mission of

15   crisis pregnancy centers?

16   A.   Yes.

17           MS. MORRIS:  No further questions at this time.

18           THE COURT:  Okay.  Any redirect?

19                       REDIRECT EXAMINATION

20   BY MR. THERIOT:

21   Q.   Dr. Lee, just to clear up the record, explain, if you

22   would, about the committee on C-sections and where that was

23   and in what capacity.

24   A.   At Delnor Community Hospital, we instituted

25   recommendations on how to decrease our C-section rate amongst

1   our own population.  We did use ACOG guidelines, but it was

2   specific for our patients.

3   Q.  So that was not part of an ACOG committee; is that right?

4   A.  Right.

5           MR. THERIOT:  Okay.  I have nothing further, Your

6   Honor.

7           THE COURT:  Okay.  I have got questions.

8           I'm trying to group them in some way that makes some

9   sense for you, but let me just start on the last one because

10  there are terms that are being used that maybe you understand

11  and counsel understands.  I don't.

12          So there was a question that you were asked about

13  whether you believed there was any physician that could

14  competently perform an abortion, and you said no.

15          Is that fair to say?

16          What do you mean by "competently"?

17          THE WITNESS:  To do it correctly and without harm to

18  the woman.

19          THE COURT:  Okay.  And harm to the woman would

20  include what?

21          THE WITNESS:  Perforation of the uterus, retain

22  tissue.

23          THE COURT:  Okay.

24          THE WITNESS:  That's not an all-inclusive.

25          THE COURT:  Okay.  Yes.  Any others that come to your

SA-052

1   mind?

2          THE WITNESS:  Laceration of the cervix, bleeding.

3   Those are the kind of things I get called to the ER for.

4          THE COURT:  Okay.  That's kind of where I was going

5   next.

6          You do some time as an ER physician; is that right?

7          Are you board certified as an ER physician?

8          THE WITNESS:  No.

9          THE COURT:  Okay.  Do you on occasion see ectopic

10  pregnancies in the ER?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.  So a woman comes in to the

13  ER.  She is in a significant amount of pain, maybe bleeding,

14  and you determine that it's an ectopic pregnancy.  What do you

15  do?

16         THE WITNESS:  See if she is hemodynamically stable.

17         THE COURT:  Okay.

18         THE WITNESS:  All right?  If she is not, then I have

19  to remove that ectopic pregnancy.

20         THE COURT:  And you anticipated my next question.

21  You would do that.

22         THE WITNESS:  I would do that.

23         THE COURT:  Okay.  Do you do that in part because of

24  your obstetrics and gynecology background, or could any ER

25  doctor do that?

1          THE WITNESS:  No.  An obstetrician-gynecologist does

2    that.

3          ER doctors do not want to do that.  Believe me, they

4    are not happy when they have that role.

5          THE COURT:  So an ectopic pregnancy hits the table,

6    and they get on the phone, and they call somebody with

7    experience --

8          THE WITNESS:  Yes.

9          THE COURT:  -- education in obstetrics and gynecology

10   and training.

11         THE WITNESS:  Training.

12         THE COURT:  Okay.  But because you have sort of the

13   dual skill set, you are able to do it?

14         THE WITNESS:  Yes.

15         THE COURT:  Any idea how many times you have seen an

16   ectopic pregnancy in the ER?

17         THE WITNESS:  I don't keep track, but probably

18   at least once a year.  I don't have hard statistics to give

19   you, Judge.

20         THE COURT:  Sure.  You don't go home and keep a tally

21   sheet.  I understand that.  Okay.

22         Okay.  This is sort of a one-off question:  You were

23   asked some questions on direct examination about patients who

24   have come to you, asked you about abortions, and you said, "I

25   don't do them."  Right?  And then they go off, and eventually

1    they come back and they are no longer pregnant.  And so your

2    assumption is they had an abortion.

3             Did they ever tell you that they had a child, or did

4    you determine that they had a child?

5             THE WITNESS:  I'm sorry, with that pregnancy they are

6    questioning?

7             THE COURT:  Yeah.  Yeah.

8             THE WITNESS:  No.

9             THE COURT:  Okay.  So in all those times that you've

10   had that experience, it was your understanding that an

11   abortion occurred?

12            THE WITNESS:  Yes.

13            THE COURT:  Can you give me an estimate of how many

14   times that happened?

15            Now, I know you have been an ER doctor -- or you have

16   been in obstetrics and gynecology for 30 years --

17            THE WITNESS:  Yes.

18            THE COURT:  -- but if you can give me a ballpark, it

19   will be helpful.

20            THE WITNESS:  It has happened at least once a year.

21            THE COURT:  Okay.

22            THE WITNESS:  The social situations, Judge, the

23   gamut.

24            THE COURT:  Sure.  Okay.

25            And I think along that line of questioning, you

1    mentioned that, well, the Internet is available, and if they

2    don't have access to Internet, public libraries have the

3    Internet available, correct?

4            THE WITNESS:  Correct.

5            THE COURT:  All right.  Have you ever referred a

6    patient to a public library to get access to the Internet?

7            THE WITNESS:  No.

8            THE COURT:  Did it ever occur to you to do that?

9            THE WITNESS:  No.

10           THE COURT:  Okay.  My question had an assumption

11   built in.  That's why I wanted to follow up.

12           Go ahead.

13           THE WITNESS:  Judge, I have never had a patient come

14   back to me after I have told them that I don't provide

15   abortions and tell me, "I cannot find a provider."

16           THE COURT:  Okay.  That's helpful.

17           Staying with this phenomena that you have had, do you

18   recall times when you have told a patient that you don't

19   provide abortions where the patient never came back?

20           THE WITNESS:  No.

21           THE COURT:  Okay.

22           THE WITNESS:  Judge --

23           THE COURT:  Yeah?

24           THE WITNESS:  -- I have been doing this so long, I

25   feel like Mufasa.

1          THE COURT:  Okay.

2          THE WITNESS:  I have delivered babies from the babies

3     I have delivered.  I have lived through the lives of many

4     women.

5          THE COURT:  Okay.  I have got friends who are

6     teachers, and they are teaching the kids of kids they taught.

7          THE WITNESS:  Yes.

8          THE COURT:  So I understand, you do it long enough.

9          We sentence -- I sentence people who are the kids of

10    people who got sentenced.  Okay.

11         THE WITNESS:  And, Judge, that's why we believed we

12    provided good care because the women who disagreed with our

13    viewpoints came back to us for ongoing care.

14         THE COURT:  Okay.

15         THE WITNESS:  We did not end the patient-physician

16    relationship.

17         THE COURT:  It continued on?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.  All right.  I'm going to try to

20    group these, and I'm going to start with -- there was -- and

21    I'm going to give you the background before I give you the

22    question.

23         So on direct examination, I think you said you do not

24    believe there were any benefits to abortion.  On cross,

25    Ms. Morris went through several types of medical conditions

1  where abortion's -- I'm going to use the word "appropriate,"

2  but that wasn't the word that was used.  So I apologize.

3  Eclampsia, preeclampsia, cervical incompetence, premature

4  rupture, those types of things.

5          Would those -- when abortion occurs because of

6  eclampsia, preeclampsia, cervical incompetence, would that be

7  beneficial to the patient?

8          Do you understand my question?

9          THE WITNESS:  No.

10         THE COURT:  Okay.

11         THE WITNESS:  They don't want that to happen to them,

12  but they are experiencing it.

13         THE COURT:  They don't want to have eclampsia,

14  preeclampsia, right?

15         THE WITNESS:  Yes.

16         THE COURT:  Okay.  But if they don't get the

17  abortion -- obviously, they are pregnant.  They have this

18  medical condition.  If they don't have the abortion -- let's

19  take eclampsia, for example -- could the health and safety of

20  the patient be at risk?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.

23         THE WITNESS:  The mother.

24         THE COURT:  The mother.  Fair enough.

25         So if they do get an abortion, doesn't that provide a

1    benefit because the health relating to the eclampsia, for

2    example, is addressed?

3            THE WITNESS:  It is a consequence of providing care

4    for the mother.

5            THE COURT:  Okay.

6            THE WITNESS:  The intention is not to terminate the

7    fetus.

8            THE COURT:  So that's why you are using the word

9    "benefit"?

10           THE WITNESS:  I think it is kind of a weird

11   definition there.

12           THE COURT:  Okay.  I'm just trying to clarify in my

13   head as to what is beneficial to the mother/patient.

14           So Ms. Morris went through a few of the medical

15   conditions that she described and asked you questions about

16   that.  Say a 25-year-old female, mother of twins, comes in and

17   says, "I am diagnosed with Hodgkin's lymphoma.  What are my

18   options?"  What do you tell that person?

19           THE WITNESS:  You are going to need to see a

20   maternal-fetal medicine specialist.  You are probably going to

21   need your oncologist also.  These are going to be complex

22   decisions talk.

23           THE COURT:  Okay.

24           THE WITNESS:  No guideline is going to give you the

25   answer.

1          THE COURT:  So you are not going to say, "Well,

2   abortion is an option," but you are going to refer them to

3   that fetal- --

4          THE WITNESS:  Maternal-fetal medicine.

5          THE COURT:  Maternal-fetal medicine person, and

6   obviously an oncologist because you have cancer in play,

7   right?

8          THE WITNESS:  Yes.

9          THE COURT:  But you are not going to say, you know,

10  "One of your options is an abortion."

11         THE WITNESS:  Correct.

12         THE COURT:  And you would not provide that option

13  because of your conscientious objection to it; is that right?

14  Or because it is just not within the standard of care?

15         THE WITNESS:  You haven't told me what gestational

16  age she is.

17         THE COURT:  That's true.  That's true.  So I haven't

18  given you a complete hypothetical.

19         So let's say 12 weeks.

20         THE WITNESS:  MFM may give her that as an option.

21         THE COURT:  So they may do it, but that's -- and

22  that's why you were referring it to those specialists.

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  So are you referring to the

25  specialists because they are specialists, or because you, with

1   your conscience, can't make that referral?

2           THE WITNESS:  Because they are specialists.

3           THE COURT:  Okay.

4           THE WITNESS:  A women's desire to have no harm to

5   come to their fetus, it's amazing.

6           THE COURT:  I mean, it is a terrible position for

7   that person to be in, right?

8           THE WITNESS:  Yes.  Yes.

9           THE COURT:  You can't go through radiation and chemo

10  when you are pregnant?

11          THE WITNESS:  There are some -- well, it is not good

12  for the baby.

13          THE COURT:  Correct.

14          THE WITNESS:  But sometimes you have to make tough

15  choices.

16          THE COURT:  Right.  Right.  And so it's -- she's

17  trying to determine, "Look, I have got Hodgkin's lymphoma and

18  I have got to go through radiation, chemo to save me."  It is

19  going to be, obviously, I think you said, not good for the

20  fetus, but Hodgkin's lymphoma can kill you, too.  Right?

21          THE WITNESS:  Yes.  And it is not just Hodgkin's.

22          THE COURT:  I'm just picking that as an example.

23          THE WITNESS:  Yes.

24          THE COURT:  But, yeah, it could be all kinds of

25  things, right?

1          Any others you can think of?

2          THE WITNESS:  Breast cancer.

3          THE COURT:  Okay.  That's a good one.

4          In your experience, have you ever had that situation,

5   or something along --

6          THE WITNESS:  Women with breast cancer?

7          THE COURT:  Yes.

8          THE WITNESS:  Yes.

9          Pregnant women with cervical cancer.

10          THE COURT:  Yeah.

11          THE WITNESS:  Yes.

12          THE COURT:  And then what do you do?

13          THE WITNESS:  We counsel them.

14          THE COURT:  Okay.  And in that counseling, you are

15   still not going to talk about abortion, correct?

16          THE WITNESS:  Correct.

17          THE COURT:  Okay.  And, again, that's because of your

18   conscientious objection to it?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.

21          THE WITNESS:  But loss of the fetal life can result

22   from treating to keep the mother alive.

23          THE COURT:  Right.  Exactly.  Yes.

24          Thank you very much.  That has been helpful to me.

25          Any follow-up questions based upon my questioning?

1          MR. THERIOT:  Yes, Your Honor.

2   BY MR. THERIOT:

3   Q.  Dr. Lee --

4          THE COURT:  Do you know what?  Sorry.  I did have a

5   whole separate list here.

6          MR. THERIOT:  Okay.

7          THE COURT:  I apologize.  I jumped the gun on you.

8   Sorry.

9          Dr. Lee, are you familiar with a service called

10  *Up-To-Date*?

11         THE WITNESS:  Yes.

12         THE COURT:  And what is *Up-To-Date*?

13         THE WITNESS:  Tries to provide the latest medical

14  recommendations on various conditions --

15         THE COURT:  Okay.

16         THE WITNESS:  -- including obstetrics.

17         THE COURT:  Okay.  Good.  You are anticipating some

18  of my questions.

19         Do you have access to it or subscribe to it or does

20  your employer subscribe to *Up-To-Date*?

21         THE WITNESS:  The hospital has access.

22         THE COURT:  Do you consult *Up-To-Date* on occasion?

23         THE WITNESS:  Yes.

24         THE COURT:  How often would you say you consult

25  *Up-To-Date*?

1          THE WITNESS:  Two times a year, three times a year.

2          THE COURT:  Okay.  Would you consider *Up-To-Date* to

3  be authoritative?

4          THE WITNESS:  It's one of them, not the only one.

5          THE COURT:  Sure, sure.  There could be all kinds of

6  other resources out there.

7          THE WITNESS:  Correct.

8          THE COURT:  But it's an authoritative resource,

9  correct?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  Can you think of why you consulted

12  *Up-To-Date* like in the last year or so, what types of issues?

13          THE WITNESS:  Because they are uncommon, bizarre.

14          THE COURT:  Okay.  So as a doctor, you are trained.

15  You hear hoofbeats, you think horses, not zebras.  And so you

16  now you got something bizarre.  You have to go someplace that

17  is going to help you?

18          THE WITNESS:  Very good illustration, Judge.

19          THE COURT:  I'm full of information here.

20          So if you know, does *Up-To-Date* provide any

21  information on the standard of care as it relates to

22  conscientious objectors?

23          THE WITNESS:  No.

24          THE COURT:  Darn.  So nothing in *Up-To-Date* would

25  address what we are talking about here?

SA-064

1          THE WITNESS:  I don't know that answer.

2          THE COURT:  Okay.  Did you look at *Up-To-Date* before

3  you testified either today or your deposition or wrote your

4  report?

5          THE WITNESS:  For this?

6          THE COURT:  Yes.

7          THE WITNESS:  No.

8          THE COURT:  So you just don't know whether it

9  addresses it?

10          THE WITNESS:  Correct.

11          THE COURT:  So maybe it does; we just don't know as

12  we sit here?

13          THE WITNESS:  I don't know.

14          THE COURT:  And I don't.  That's why I'm asking the

15  question.  I appreciate that.

16          Okay.  Now I'm done.  Thank you.

17          MR. THERIOT:  Thank you, Your Honor.

18  BY MR. THERIOT:

19  Q.  Dr. Lee, just a couple follow-up questions about the

20  situations where a mother's life is threatened by the fetus.

21          In those situations where you have to deliver the

22  fetus early and you know the fetus isn't going to survive, but

23  you have to do it in order to save the life of the mother, do

24  you consider that an abortion?

25  A.  No.

1    Q.  Why don't you consider that an abortion?

2    A.  It's a consequence of providing mother's care.

3    Q.  So the difference between that and an elective abortion

4    where a mother's life is not threatened, is the difference

5    between that the intent to kill the fetus and not in the

6    intent to save the life of the mother?  Are those two

7    different things?

8    A.  They are two different things.

9            THE COURT:  So consequence and intention, that's what

10    you are drawing?  The distinction?

11           THE WITNESS:  That's a good way to put it.

12           THE COURT:  Okay.  I just want to make sure.  Go

13    ahead.  I apologize for interrupting.

14    BY MR. THERIOT:

15    Q.  And those lists of conditions that my opposing counsel

16    listed where you said that, yes, abortion may be indicated,

17    what you meant, they don't really necessarily fall within your

18    definition of abortion?

19    A.  Correct.

20    Q.  Okay.

21           MR. THERIOT:  I don't think I have anything further,

22    Your Honor.

23           THE COURT:  Okay.  Thanks.  Do you have any follow-up

24    questions based upon my questioning or the questioning from

25    counsel?

SA-066

1              MS. MORRIS:  I just have one, maybe two, Your Honor.

2                         RECROSS-EXAMINATION

3    BY MS. MORRIS:

4    Q.  Dr. Lee, as I'm understanding you today, the difference

5    for you is not the procedure.  It's not the procedure that

6    differs, but the intent of the pregnant patient, in your mind,

7    defines whether something is an elective abortion or is

8    treatment for another medical condition or delivery of a

9    pre-viable fetus; is that correct?

10             THE WITNESS:  How many questions did she ask me?

11             MR. THERIOT:  Objection.

12             THE COURT:  Can you break that out?  It is -- I'm

13   having trouble following it myself.

14             MS. MORRIS:  Sure.

15   BY MS. MORRIS:

16   Q.  So, Dr. Lee, to make sure we understand, in your -- for

17   you, the difference between an elective abortion and treatment

18   for a medical condition is based on the intention of the

19   patient; is that correct?

20             MR. THERIOT:  Objection to the characterization of

21   his testimony.

22             THE COURT:  I will overrule.

23             You can go ahead and answer that, if you can.

24             THE WITNESS:  Can I ask her to be even more specific

25   than she just asked?

```
 1            THE COURT:  What more specificity would you need?
 2            THE WITNESS:  She has given me a general scenario.
 3            Start again.  Start again.
 4  BY MS. MORRIS:
 5  Q.  It's okay.  Dr. Lee, if a patient with one of the medical
 6  conditions I described earlier today presented to you --
 7  A.  Correct.
 8  Q.  -- and a treatment option was to terminate the pregnancy,
 9  you would not consider that an abortion; is that correct?
10  A.  Correct.  Fetal life, it is amazing.  Some kids you don't
11  think are going to live, live.
12  Q.  You --
13  A.  If you want to call them miracles, sometimes miracles
14  happen.
15  Q.  Dr. Lee, it's fair to say that you would not consider that
16  to be an abortion because the intention of the pregnant
17  patient is the treatment of the medical condition; is that
18  accurate?
19            MR. THERIOT:  Objection.
20            THE COURT:  Overruled.
21            THE WITNESS:  The treatment of the mother.  We're not
22  treating a condition; we are treating a person.
23            MS. MORRIS:  Okay.
24  BY MS. MORRIS:
25  Q.  Dr. Lee, is it fair to say that if you had a patient that
```

SA-068

1    did not have one of those medical conditions but wanted to end

2    their pregnancy for personal reasons, you would consider that

3    to be an elective abortion?

4    A.  Yes.

5    Q.  And it's fair to say that the distinction there is the

6    intent of the request of the pregnant patient; is that

7    correct?

8    A.  Yes.

9            MS. MORRIS:  Okay.  No further questions at this

10   time.

11           THE COURT:  Okay.  Thank you.

12           Thank you, Dr. Lee.  I appreciate your time today.

13   You are free to go.

14           THE WITNESS:  Thank you, sir.

15           THE COURT:  You can stay, you can go, whatever you

16   want to do.

17           THE WITNESS:  I appreciate it.

18           THE COURT:  You're welcome.

19           THE WITNESS:  Do I just leave these here?

20           THE COURT:  You can just leave that.  The attorneys

21   will take care of it.

22           THE WITNESS:  Thanks.

23     (Witness excused.)

24           THE COURT:  Okay.  Who is the next witness?

25           MR. THERIOT:  Are we ready to go with the next

```
 1   witness, or do we need to take a break?

 2             The plaintiffs call Kathy Lesnoff, L-e-s-n-o-f-f.

 3             THE COURT:  All right.  Hold on one second.

 4      (Witness duly sworn.)

 5             THE COURT:  Watch your step.

 6             Have you ever testified in court before?

 7             THE WITNESS:  I have not.

 8             THE COURT:  Okay.  So, again, the ground rules are

 9   wait until they are done with the question before you start

10   answering.  They are going to wait until you are done with

11   your answer before they ask you another question.  Speak

12   slowly and clearly into the microphone.  If you don't

13   understand a question, just let us know, okay?

14             Thank you.

15             THE WITNESS:  Thank you.

16             KATHLEEN LESNOFF, PLAINTIFF'S WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. THERIOT:

19   Q.  Please state your full name for the record.

20   A.  Kathleen Lesnoff.

21   Q.  And, Ms. Lesnoff, what is your position?  Where do you

22   work?

23   A.  I work at Mosaic Health, and my current position is

24   president and CEO.

25   Q.  What are your job duties as president and CEO of Mosaic
```

SA-070

1    Health?

2    A.   I am to oversee the staff and the daily operations of the

3    ministry.  I do a lot of community resource investigations.  I

4    do donor solicitations.  I speak to the community representing

5    the ministry.  I hire, fire.  Just I oversee the general

6    operations of Mosaic Health.

7    Q.   Okay.  How long have you been working at Mosaic Health?

8    A.   37 years.

9    Q.   37 years?

10   A.   Yes.

11   Q.   So was Mosaic Health in existence before you started

12   working there?

13   A.   No.

14   Q.   So are you one of the founders of Mosaic Health?

15   A.   I am.

16   Q.   What did you do immediately prior to founding Mosaic

17   Health?

18   A.   Before I founded Mosaic Health, actually it was five years

19   previously, I was involved in working at an abortion clinic in

20   the Midwest, the Hope Clinic for Women.

21   Q.   How did you come to work at an abortion clinic?

22   A.   Well, at that time, I was two and a half years into my

23   nursing school, and my husband -- I was married.  My husband

24   and I found out we were pregnant.  We were financially in

25   debt.  So we both made a decision that I would step out of

SA-071

1  college and that I would get a job, pay down some of our debt,

2  and then resume my last year of school.

3          So a friend told me about an opening in one of the --

4  at that time, one of the largest abortion clinics in the

5  Midwest.  They were looking for a medical assistant.  I was

6  studying to be a nurse, and so I went down and applied, and

7  they hired me.

8  Q.  What were your job duties at -- is it -- did you say

9  "Hope"?

10  A.  Hope, yes.  Hope Clinic for Women.

11  Q.  Yes.

12          What were your job duties there?

13  A.  My primary responsibility was to assist the doctors during

14  the abortion procedure, and yet they trained me in every area

15  of that clinic.  So I answered phones.  I sat in on counseling

16  sessions.  I worked recovery.  Clean-up room, setup.  But

17  primarily, I assisted the doctors during the actual abortion

18  procedure.

19  Q.  How long did you work at Hope?

20  A.  Just under three months.

21  Q.  What prompted you leaving Hope?

22  A.  Well, personally, a lot of things were going on in my life

23  at that time.  My husband and I were looking to get a divorce.

24  We were one day away from divorce.  Financially, we were in

25  debt, and just a crisis in my life which led to an attempted

1    suicide which failed.  I went over to my mother-in-law's

2    house.  And she was a Christian, and she just introduced me to

3    Christ, and I gave my heart to Him.  Shortly after that, my

4    husband did, and shortly after that, I witnessed a 23-week

5    abortion.  And when I saw that little baby boy, I knew that,

6    whether the lady was six weeks pregnant, whether the mom was

7    eight, ten, 12, I knew that they were all babies and I was

8    killing babies.  And so I left the very next day.

9    Q.  And then as I understand it, about five years later, you

10   helped found Mosaic?

11   A.  Yes.  Yes.  My husband and I, I just had a real burden for

12   the woman because I had seen so many women in those three

13   short months and just knew the type of crisis that they were

14   in, and I felt that they needed alternatives to the abortion

15   procedure.  And so we met with five other Christians, and we

16   just prayed, and we began what is now known as Mosaic Health.

17        So I was an original founder, and then I moved into a

18   board position.  And then they actually approached me and

19   asked me to apply for the position of center director at that

20   time.

21   Q.  What is the mission of Mosaic Health?

22   A.  Well, we exist to help women by educating them, providing

23   alternatives, talking to them about what their options are,

24   and supporting them through their pregnancy and afterwards,

25   depending on how long they need it.

SA-073

1   Q.   Does Mosaic Health have religious convictions about

2   abortion?

3   A.   Yes.   We are definitely a Christian organization.   So we

4   are many different denominations, but we all have personal

5   relationships with Jesus Christ and we all attend church.   So

6   that would be our commonality.

7   Q.   And what specifically are your religious beliefs about

8   abortion?

9   A.   Well, we believe that God creates all life and that

10  abortion will end the life of that unborn baby.   So we do not

11  do abortions, nor do we refer for them in any case.

12  Q.   Okay.   What about contraception?

13  A.   We also do not provide contraception to any of our

14  patients.   We do just suggest that they talk to either their

15  OB/GYN or, in the case if they have spiritual convictions, to

16  talk to their pastor.

17  Q.   What services do you provide at Mosaic?

18  A.   We offer free ultrasounds, pregnancy testing, STI testing

19  and treatment.

20          We are APR providers, abortion pill reversal

21  providers.

22          We have a lot of material assistance in the way of

23  car seats, diapers, lotion.

24          We do a lot of resource -- community resource

25  referrals.   So we refer them to OB/GYNs.   We do have a medical

SA-074

1    director who is an OB/GYN, and so he definitely agrees to see

2    any of our patients who don't have a doctor.

3         We do have six registered nurses that have been

4    trained in sonography.  So in doing the ultrasounds, they are

5    professionally trained to do ultrasounds to determine if the

6    pregnancy is viable.  And so --

7         And we do post-abortion counseling, as well, for

8    women who choose abortion, regret their decision.  We help

9    them work through that so they can move on with their lives.

10   Q.  Do you make any charge for any of those services that

11   Mosaic provides?

12   A.  No.  All of our services are free and confidential.

13   Q.  Where does Mosaic get the funds to provide those free

14   services?

15   A.  We have 95 different churches of different denominations

16   who believe in the mission of Mosaic, and they support us

17   financially.  We do an annual gala every year which allows our

18   donors to be able to see what we do and hear patient testimony

19   and ministry report.  It gives them an opportunity to join

20   with us or continue their support.  So we have galas and -- so

21   basically that's how we are supported.

22   Q.  Does Mosaic receive any government money?

23   A.  No, sir, we do not.

24   Q.  Would you walk the Court through a typical visit by a

25   woman to Mosaic, to one of the Mosaic facilities.

SA-075

1    A.   Sure.  And we do have two brick-and-mortar offices, and we

2    also have a mobile medical unit that we have, which is parked

3    right next to Planned Parenthood, which is one of the largest

4    abortion clinics in the Midwest in Fairview Heights.

5         So in the brick-and-mortar offices, if they would

6    walk in -- we do take appointments, and we also have walk-ins.

7    So once they enter the office, we are going to get some

8    general information.  They have an intake form that they have

9    to sign.  And then they will first see a client advocate or a

10   staff member, who will do some general counseling, find out

11   what's going on in their lives, how we can help them by

12   providing the services that we offer.

13        At that time, after counseling, then they will see

14   one of our registered nurses, who will take them in and do the

15   pregnancy test, and they will also do an ultrasound.  And

16   after they have had the ultrasound, then they are free to go.

17   Q.   Do you inform women before they come in that you don't

18   provide or refer for abortion?

19   A.   We have on our website -- on every single page, it says

20   that we do not do abortions nor do we refer for them.  If they

21   call the office for an appointment and are looking to obtain

22   an abortion, they are told that -- there we have a text that

23   we use that we never do abortions, we don't refer for them.

24        And upon their arrival at any one of the three

25   offices, they have to sign one of our forms -- it's called

1    "Limitation of Services" -- and right in the middle of that

2    form, bolded and italicized and one font larger, you can see

3    it, it says that Mosaic Health does not do abortions, nor do

4    we refer for abortion.

5            So before we help anyone, talk to them, provide any

6    services, they have to sign that form and understand that they

7    will not be referred for an abortion nor do we do them.

8    Q.  That limitations of services form, how do women access

9    that?

10   A.  Well, over the last three -- three years -- it has

11   actually been almost four now -- we converted to paperless.

12   We used to have forms that we would give them.  Now they fill

13   out the intake forms, Request for Services, Limitation of

14   Services on their device, on their phone.

15   Q.  Do they have to have access to the Internet in order to do

16   that?

17   A.  Yes, they do.

18   Q.  What if a woman, or I guess possibly a man, were to call

19   Mosaic and not -- are they informed also of the fact that you

20   don't perform or refer for abortion?

21   A.  Yes.  If they mention that they are calling to obtain

22   abortion information or, you know, somehow they think we do

23   abortions, we tell them on the phone that we do not do

24   abortions nor do we refer for them.  However, these are the

25   services that we do offer.

SA-077

1          So we let them know what they can expect when they do

2    come to the office.  So they are definitely told before they

3    enter the office what services they can expect from Mosaic

4    Health.

5    Q.  Mosaic is, I believe you testified, is a faith-based

6    organization?

7    A.  Yes.

8    Q.  Okay.  And are women who visit Mosaic told that it is a

9    faith-based organization?

10   A.  No.  Not on the phone, not initially.

11   Q.  What about when they get there?

12   A.  Yes.  Upon the counseling session, they are all told that

13   we are a Christian organization.

14   Q.  And you said they are not told on the phone.  Why aren't

15   they told on the phone that you are a faith-based

16   organization?

17   A.  Well, it's important to us, first of all, even though we

18   are Christians, we serve anyone.  They can have the same

19   faith, they can have a different faith, or they can have no

20   faith.  So we don't want the fact that we are a Christian

21   organization to deter anyone to come in to receive the

22   services that we do offer.

23          The second reason is the patients that contact us

24   aren't coming in necessarily for that.  They are coming in for

25   the free resources that we have available to them.

SA-078

1  Q.  And is it your experience that women think that that --

2  your Christian convictions are relevant for the free resources

3  that you provide?

4  A.  No, not at all.

5  Q.  Okay.  And your website -- well, let me ask you this:

6  Does your website indicate that you are a Christian

7  organization?

8  A.  We have two websites.  We have a client website and we

9  have a donor website.  They do two completely different

10  things.  So it is not up front in the client website, but it

11  is on the donor website.

12  Q.  Can anyone access either of those websites?

13  A.  Yes.

14  Q.  And is the reason why that it is not in the donor-facing

15  website, the one purposed for donor -- I'm sorry.  Strike

16  that.

17       Is the reason why your religious convictions aren't

18  mentioned in the website for -- that is focused on clients is

19  because, similar to the telephone, that you don't -- you want

20  to make sure that -- you don't want to give them the

21  impression that you discriminate in favor of people with your

22  religious conviction?

23  A.  Exactly.

24       MR. HAZINSKI:  Objection, Your Honor, leading.

25       THE COURT:  Okay.  Try not to lead.

SA-079

1          But Ms. Perkins-Reiva couldn't see who was making the

2    objection.

3          MR. HAZINSKI:  John Hazinski, Your Honor.

4          THE COURT:  Okay.

5          MR. THERIOT:  So your answer to that question was

6    "yes"?

7          THE WITNESS:  Yes.

8    BY MR. THERIOT:

9    Q.  Okay.  Are clients or patients generally aware of their

10   pregnancy options when they arrive at Mosaic?

11   A.  Excuse me.  Could you repeat the question one more time?

12   Q.  Yes.

13          Are clients generally aware of their pregnancy

14   options when they arrive at Mosaic?

15   A.  Yes.  Yes, they are.

16   Q.  How do you know?

17   A.  When we sit down to talk with them, that's one of our

18   objectives, is to make sure that they do know.  So during that

19   counseling, the initial counseling by a client advocate or one

20   of our staff members, we discuss with them what their options

21   are, and that's how we know that they do know what their

22   options are.

23          We are just going to explain how we can help them,

24   possible community resources.  They are not always aware of

25   all the community resources that are available to them.  Some

1    of them do not have an OB/GYN, and so we are able to do the

2    referral to that as well.

3    Q.  Are they aware that abortion is an option?

4    A.  Yes, absolutely.

5    Q.  What information do you provide to patients, clients,

6    about abortion?

7    A.  We talk to them about the types of abortions that are

8    available in our immediate area.  So in the -- down by

9    St. Louis, or just on the east side of the river of St. Louis,

10   we have two abortion facilities that actually provide

11   abortions through the 24th, 25th week.  So what we are going

12   to do is talk to them about the types of abortions that are

13   available in our area and the possible dangers and risks that

14   are involved with the abortion procedure.

15   Q.  Who provides that information?

16   A.  The client advocate.

17   Q.  And so you talk to them.  Do you provide them with any

18   resources?

19   A.  Yes, we do.  We provide -- we have packets of information

20   that we hand the patients after the counseling session is

21   over.  So all of that is documentation as to where they can

22   further investigate some of the possible dangers and risks

23   that are involved with the medical procedure, abortion.

24          MR. THERIOT:  If you could bring up NIFLA

25   Exhibit No. 6.

SA-081

```
 1    BY MR. THERIOT:

 2    Q.  Is this one of the ways -- I believe this -- I will

 3    represent to you this is part of your web page.

 4         Is this one of the ways that you provide information

 5    to women about abortion?

 6    A.  Yes.

 7    Q.  Okay.  And if you would scroll down to the bottom of that

 8    page.

 9         You testified earlier that the web pages talk about

10    the fact that you don't refer for abortion; is that right?

11         I think you need to scroll down a little bit more to

12    see if that's what you are talking about.

13         All right.  Is that what you were referring to there?

14    A.  Yes, correct.

15    Q.  Okay.  In Exhibit 6.

16         MR. THERIOT:  Let's bring up Exhibit 7.

17    BY MR. THERIOT:

18    Q.  "Mosaic Pregnancy and Health Centers."

19         Do you see that, Ms. Lesnoff?

20    A.  Yes.

21    Q.  Is that also one of the resources that you provide to

22    women about abortion?

23    A.  Yes.  And I would just like to point out to the Court that

24    they update this information, so the information is currently

25    updated.  So whenever there are new statistics available, they
```

SA-082

1    are going to update the basic brochure.  So this would be

2    information that we continue to give, but since this was

3    introduced at the time of deposition, it could be updated.

4    But, yes, we use something very -- this, a little bit updated.

5    Q.  Does this resource also inform women that you don't

6    provide or refer for abortion?

7         MR. HAZINSKI:  I'm going to object, again, to

8    leading.

9         THE COURT:  It's a foundational question.

10        THE WITNESS:  I'm not sure.  To be honest, I'm not

11   sure.  This says that -- can we go to --

12        MR. THERIOT:  If we could go to page 4.  If you could

13   review page 4 there.

14        Page 4 of the exhibit, so one up, I believe.

15        Maybe that's it.  Yes.

16   BY MR. THERIOT:

17   Q.  If you could read that?

18   A.  Oh, definitely, yes.  This says:  "We do not do or refer

19   for abortions," yes.

20   Q.  Okay.

21        THE COURT:  Hold on one second.  Where does it say

22   that?

23        THE WITNESS:  It is the very first paragraph in

24   Section 2.

25        THE COURT:  There we go.  Got it.  The first

1    sentence.  Thank you.

2              THE WITNESS:  Sure.

3              MR. THERIOT:  Let's bring up, if you would, please,

4    show the witness Exhibit 8.

5    BY MR. THERIOT:

6    Q.  "I'm Pregnant, Now What?"

7              Is this also one of the resources that you provide?

8    A.  Yes.

9    Q.  Okay.  And how is it used?

10   A.  If the women -- well, excuse me, if I could start again.

11             THE WITNESS:  We have packets of information, Your

12   Honor, that are age appropriate.  So if they are abortion

13   determined but they would be 17 years old or younger, we are

14   going to provide information with medically accurate

15   information that would speak to them at their age and address

16   some of their concerns.  If they are 18 years old and older,

17   they may be in college and so their concerns may be different.

18             So the information provided in our packets of

19   information are age appropriate.  This would be a brochure

20   that we would hand out to a woman who would find herself

21   thinking abortion might be an option.  So some of our patients

22   that come in are not abortion determined.  They are happy

23   about being pregnant.  And, of course, we are going to care

24   for them and help them throughout their pregnancy as well.

25             So we wouldn't necessarily give them a packet that

1    talks and addresses abortion because, obviously, abortion

2    isn't something they want to do.  So this would be one that we

3    would introduce to our patients who are abortion determined or

4    looking at abortion as an option.

5            THE COURT:  What do you mean by "abortion

6    determined"?

7            THE WITNESS:  There are two categories that we in our

8    pregnancy centers look at.  One would be if they are

9    determined, they have an appointment to have an abortion the

10   following week.  If they are abortion vulnerable, then that

11   means there are things that are happening in their lives that

12   could point them to abortion, such as the boyfriend is really

13   pushing them to want to abort.  He doesn't want the

14   responsibility, so he wants them to abort.  Or maybe they have

15   a fear of telling their parents.  So that would be more

16   abortion vulnerable.

17           Determined would be, I have made the decision.  I'm

18   going to have an abortion.  I'm coming to Mosaic Health for an

19   ultrasound because I don't want to have to pay for it at the

20   abortion clinic.

21   BY MR. THERIOT:

22   Q.  Do you provide those patients an ultrasound if they ask?

23   A.  Yes, absolutely.

24   Q.  Okay.

25           MR. THERIOT:  And if we could bring up Exhibit 9.

```
 1   BY MR. THERIOT:
 2   Q.  Is this also one of the resources that you provide to --
 3   this is NIFLA Exhibit 9, by the way -- that you provide to
 4   patients or clients?
 5   A.  Yes.
 6   Q.  And how is it used?  Is it any different than what you
 7   were talking about before?
 8   A.  No, we put this in one of the abortion determined packets
 9   as well.  This is designed -- and the reason that we are APR
10   providers is because oftentimes, now that medical abortions
11   are readily available, if women take the first dose of the
12   medical abortion and then they change their mind and they have
13   regret, buyer's regret if they were buying a used car, but
14   instead, "Oh goodness, I don't want to abort the baby," we
15   want to let them know that we are there for them to try to
16   help them.
17           So studies have shown that up to 68 percent of women
18   who get this dose of medication in the first 72 hours after
19   they take that first group of pills of RU-46 that they could
20   successfully carry the child to term.  So that's what we are
21   saying.
22           We are telling them, "If you regret your decision,
23   call this number.  Our medical director would be happy to help
24   you."
25   Q.  Are all these vetted by your medical director or another
```

SA-086

1  medical professional?

2  A.  Yes, sir.

3  Q.  Okay.  Do you discuss the benefits of abortion with

4  patients or clients?

5  A.  We do not.

6  Q.  Why not?

7  A.  We do not believe there are any benefits to the abortion

8  procedure.

9        THE WITNESS:  And I would just address the Court in

10 the fact that I am myself post abortive.  So my own opinion,

11 there were no benefits to me at all from choosing abortion.

12 BY MR. THERIOT:

13 Q.  What about the women that you have cared for in your --

14 how long have you been with Mosaic?

15 A.  37 years.

16 Q.  37 years?

17 A.  Yes.

18        THE COURT:  What do you mean by "post abortive."

19        THE WITNESS:  Post abortive are women -- like I have

20 had an abortion when I was in college.

21        THE COURT:  Again, there is terms that are being used

22 I don't know.  I'm not trying offend anybody.  I just don't

23 know these things.

24        Okay.  Thank you.

25        THE WITNESS:  Sure.

1    BY MR. THERIOT:

2    Q.  Do you -- your opinion, I believe you testified -- and

3    correct me if I'm wrong -- that you don't believe there are

4    any benefits to abortion.

5    A.   Correct.

6    Q.  And you mentioned that based on your personal experience.

7         What about the women that you have interacted with at

8    Mosaic for the past 37 years?

9    A.  Yes.  I have not yet met anyone who would talk to me about

10   any benefits of having an abortion procedure.  And on the

11   contrary, we have helped a lot of women through post-abortion

12   counseling and education, which is a program that we offer at

13   Mosaic Health, and they regret their decision.  So we have

14   known a lot of women who have aborted and regretted their

15   decision.

16   Q.  Are you aware of any list of benefits to abortion that is

17   published somewhere?

18   A.  I am not.

19   Q.  So if you were required, if this law were to go into

20   effect that we are challenging here, to provide a list of

21   benefits, would you know where to go to find those?

22   A.  I do not.  I would not.

23   Q.  Are you aware of any list published by the State of

24   Illinois of the benefits of abortion?

25   A.  I am not aware.

1   Q.  Do you -- when you -- I believe you testified that you

2   refer women for certain resources to support them in carrying

3   their pregnancy; is that right?

4   A.  Yes, yes.

5   Q.  Okay.  Would you refer to a community service organization

6   or to a provider that does abortion?

7   A.  No, we never would.

8           MR. THERIOT:  Could you bring up Exhibit 10, please,

9   and show that to Ms. Lesnoff.

10  BY MR. THERIOT:

11  Q.  Is Exhibit 10 an example of your *Community Resource Guide*,

12  the folks you provide referrals to?

13  A.  Yes.

14  Q.  Do any of those on those lists or that list provide

15  abortion as far as you know?

16  A.  No, they do not.

17  Q.  How do you make that determination?

18  A.  Once a year, our entire *Community Resource Guide* is

19  checked to assure us that the people on this resource list do

20  not do abortions, nor would they refer for abortion.

21  Q.  What's your reason for not referring -- for not providing

22  a list of physicians that you reasonably believe would provide

23  an abortion?

24  A.  As a Christian organization, it's against our deepest

25  convictions that abortion takes the life of an innocent baby,

SA-089

1    and so, therefore, as a Christian organization, we do not want

2    to do or refer for abortion.  It's against our principles.

3    Q.  Does Mosaic market or provide advertising for the free

4    services you provide?

5    A.  Yes.

6    Q.  Why do you do that?

7    A.  So that the community is aware of the many resources that

8    are available through Mosaic Health.

9    Q.  Does it also provide other information other than just the

10   resources that are available?  Does it provide -- does your

11   marketing provide information about abortion?

12   A.  Could you clarify that question, please?

13   Q.  Strike it.  Let's just strike that question.

14          Do you view -- I believe you testified you don't make

15   any charge for your services?

16   A.  Correct.

17   Q.  So is this advertising for some sort of business

18   transaction?

19   A.  No, absolutely not.  We are just advertising the resources

20   that we have available, the services that we offer, that they

21   are free and they are confidential, and it's basically what we

22   are offering the community.

23   Q.  Is it your understanding that the patients and clients

24   that come to Mosaic can get access to where to get an abortion

25   and the benefits of abortion from other resources?

SA-090

1    A.  Yes, absolutely.

2    Q.  How do you know that?

3    A.  In our particular area, since we have two very large

4    abortion clinics, which the Hope Clinic for Women is one

5    located in Granite City, and the other is Planned Parenthood

6    in Fairview Heights, they are -- one of them says they do

7    14,000 procedures a year and the other one 6,000.  So they do

8    a lot of advertising.  They have -- they spend a lot of money

9    on advertising.  So it is very well-known in our immediate

10   entire Metro East St. Louis area where they can get an

11   abortion.

12   Q.  Do most of your clients have Internet access?

13   A.  Yes.  To my knowledge, all of them do.

14   Q.  How do you know that?

15   A.  We have never had anyone -- number one, they have to have

16   Internet and a mobile device for them to check in, but we've

17   never had anyone tell us that.  And I just really want to

18   testify here for the last three and a half years since we are

19   online all the time, and that's how I would know that -- is

20   they would have to ask for some type of device to be able to

21   check in because it is all done online.

22   Q.  Does Mosaic talk to women who visit your service, visit

23   your brick-and-mortar places or your mobile unit about the

24   medical risks of carrying a child to term?

25   A.  We don't believe that there are any medical risks in

SA-091

1  carrying a child to term.

2  Q.  Do any of your medical professionals wear scrubs?

3  A.  Yes.

4  Q.  Does anyone else other than medical professionals at

5  Mosaic wear scrubs?

6  A.  No.

7  Q.  In emergency situations where a patient or client is in an

8  emergency situation, how do you ensure that your religious

9  beliefs regarding referral for abortion or talking about the

10  benefits of abortion do not harm the client in any way?

11  A.  Could you clarify the question, please?

12  Q.  Sure.

13         How do you ensure that your religious convictions

14  don't result in any harm to any patients or clients?

15  A.  Well, we refer them to -- we are quick to refer them to

16  the emergency room.  We do have a medical professional, an

17  OB/GYN, that oversees our medical services, and we have

18  people -- but the first thing that we are going to do is refer

19  them to the ER if there is any indication that there is

20  something wrong or that they are in any way, shape, or form in

21  harm.

22  Q.  What services are provided on Mosaic's mobile unit?

23  A.  We offer that we are going to do the pregnancy test, STI

24  test -- sexually transmitted infected test -- and we are going

25  to provide an ultrasound and counseling.

SA-092

1   Q.  Do you tell -- well, so for a patient that comes on the

2   mobile unit, do they usually come -- walk in, or do they

3   schedule an appointment ahead of time?

4   A.  They are all walk-in patients.

5   Q.  So in those instances, how do they know, how are they

6   informed about the fact that Mosaic doesn't perform or refer

7   for abortion?

8   A.  Before we even see them or talk to them or even perform a

9   pregnancy test, STI test, anything, we are going to have them

10  look at our Limitation of Services, and so we are going to

11  talk to them and tell them.  And, in fact, we verbally give

12  that to them as well, right before they step on board, because

13  the location of our mobile unit is parked next to Planned

14  Parenthood.

15          And so we will tell them we don't do abortions, we

16  will not refer for them.  So then they can either continue

17  with us or they can step off board.

18  Q.  What do you tell women who have a positive pregnancy test?

19  A.  We tell them that their pregnancy -- this would be done by

20  our registered nurses, they are the only ones that actually

21  deal with the pregnancy test -- and we would tell them it is

22  not a diagnosis, and that they would have to go and see our

23  medical director, OB/GYN, Dr. Baer, or one of their own

24  doctors to be able to confirm that they are pregnant.

25  Q.  Does Mosaic provide medical treatment for pregnancy?

SA-093

1    A.  We do not.

2    Q.  If Mosaic were forced to describe the benefits of abortion

3    or to refer for abortion, how would that affect the employees

4    and the volunteers that work there?

5    A.  Well, none of the people that work at Mosaic Health would

6    work there.  I wouldn't work there.  I couldn't -- it would

7    violate my deepest convictions.

8          So we could -- I could speak for all of our staff

9    that they wouldn't end -- the people who support us as well.

10   So they wouldn't support us.  So we would no longer have any

11   financial support, nor would we have any staff or volunteers,

12   because every one of them are committed to the life issue, and

13   we all believe that God creates babies and abortion will kill

14   the innocent baby.

15         So that's our conviction, our religious conviction.

16   Q.  Have you ever seen a public awareness campaign regarding

17   how to obtain an abortion from the State of Illinois?

18   A.  No, I have not.

19         MR. THERIOT:  We pass the witness.

20         THE COURT:  Okay.  Hold on one second.

21         Is the medical director on-site?

22         THE WITNESS:  No, sir.

23         THE COURT:  Do any patients see the medical director?

24         THE WITNESS:  Yes.

25         THE COURT:  When would the medical director see

SA-094

1   patients?

2            THE WITNESS:  After the initial counseling session

3   and the ultrasound, then we would refer her to Dr. Baer,

4   Dr. Scott Baer.

5            THE COURT:  So you have got a medical director and

6   you have nurses, right?

7            THE WITNESS:  Yes, correct.

8            THE COURT:  Do you have any non-medical professionals

9   working there?

10           THE WITNESS:  Yes, correct.

11           THE COURT:  That's what I thought.

12           And what do those people do, the non-medical

13  professionals?

14           THE WITNESS:  They are -- some of them are staff, so

15  some of them direct the offices.  So they would be patient

16  service directors.  Others would be administrative.  So we

17  have administrative.  We have a director of finance who takes

18  care of all the financial issues.  And then we have a few

19  volunteer client advocates who do peer counseling.

20           THE COURT:  Okay.  It is coming back to me now.

21           And peer counseling would be somebody who is in

22  crisis trying to figure out what they want to do.

23           THE WITNESS:  Yes.

24           THE COURT:  And they talk to the person.

25           THE WITNESS:  Yes.

SA-095

1           THE COURT:  And none of those people will mention

2   "benefits."  That's a word that keeps getting used today,

3   "benefits" of abortion, right?

4           THE WITNESS:  Correct.  You are correct.

5           THE COURT:  Okay.  Their counseling would always be

6   geared towards keeping the pregnancy.

7           THE WITNESS:  Yes.

8           THE COURT:  Okay.  All right.  I have got a bunch of

9   other questions.  So let me -- let you go, you guys ask some

10  questions.

11                       CROSS-EXAMINATION

12  BY MR. HAZINSKI:

13  Q.  Good morning, Ms. Lesnoff.  My name is John Hazinski.  I'm

14  an attorney for the defendant in this case.  It is a pleasure

15  to meet you.

16  A.  Nice to meet you.

17  Q.  I want to begin with a little bit of the history.

18          So the facility that is now known as Mosaic has had

19  different names over the years, right?

20  A.  Yes.

21  Q.  And at one point it was called Crisis Pregnancy Center,

22  correct?

23  A.  Correct.

24  Q.  And then at some point the name of the facility changed

25  from Crisis Pregnancy Center to New Beginnings; is that right?

SA-096

1    A.  Yes.

2    Q.  And around the time of that name change is when the

3    facility started offering medical care, correct?

4    A.  Yes.

5    Q.  So is it fair to say that before that, there were no

6    medical services being offered at that facility?

7    A.  We did self-testing, pregnancy testing.  It was self-test.

8    So they would run their own pregnancy test, and then we would

9    refer them to an OB/GYN.

10   Q.  There were no ultrasounds being performed at that time; is

11   that right?

12   A.  Correct.

13   Q.  And no STD testing performed at that time?

14   A.  Correct.

15   Q.  Okay.  Do you recall testifying just now about Mosaic

16   serving different types of clients who come to the center?

17   A.  (Nodding head up and down.)

18           THE COURT:  Is that a "yes"?

19           THE WITNESS:  Oh, I'm sorry.  Yes.

20           MR. HAZINSKI:  That's okay.  You have to answer out

21   loud.

22           THE WITNESS:  Okay.

23   BY MR. HAZINSKI:

24   Q.  And you also testified about some materials, informational

25   materials, that were targeted or geared towards younger

SA-097

1   people, right?

2   A.  Yes.

3   Q.  Is it fair to say that some of the people that come visit

4   the center are minors?

5   A.  Yes.

6   Q.  Okay.  Is it fair to say that some of the people who come

7   visit the center may not share the center's religious views

8   about abortion?

9   A.  Yes, correct.

10  Q.  Ultrasounds at Mosaic are performed by the licensed

11  nurses, correct?

12  A.  Yes.

13  Q.  And those nurses, when they are performing the

14  ultrasounds, they wear scrubs, right?

15  A.  Yes, sir.

16  Q.  Okay.  And you testified just now about the circumstance

17  where if a patient doesn't have their own OB/GYN doctor that

18  Mosaic could send them to see the medical director of Mosaic;

19  is that right?

20  A.  Correct.  Or, also, any one of the OB/GYNs that are on our

21  resource guide in their communities for the convenience of --

22  some people, transportation could be an issue.  And so we want

23  to make sure that we do a referral to other doctors as well.

24  Q.  Okay.  Now, the medical director of Mosaic, does he share

25  the organization's faith-based objections to abortion?

1   A.  Yes, he does.

2   Q.  Okay.  And similarly, you testified that the doctors who

3   are on the resource guide, they also don't perform abortions,

4   and you confirmed that?

5   A.  Yes.

6   Q.  Thank you.

7          Now, Ms. Lesnoff, you in particular are not a trained

8   medical professional, right?

9   A.  Correct.  I'm not.

10  Q.  Okay.  Do you recall testifying on direct about a study

11  related -- a medical study related to abortion pill reversal?

12  A.  Okay.  Oh, earlier today?

13  Q.  Yes, just now.

14  A.  Yes.  Thank you.  I'm thinking of my deposition.  So yes.

15  Q.  When I say "on direct," I mean the questions by your

16  lawyer.

17  A.  Yes.  Yes.

18  Q.  Now, your testimony about that study, it's not based on

19  medical training or experience that you personally have,

20  right?

21  A.  Correct.

22  Q.  Okay.  At Mosaic, the personnel who counsel women about

23  pregnancy decisions are called client advocates; is that

24  right?

25  A.  Correct.

1    Q.  Okay.  You were asked on the direct questioning about some

2    general informational materials and they showed them on the

3    screen.

4             Do you remember that?

5    A.  Yes.

6    Q.  Now, the counseling sessions involve more than just

7    providing that information.  They also involve a

8    back-and-forth discussion with the client, correct?

9    A.  Correct.

10   Q.  Okay.  And some of the people who serve in the role of

11   client advocates at Mosaic are registered nurses, correct?

12   A.  Yes.

13   Q.  I believe you testified that when a pregnant person comes

14   to Mosaic, they are told they are going to be given

15   information on all their options, right?

16   A.  Correct.

17   Q.  Those options are abortion, adoption, and parenting,

18   correct?

19   A.  Yes.

20   Q.  Okay.  And the counseling about those options at Mosaic

21   involves discussing possible medical risks of having an

22   abortion, correct?

23   A.  Yes.

24   Q.  But that counseling would not involve any discussion of

25   any medical benefits that abortion could have for that

1  patient, right?

2  A.  Yes, correct.

3  Q.  Ms. Lesnoff, do you agree that if Mosaic provided pregnant

4  women with information about medical benefits of abortion,

5  that information would be relevant to the woman's decision

6  about whether to obtain an abortion?

7  A.  Well, if there were benefits, it would be relative; but in

8  our opinion, there are no benefits.  So, basically, we would

9  have to lie to them to tell them that there would be benefits.

10  And we would never do that.

11  Q.  So let me ask it this way, then.  Suppose you provided

12  information that the client, from her perspective, perceived

13  to be a medical benefit to abortion.

14      Do you believe that providing that information would

15  be relevant to her decision-making about whether to seek an

16  abortion?

17  A.  Well, then, we would say it would be against our religious

18  convictions as Christians, that we would not.  If she were to

19  perceive that that would be a benefit, that would be her

20  perception, and we would still not refer for an abortion

21  because it would be against our deepest religious convictions.

22  Q.  I understand that.

23      The question is just slightly narrower, and it is

24  really just, would that information that she perceived to be

25  describing a medical benefit to abortion, in your opinion,

1   would that be relevant to her decision about whether to seek

2   an abortion?

3   A.   It may be.

4   Q.   Okay.  Would you agree that Mosaic's clients would be more

5   likely to obtain an abortion if they were told about -- if

6   they were told information that from their perspective

7   described medical benefits of abortion?

8   A.   I don't know.

9        MR. THERIOT:  Objection, calls for speculation.

10       THE COURT:  Overruled.

11  BY MR. HAZINSKI:

12  Q.   I'm sorry, could you repeat your answer?

13  A.   I don't know.

14  Q.   You don't know.

15       You gave a deposition in this case, correct?

16  A.   Yes.

17  Q.   And you were under oath and answering questions under oath

18  in that deposition?

19  A.   Yes.

20  Q.   Okay.  Ms. Lesnoff, I would like to show you a copy of

21  your deposition transcript.

22       MR. HAZINSKI:  May I approach the witness,

23  Your Honor?

24       THE COURT:  Sure.

25       If you put it on the ELMO, it will show up

 1    everywhere, if you want to use that.

 2            MR. HAZINSKI:  I will try to be not too afraid of

 3    technology.

 4            THE COURT:  It is called an ELMO.

 5    BY MR. HAZINSKI:

 6    Q.  Now, Ms. Lesnoff, I'm looking at your deposition on

 7    page 244, starting at line 14.  It says -- beginning at

 8    line 11 is a question that is struck, and then at line 14 it

 9    says:

10            "Q.  Does Mosaic believe that its clients would be

11    more likely to obtain an abortion if they are told about the

12    supposed benefits of abortion?

13            "A.  Yes."

14            Was that the answer you gave at your deposition?

15    A.  Yes, I'm sure it was.

16    Q.  Okay.  Thank you.

17            And you also testified that Mosaic does not provide

18    counseling to pregnant women about risks or medical

19    complications that could arise from carrying a pregnancy to

20    term, correct?

21    A.  Correct.

22    Q.  And, in fact, you testified you don't believe that there

23    are any such risks, right?

24    A.  Well, are we talking -- excuse me.  If I could clarify?

25    Q.  Of course.

1   A.  Are we talking about the deposition or are we talking

2   about today?

3   Q.  Today.

4   A.  Today.  I do not -- I'm not qualified to talk about the

5   possible dangers and risks of carrying a baby to term, but I

6   believe, it is my unprofessional opinion that they are minimal

7   versus carrying the baby to term.

8   Q.  Mosaic also doesn't counsel about any medical benefits of

9   sterilization or birth control; is that right?

10  A.  That is correct.

11  Q.  And when Mosaic provides counseling about birth control,

12  the only medical information that's provided is about why

13  abstinence should be practiced instead of any other form of

14  contraception; is that right?

15  A.  Yes, correct.

16  Q.  One reason that Mosaic offers ultrasounds is to make it

17  less likely that a woman will choose to have an abortion,

18  correct?

19  A.  We believe that women have a right to know what's

20  happening in their bodies, and also an ultrasound will confirm

21  if the pregnancy is viable.  If they do have an ectopic

22  pregnancy where they have no physical indication of pregnancy

23  yet, which would be earlier in their pregnancy, it could be

24  dangerous to have an abortion, a regular typical abortion, if

25  they are pregnant in their tube.  So, therefore, we do an

SA-104

1   ultrasound to see if the pregnancy is viable.

2   Q.  Is it also true that another reason that Mosaic provides

3   ultrasounds is to help make it less likely that a woman will

4   choose to have an abortion?

5   A.  Yes.

6   Q.  And when a pregnant patient comes into Mosaic, the person

7   who conducts the initial interview asks questions to determine

8   whether the woman is abortion vulnerable; is that correct?

9   A.  Yes.

10  Q.  Okay.  I would like to show you a document, what's been

11  marked as NIFLA Exhibit 17.

12       Ms. Lesnoff, do you recognize this document?

13  A.  Yes.

14  Q.  And this is the "Mosaic telephone talking points"

15  document, right?

16  A.  Yes.

17  Q.  This document is provided to Mosaic staff to provide

18  guidance about having phone conversations with potential

19  clients, correct?

20  A.  Correct.

21  Q.  In the section of this document called "Abortion-minded

22  caller," do you see that part of the document?

23  A.  Yes.

24  Q.  Is this part of the document intended to be used when

25  there is a caller who contacts Mosaic asking about abortions?

1  A.  Yes, correct.

2  Q.  Okay.  And these talking points are designed to encourage

3  a caller who asks about abortion to obtain medical services at

4  Mosaic, correct?

5  A.  Yes, definitely, to be able to share the medical services

6  that we offer at the office, yes.

7  Q.  Okay.  And specifically they encourage the caller to get a

8  pregnancy test and ultrasound and STD testing, correct?

9  A.  Yes.

10  Q.  Okay.  These talking points also mention the medical risks

11  of abortion, right?

12  A.  Yes.  I think maybe further down a little bit, but yes.

13         THE COURT:  Where would that be?  What should I be

14  looking at?

15         Okay, got it.  It is the bullet point, first bullet

16  point there.  Got it.  Thank you.

17  BY MR. HAZINSKI:

18  Q.  And the bullet point:  "These services may help you avoid

19  the expense and possible risks of an abortion."

20  A.  Correct.

21  Q.  Now, you testified earlier that Mosaic uses online

22  advertising, correct?

23  A.  Correct.

24  Q.  Specifically, Mosaic uses a tool called "search engine

25  optimization," correct?

1    A.   Yes.

2    Q.   Okay.  And that involves using key words to effect search

3    results; is that right?

4    A.   Yes.

5    Q.   And one of the key words Mosaic uses is "abortion,"

6    correct?

7    A.   Yes.

8    Q.   And just to clarify, that means that Mosaic uses this

9    search engine optimization in a way where if someone searches

10   for the word "abortion," Mosaic's website will be more likely

11   to show up as a search result, right?

12   A.   Yes, correct.

13   Q.   Other words that Mosaic uses for search engine

14   optimization include "pregnancy," "clinic," "baby," and

15   "help," correct?

16   A.   Yes.

17   Q.   Okay.  Mosaic also has a website with information for

18   potential clients, right?

19   A.   Yes.

20   Q.   And fair to say that the information on that site is

21   geared towards potential clients who are people who think they

22   might be pregnant, correct?

23   A.   Yes.

24   Q.   And that URL, that website URL is revealmosaic.com?

25   A.   Yes.

1  Q.  And you are personally responsible for overseeing the

2  content on that website, correct?

3  A.  Yes.

4  Q.  I would like to show you now what has been marked as

5  Defendant's Exhibit 68, I believe 68-1.  For the record,

6  IDFPR 9416.

7          Ms. Lesnoff, do you recognize this, the information

8  on this page?

9  A.  Yes.

10 Q.  And this is a printout of a "Frequently Asked Questions"

11 page on the revealmosaic.com website, correct?

12 A.  Yes.

13 Q.  Okay.  Now, looking down at the third question and answer,

14 Mosaic describes itself as a medical clinic on this page,

15 correct?

16 A.  Yes, limited medical facility.

17 Q.  Okay.  And the page also mentions that the clinic is

18 overseen by a licensed medical director, correct?

19 A.  Yes.

20 Q.  And it mentions that the clinic can answer general

21 pregnancy questions, correct?

22 A.  Yes, most.

23 Q.  Okay.  I'm going to skip ahead to the next page.

24         MR. HAZINSKI:  And I have extra copies.

25

```
 1   BY MR. HAZINSKI:
 2   Q.  Looking now at IDFPR 9417, do you see at the bottom of
 3   this page where it says "What is the safest type of abortion?"
 4   A.  Yes.
 5   Q.  Now flip to the following page.  And the answer to that
 6   question at the top of the next page lists possible physical
 7   and emotional side effects of abortion, correct?
 8   A.  Yes.
 9   Q.  But it doesn't provide information about the safest type
10   of abortion, does it?
11   A.  No.
12   Q.  And it doesn't provide information about how a person
13   could access safe abortion services, correct?
14   A.  Correct.
15   Q.  Okay.  Is that information about safe abortion services
16   listed anywhere else on the revealmosaic website?
17   A.  No.
18   Q.  Ms. Lesnoff, do you recall being asked earlier some
19   questions about whether people who come to Mosaic have access
20   to the Internet?
21   A.  Yes.
22   Q.  Does Mosaic keep track of whether clients have personally
23   owned smartphones or other devices with Internet access?
24   A.  No.
25   Q.  You testified that women who come to Mosaic know about
```

SA-109

1    abortion.

2           Do you recall that?

3    A.  Yes.

4    Q.  And to be clear, your testimony about that subject was

5    based on the fact that when they show up, Mosaic informs them

6    of their options, correct?

7    A.  Yes.  When we talk about their options, we are actually

8    going to go into a little more detail about their options.

9    But we do not have any patients that I am aware of -- and I

10   believe that I would know that -- that are unaware of what

11   abortion is or that it's available in -- to large facilities

12   in our immediate service area.  So...

13   Q.  Well, I believe you testified that one of the first

14   conversations that happens when a woman comes to Mosaic, a

15   pregnant person comes to Mosaic, is that they are told about

16   their options, correct?

17   A.  Yes.

18   Q.  Okay.  So Mosaic doesn't keep data about how many women

19   who visit Mosaic are aware of abortion as an option the moment

20   they walk in the door, correct?

21   A.  Correct.  We do not keep record of that.  You are correct.

22   Q.  Okay.  And Mosaic also doesn't keep record of whether the

23   women who come to Mosaic know about providers who perform

24   abortions, correct?

25   A.  We do not keep record of that.

1   Q.  Okay.

2   A.  It is discussed, but we do not keep record of that.

3   Q.  And you also don't know how many women who come to Mosaic

4   already know about risks and benefits of abortion procedures,

5   correct?

6   A.  You are correct.

7           MR. HAZINSKI:  Could I just have one moment,

8   Your Honor?

9           THE COURT:  Take your time.

10          MR. HAZINSKI:  Thank you.

11          I have nothing further at this time.

12          THE COURT:  Any redirect?

13                      REDIRECT EXAMINATION

14  BY MR. THERIOT:

15  Q.  Ms. Lesnoff, I just wanted to clear up a couple of things.

16          When you -- a client comes in and gets a positive

17  pregnancy test, you refer them to your medical director or

18  another medical professional.

19          Is that what you testified to?

20  A.  Yes.

21  Q.  When you refer them to your medical director, does he

22  provide pregnancy care?

23  A.  Yes.

24  Q.  Does he do that in his capacity as the medical director of

25  Mosaic or as a licensed OB/GYN with a private practice?

 1  A.   A licensed OB/GYN with private practice.

 2  Q.   Do you offer -- strike that.

 3          If a woman comes in and she's abortion determined,

 4  you offer her an ultrasound?

 5  A.   Yes.

 6  Q.   And if a woman comes in and she's unsure, do you offer her

 7  an ultrasound?

 8  A.   Yes.

 9  Q.   If a woman asks for an ultrasound, you will provide that

10  to them?

11  A.   Yes.

12  Q.   And STD testing, any of your other services?

13  A.   Yes.

14  Q.   Okay.  And that doesn't matter where she is on the

15  spectrum of whether she wants an abortion or is unsure or

16  doesn't want one?

17  A.   Yes.  We offer our services to anyone and to everyone,

18  whether they are happy about being pregnant, they don't know

19  what they are going to do, or they do know what they want to

20  do.

21  Q.   And just to be clear, have you ever encountered a patient

22  or a client that before they came to Mosaic didn't know that

23  abortion is an option?

24  A.   I have never heard of us seeing a patient at Mosaic Health

25  that did not know about abortion as being an option.

1   Q.   Before she came in?

2   A.   Before she came in, correct.

3           MR. THERIOT:  Nothing further, Your Honor.

4           THE COURT:  Okay.  Thank you.

5           All right.  So a lot of times when you go to a

6   business, you get these annoying customer surveys, and one of

7   the questions is:  How did you learn about our company?  And

8   it will be word of mouth, advertising, a newspaper, TV,

9   Internet, that type of thing.

10          Do you know -- have you ever looked into how your

11  patients learn about you and decide to contact you?

12          THE WITNESS:  Yes.

13          THE COURT:  And what's the answer to that?

14          THE WITNESS:  Yes, we do.  I don't have the exact

15  numbers, but I can give you a general idea.

16          THE COURT:  That's -- that would be helpful.

17          THE WITNESS:  Okay.  So definitely word of mouth.

18  Online would be a primary.  So they do look and do search, and

19  we pop up online.  So that's one way.

20          They have been in before, a previous client.

21          THE COURT:  Okay.

22          THE WITNESS:  So that would be another way.

23          We do let our community resources, which would be the

24  doctors in our area, the schools, they know about us, so they

25  could hear from one of those sources --

SA-113

 1          THE COURT:  Okay.

 2          THE WITNESS:  -- from one of the schools.  Or -- you

 3  know, we have several colleges as well as high schools, and

 4  they would hear about us through a guidance counselor as well.

 5          THE COURT:  As you sit here today, do you know which

 6  one of those ways that people learn about Mosaic is the most

 7  common?

 8          THE WITNESS:  I would say more than 50 percent, but

 9  not greatly more than 50 percent, would be online.

10          THE COURT:  Okay.  Thank you.

11          Any idea what the youngest patient you have seen is?

12          THE WITNESS:  Yes.  The youngest patient that we saw

13  was 11 years old.

14          THE COURT:  Did she come in by herself?

15          THE WITNESS:  No.  Her father brought her.  Her

16  father brought her in.

17          That was a situation -- do you want me to elaborate?

18          THE COURT:  Yes, I was going to follow up.

19          THE WITNESS:  Okay.  She was just an ordinary-built

20  young lady, real cute little girl, and she had an extension in

21  her abdomen, so her abdomen was extended.  Her father thought

22  that she was pregnant.

23          It was a divorce situation, so the mother had

24  custody, an hour away from where he lived in our area.  So he

25  thought she was pregnant.  And he brought her in to see us,

1  but she assured her client advocate that she had not been

2  sexually active and that she was not pregnant.  And we did a

3  pregnancy test, and it was negative.

4       We also did a routine STI screen on her, and a week

5  later it was determined that she tested positive for an STI.

6       So then we had to call her and have her father bring

7  her back in.  And she came in, and of course we were

8  counseling her alone because it is confidential, she would

9  have had to have given us, and she did, permission to have her

10 father in, and we found out that she had been sexually abused

11 by her mother's boyfriend.  He was 37 years old, and he had

12 been abusing her for almost a year, and had given her a

13 sexually transmitted disease.

14       So then we are mandated reporters, and so we first

15 had the father come in, and then we reported, and then he

16 ended up getting custody.  And that would be the youngest that

17 we've had.

18       THE COURT:  She tested negative for the pregnancy

19 test.

20       THE WITNESS:  Yes.

21       THE COURT:  But she had, obviously, other

22 manifestations of something.

23       THE WITNESS:  Yes.

24       THE COURT:  Did it turn out she was, in fact,

25 pregnant?

1    THE WITNESS:  She was not pregnant.  It was that she

2  had had this sexually transmitted disease that had gone

3  unattended for so long that she had swelling in her abdomen.

4    THE COURT:  All right.  You have used the terms a

5  couple times, and I asked you about it, "abortion determined"

6  and "abortion vulnerable."  So I'm going to ask you about this

7  abortion-determined type of patient that comes in to Mosaic.

8    You have got this information that you have said they

9  are told that Mosaic doesn't provide abortions, there is the

10  list of services specifically saying that you don't provide

11  abortions.  Why would somebody who is abortion determined come

12  into Mosaic?

13    THE WITNESS:  Well, primarily, when they want to

14  obtain an abortion, they have to have an ultrasound,

15  especially if they are 12, 14, 16 weeks along in their

16  pregnancy.  And if they go to one of our abortion clinics,

17  they are going to have to pay for that.  So we will do the

18  ultrasound for them.

19    We do have them sign a form saying that we are not

20  doing the ultrasound so they can obtain an abortion, but

21  that's why they are coming to us, is they want to get that

22  free ultrasound.

23    And, also, you can have a false negative in a

24  pregnancy test, and many of these women do home pregnancy

25  tests.  And so they want to come in to have a more medically

1    accurate pregnancy test done to confirm whether or not they

2    really are pregnant.

3       THE COURT:  How often do you see these

4    abortion-determined patients?

5       THE WITNESS:  That's a good question.  Fairly often.

6    I would like to give you an exact number, but we see on the

7    mobile medical unit every single one of them because they are

8    all walking into the abortion clinic and they come to us

9    first.

10       THE COURT:  Okay.

11       THE WITNESS:  So that would be a hundred percent of

12    those patients.  Then we see them every week at both of our

13    offices.  We see abortion-determined women at both of our

14    other offices as well.

15       THE COURT:  As they come into the mobile unit, are

16    they telling you, Well, I know I need to get an ultrasound, so

17    I'm here to get my free ultrasound?

18       THE WITNESS:  Yes.  They -- there are people that

19    work the gate.  They are just sidewalk counselors.  We are not

20    affiliated with them, but they are sidewalk counselors, and as

21    they pull up to the gate, then they are told that if they want

22    a free ultrasound, they don't want to pay for it, then we

23    would be happy to do it.

24       When they come on board, the first thing that we tell

25    them is that there are three different organizations here:

1    Mosaic Health; the sidewalk counselors, they are independent

2    of who we are; and Planned Parenthood is right there.  So we

3    let them know right away that we don't do abortions, we don't

4    refer for them, but we can do the free ultrasound and an STI

5    test on them and do some counseling for them and they can

6    decide if they want to stay and they want our services or not.

7         THE COURT:  Do you have any personal knowledge as to

8    the number of people who come to the mobile unit who have had

9    an abortion previously?

10        THE WITNESS:  I wouldn't off the top of my head have

11   that number.  I would have a good statistic of how many

12   changed their minds.  But after visiting the mobile unit and

13   seeing an ultrasound and being aware of what the community

14   offers them in the way of support, 35 percent of those women,

15   you know, change their minds, carry their babies to term.

16   Others decide to go through with the abortion.

17        So I wouldn't really know how many of them are

18   supported.  But I can say this.  I can say this:  Overwhelming

19   majority of our patients in the year 2023 have experienced

20   abortion.  So we are seeing people come to us even after they

21   have had an abortion.

22        THE COURT:  Okay.  All right.  So if they have had an

23   abortion, they are going to have some knowledge, background of

24   the process and know about you need an ultrasound before you

25   can get an abortion, those types of things?

SA-118

1            THE WITNESS:  Yes, correct.

2            THE COURT:  Okay.  Overwhelming majority of the

3    patients in 2023.

4            THE WITNESS:  Yes.

5            THE COURT:  Has that been a change that you have

6    seen --

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.

9            THE WITNESS:  Sorry.

10            THE COURT:  That's all right.

11            When did you see that change start to develop?

12            THE WITNESS:  I think I would -- I would say, if I

13    had to guess -- I'm not guessing.  I'm sorry.

14            An educated answer here would be when medical

15    abortions became more available.

16            THE COURT:  Okay.  And when we say "medical

17    abortions," we mean the pill, the RU-486, correct?

18            THE WITNESS:  Yes.  The RU-486 and the morning-after

19    pill, which would be emergency contraceptive, Plan B.

20            THE COURT:  All right.  That's helpful.

21            All right.  Last type of sort of series of questions

22    is on the -- the word that keeps getting used is "benefits" of

23    abortion.  You have already talked about situations where

24    there is an emergency; say there is an ultrasound and it shows

25    an ectopic pregnancy, and a nurse takes the ultrasound and the

1  nurse says, Well, we have got a problem here.  Right?

2          THE WITNESS:  Yes.

3          THE COURT:  And then is there an immediate referral

4  to an ER?

5          THE WITNESS:  Yes, Your Honor, correct.  Immediately

6  we are going to send them to the emergency room.

7          THE COURT:  So they don't see the medical director.

8  You say, You got to get to the ER?

9          THE WITNESS:  Immediately.

10          THE COURT:  Okay.  Any other types of situations when

11  someone is referred to the ER?

12          THE WITNESS:  If they are bleeding, you know, where

13  their bleeding hasn't stopped and it is pretty excessive, and

14  they come to us, A, we are not going to do an ultrasound if

15  there is any bleeding present, but we are going to send them

16  to an emergency room right away.

17          If there is any situation that there is something

18  physically wrong with her in an immediate way, our protocol or

19  policies and procedures warrant that we send them to the

20  emergency room right away.  And there is an emergency room at

21  both of our locations, within six minutes of both of our

22  locations.

23          THE COURT:  Okay.  So if a patient comes in to

24  Mosaic, the ultrasound is taken, shows an ectopic pregnancy,

25  you are sending them off to the ER, the fetus is going to be

SA-120

 1  removed from the body; fair to say?

 2          THE WITNESS:  Yes.

 3          THE COURT:  Would you consider that, and I'm using

 4  the word here because it keeps getting used today, a benefit

 5  to an abortion?

 6          THE WITNESS:  I wouldn't call it a benefit.  I would

 7  call it a necessity.

 8          THE COURT:  Okay.

 9          THE WITNESS:  In order to save the mother's life.

10  The baby is not going to live anyway.  So in my opinion, it

11  would be a necessary procedure to save the mother's life.

12          THE COURT:  All right.  Okay.  So that's helpful.

13          And I gave you the example of an ectopic pregnancy.

14  I'm going to give you the example of a hypothetical I used

15  previously with Dr. Lee.

16          So say you got a 20-something -- let's say

17  23-year-old woman comes in.  She has already had twins.  She

18  is about 12 weeks pregnant, and she has had issues.  She has

19  seen an oncologist, and she is told, You have Hodgkin's

20  lymphoma.  So she is pregnant.  She is in a crisis.

21          THE WITNESS:  Yes.

22          THE COURT:  What do you tell her?

23          THE WITNESS:  We have specialists over -- just across

24  the river in St. Louis that will take care of our high-risk

25  patients.  So we would refer her to a high-risk OB/GYN.

SA-121

```
 1              I would just share my own testimony with her, would

 2    encourage her and tell her that we care about her.  We do

 3    believe that she is going to need to get help and care, a

 4    specified, specific type of care.

 5              Just personally, my cousin had that very thing happen

 6    to her when she was married, and she chose to carry the child

 7    to term.  He was six months old when she passed, but he lives

 8    today and is 38.  And, you know, she could have aborted him,

 9    but she and her husband, Terry, made the decision to carry

10    David.

11              So it is their decision, but we are going to get them

12    care, medical care, immediately by doing that referral to a

13    high-risk OB/GYN.

14              THE COURT:  So she carried the child to term.

15              THE WITNESS:  Yes.

16              THE COURT:  Had the child, and then passed six months

17    after childbirth?

18              THE WITNESS:  Yes.

19              THE COURT:  All right.  And that's kind of my point.

20    It is almost a binary choice?

21              THE WITNESS:  Yes.

22              THE COURT:  Okay.  Any follow-up questions based upon

23    that?

24              MR. THERIOT:  None from plaintiffs, Your Honor.

25              MR. HAZINSKI:  None from defendants.
```

SA-122

1    (Witness excused.)

2         THE COURT:  We are at 12:19.  We will start up at

3    1:20, okay?  Is that enough time for you folks?  1:20.

4         You are done.  You are free to go.  You are free to

5    stay, whatever you want.

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Thank you.

8    (Recess taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             WESTERN DIVISION

 3   NATIONAL INSTITUTE OF FAMILY     )   Docket No. 16 CV 50310
     AND LIFE ADVOCATES, et al.,      )
 4                                    )   Rockford, Illinois
                        Plaintiff,    )   September 20, 2023
 5     v.                             )   1:20 o'clock p.m.
                                      )
 6   MARIO TRETO, JR.,                )   P.M. SESSION
                                      )
 7                     Defendant.     )
     _____)   _____
 8   RONALD L. SCHROEDER,             )   Docket No. 17 CV 04663
                                      )
 9                     Plaintiff,     )
                                      )
10     v.                             )   VOLUME I
                                      )   PAGES 1-295
11   MARIO TRETO, JR.,                )
                                      )
12                     Defendant.     )

13                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE IAIN D. JOHNSTON
14
     APPEARANCES:
15
     For the Plaintiffs:        ALLIANCE DEFENDING FREEDOM
16                              (15100 North 90th Street,
                                 Scottsdale, AZ  85260) by
17                              MR. NOEL W. STERETT
                                MR. KEVIN H. THERIOT
18
                                THOMAS MORE SOCIETY
19                              (309 West Washington Street,
                                 Suite 1250,
20                               Chicago, IL  60606) by
                                MR. PETER C. BREEN
21                              MR. THOMAS G. OLP
                                (1581 Oakes Boulevard,
22                               Naples, FL  34119) by
                                MR. PATRICK T. GILLEN
23

24

25
```

```
 1   For the Defendant:          OFFICE OF THE ILLINOIS
                                 ATTORNEY GENERAL
 2                               (100 West Randolph Street,
                                  Chicago, IL  60601) by
 3                               MS. KARYN L. BASS-EHLER
                                 MS. SARAH J. GALLO
 4                               MR. JOHN T. HAZINSKI
                                 MS. HANNAH YEON MEE JUROWICZ
 5                               MS. ELIZABETH A.F. MORRIS
                                 MR. CHRISTOPHER WELLS
 6
     Court Reporter:            Heather M. Perkins-Reiva
 7                              327 South Church Street
                                Rockford, Illinois  61101
 8                              (779) 772-8309

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  All right.  Anything to talk about before

2   we move on to the next witness?

3          No.  Okay.  All right.  Let's call the next witness.

4          MS. PAYNE:  Your Honor, we would like to call Sarah

5   Vanderlip to the stand.

6          THE COURT:  Okay.

7          Why don't you pause right there.  I will swear you

8   in.

9     (Witness duly sworn.)

10         THE COURT:  All right.  Have a seat.  Watch your

11  step.

12         And have you testified in court before?

13         THE WITNESS:  I have not.

14         THE COURT:  Okay.  So speak slowly and clearly into

15  the microphone.  Wait until the question is done before you

16  start to answer.  Likewise, the attorneys are going to wait

17  until you are finished with your answer before they ask you

18  another question.  If you don't understand something, just let

19  us know, okay?

20         All right.  Whenever you are ready.

21         SARAH VANDERLIP, PLAINTIFF'S WITNESS, SWORN

22                    DIRECT EXAMINATION

23  BY MS. PAYNE:

24  Q.  Could you state and spell your name for the court

25  reporter?

1   A.  Sarah Vanderlip, S-a-r-a-h.  And then it is

2   V-a-n-d-e-r-l-i-p.

3   Q.  And where do you work?

4   A.  I work for Informed Choices.

5   Q.  What is your position at Informed Choices?

6   A.  I'm the executive director.

7   Q.  And what are your duties as executive director?

8   A.  As executive director, I oversee the operation over two

9   pregnancy center locations.  We also run two resale shops that

10  help with funding, as well as a program that's in the middle

11  schools.

12  Q.  Where does Informed Choices get its funding?

13  A.  We are a hundred percent donor funded from individuals,

14  churches, businesses, and the fundraising events that I also

15  oversee.

16          MS. PAYNE:  Could we look at NIFLA Exhibit 14?

17  BY MS. PAYNE:

18  Q.  This is "Informed Choices Statement of Principle."

19          Sarah, could you take a look at the introductory

20  paragraph?

21          Why is it important that board members, directors,

22  staff, and volunteers know Christ as their Lord and Savior?

23  A.  Our religious foundation is central to our mission and why

24  we want to serve women.  So we want to make sure that anyone

25  working in our centers or on our board that represent us to

1   clients or the community agree with those religious beliefs.

2   Q.  Could you take a look at paragraph 1?

3           What does Informed Choices do to ensure that clients

4   are provided with accurate and complete information?

5   A.  We utilize what's called a *Before You Decide* magazine that

6   provides clients with information about all three options,

7   medically referenced facts on all options, as well as a

8   pregnancy test and an ultrasound to determine how far along

9   she is.

10          MS. PAYNE:  Can we take a look at NIFLA Exhibit 15?

11  BY MS. PAYNE:

12  Q.  "Informed Choices Policy and Procedures Manual."

13          Does Informed Choices follow these procedures?

14  A.  Can you scroll down a little bit?  Too far.

15          Yes.

16  Q.  What does Informed Choices do to ensure that all its

17  policies and procedures are followed?

18  A.  Well, the nurse manager and I review -- as well as the

19  medical director review this policy and procedure manual

20  at least biannually, but the nurse manager ensures that all

21  medical staff are following all the procedures.

22  Q.  Does Informed Choices provide any emergency medical

23  services?

24  A.  No.

25  Q.  And what does Informed Choices do if a medical emergency

SA-128

1  occurs at its center?

2  A.  Fortunately, we have not had that situation yet, but we

3  would call 911 if there was a medical emergency in our

4  building.

5  Q.  How do clients normally learn about Informed Choices?

6  A.  Most often it's through an Internet search or word of

7  mouth.

8       MS. PAYNE:  Let's take a look at NIFLA Exhibit 1.

9  BY MS. PAYNE:

10  Q.  Ms. Vanderlip, is this Informed Choices' website home

11  page?

12  A.  Yes, it is.

13  Q.  How would a potential client looking at the website know

14  that Informed Choices does not provide abortion?

15  A.  A couple different ways.  It is very likely if she found

16  her way to our website that she found us through a Google ad.

17  As a subheading under each Google ad, Google adds the term

18  "does not perform abortion."  Then as she gets to the website,

19  below the pictures is a paragraph -- a little bit further --

20  whoops, up, too far -- there is -- a little bit higher up,

21  there is a paragraph that says "We offer alternatives to

22  abortion" -- the bold word there.

23       Oh, too far.

24       "We offer abortion clinic alternatives in Illinois,"

25  "alternatives" being the one bold word in that section.  And

SA-129

1    then at the bottom of every page on our website is a

2    disclaimer that says "We do not perform or refer for

3    termination."

4           And as well, that link that says "Commitment of care

5    and competence," that opens up a document that explains we are

6    a faith-based organization and again says that we do not

7    perform or refer for abortion.

8    Q.  Does Informed Choices have any information about abortion

9    on its website?

10   A.  Yes.

11          MS. PAYNE:  Let's take a look at NIFLA Exhibit 4.

12          Could you scroll down a bit?

13   BY MS. PAYNE:

14   Q.  Ms. Vanderlip, is this that information?

15   A.  Yes, it is.

16   Q.  Where does Informed Choices get this information?

17   A.  Our medical information is provided through Care Net's

18   medical team.  RankMonsters is the website provider that works

19   with them to put it out on the Internet.

20   Q.  Do most of Informed Choices' clients have Internet access?

21   A.  Yes.

22   Q.  And how do you know that?

23   A.  Well, we send their intake forms electronically now, so

24   they need to have a mobile device to receive that and complete

25   it and send it back to us before they ever come in for an

1    appointment.

2    Q.  Are you aware of any place someone could go to get

3    Internet access?

4    A.  Public library, McDonald's, Starbucks across the street.

5    Q.  How do potential clients make an appointment at Informed

6    Choices?

7    A.  Either through our website, there is a submission; so it's

8    an email, a text, or a phone call.

9    Q.  Does Informed Choices disclose to clients that it does not

10   provide or refer abortion when they schedule an appointment?

11   A.  Absolutely.  In any form of contact, we explain to her

12   what services we can help her with, that we do not perform or

13   refer for abortion, and ask her if she would like to make an

14   appointment.

15   Q.  All right.

16          MS. PAYNE:  Let's take a look at Defendant

17   Exhibit 15.

18          THE COURT:  You said Defendant Exhibit 15?

19          MS. PAYNE:  Yes.

20          THE COURT:  Sorry.  All right.  Go ahead.  Sorry.

21          MS. PAYNE:  Thank you, Your Honor.

22   BY MS. PAYNE:

23   Q.  Ms. Vanderlip, do you recognize this document?

24   A.  Yes.  It's our intake form.

25   Q.  Does the intake form inform the client that Informed

1  Choices does not provide or refer for abortion?

2  A.  It does.  On the bottom half there, the bullet point about

3  halfway down --

4  Q.  Could you read that bullet point?

5  A.  Sure.

6      "Our center does not benefit financially from your

7  decision regarding your pregnancy.  We do not perform or refer

8  for abortion, but we do provide information and services so

9  that you are equipped to make an informed choice about your

10  pregnancy."  And then that's followed by:  "This facility is a

11  non-profit, faith-based charitable organization."

12  Q.  When a woman arrives at Informed Choices for her

13  appointment, what happens?

14  A.  She is welcomed by a receptionist, offered a bottle of

15  water.  We scan her photo ID, and then she is brought back

16  into a client room to meet with a volunteer advocate or a

17  staff member.

18  Q.  What is the role of a volunteer advocate?

19  A.  They start by reading a disclaimer paragraph to explain

20  that they are a volunteer advocate.  We are a faith-based

21  organization.  We don't perform or refer for abortion.  And we

22  will explain what she can expect at that appointment.  And

23  then they ask some questions like what pregnancy options is

24  she considering, is she being pressured in her decision one

25  way or the other, does she feel safe in her living

 1   environment.

 2   Q.  Do volunteer advocates wear scrubs?

 3   A.  No, they do not.

 4   Q.  Does anyone else at Informed Choices wear scrubs?

 5   A.  Only the registered nurses.

 6   Q.  Are clients generally aware of their pregnancy options

 7   when they arrive at Informed Choices?

 8   A.  Yes.

 9   Q.  And how do you know that?

10         MS. MORRIS:  Objection, calls for speculation.

11         THE COURT:  It is a foundational question.  "How do

12   you know?"  Overruled.

13         THE WITNESS:  They are often looking for information

14   about abortion.  I would say adoption is something they don't

15   often consider at that point, so it is an option that we bring

16   up and walk through.

17         THE COURT:  But how do you know this?  Do they tell

18   you?  How do you get this information?

19         THE WITNESS:  Yes.  We ask them what options they are

20   considering as part of our intake.  So they will often say

21   "Abortion" or "I don't know."

22         THE COURT:  Okay.

23   BY MS. PAYNE:

24   Q.  After the client meets with the volunteer advocate, what

25   happens next?

1    A.   Then our nurse would come in and do a medical intake that

2    asks questions like if she has had past miscarriages, ectopic

3    pregnancies, if she is actively bleeding, determine how far

4    she is from her last menstrual period.  And then the nurse

5    would do a pregnancy test.

6    Q.   What happens if the pregnancy test comes back positive?

7    A.   If it is positive, it depends how far along she is.  We

8    may do an ultrasound that day or we will schedule an

9    ultrasound when she is closer to six weeks.

10   Q.   Are there any times when you don't recommend an

11   ultrasound?

12   A.   If a woman is happily pregnant, married, has full support

13   of family and friends and her support circle, then it is in

14   her best interest to get OB care and a prenatal ultrasound.

15   Q.   If a woman does have an ultrasound, what happens after the

16   ultrasound?

17   A.   After the ultrasound, she would go back and meet with her

18   advocate again.  The advocate would ask her how she feels

19   about seeing the ultrasound, what she is considering now, and

20   provide her with the other resources that we have available.

21   Q.   Does Informed Choices provide any medical treatment for

22   pregnancy?

23   A.   No.  We offer her a starter bottle of prenatal vitamins,

24   but there is a form that we discharge the patient at that

25   first appointment.

SA-134

1   Q.  If a patient decides that she would like an abortion, how

2   is she counseled?

3   A.  We would tell her that we don't refer for abortion, that

4   she would have to research that option herself.

5   Q.  Would you provide that woman with any written materials?

6   A.  All clients go home with the *Before You Decide* magazine,

7   which walks them through all options and the associated risks.

8   And that's either in print or a QR code that she scans on her

9   phone.

10         MS. PAYNE:  Could you scroll down to -- it's Bates

11   00092, or page 10 of the PDF document.  A little further up.

12   BY MS. PAYNE:

13   Q.  Is this the *Before You Decide* magazine?

14   A.  Yes, it is.

15   Q.  And which patients does Informed Choices provide this

16   magazine to?

17   A.  Every patient, whether the pregnancy test is positive or

18   negative.

19   Q.  And where does Informed Choices get this magazine?

20   A.  We purchase them from Care Net.

21   Q.  Has the information about abortion that you give to

22   patients, here I'm including about the website and the

23   magazine, been reviewed by a medical professional?

24   A.  Yes.  Care Net has a medical team physician that reviews

25   all this.

1  Q.  Does Informed Choices refer women to any providers that

2  you know perform abortions?

3  A.  No, we do not.

4  Q.  Would it violate Informed Choices' religious beliefs to

5  refer a patient to a provider that you know performs

6  abortions?

7  A.  Absolutely.

8  Q.  And how do you determine whether providers perform

9  abortions?

10  A.  Well, we don't refer to any provider.  What we usually

11  recommend a woman, if she has insurance, to work with her

12  insurance company to find OB care.  Most of our clients do not

13  have health insurance, so then we are referring them to the

14  local health department.  We send them with a proof of

15  pregnancy letter that helps get them started there.

16          But as far as the health departments, I have looked

17  at their website, and it's -- abortion is not listed as one of

18  their services.

19  Q.  If you discover that the health department did perform

20  abortions, would you continue referring to the health

21  department?

22  A.  No, we would not.

23          MS. PAYNE:  Your Honor, I would like to pass the

24  witness.

25          THE COURT:  Okay.

SA-136

```
 1                        CROSS-EXAMINATION
 2   BY MS. MORRIS:
 3   Q.  Good afternoon, Ms. Vanderlip.
 4           Ms. Vanderlip, you have been involved with Informed
 5   Choices a long time.  It's correct you have been there for
 6   over 20 years, right?
 7   A.  Correct.
 8   Q.  Okay.  Is it also true that Informed Choices was not
 9   always called Informed Choices?
10   A.  That's right.
11   Q.  Okay.  It was originally founded in 1987; is that correct?
12   A.  That's right.
13   Q.  And its original name was Tri-County Crisis Pregnancy
14   Center; is that correct?
15   A.  Correct.
16   Q.  Is it fair to say that when Tri-County Crisis Pregnancy
17   Center was founded, it was because the founders were compelled
18   to do something for the pregnant 8th graders in their
19   community?
20   A.  That's accurate.
21   Q.  When Tri-County Crisis Pregnancy Center was founded, it
22   did not offer medical services at that time; is that right?
23   A.  That's right.
24   Q.  It was originally an education center supported by local
25   churches, correct?
```

1  A.  Yes.

2  Q.  It provided counseling around pregnancy and parenting and

3  resources like diapers; is that right?

4  A.  That's right.

5  Q.  Is it correct that your organization began offering

6  medical services in 2012?

7  A.  Yes.

8  Q.  And when you began offering medical services, that's also

9  when Tri-County Crisis Pregnancy Center changed its name; is

10  that right?

11  A.  That's right.

12  Q.  And you changed the name to Informed Choices, correct?

13  A.  Yes.

14  Q.  Is it fair to say that you changed the name for marketing

15  purposes?

16  A.  Yes.

17  Q.  But your mission has been the same all along, correct?

18  A.  Mission statement is the same, yes.

19  Q.  Okay.  Your mission has always been to empower women to

20  make informed choices, and the name "Informed Choices"

21  represented that better than "Crisis Pregnancy"; is that

22  right?

23  A.  Correct.

24  Q.  In fact, it's fair to say that allowing women to make an

25  informed choice is the reason your organization exists; is

1   that right?

2   A.  Yes.

3   Q.  Okay.

4          MS. MORRIS:  May I use the ELMO, please?

5          THE COURT:  Sure.

6          MS. MORRIS:  For the record, I have put NIFLA

7   Exhibit 14.

8          THE COURT:  Okay.

9   BY MS. MORRIS:

10  Q.  Ms. Vanderlip, I'm returning to this exhibit that you

11  testified about earlier on direct.

12          I wanted to draw your attention to Principle No. 1.

13          Is it fair to say that Principle No. 1 for Informed

14  Choices is that Informed Choices is committed to providing its

15  clients with accurate and complete information about both

16  prenatal development and abortion?

17  A.  Yes.

18  Q.  Okay.  And is it fair to say that as one of Informed

19  Choices' principles, you do that because you strive to meet

20  every patient's individual need?

21  A.  Yes.

22  Q.  Okay.  It's also fair to say, though, that Informed

23  Choices provides an alternative view that doctors are not

24  otherwise providing; is that right?

25  A.  I'm not sure I could answer what doctors are providing.

1    Q.  So, for example, is it fair to say that Informed Choices

2    exists because, in the opinion of the organization,

3    traditional medical doctors might not be providing what you

4    would consider to be a full view of pregnancy options?

5    A.  I don't think I could answer what traditional medical

6    doctors are providing.

7    Q.  Is it fair to say that your patients are perhaps not

8    getting an alternative view from doctors they visit?

9    A.  Perhaps.

10   Q.  Ms. Vanderlip, do you remember taking a deposition?

11   A.  Yes.

12   Q.  Okay.  Do you recall that date was August 20th, 2019?

13   A.  Yes.

14   Q.  And you remember that you were sworn to tell the truth at

15   that deposition; is that right?

16   A.  That's right.

17   Q.  All right.  And you, in fact, told the truth at that

18   deposition?

19   A.  Yes.

20   Q.  Okay.  This is from page 76 of your deposition.

21   A.  Okay.

22   Q.  I'm starting at line 13.  I'm going to go ahead and read.

23          Can you see, Ms. Vanderlip?

24   A.  Yes, I can.

25   Q.  If you can please read along while I'm reading, I would

1    appreciate it.

2            "Q.  Is it fair to say that you feel you sort of

3    provide this alternative view because you feel your patients

4    are perhaps not getting an alternative view from other

5    doctors?

6            "A.  Yes."

7            Did I read that correctly, Ms. Vanderlip?

8    A.  Yes.

9    Q.  Okay.  Is it fair to say that the mission of Informed

10   Choices is to provide a second opinion about pregnancy?

11   A.  A second opinion being if they are pregnant or not, or...

12   Q.  As opposed to what their options might be in relation to

13   this alternative view.

14           MS. PAYNE:  Objection, vague.

15           THE COURT:  I'm sorry, objection what?

16           MS. PAYNE:  Objection, vague.  I just don't

17   understand what counsel is asking.

18           THE COURT:  Okay.  Can you repeat the question?

19           MS. MORRIS:  We can strike that question.  That's

20   fine.

21   BY MS. MORRIS:

22   Q.  Ms. Vanderlip, is it fair to say that a central part of

23   one of Informed Choices' principles is that you do not advise,

24   provide, or refer for abortion or abortifacients?

25   A.  Yes.

1  Q.  And that, in fact, is Principle No. 4 that is on your

2  Statement of Principles sheet currently before you; is that

3  right?

4  A.  Correct.

5  Q.  Okay.  Is it also fair to say that approximately 80

6  percent of the patients who go to Informed Choices come for

7  some kind of abortion counseling?

8  A.  70 to 80 percent come wanting to know what their options

9  are, information about the procedure, yes.

10  Q.  Okay.  So it is fair to say that roughly 80 percent of

11  people who come want more information about abortion?

12  A.  Yes.

13  Q.  Okay.  And on your intake form, Informed Choices

14  communicates to patients that you do not perform or refer for

15  abortion, but that you do provide information and services so

16  that you are equipped to make an informed choice about your

17  pregnancy?

18  A.  Correct.

19  Q.  Is that right?

20  A.  Uh-huh.

21  Q.  Now, Ms. Vanderlip, after Informed Choices decided to add

22  medical care, Informed Choices joined NIFLA; is that correct?

23  A.  That's right.

24  Q.  Okay.  And you did that because NIFLA provides training

25  and support for adding ultrasound services to pregnancy

SA-142

1   centers?

2   A.   Right.

3   Q.   Okay.   To join NIFLA, you agree to pay dues and abide by

4   the standards of care set by them; is that right?

5   A.   That's right.

6   Q.   And as part of their standard of care, a NIFLA member

7   agrees not to perform or refer out for abortions; is that

8   right?

9   A.   Correct.

10  Q.   Your medical staff receive ongoing training at NIFLA in

11  ultrasound scanning?

12  A.   That's right.

13  Q.   And NIFLA also provides sample documents for member

14  pregnancy centers to use; is that right?

15  A.   That's right.

16  Q.   And Informed Choices uses the NIFLA model for your medical

17  and consent form; is that accurate?

18  A.   Yes.

19  Q.   Okay.   Now, at Informed Choices, you typically have a

20  doctor who serves as a medical director; is that correct?

21  A.   That's correct.

22  Q.   Okay.   The medical director oversees medical services; is

23  that right?

24  A.   Yes.

25  Q.   The medical director does not see patients, but they

1    review ultrasounds and medical intakes; is that right?

2    A.   Right.

3    Q.   And this medical director is also on call if there is a

4    problem with a patient; is that right?

5    A.   That's right.

6    Q.   And the medical director also reviews and approves

7    policies and procedures; is that correct?

8    A.   Correct.

9    Q.   Okay.  Is it fair to say that at Informed Choices, nurses

10   are present and -- to perform medical procedures?

11   A.   The nurses are performing the pregnancy tests and the

12   ultrasounds, yes.

13   Q.   Okay.  So it is fair to say that it is the nurses that are

14   performing the pregnancy test?

15   A.   Yes.

16   Q.   And it's the nurses that do a medical intake of each

17   client to determine if they are eligible for an ultrasound; is

18   that right?

19   A.   That's right.

20   Q.   And the nurses are trained to provide ultrasounds?

21   A.   Yes.

22   Q.   And after the ultrasound, nurses provide follow-up

23   instructions; is that right?

24   A.   That's right.

25   Q.   Nurses are not always present at your facilities; is that

1  correct?

2  A.  That's correct.

3  Q.  But your volunteer advocates are always present; is that

4  right?

5  A.  Yes.

6  Q.  If a nurse wasn't present, a volunteer would do an intake

7  and then call a medical person for a pregnancy test; is that

8  right?

9  A.  We only schedule pregnancy tests on days that medical

10  staff is there.

11  Q.  I see.

12  A.  So the other days are parenting education.

13  Q.  Sure.

14         Ms. Vanderlip, do you recall earlier on your direct

15  testimony you testified that individuals use -- or can find

16  Informed Choices online?

17  A.  Yes.

18  Q.  Is it also accurate that Informed Choices uses Google Ads

19  and search engine optimization?

20  A.  Yes, ma'am.

21  Q.  And the reason you do that is for advertising purposes?

22  A.  Yes.

23  Q.  All right.  Ms. Vanderlip, I would like to talk a little

24  bit more about the patient experience.

25         I believe you testified earlier that a volunteer

1  advocate would perform an intake when a patient arrives; is

2  that correct?

3  A.   Yes.

4  Q.   And part of that screening helps indicate when a

5  patient -- strike that.

6          Part of that screening helps indicate what a patient

7  might do in the event of a positive pregnancy test; is that

8  correct?

9  A.   Yes.

10  Q.   In the course of that intake, a volunteer might ascertain

11  that a patient is considering abortion; is that right?

12  A.   Yes.

13  Q.   Now, if that is the case, the volunteer advocate will talk

14  about abortion, correct?

15  A.   No.   The nurse talks about the abortion procedures after

16  we know how far along she is.

17  Q.   But does the volunteer advocate explain the potential rate

18  of miscarriage to a patient?

19  A.   The nurse would.

20  Q.   Is that a change in your policy since I took your

21  deposition?

22  A.   Yes.   I think the nurse now covers all the medical

23  procedures related to abortion, and then a volunteer talks

24  about the emotional and spiritual relational aspects.

25  Q.   So it is your testimony today that the volunteer advocate

1   once talked about miscarriage, but they no longer talk about

2   miscarriage?

3   A.   Right.

4   Q.   Now, Ms. Vanderlip, if I understood your earlier

5   testimony, it sounds like you don't perform ultrasounds in all

6   circumstances; is that right?

7   A.   Not in all circumstances.

8   Q.   And it sounds like if you have a patient who comes in the

9   door, that if that person seems fully supported and excited to

10  be pregnant, they necessarily will not get an ultrasound; is

11  that correct?

12  A.   In the rare instance that we have someone like that,

13  that's true.

14  Q.   Okay.  But is it fair to say that an ultrasound is

15  recommended if someone is unsure about what they want to do

16  regarding abortion?

17  A.   Yes.

18  Q.   And then before the ultrasound, is a patient given a form

19  called "The Informed Consent for Limited OB Ultrasound" to

20  sign?

21  A.   Yes.

22  Q.   And does that form -- and that form indicates that a

23  referral will be made to another medical provider for

24  follow-up and prenatal care?

25  A.   I don't have it in front of me.  We don't have a provider

SA-147

1   that we refer to directly.

2   Q.  But you have a referral list, though; is that correct?

3   A.  We don't.  We ask them to look -- you know, if they have

4   insurance, to go through their insurance, or we will refer

5   them to the health department if they don't have medical

6   coverage.

7   Q.  Is that a change in your policy, Ms. Vanderlip?

8   A.  We haven't had a list of physician referrals for years and

9   years.

10  Q.  Okay.  But there was a time when you had a referral list?

11  A.  Not in my eight years as executive director.

12  Q.  Okay.  Now, during the ultrasound, Ms. Vanderlip, a

13  sonographer provides medical information about what they see

14  in the ultrasound; is that correct?

15  A.  Yes.

16  Q.  And after the ultrasound, they advise on the viability of

17  pregnancy; is that correct?

18  A.  No.  A nurse can't diagnose if the pregnancy is viable;

19  only a doctor can.  The nurse will give a measurement for

20  gestational age and take a heart rate.

21  Q.  Ms. Vanderlip, I'm getting ready to put your deposition up

22  on the ELMO.  I'm on page 42.  I'm going to start at the

23  bottom at line 22.

24          Do you see line 22 on page 42?

25  A.  Yes.

1   Q.  Okay.  I'm going to go ahead and read, if you can read

2   along.

3           "Q.  So after you have counseled a patient about

4   their different pregnancy choices, what's the next step after

5   that?

6           "A.  We give a basic discussion before the pregnancy

7   test.  Then after she has the pregnancy test and ultrasound,

8   we will go more in depth on, you know, if the pregnancy is

9   viable.  These are the procedures based on how far along she

10  is."

11          Did I read that accurately?

12  A.  Yes.

13  Q.  Is it your testimony today that you no longer advise on

14  viability?

15  A.  We'll let a patient know if we see what we would expect

16  based on her last menstrual period, but the nurse is not

17  telling a patient if her pregnancy is viable.

18  Q.  At the conclusion of a visit, Informed Choices provides

19  paperwork acknowledging that any provider-patient relationship

20  is terminated; is that correct?

21  A.  Yes.

22  Q.  And on that paperwork, you advise the patient to seek

23  follow-up prenatal care; is that right?

24  A.  Correct.

25  Q.  And a nurse always follows up with a patient within

1    24 hours after the visit; is that correct?

2    A.   Yes.

3           MS. MORRIS:  No more questions at this time.

4           THE COURT:  Okay.  Any redirect?

5           MS. PAYNE:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MS. PAYNE:

8    Q.   Ms. Vanderlip, what is the purpose of Informed Choices'

9    advertising?

10   A.   We get no financial gain.  It is just to be able to reach

11   women who are in the position of an unplanned pregnancy and to

12   educate them about their options.

13   Q.   And do those advertisements propose a commercial

14   transaction?

15   A.   No.

16   Q.   Is there any way that a woman looking at Informed Choices'

17   Google advertisement would know that Informed Choices does not

18   provide or refer for an abortion?

19   A.   It is in our paid ads -- Google Ads.  It is on our paid

20   ads, on our website, and in every initial contact with a

21   patient before we schedule an appointment.

22           MS. PAYNE:  I have no further questions at this time.

23           THE COURT:  Okay.  You said as soon as somebody

24   leaves Informed Choices, they are given a document that says

25   that the relationship is terminated, right?

1          THE WITNESS:  We let her know that we will call her

2     when her ultrasound report is complete and read.  And then she

3     can pick that up if she wants to, but then we are discharging

4     her from that day.

5          THE COURT:  Okay.

6          THE WITNESS:  We also give her ectopic and

7     miscarriage precautions.

8          THE COURT:  But then does a nurse follow up within

9     24 hours after the person leaves?

10         THE WITNESS:  She lets her know when the ultrasound

11    report has been read by the physician.

12         THE COURT:  So that's the sole purpose?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.  Got it.  That makes more sense.

15              Any follow-up based on that?

16         MS. PAYNE:  No, Your Honor.

17         MS. MORRIS:  Two more quick ones.

18                        RECROSS EXAMINATION

19    BY MS. MORRIS:

20    Q.  Ms. Vanderlip, do you recognize this page out of the

21    Informed Choices policies and procedures manual?

22    A.  We do.

23         MS. PAYNE:  Your Honor, objection.  I think this is

24    going beyond the scope.

25         THE COURT:  I do, too.  What are we doing?

1          MS. MORRIS:  Okay.

2          THE COURT:  Sustained.

3          Thank you, ma'am.  You can step down.

4          THE WITNESS:  Sure.  No problem.

5     (Witness excused.)

6          MR. STERETT:  Good afternoon, Your Honor.  Noel

7     Sterett on behalf of the NIFLA plaintiffs.  We will be calling

8     Ms. Vivian Maly.

9          You want to stop right there, and the Judge will

10    swear you in.

11         Stop right there, and the Judge will swear you in.

12         THE COURT:  Raise your right hand.

13    (Witness duly sworn.)

14         THE COURT:  Have a seat and watch your step.

15         Have you testified in court before?

16         THE WITNESS:  In a deposition, but not in this type

17    of a setting.

18         THE COURT:  Okay.  So make sure you speak slowly and

19    clearly into the microphone.

20         THE WITNESS:  I'm sorry, pardon?

21         THE COURT:  Make sure you speak slowly and clearly

22    into the microphone.  If you can't hear somebody, let us know

23    and we will repeat.  Wait until the question is done before

24    you start to answer.  Likewise, they are going to wait until

25    you are done with your answer before they ask you another

1    question.  If you don't understand a question or you can't

2    hear a question, let us know.  Okay?

3                THE WITNESS:  Okay.  Thank you.

4                THE COURT:  Thank you.

5                VIVIAN MALY, PLAINTIFF'S WITNESS, SWORN

6                        DIRECT EXAMINATION

7    BY MR. STERETT:

8    Q.  Good afternoon, Ms. Maly.  Would you state and spell your

9    name for the record?

10   A.  Yes, my name is Vivian Maly.  M-a-l-y is the last name.

11   Q.  And are you the executive director of TLC Pregnancy

12   Services?

13   A.  I am.

14   Q.  And how long have you been with TLC?

15   A.  27 years.

16   Q.  Were you a founder of TLC Pregnancy Services?

17   A.  You could say that.

18   Q.  Okay.  And what positions have you had at TLC Pregnancy

19   Services?

20   A.  Positions?

21   Q.  Yes, what roles have you played?

22   A.  Oh, what roles do I play?  Fundraising and connecting with

23   donors and making sure the bills are paid.  Going through our

24   annual audit every year and making sure our trainings are

25   taking place, working with our clinic manager, too.  She will

1    meet with me every week, and she will give me an update as to

2    how things are going.

3         Thank-you letters.  I send thank-you letters out to

4    our donors.  I compose thank-you letters and send them out to

5    the donors after they are typed, and I'll sign them, make sure

6    I put little nice notes showing our donors how much we

7    appreciate their help.  I have many hats I wear.

8    Q.  Is that how TLC Pregnancy Services exists, by the

9    donations of individuals and other organizations?

10   A.  Yes.

11   Q.  Was your answer yes?

12   A.  Yes, individuals and organizations, churches, grants,

13   fundraisers.

14   Q.  And what types of service and support does TLC offer?

15   A.  Okay.  We provide the pregnancy testing, as was mentioned,

16   free ultrasounds.  All of our services are free, by the way.

17   We now have a prenatal program where we -- moms can come to us

18   after they have had an ultrasound.  And they can come to us

19   for prenatal care up until the 20th week, and then we refer

20   them to a doctor.  And we also provide STD testing and

21   practical help such as diapers, clothing, formula, things of

22   that sort, baby equipment, some baby equipment.

23        We have a "Surrendering a Secret Program," again, a

24   post-abortive recovery program for ladies who have been

25   wounded by abortion, their abortion experience.

SA-154

1          Then we have a men's program and a mom's program

2    called "A Mom's Connection."  And with "A Mom's Connection,"

3    it is a once-a-month program.  We have two nurses that lead

4    that program teaching the moms how to properly care for their

5    children.

6    Q.  Okay.  And just to abide by the Court's admonition to

7    define our acronyms, can you please explain to the Court what

8    TLC stands for?

9    A.  The Life Center.  It was the original name of our

10   organization, so -- and it's -- we are doing business now as

11   TLC Pregnancy Services.

12   Q.  Okay.  But when you say "doing business," you are not

13   proposing any commercial transactions or selling anything?

14   A.  No.  No.

15   Q.  What was the answer?

16   A.  Pardon?

17   Q.  What was the answer?  I'm sorry, I didn't hear.

18   A.  No.  No.  There is no money exchanged, and we charge

19   absolutely nothing for any of our services.

20   Q.  And what's the relationship between Your Life Choices and

21   TLC Pregnancy Services?

22   A.  Okay.  Again, TLC Pregnancy Services is kind of like the

23   mother organization, or like the mother ship, I guess you

24   would say, or the umbrella organization over our services.  So

25   it's TLC Pregnancy Services, and under that name is the -- our

1  Life Choices Medical Clinic.  We have a mobile unit ministry.

2  We have our Hope services, which is a practical support.

3  SHIFRA is our latest program that we have added on for the

4  prenatal care.  And then our men's program.  Again, "A Mom's

5  Connection," the program for the moms, new moms.

6           So those are just a few of our services that are

7  under the umbrella of TLC Pregnancy Services.

8  Q.  This prenatal care ministry that you have, that's a recent

9  addition?

10  A.  It is.

11  Q.  Okay.  Is TLC a member of the National Institute of Family

12  and Life Advocates?

13  A.  Yes, we are.

14  Q.  Okay.  And we can refer to that as NIFLA, so you know what

15  I mean when I say "NIFLA"?

16  A.  Yes.

17  Q.  Okay.  What are TLC's religious beliefs concerning an

18  abortion?

19  A.  Okay.  We are a Christian, nondenominational Christian

20  organization.  We believe that life is sacred and should be

21  protected, and it should not be taken.

22  Q.  Could you please describe the typical process for women

23  when they come to one of your brick-and-mortar locations?

24  A.  Okay.  A woman will enter into our waiting room, and she

25  will talk to the receptionist.  And then -- between a sliding

1    glass window.  And so she will be given a form to fill out or

2    intake sheet.  So she will fill out the sheet, but the

3    receptionist will also ask her some questions, what her needs

4    are.  And then once she finishes the intake form and the

5    proper paperwork, then the woman is connected with a nurse.

6        If she is -- in most cases, the woman is looking to

7    confirm her pregnancy, so she will have a pregnancy test that

8    will be done by the nurse.  And then if she is far enough

9    along, she is entitled to have an ultrasound.

10   Q.  Okay.  Can I show you what has been marked Defendant's

11   Exhibit 10, which I believe is already admitted in the record.

12   A.  Okay.  I see that.  That's our intake form.

13   Q.  Is that your intake form?

14   A.  Uh-huh.

15   Q.  And the website link there at the top,

16   thinkimpregnant.com, is that the website that you guys use for

17   Life Choices?

18   A.  Yes, uh-huh.

19   Q.  Okay.  If you scroll all the way to the bottom.

20   A.  Okay.

21   Q.  What's the last sentence above the patient's signature

22   line say?

23   A.  "This clinic does not perform or refer for abortion."  It

24   is right above the signature where the client or patient would

25   have to sign.

1    Q.  Okay.  Do you have that disclaimer anywhere else?  Do you

2    have that on your website?

3    A.  It appears on our website, right.

4    Q.  And when a woman calls in to TLC Pregnancy Services, do

5    you make that same disclaimer?

6    A.  We do.  Sometimes women will call and they will ask

7    for -- they will say that they are looking for an abortion,

8    and we tell them that we do not perform abortions, we do not

9    refer for abortions; however, we can provide free services for

10   them.  We can provide an ultrasound to confirm the viability

11   of their pregnancy.

12   Q.  And why does TLC Pregnancy Services not perform abortions?

13   A.  Again, this goes against our core values, our core beliefs

14   as -- as believers in Jesus Christ, that, again, we don't

15   believe in abortion because we believe it is taking a human

16   life.

17   Q.  And why do you not refer for abortions?

18   A.  For the same reason.

19   Q.  Okay.  Are all the women that come to TLC given this

20   intake form?

21   A.  Yes.

22   Q.  Ms. Maly, I would like to now show you what has been

23   marked as NIFLA Exhibit 2.

24   A.  Okay.

25   Q.  Can you identify what this exhibit is or these pages are?

1              Is this the TLC Pregnancy Services website?

2    A.   Okay.  Yes.

3    Q.   Okay.  And then you have a similar disclaimer on this

4    website that you do not perform abortion or refer for

5    abortion?

6    A.   That's correct, uh-huh.

7    Q.   Okay.  You can look at NIFLA 1689 right there at the top

8    bullet point.  Is that where it's located on your website?

9    A.   Yes.  I see -- "Life Choices does not perform abortions or

10   refer for abortions."  Correct.

11   Q.   Okay.  Does TLC staff or the nurses talk to every woman

12   that comes through the door about abortion?

13   A.   Not if they are not asking about abortion.  If they are

14   interested in abortion, if they come because they just need

15   some -- just support or information, references -- or

16   referrals, rather, local referrals, or just maybe questions,

17   again, they will come to us.

18   Q.   Do some women come for diapers?

19   A.   They know that that's -- of course.  We have been in the

20   Elgin area for so long.  The people -- we are located in a

21   very low-income community, and so the community knows that we

22   are kind to the women, that we provide material support for

23   them.  We even have a small food pantry, sometimes even gift

24   cards if they need gas gift cards or whatever, or gift cards

25   for baby formula or whatever, if we don't have the type that

SA-159

1    they need.

2            And so they know that we are -- we care about these

3    women, and we provide services for the women, and so the word

4    gets out.

5            And, I'm sorry, going back to your question, I don't

6    want to drift too far.

7    Q.  No, that's fine.  I will ask a new one.

8            You said you have been with TLC since its inception

9    27 years ago, is what you said?

10   A.  Correct, yes.

11   Q.  In all those years, have you ever encountered a woman who

12   didn't know that an abortion was an option for her pregnancy?

13   A.  No, I have not.

14   Q.  In all those years, have you ever encountered a woman who

15   didn't know that she had a legal right in the state of

16   Illinois to have an abortion?

17   A.  No, I haven't.

18   Q.  For those women who are considering an abortion, do the

19   medical professionals at TLC discuss the negative effects of

20   abortion or risks of abortion with them?

21   A.  If the women are really seeking an abortion, we do want to

22   let them know that there are risks and complications,

23   long-term consequences, many times, to abortion as well.

24   Q.  Do they discuss the benefits of abortion?

25   A.  I'm sorry?

1   Q.  Do they discuss the benefits of abortion?

2   A.  No.  We would not do that because, again, we don't -- I

3   don't know of any benefits, and I don't think our staff does

4   either.  I see no benefit with having an abortion, to a woman

5   having an abortion.

6   Q.  So you are not aware of any comprehensive list of benefits

7   put out by the State --

8   A.  No.

9   Q.  -- or some other organization of what an abortion

10  provides?

11  A.  No.  No, I'm not.

12  Q.  Just for the court reporter's sake, if you wouldn't mind

13  just letting me finish the question, and then you can deliver

14  your answer.

15  A.  Okay.

16  Q.  Does TLC provide women with a list of physicians you

17  reasonably believe would provide an abortion?

18  A.  No, we do not.

19  Q.  And why not?

20  A.  Because, again, we don't believe in abortion, providing

21  abortions, referring for abortions.  We feel that abortion,

22  again, is taking a human life, and it would go against our

23  core value and beliefs.

24  Q.  And in the same vein, TLC would not refer women to health

25  centers if you reasonably knew that they provided abortions?

1    A.   That's correct.

2    Q.   And for the same reason?

3    A.   For the same reason, yes.

4    Q.   I would like to show you what is marked NIFLA Exhibit 12.

5         Ms. Maly, does this look like a medical referral

6    sheet that TLC is --

7    A.   Yes.  Yes.

8    Q.   -- providing women?

9    A.   Yes, it does.

10   Q.   Okay.  And if you found out that any of the institutions

11   identified on this sheet provided abortions, TLC Pregnancy

12   Services would no longer refer women to these centers?

13   A.   No, we would not.

14   Q.   Okay.  What information do you provide women about

15   abortion?

16   A.   Again, explaining the short-term, long-term consequences

17   of abortion.  And with being around for so many years, we

18   have -- and having the post-abortive recovery class, we have

19   met many women who have been damaged.

20        One woman aborted the only two children she could

21   ever have, and when she came to the class, she couldn't even

22   speak.  She just sobbed.

23   Q.   And who provides the medical information regarding

24   abortion and regarding the risks?

25   A.   In most cases, our medical people do that.

1    Q.  And are you a medical professional?

2    A.  I am not.

3    Q.  Okay.  Where does the information TLC provides women about

4    abortion come from?  What are the sources?

5    A.  Well, there is Care Net, which is a major organization of

6    which there are over a thousand members across the country,

7    and then also Focus on the Family has some very good

8    literature also.

9    Q.  And who reviews the medical information before it is --

10   A.  Our medical director, our clinic director, and I review

11   some of it.  I review it too, as well.

12   Q.  Just, again, if you wouldn't mind letting me finish the

13   question.

14   A.  I'm sorry.

15   Q.  It's okay.  I just want to make it easier on the court

16   reporter.

17           Do you know if the women who come to TLC have the

18   ability to find information about abortion providers in

19   Illinois?

20   A.  I'm sorry, could you say that again?

21   Q.  Do you know if the women who come to TLC to receive

22   services have the ability to find information about abortion

23   providers in Illinois?

24   A.  I'm sure they do.

25   Q.  And why do you say that?

1  A.  Because they all come in with their cell phones, they are

2  online, they are texting their friends, talking to friends and

3  whoever, and on Facebook.  And so they are very connected with

4  that sort of information because of being online.

5  Q.  Does TLC connect with these women through the Internet?

6  A.  To?

7  Q.  To the women.  Do you communicate with the women through

8  the Internet?

9  A.  Through their phones, uh-huh, more than emails.  We

10 use -- they use their phones and they are connecting with us

11 by phone.

12 Q.  Okay.  And how many people -- how do women find out about

13 TLC Pregnancy Services?

14 A.  Okay.  We do online ad marketing.  We have been around,

15 again, in our Elgin location since 2014 -- or 2008, actually,

16 and then we have been around Palatine -- Schaumburg for a long

17 time, and then Palatine for about three, four years or so.

18       So people in the community find out about us.

19 Schools find out about us.  We have some of our nurses

20 visiting schools and passing our information out to school

21 nurses.  So these are some of the ways that our clients find

22 out about us.

23 Q.  So some is by word of mouth?

24 A.  Yes, of course, yes.  Especially in Elgin; we have been

25 there forever, so...

SA-164

1  Q.  And would you have any idea what percentage of women find

2  out about TLC Pregnancy Services online?

3  A.  Online?  Oh, probably about 50 percent, I would say.

4        MS. JUROWICZ:  Objection, Your Honor.  Calls for

5  speculation.

6        THE COURT:  Overruled if the next question is "How do

7  you know?"

8  BY MR. STERETT:

9  Q.  How do you know?

10  A.  Because I do get reports from our medical, our clinic

11  manager, and she gives me monthly reports.

12  Q.  Are there any abortion providers close to any of the

13  brick-and-mortar facilities that TLC Pregnancy Services has?

14  A.  Well, I think the closest one to the Elgin location is a

15  Planned Parenthood which is in Aurora.  That is about a half

16  hour south of us.  And then the Palatine location has three

17  different locations within a half hour of that location.

18  Q.  Switching topics a bit, do you typically inform the women

19  right away that TLC Pregnancy Services is a religious or

20  faith-based organization?

21  A.  No, we don't.

22  Q.  And why not?

23  A.  There is really no need to do that.  They are not coming

24  for that reason.  It is -- it is not as though they are going

25  to a church and looking for some religious connection.  They

SA-165

1   don't come -- they come for care and for information for the

2   support and help that they need.

3           MS. JUROWICZ:  Objection, Your Honor.  Calls for

4   speculation again.

5           THE COURT:  Overruled.

6   BY MR. STERETT:

7   Q.  Are you trying to hide the fact that you are a religious

8   organization?

9   A.  No, we are not.

10   Q.  Do you ever disclose to the women that come in for

11   services that you have a faith-based or religious beliefs?

12   A.  As they come to us, they sit and talk with us and they

13   share their hearts, they share their problems.  And we do

14   explain, yes, about our faith, and many times ask if we could

15   share our faith with them, our faith in Jesus Christ with

16   them.  And if they are in agreement with that, if they allow

17   us to, then we do.

18   Q.  So I think you kind of get into my next question.

19           If a woman comes to TLC unaware of the fact that you

20   are a religious organization, how might they find out that you

21   are a religious organization?

22   A.  We are a religious organization?

23   Q.  Or a Christian organization, whatever you use?

24   A.  How would they find out?

25   Q.  Yeah.  What are the ways that women discover that TLC

SA-166

 1  Pregnancy Services --

 2  A.  Well, as they come to us -- and they can see the

 3  Christ-like care we give them.  We don't charge a penny for

 4  our services at all, and we care about the women and we have a

 5  reputation for caring.  And I think just by being with us and

 6  coming to us for help, they see that we are maybe a little

 7  different than most social services organizations.  And we do

 8  share Christ with them.  Again, if we are allowed to do that,

 9  we ask their permission to pray with them, to share the gospel

10  with them.  And if they say yes to that, then we are very

11  happy.

12  Q.  Do any of your medical professionals wear scrubs?

13  A.  The medical professionals do, yes.

14  Q.  Any non-medical professionals or your volunteers wear

15  scrubs?

16  A.  No.  They wear street clothes.

17  Q.  Again, the reporter, I can see the nodding, so I just want

18  to slow you down.

19          What happens when a woman comes to TLC and presents

20  with an emergency situation?

21  A.  She comes and she has an emergency situation?

22  Q.  Correct.  If one of your medical professionals identify --

23  A.  If it's -- if she has -- if she's bleeding or has pain,

24  then we would refer immediately to the ER, local ER or to her

25  physician.

1    Q.   Do you have protocols in place --

2    A.   Yes.

3    Q.   -- for women who present with an emergency situation?

4    A.   Yes, we do.

5    Q.   What does your staff tell women who have a positive

6    pregnancy test?

7    A.   What is the procedure for someone?

8    Q.   Yes.

9    A.   Okay.  So a woman will come to us.  We'll have -- she will

10   draw a urine sample.  Our nurse will do a pregnancy test.  If

11   the test is a positive, then she is able to -- she is offered

12   an ultrasound if she is at least six weeks into her pregnancy

13   to verify that she has a viable pregnancy.

14   Q.   And who provides the medical services at TLC Pregnancy

15   Services' brick-and-mortar sites?

16   A.   We have nurses and also two ultrasound technicians.

17   Q.   Do you have an APN or an advanced practice nurse?

18   A.   And, yes, I was just going to add that we do have an

19   advanced practice nurse.  She is the newest addition to our

20   staff.

21   Q.   When did you add her?

22   A.   It was about June, July, August; about three or four

23   months ago.

24   Q.   Okay.  Are medical professionals always present when

25   medical services are provided to the women?

SA-168

1   A.  Yes.

2   Q.  And I think you covered that.

3           Ms. Maly, are you aware of any state-sponsored public

4   awareness campaigns aimed at informing women about the

5   benefits of abortion or where they can access abortion in

6   Illinois?

7   A.  I am not aware of that.

8           MR. STERETT:  We will pass the witness, Your Honor.

9           THE COURT:  All right.  Ms. Maly, so the same rules

10  apply.  Wait until the question is done before you start to

11  answer.  She will wait until you are finished with your answer

12  before she asks you another question.  If you don't

13  understand, let us know, okay?

14          THE WITNESS:  Okay.  Thank you.

15          THE COURT:  Whenever you are ready, Counsel.

16                          CROSS-EXAMINATION

17  BY MS. JUROWICZ:

18  Q.  Good afternoon, Ms. Maly.  We appreciate your time today.

19  A.  Good afternoon.

20  Q.  Thank you for coming.

21          I'm just going to be asking some questions about what

22  you talked about before.

23          You mentioned that you serve a number of communities,

24  correct?

25  A.  Yes, that's correct.

1   Q.  And you mentioned, for example, that the Elgin community,

2   it is a very low-income community that you serve?

3   A.  It is -- pardon?

4   Q.  Very low-income?

5   A.  It is.

6   Q.  And you would agree, wouldn't you, that those who come to

7   the Life Choices Medical Clinic are often desperate and

8   confused?

9   A.  I would say so, yes.

10  Q.  Now, Ms. Maly, you mentioned earlier that TLC is sort of

11  the "mother ship," right, or the mother umbrella of the

12  various organizations?

13  A.  Correct.

14  Q.  And that Life Choices Medical Clinic is the medical branch

15  of TLC Services?

16  A.  That's correct.

17  Q.  Okay.

18          MS. JUROWICZ:  And if you don't mind, I'm going to

19  use the ELMO.

20          THE COURT:  That's fine.

21  BY MS. JUROWICZ:

22  Q.  I'm going to show you something that you were shown.  I'm

23  going to show you what is marked as Defendant's Exhibit 69.

24  A.  Okay.

25  Q.  And these are just printouts from the website.  I'm going

1    to show you the first page -- oh, excuse me, I'm sorry.  I

2    will show you that one and another.

3          I'm going to show you the first page, and I'm turning

4    to what is marked as IDFPR 9430.  This is just one of the

5    pages on the website.

6    A.   Okay.

7    Q.   Ms. Maly, at the top of the page here, there is a logo,

8    correct?

9    A.   Yes.

10   Q.   Okay.  And that's the logo for Life Choices Medical

11   Clinic?

12   A.   That's correct.

13   Q.   And that's the logo that the public and patients would

14   see, correct?

15   A.   That's the logo that?

16   Q.   That the public and that patients would see?

17   A.   That's correct, yes.

18   Q.   Now, Ms. Maly, you testified earlier that TLC and Life

19   Choices Medical Clinic have two separate websites, correct?

20   A.   Yes, that's correct.

21   Q.   Okay.  The TLC website is tlcpregnancyservices.com,

22   correct?

23   A.   Yes, it is.

24   Q.   Okay.  And the Life Choices Medical Clinic website is a

25   separate site, correct?

```
1    A.   That's correct.

2    Q.   And its address is thinkimpregnant.com, correct?

3    A.   Yes.

4    Q.   Now, the two websites have different content, yes?

5    A.   They do.

6    Q.   Okay.  The TLC website content was created by TLC,

7    correct?

8    A.   Right, by the marketing firm that has worked with us, yes.

9    Q.   Okay.  But in contrast, most of the Life Choices Medical

10   Clinic website materials were created by the national

11   organization Care Net, correct?

12   A.   Could you repeat that, please?

13   Q.   Sure.

14        So we just talked about the TLC website content, but

15   separately, the Life Choices website content, that was

16   provided by the national organization Care Net, correct?

17   A.   I'm not sure if it was Care Net or not, but okay.

18   Q.   Would it refresh your -- you testified about this

19   previously, and you don't recall at this time?

20   A.   About creating our website?

21   Q.   The website materials.

22   A.   For TLC Pregnancy Services or for Life Choices?

23   Q.   For Life Choices.

24   A.   Okay.  Again, we work with a marketing company.  We

25   created that website with them.  But information that we
```

SA-172

1  receive from Care Net, since we are a member of that, is --

2  yes, or NIFLA, we use that information for our website,

3  uh-huh.

4  Q.  So to summarize, it is correct that the materials on the

5  Life Choices website come from Care Net?

6  A.  I would have to go through each page to agree with you

7  about that, but I suppose they do.

8  Q.  Okay.

9  A.  I mean the factual information.  Is that what you are

10 referring to?

11 Q.  Yes, the factual information.

12 A.  Yes, yes.

13 Q.  And that is because the Life Choices website has medical

14 services and information, correct?

15 A.  Life Choices does, medical information, correct.

16 Q.  Okay.  And you use the Care Net materials for the medical

17 information on that site, correct?

18 A.  Yes, uh-huh.

19 Q.  And the Care Net is a pro-life organization?

20 A.  Yes, it is.

21 Q.  Okay.  Now, it is possible for a person to visit the TLC

22 website without going to Life Choices' website, correct?

23 A.  Yes.

24 Q.  And it is also possible for someone to go to the Life

25 Choices website without first visiting TLC?

1   A.  That's correct.

2   Q.  Okay.  Now, as the medical branch of TLC, the Life Choices

3   Medical Clinic provides free medical services, correct?

4   A.  That's correct.

5   Q.  And the Life Choices Medical Clinic has a section of its

6   website listing its services, correct?

7   A.  That's right, uh-huh.

8   Q.  And Life Choices Medical Clinic lists three medical

9   services, correct?

10  A.  Yes.  I think so.  I would have to look at it again.  I

11  don't have it in front of me.

12  Q.  Okay.  Would it refresh your recollection to see the

13  website?

14  A.  That would be fine.

15  Q.  I'm putting back on Defendant's Exhibit 69.

16          And also, Ms. Maly, if one were to double-check about

17  the three free services, they could just go to the website and

18  look at the website, correct?

19  A.  I would think so, yes.

20  Q.  Okay.  Now, Ms. Maly, the first one, service is pregnancy

21  test, correct?

22  A.  Correct.  That's correct.

23  Q.  A second service is ultrasounds?

24  A.  Yes.

25  Q.  And a third service is consultations?

 1  A.  Yes.

 2  Q.  And you have used the term -- you mentioned ultrasounds.

 3  Are you familiar with the term "limited obstetrical

 4  ultrasound"?

 5  A.  Yes.

 6  Q.  And by "limited," you are simply referring to the fact

 7  that the Life Choices Medical Clinic takes ultrasounds of the

 8  fetus as opposed to, say, other body parts unrelated to

 9  pregnancy, correct?

10  A.  That's correct, yes.

11  Q.  And for patients considering abortion, you believe that

12  these three services are directly related to the choice of

13  whether to have an abortion, correct?

14  A.  Could you repeat that?  I'm getting a little confused.

15  Q.  I'm happy to.

16         You mentioned the three services before, correct?

17  A.  Uh-huh.

18  Q.  Pregnancy tests, ultrasounds, and consultations.

19  A.  Consultation meaning -- yeah, I guess you would call it a

20  consultation, correct.

21  Q.  And that's, in fact, how Life Choices Medical Clinic

22  refers to it on the website, correct?

23  A.  Yes, I suppose so.

24  Q.  And by "consultations," that refers to pregnancy options

25  counseling?

1  A.  Yes.

2  Q.  And those three services -- pregnancy tests, ultrasounds,

3  and consultations -- you believe that those three services are

4  directly related to the choice for abortion, correct, whether

5  to choose to have an abortion?

6  A.  Not necessarily.

7  Q.  Ms. Maly, you believe that the information on the Life

8  Choices website is accurate, correct?

9  A.  Yes.

10  Q.  And the information is not misleading?

11  A.  No, it's not.

12  Q.  Okay.  And you believe that the information is on the

13  website because it's important for people to know that

14  information?

15  A.  Yes.

16  Q.  Okay.  I'm returning to the screen here what is marked as

17  Defendant's Exhibit 69, and I'm turning to page IDFPR 9427.

18  That's the first page of the exhibit.

19       The top of the page says "Abortion."  The first

20  header says "Considering Abortion."  Correct?

21  A.  Yes.

22  Q.  Okay.  Now, Life Choices Medical center provides this page

23  for pregnant people who are considering whether to have an

24  abortion, correct?

25  A.  Yes, for those who are considering abortion.

1  Q.  So people who are aware abortion exists but do not know

2  the details about their particular abortion options, correct?

3  A.  Could you repeat that again?

4  Q.  Sure.

5       This here is for pregnant people who might be aware

6  that abortion exists but do not know the specific details

7  about their options, correct?

8  A.  Well, it's not our place to give them the details either,

9  is it?

10  Q.  Ms. Maly --

11       THE COURT:  That's not the question.

12  BY MS. JUROWICZ:

13  Q.  -- that's not the question.  If you could please answer

14  the question.

15       THE COURT:  Do you want it read back?

16       THE WITNESS:  I'm sorry.  Strike that.  I shouldn't

17  have --

18       THE COURT:  Do you want to read it again or have it

19  read back?  Which one do you want?

20       Read it back or ask it again?

21       MS. JUROWICZ:  I could just ask it again.

22       THE COURT:  Okay.

23  BY MS. JUROWICZ:

24  Q.  Ms. Maly, this is offered for people who are aware that

25  abortion exists?

1    A.  Yes.

2    Q.  But don't know necessarily the details about their

3    particular options, correct?

4    A.  This is not telling them the options right here.

5    Q.  Ms. Maly, I asked you a question.  It was a simple "yes"

6    or "no."

7    A.  I'm sorry.  Really, I'm getting confused about where we

8    are going with this.  But, anyway, could you explain that

9    again, or could you repeat that again, please?

10   Q.  Ms. Maly, it is a fact that this page here is for people

11   considering abortion, correct?

12   A.  For people who are considering abortion, correct.

13   Q.  Okay.  And they believe -- and the Life Choices medical

14   procedure, looking here, it says:  "It is important" -- I'm

15   reading from the third line.  "It is important to remember

16   abortion is a serious medical procedure that comes with a set

17   of risks and side effects."

18          You agree with that sentence?

19   A.  Yes.

20   Q.  And similarly, Life Choices Medical Clinic believes that

21   people deserve to carefully consider every option before

22   making their decision, correct?

23   A.  Correct.

24   Q.  Now, I'm turning slightly lower on the page here.

25          It says:  "What should I do first?"

1          It's correct, Ms. Maly, that Life Choices Medical

2    center believes that -- excuse me.  Strike that.

3          That Life Choices Medical Clinic believes that it is

4    important for a pregnant person to receive a pregnancy test

5    before deciding about an abortion, correct?

6    A.   In some cases, yes.

7    Q.   Under this page, it says "What should I do first," if

8    someone is considering an abortion.  It says:  "If you haven't

9    already, the first thing you should do is to confirm your

10   pregnancy with a pregnancy test."

11         You agree with that sentence, correct?

12   A.   Yes.

13   Q.   Okay.  Now, Life Choices Medical Clinic also believes that

14   it is important for a pregnant person to have an ultrasound

15   before deciding whether to have an abortion, correct?

16   A.   Yes, I agree.

17   Q.   Because this service is related to their decision on

18   whether to have an abortion, correct?

19   A.   Yes.

20   Q.   Okay.  You agree with the statement, as well, that "After

21   a positive pregnancy test" -- this is the last paragraph.

22   A.   Okay.

23   Q.   "After a positive pregnancy test, your next step should be

24   to get an ultrasound.  This will reveal important information

25   about your pregnancy which will determine which option you can

1    choose."

2            You agree with that sentence, correct?

3    A.   Yes.

4    Q.   And the information from the ultrasound is patient

5    specific, correct?

6    A.   The information about the ultrasound is?

7    Q.   Is patient specific, correct?  It is specific to the

8    individual patient --

9    A.   Yes.

10   Q.   -- that receives the ultrasound?

11           Okay.  And this patient-specific information from the

12   ultrasound informs the particular pregnancy options a patient

13   may have, correct?

14   A.   I'm sorry, could you say that again?

15   Q.   Sure.

16           Let's look at the last sentence on that page.  It

17   says:  "The answer to each" -- I'm talking about the

18   ultrasound.

19   A.   -- "which determines the type of abortion."

20   Q.   Abortion -- "determines the type of abortion you can

21   choose."

22           You agree with that sentence, correct?

23   A.   I -- yes, uh-huh.

24   Q.   Okay.  Because those are directly related to their

25   decision on an abortion, correct?

1   A.   Yes.

2   Q.   Okay.  Now, Ms. Maly, I'm going to take this off.

3   A.   If I could explain that.

4   Q.   No, Ms. Maly, it was just a simple question.

5   A.   Okay.

6   Q.   I didn't ask for your explanation.  Thank you.

7          THE COURT:  Your attorney will ask.  Don't worry

8   about it.

9   BY MS. JUROWICZ:

10  Q.   Ms. Maly, you mentioned earlier about pregnancy options

11  counseling.  It's provided by medical staff, correct?

12  A.   That's right.  Correct.

13  Q.   And options counseling at Life Choices Medical Clinic is

14  given by either nurses or ultrasound technicians, correct?

15  A.   That's correct.

16  Q.   Okay.  And so the consults, the pregnancy options

17  counseling is between the patient and a licensed medical

18  staff?

19  A.   Yes.

20  Q.   You also have volunteers that do not have medical

21  backgrounds, correct?

22  A.   Yes, we do.

23  Q.   But they only interact with clients via answering phones,

24  greeting people, and things like that, correct?

25  A.   That's correct.

1    Q.  Now, Ms. Maly, I'm going to turn now to talk a little bit

2    more about consultations.

3            I'm putting back up DX 69, and this is IDFPR 9432.

4    A.  Okay.

5    Q.  Ms. Maly, the Life Choices Medical Clinic Consultation web

6    page has a title sectioned "You Deserve to Know," correct?

7    A.  Correct.

8    Q.  Okay.  The "you" is a pregnant person looking at the

9    website?

10   A.  I'm sorry?

11   Q.  The "you" that it refers to here is a person looking at

12   their options, correct, for pregnancy?

13   A.  Yes, uh-huh.

14   Q.  And under the "You Deserve to Know" heading, it says:  "A

15   large majority of women report that they didn't receive

16   adequate information prior to making their decision."

17            That's correct?

18   A.  That's definitely correct.

19   Q.  And you agree with this statement?

20   A.  I do.

21   Q.  And this lack of adequate information is why Life Choices

22   has medical staff to "sit down and help them process every

23   option," correct?

24   A.  Yes.

25   Q.  You believe a pregnant person deserves to have adequate

1  information prior to making her pregnancy decision?

2  A.  Yes.

3  Q.  Okay.  Now, directly below that section, the Life Choices

4  Medical Consultation page has a section titled "We Are Here to

5  Help."

6        Do you see that?

7  A.  Yes, I do, uh-huh.

8  Q.  Your website promises to provide unbiased, scientific,

9  accurate information so you can make the most educated choice

10  possible, correct?

11  A.  That's correct.

12  Q.  "Unbiased" means that it is not one-sided?

13  A.  Yes, uh-huh.

14  Q.  It is important for women to consider scientific and

15  accurate information, correct?

16  A.  That's correct.

17  Q.  Important for them to consider unbiased information?

18  A.  Yes.

19  Q.  And scientific information means information that has been

20  confirmed through scientific studies, right?

21  A.  That's right.

22  Q.  Okay.  Ms. Maly, the Life Choices Medical Clinic provides

23  information about medical risks of abortion and medical

24  information about abortion, correct?

25  A.  Correct.

1   Q.  But it does not provide information about any benefits,

2   correct?

3   A.  You are right, it doesn't.

4   Q.  Okay.  Now, and that is because based on your religious

5   belief and the clinic's belief, abortion has no benefit,

6   correct?

7   A.  No, it has no benefits as far as we are concerned, as far

8   as --

9   Q.  And when you say -- oh, excuse me.

10          And when you say "as far as we are concerned," that's

11  based on your religious belief, correct?

12  A.  As far as we know.  Okay?

13  Q.  And, Ms. Maly, you are not a medical professional,

14  correct?

15  A.  I am not.

16  Q.  Okay.  So this is not based on your medical opinion?

17  A.  That's right.

18  Q.  Okay.  Now, Life Choices Medical Clinic also counsels

19  unmarried people about the medical risks of having sex,

20  correct?

21  A.  Yes.

22  Q.  Okay.  It discusses the risks of having unmarried sex?

23  A.  Yes.

24  Q.  It advises people about risks of STIs?

25  A.  That's correct.

1    Q.  It does not discuss any benefits of contraception,

2    correct?

3    A.  That's right.  You are right.

4    Q.  Now, based on your religious -- and this is because you

5    have a religious belief that for unmarried people, there are

6    no benefits of contraception, correct?

7    A.  Many contraceptives can work as abortifacients, and this

8    is why we don't refer for contraceptives.  And we feel and we

9    believe --

10   Q.  Excuse me, Ms. Maly.  It was a simple question.

11              THE COURT:  Go ahead and let her finish.

12              MS. JUROWICZ:  I move to strike the unresponsive --

13              THE COURT:  Go ahead and let her finish.

14   BY MS. JUROWICZ:

15   Q.  It's just "yes" or "no."

16              THE COURT:  Stop.

17              MS. JUROWICZ:  Oh, I'm sorry, Your Honor.

18              THE COURT:  Go ahead and finish.

19              THE WITNESS:  As far as we are concerned, we believe,

20   and I believe this is true and a fact, that sexual abstinence

21   outside of marriage is the only healthy lifestyle for singles,

22   for teenagers.  I would say "Wouldn't you agree," but I guess

23   I'm not supposed to ask you a question.

24   BY MS. JUROWICZ:

25   Q.  Is that your testimony?

1    A.   Pardon?

2    Q.   Ms. Maly, this is not based on your medical opinion,

3    though, correct?

4    A.   This is --

5    Q.   Ms. Maly, let me rephrase that.

6    A.   Not on my medical opinion, no, it is not.

7    Q.   Thank you.

8         Ms. Maly, TLC began offering medical services

9    specifically to try to show pregnant persons that they should

10   give birth, correct?

11   A.   Show pregnant persons that they should give birth.  To

12   come alongside of them, support them, and encourage them, yes.

13   Q.   TLC first began offering ultrasounds around 2008, correct?

14   A.   Yes, correct.

15   Q.   And one of the main reasons they began offering

16   ultrasounds was to convince pregnant persons to give birth

17   instead of having an abortion, correct?

18   A.   It's once the women see that baby's beating heart, they

19   know that it is their child.  It is an actual baby.  And, yes,

20   their hearts are opened and softened and they see that, again,

21   it is not just a blob of tissue or a product of conception,

22   but it is an actual living human being.  It's a child with a

23   heartbeat.

24   Q.   And, Ms. Maly, TLC and Life Choices track whether the

25   ultrasound influences a patient's decision about abortion,

1    correct?

2    A.  Could you repeat that?

3    Q.  Yes.  TLC and Life Choices, they track, whether before and

4    after, the person's intention about pregnancy?

5    A.  Yes, uh-huh.

6    Q.  And TLC internally reports this data, correct?

7    A.  Correct.

8    Q.  And they hope that the data will show the ultrasound

9    changed people's minds, correct?

10   A.  Yes, we hope so, uh-huh.

11   Q.  Ms. Maly, I just want to make one clarification from

12   earlier.  You were shown previously NIFLA Exhibit 2, and I

13   just wanted to clarify one thing about it.

14        I'm showing to you -- this is the first page of NIFLA

15   Exhibit 2, and you pointed out on direct, correct, that it is

16   TLC Pregnancy Services, correct?  The website at the bottom?

17   A.  It may have -- TLC Pregnancy Services.  Again, it is one

18   and the same organization; however, TLC, again, is the -- like

19   the umbrella over Life Choices.

20   Q.  And as you testified previously, there is two separate

21   websites.  This is the TLC website, correct?

22   A.  This is TLC?  Yes, it could be.  I don't have the whole

23   website in front of me, so I'm believing that it is a part

24   taken from the website.

25   Q.  If you could look at the bottom left -- I'm sorry, it is a

1    little blurry.

2    A.  NIFLA, and TLC Pregnancy Services.

3    Q.  That's okay.

4         Ms. Maly, it is fair to say if the website says "TLC

5    Pregnancy Services" on it, that it would be the TLC site and

6    not the Life Choices site, correct?

7    A.  You know what?  Without seeing -- without seeing the whole

8    whatever you are showing, the whole website or whatever, I

9    can't say yes or no to it.  I'm sorry.

10         MS. JUROWICZ:  Your Honor, may I approach?  I'm just

11    having a hard time with the focus.

12         THE COURT:  Sure.

13    BY MS. JUROWICZ:

14    Q.  Can you see?

15    A.  Yes, I see that.

16    Q.  Okay.  Ms. Maly, can you confirm that this is -- okay.

17    You can just have a copy, okay?

18    A.  Okay.  Thank you.

19    Q.  And, Ms. Maly, with that in your hand, you can clarify

20    that this exhibit is from the TLC website, correct?

21    A.  I'm taking your word for it.  Yes, I believe so.

22    Q.  Based on the web address in the corner, correct?

23    A.  Okay.  Yes, uh-huh.

24    Q.  And that's a yes?

25    A.  Yes, yes.

```
 1            MS. JUROWICZ:  Your Honor, no further questions at
 2   this time.
 3            THE COURT:  Okay.  Any redirect?
 4            MR. STERETT:  Just briefly.
 5                     REDIRECT EXAMINATION
 6   BY MR. STERETT:
 7   Q.  You wanted to explain one of the answers to your questions
 8   earlier.  Would you like to provide the explanation that you
 9   weren't allowed to?
10   A.  You know, I was trying to remember.  It was just a good
11   point, too, and I wish I could remember it now with everything
12   else that was being said.
13            I guess just through experiences meeting with these
14   women, meeting with the young people, such a hurting society
15   that we are living in today.  And whatever we can do to help
16   these women, again, we get -- actually, I worked for the first
17   five or six years trying to establish the center without even
18   getting a salary.  And sometimes I would even work on
19   Saturdays and that too.  But it is because we care, and that's
20   why we are there.  We are not trying to trick or fool anyone
21   at all.  We really sincerely care about the people who come.
22   Q.  Thank you.
23            The last question, just to clarify this idea or
24   notion of a limited obstetric ultrasound.  Why is that
25   limited?  Is it because of the purpose, the different purposes
```

SA-189

1    for which the ultrasound is conducted?

2    A.   Right.  Because when people come to see us, we are not

3    going to show them a part of their body.  We are going to show

4    them the baby.  They are pregnant, and we want to explain, you

5    know, or at least give them a picture of what that baby looks

6    like, even at an early stage, that the baby even at six weeks

7    can have a beating heart.  So that's why we -- but we are

8    limited to that, just what is within the womb, the child

9    within the womb.

10   Q.  So it is not for diagnostic purposes?

11   A.  Exactly.  No, it is not.

12          MR. STERETT:  That's all I have, Your Honor.

13          THE COURT:  Okay.  Thanks.

14          I don't think I have any questions.  Give me a

15   second.

16          Thank you for your time.  I appreciate it.

17          THE WITNESS:  Thank you.  Thank you, Judge.

18     (Witness excused.)

19          THE COURT:  All right.  Whoever is the next witness.

20          MR. GILLEN:  Judge, could I ask for a five-minute

21   break?

22          THE COURT:  Absolutely.  Sure.  That's fine.  We will

23   take a five-minute break.  We will start back up at ten till.

24     (Recess taken.)

25          MR. BREEN:  Your Honor?

```
 1          MR. GILLEN:  Your Honor, the plaintiffs would like to

 2    call Judy Cocks to the stand.

 3          THE COURT:  Hold on a second.

 4          All right.  Raise your right hand.

 5      (Witness duly sworn.)

 6          THE COURT:  You know how it goes.  Watch your step.

 7    And I know you were here a couple weeks ago, so all the same

 8    rules apply.

 9          THE WITNESS:  Okay.

10              JUDY COCKS, PLAINTIFF'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12    BY MR. GILLEN:

13    Q.  All right.  You know the drill.  I will ask the questions,

14    and really the Judge is the fact finder, so the answer is for

15    him.  Speak into the microphone, speak slowly, but to the

16    extent you can, keep your eye on the Judge and provide him

17    with the information.

18    A.  Will do.

19    Q.  Would you please state your full name and spell your last

20    name for the record?

21    A.  Judy K. Cocks, C-o-c-k-s.

22    Q.  And, Judy, where are you currently employed?

23    A.  Women's Help Services.

24    Q.  Okay.  And Women's Help Services, does that operate under

25    DBAs?
```

1   A.  Yes, we have two.

2   Q.  And what are they?

3   A.  1st Way Life Center and Focus Women's Center.

4   Q.  And are you an executive director at both of those

5   centers?

6   A.  Yes.

7   Q.  And how long have you been executive director for Women's

8   Help Services?

9   A.  Approximately ten years.

10  Q.  All right.  And does that entity have a board of

11  directors?

12  A.  Yes.

13  Q.  And are you on it?

14  A.  No.

15  Q.  Okay.  And does the board oversee Women's Help center

16  services operations?

17  A.  Yes.

18  Q.  And let me correct that.  It is Women's Help Services,

19  right?

20  A.  Yes.

21  Q.  That's the overarching corporate entity; is that right?

22  A.  Correct.

23  Q.  That's a non-profit.  Okay.

24          And does the board set the mission of Women's Help

25  Services?

1  A.  Yes.

2  Q.  And does the board have the final say in the governance of

3  the affairs of Women's Help Services?

4  A.  Yes.

5  Q.  All right.  You talked about two entities, two different

6  ones:  1st Way Life Center and women's -- or Focus Women's

7  Center.  So let's look first at 1st Way.

8         Can you briefly describe what 1st Way Life Center

9  does?

10 A.  1st Way Life Center is basically a social service agency.

11 We are serving pregnant women and newly -- new moms, and we

12 are serving them with classes on prenatal care, childbirthing,

13 parenting, child development.  We have a mom's support group

14 that meets.  Additionally, we provide peer-to-peer counseling,

15 and we also provide material resources such as formulas and

16 diapers and clothing and maternity clothes and such.

17 Q.  And then when you say "peer-to-peer counseling," what do

18 you mean by that?

19 A.  Person-to-person.

20 Q.  Okay.  And there has been some questioning or discussion

21 in the case about who wears what kind of clothes when they do

22 what.  So let's get to that with respect to 1st Way.

23        What kind of clothes do the people who volunteer or

24 work at 1st Way wear?

25 A.  Just business casual at 1st Way.

SA-193

```
 1   Q.  And how long has 1st Way been in existence?

 2   A.  45 years.

 3   Q.  And does it provide any medical services?

 4   A.  No.

 5   Q.  And I think you've already described what sort of services

 6   you do provide.  Does 1st Way get any government funding?

 7   A.  No.

 8   Q.  Where does it get funding from?

 9   A.  We are totally funded by private sources.

10   Q.  All right.  Let's turn our attention to Focus Women's

11   Health Center [sic].

12            THE COURT:  If I can pause you so it gets in my head.

13            One is Johnsburg, one is McHenry, right?

14            THE WITNESS:  Correct.

15            THE COURT:  Okay.  I got it.  Go ahead.

16   BY MR. GILLEN:

17   Q.  So let's then, you know, Focus Women's health center.

18   Where is that?

19   A.  We are in McHenry.

20   Q.  Okay.  Good.  I didn't know.

21            Do you -- briefly describe what Focus Women's health

22   center does.

23   A.  Focus Women's Center is a medical center, and we do

24   limited medical services.

25   Q.  Okay.  And you talked about limited medical services.
```

1  What are the limited medical services providing?

2  A.  Yes.  So we provide pregnancy testing, we provide limited

3  ultrasounds, and STD testing and treatment.

4  Q.  All right.  So we will get to that in a little more

5  detail, but first let me just ask you this question:  Why two

6  centers?

7  A.  Well, we keep statistics on everything we do, and it was

8  approximately eight years ago that we determined we were not

9  seeing abortion-minded women come in to 1st Way Life Center,

10  most likely because we had "life" in our name.  We had been in

11  the community for a long time, they might feel we were

12  judgmental if they were coming in seeking an abortion.  So we

13  sought to create another center that would be able to engage

14  with those women.

15  Q.  And if you were worried about the name 1st Way Life Center

16  kind of conveying a sense that you got an agenda, you are

17  going to be judgmental, was that true of 1st Way Life Center?

18  A.  No, not at all.

19  Q.  Okay.  And then with Focus Women's health center, is part

20  of your goal, then, to be nonjudgmental?

21  A.  Correct.

22       Just to continue on, what we have always done at

23  1st Way and not being nonjudgmental -- I said -- that's two

24  negatives.  That's wrong.  To be nonjudgmental.

25  Q.  Okay.  And do you think that's important to the women that

1  you seek to serve?

2  A.  Absolutely.

3  Q.  So let's go back to your role as executive director and

4  just give a brief description of what you do in your capacity

5  as an executive director.

6  A.  So I oversee the general operations, the day-to-day, the

7  taking on of new volunteers, new staffing.  I'm budgeting,

8  pursuing donations to help support us, and just overall

9  operations.

10  Q.  Okay.  Now, in this case, there is going to be a lot of

11  paper the Judge is going to look at, and a bunch of that is

12  policies, procedures, protocols, or forms that relate to the

13  limited medical services that are provided at Focus Women's

14  Center.  So I want to talk briefly about your role with

15  respect to formulating those policies, procedures, and

16  guidelines, et cetera.

17          So let's start with the procedures that govern the

18  limited medical care that's delivered at Focus Women's Center.

19  What is your role in creating, implementing those procedures?

20  A.  Well, initially, it's -- the medical procedures have been

21  established by our medical staff and our medical director, and

22  then they will come to me with generally the finished -- or

23  the draft, the first draft, of the policies and procedures,

24  and then I will okay it or have questions about it.  Once it

25  is done, then we take it to the board for their approval.

1    Q.  And why do you have the medical director looking at

2    policies, procedures, protocols, and forms that govern the

3    delivery of medical services?

4    A.  Well --

5    Q.  Go ahead.

6    A.  -- it's important to have a medical -- our medical

7    director oversee and know how we are going to be operating.

8    Q.  And are you trying to use his expertise to ensure that

9    those services are delivered in a manner that is consistent

10   with current standards of medical practice and care?

11   A.  Yes.

12        MR. HAZINSKI:  Objection, Your Honor.  I would ask

13   counsel to try not to lead.

14        MR. GILLEN:  Okay.

15        THE COURT:  You can do this all with open-ended

16   questions:  Why do you do that, how do you do that, what's the

17   purpose of that.  We will all get there.

18        I've heard her testify before.  She will fill in all

19   the details.

20        MR. GILLEN:  I feel good about this so far.  You did

21   a good job, apparently.

22   BY MR. GILLEN:

23   Q.  Okay.  What about the policies and procedures that don't

24   relate to the provision of the limited medical services that

25   are provided through Women's Help Services?

1  A.   That, I'm probably more involved with initiating those,

2  and generally we would do that in committee.  And then we will

3  create those policies and procedures, and then we will take it

4  to the board for approval.

5  Q.   All right.  Now, what I would like to just turn our

6  attention to briefly is sort of the identity of Women's Help

7  Services, and so on.  And for that purpose, I would like to

8  draw your attention to an exhibit that has been marked for the

9  purposes of identification as Schroeder Exhibit No. 58.

10        And I'm hoping that my colleague can pull that up on

11 the screen.

12        All right.  There it is.

13        Now, I found myself somewhat embarrassed because

14 looking at this form, I can see that there are letters

15 missing, but I don't know how that happened to -- providing

16 the PDFs.

17        THE COURT:  There is a little erase button up at the

18 top right-hand corner.  You can get rid of that.

19 BY MR. GILLEN:

20 Q.   All right.  So, Judy, I want to ask you, if you look at

21 that document, do you recognize it?

22 A.   Yes.

23 Q.   And just, I guess, what I would like to do briefly, the

24 Judge can read, is to highlight the portions of this statement

25 that are sort of key to you and what you do through Women's

1  Help Services.

2  A.  Well, we are faith based, and that informs everything that

3  we do.  We are serving pregnant women or women that are in

4  unplanned pregnancies.

5       And I think towards the bottom -- I can't see it here

6  and I don't want to touch it because I made it green last

7  time -- is our statement of faith.

8  Q.  All right.  And what do you mean by "pro woman," if I

9  could fill in that?  It looks like there is a missing "W."

10 A.  Well, we are hoping that when we are engaging with women

11 and providing them with education and truth and facts, that we

12 are helping to empower them to make the best decisions that

13 they can make for their lives.

14 Q.  All right.  And is it fair to say that this mission

15 statement governs everything that you do at 1st Way Life

16 Center and Focus Women's health center?

17 A.  Yes.

18 Q.  How do you ensure that the people who volunteer or work at

19 either of the centers conform their conduct to this statement

20 of mission, values, et cetera?

21 A.  Well, when they sign on with us, we have paperwork in

22 which they sign an acknowledgment of our mission and values

23 and statement of faith, and they agree to it.

24 Q.  All right.  I want to direct your attention to another

25 exhibit, that's a Schroeder exhibit marked for the purposes of

1    identification No. 33.

2              It is coming.  "Commitment to Care and Competence."

3              MR. GILLEN.  There you go.

4    BY MR. GILLEN:

5    Q.  Take a look at that, Judy.  Do you recognize that?

6    A.  Yes.

7    Q.  And is that in force and effect at both 1st Way and Focus

8    Women's Center?

9    A.  Yes.

10   Q.  And in your view there, would recommending an abortion be

11   consistent with your commitment to care and competence?

12   A.  No, it would not.  And in fact --

13             Can I move this?

14   Q.  Well, he can -- my colleague can scroll down for you.

15             THE COURT:  Yeah.  It is a touchscreen, so right now

16   it has been set to highlight.  So when you touch it, it keeps

17   highlighting.

18             THE WITNESS:  Okay.

19             THE COURT:  So that's what is going on there.

20             THE WITNESS:  Okay.  I think it is about midway.

21             With -- stop, please.

22             That we -- the question again, please?

23   BY MR. GILLEN:

24   Q.  Sure.  All right.  I think I know what you are directing

25   your attention to, at least on the screen right now.  One,

 1   two, three.  It is the third bullet point down.

 2   A.  Correct.

 3   Q.  Is that what you have in mind?

 4   A.  Yes.

 5   Q.  Okay.  And what does that say?

 6   A.  "And that we do not offer, recommend, or refer for

 7   abortions or abortifacients, but we are committed to offering

 8   accurate information about abortion procedures and risks."

 9   Q.  Okay.  Fair enough.

10        So let's go to kind of the typical client at 1st Way

11   or Women's -- Focus Women's health center.

12        Just briefly describe what a typical client looks

13   like.

14   A.  Well, if there is a typical client at Focus, our medical

15   center, Focus Women's Center, generally that woman is coming

16   to us pregnant or thinking that she's pregnant, and she may be

17   conflicted or stressed about the fact that she is pregnant.

18   Q.  All right.  And, you know, when -- well, let's give just

19   an overview, a general overview of the typical experience that

20   a woman who came to Focus Women's health center would have if

21   she came there for help.

22   A.  Well, officially she is going to place a phone call to us.

23   And then the person that's answering that phone is guided by a

24   form and script that makes certain that we are informing her

25   up front about everything that will be entailed in the

1    appointment.  Then --

2    Q.  You know, forgive me.  Let me cut you off.  And while we

3    are at it, go to Schroeder Exhibit No. 36.

4         And do you recognize that document?

5    A.  I do.

6    Q.  And what is it?

7    A.  It is the form that is used by the person taking -- making

8    appointments for Focus.

9    Q.  Okay.  And then, you know, as soon as I look at it, what I

10   see there on the left-hand side is "Seeking."  What's the

11   purpose of that section of the form?

12   A.  So as we are speaking to the women that calls us, we are

13   clarifying what she's interested in.  Now --

14        Go ahead.

15   Q.  Go ahead.

16   A.  Well, if she is expressing an interest in abortion, then

17   specifically we are prompted here to remind her, because she

18   should know it already if she has gone on our website, that

19   Focus Women's Center does not perform or refer for abortions.

20   Q.  Okay.  And so let's continue a little past that point of

21   the call and say they come in.

22        THE COURT:  So I'm going to pause you right there.

23        So there is a little dialogue box there with a dot.

24        THE WITNESS:  Uh-huh.

25        THE COURT:  As they are going through this intake

 1    form, the script, as you have described it --

 2            THE WITNESS:  Uh-huh.

 3            THE COURT:  -- the caller mentions abortions.  I

 4    assume there is going to be a check or an X next to abortion,

 5    and then they're going to immediately go to the right, remind

 6    them of that, and then is that little circle filled in?

 7            THE WITNESS:  Correct.  Yes.  Uh-huh.  Uh-huh.

 8            THE COURT:  Okay.  Thank you.  Got it.

 9            Go ahead.

10            MR. GILLEN:  Thank you, Your Honor.

11    BY MR. GILLEN:

12    Q.  Let's look at what happens next.  You have a -- I would

13    like to direct your attention to the Schroeder Exhibit No. 54.

14            Do you recognize that document?

15    A.  Yes.

16    Q.  What is it?

17    A.  It is our limitations of services that we give to each

18    woman that comes to Focus.

19    Q.  Okay.  And you say -- what's the purpose of the form?

20    A.  Well, it is to make certain that she is aware what is

21    going to happen during the visit with us.

22    Q.  And, again, you know, in this form, is there a section

23    where you make it plain to women who have come to Focus

24    Women's health center that you don't provide abortions, don't

25    refer for abortions, et cetera?

1  A.   Yes.

2  Q.   Let's see if we can find that.  Where is that?

3  A.   It is further.

4  Q.   Scroll and let's just take a look at it.  The Judge can

5  read, but I just want to make sure we get it in the record.

6  A.   There we go.

7  Q.   There at the bottom, just coming on the screen.

8  A.   There we go.  Second from the bottom.

9  Q.   Yeah.  And, again, why do you put that -- I mean, they

10 have just come in the door.  You want to help the women, but

11 why is that right here on the intake form?

12 A.   It is just important for us to cover all the bases and let

13 the women know up front what they can expect and not expect

14 from us.

15 Q.   All right.  Let's go back briefly to the calls.  You

16 mentioned if someone wants -- they are seeking an abortion.

17 You tell them, We can't help you here for that purpose.

18       What if they don't mention abortion when they call

19 in?

20 A.   Then we don't either.

21 Q.   And why is that?

22 A.   Well, it is not natural to assume that just because a

23 woman is pregnant and she is calling us that she wants an

24 abortion.  Most women are happy when they are pregnant.

25 Q.   And if a woman calls Focus Women's health center, she

SA-204

1    wants an abortion, you tell her that you don't provide them,

2    is it still possible in your experience that she will make an

3    appointment to come to Focus Women's Center anyway?

4    A.   Yes.

5    Q.   And why would they do that in your experience?

6    A.   In my experience, a woman is very conflicted about the

7    idea of having an abortion, and this is just one step that she

8    is able to take in gathering information before she actually

9    makes that decision.

10   Q.   All right.  So let's turn our attention, then, to another

11   document, and that's Schroeder -- it has been marked for the

12   purposes of identification as Schroeder Exhibit No. 35.  I

13   will ask my colleague to put that up for you.

14            And now I would like to draw your attention to a term

15   that appears there which is "adequate referral information."

16   And so I think when I look at that, what does that phrase,

17   "adequate referral information" mean to you?

18   A.   Well, in the event that we have a woman that comes to us

19   that's in an emerging medical situation, perhaps she is

20   bleeding, she is cramping, something such as that, we are

21   going to refer her right away.  It's beyond anything that we

22   are able to deal with.

23   Q.   Okay.  And let me just be clear.  Would a referral to

24   receive, obtain an elective abortion ever be an adequate

25   referral within the meaning of this policy?

1    A.   No.

2    Q.   Okay.  I'm going to turn your attention now to another

3    document in Schroeder Exhibit No. 42.

4         Do you recognize that document, Judy?

5    A.   Yes.

6    Q.   And what is it?

7    A.   It's the policies and procedures regarding our referrals

8    and resource list.

9    Q.   And why did you put this policy in place?

10   A.   Well, it is important for us to have consistency with

11   regards to the information that we are handing out to our

12   clients.

13   Q.   And consistency in what sense?

14   A.   Consistency, accuracy, sourcing it properly.

15   Q.   Okay.  And what kind of -- it's referral.  And when you

16   are using that term "referral," I mean, there is a technical

17   sense that doctors use.  Are you using that -- when you use

18   "referrals" here, are you using it in a technical medical

19   sense or just a general sense of give them some information?

20   A.   Just general information.  References probably isn't

21   accurate either, but it is a list of sources of services that

22   they might be able to use.

23   Q.   And what kind of services?  I mean, there is -- the range

24   of services.

25   A.   Right.

1    Q.   Describe that.

2    A.   It could have to do with housing.  It could have to do

3    with food pantries.  It could have to do with churches.  We do

4    have -- oh, goodness, there is Turning Point.  That's for

5    women in abuse situations -- abusive situations.  So it is a

6    whole host of agencies within our community.

7    Q.   Okay.  And do you -- so you mentioned limited medical

8    services.  What are they again?

9    A.   That would be pregnancy testing, limited ultrasound scans,

10   and STD testing and treatment.

11   Q.   Okay.  So let's just go through those briefly.

12        Does Focus Women's health center have in place

13   policies and procedures that govern the delivery of the

14   pregnancy test?

15   A.   Yes.

16   Q.   And has your medical director reviewed those?

17   A.   Absolutely, yes.

18   Q.   And why do you give the pregnancy test?

19   A.   Well, that's the first step in determining whether a woman

20   is pregnant.

21   Q.   Okay.  How about the STD testing?  Do you have policies

22   and procedures that govern providing those testing?

23   A.   Yes, we do.

24   Q.   Do you provide some STD treatment?

25   A.   Yes, for chlamydia.

1    Q.  And has the medical director put in place the policies

2    that govern that?

3    A.  Yes.  We have standing orders.

4    Q.  So far we have talked about pregnancy testing, STD testing

5    and treatment.  Do you have forms that the medical director

6    has put in place that ensure that you secure informed consent

7    from the woman to provide those services?

8    A.  Yes.

9    Q.  All right.  So then let's turn our attention to the

10   limited ultrasound that you have talked about.  And I would

11   like you to take a look at a document that has been marked for

12   the purposes of identification as Schroeder Exhibit No. 53.

13          Do you recognize that document, Judy?

14   A.  Yes.

15   Q.  Okay.  And what's its purpose?

16   A.  This is a consent and waiver that the client signs prior

17   to having a limited ultrasound scan at Focus.

18   Q.  And you call it "limited," right?  A "limited ultrasound."

19   What does "limited" signify?

20   A.  Well, we are not doing any diagnosing with it.  We are

21   simply determining the viability of the pregnancy, the

22   gestational age, and whether or not it is an intrauterine

23   pregnancy.

24   Q.  And let me go back.

25          Like why do you offer the limited ultrasound at all?

1   A.  Well, it's an amazing tool to be able to use.  It's a

2   great informational tool for a woman who is pregnant to be

3   able to see her baby and also to potentially hear the

4   heartbeat of her child.

5   Q.  Okay.  Now, who conducts the limited ultrasound?

6   A.  It would be our ultrasonographer.

7   Q.  And when the ultrasonographer is done, is there a

8   discussion with the woman?  Well, let me go back.

9       First of all, can the tech -- if I can call her

10  that -- who performs the procedure, can that person give a

11  diagnosis?

12  A.  No.

13  Q.  Who gives the diagnosis?

14  A.  That would be done by our medical director, Dr. Persino.

15  Q.  And is there a discussion with the woman after the

16  ultrasound has been performed?

17  A.  Yes.

18  Q.  And who does the woman talk to?

19  A.  She will finish the ultrasound part of the appointment

20  with our sonographer, and then the RN steps in and finishes up

21  the appointment.

22  Q.  And what does the RN discuss with the woman?

23  A.  Well, by the end of the appointment, she is discussing the

24  various options that the woman has, and then offering at the

25  end of the appointment -- it's -- we call it a PSA, patient

1    something.

2         THE COURT:  Service agreement?

3         THE WITNESS:  Like a service agreement.  It is

4    just -- it is a list of options and references that might be

5    helpful for her.

6    BY MR. GILLEN:

7    Q.  All right.  Fair enough.

8         So you talked about options.  What are the options

9    that the nurse will discuss with the woman after the

10   ultrasound?

11   A.  Well, by that time in the appointment, we are aware

12   whether or not this woman is considering an abortion.  So we

13   will be discussing the options of parenting, adoption, and

14   abortion.

15   Q.  Now, does she provide some medical information when she is

16   speaking with the woman?

17   A.  Generally accepted medical information.  It is not going

18   to be anything specific to this woman, but she will be

19   providing her information about pregnancy, general pregnancy

20   development, and also abortions and what type of abortion this

21   woman might be a candidate for depending on how far along she

22   is in her pregnancy.

23   Q.  Okay.  And you described that information as "generally

24   available."  Can you give the Judge some idea of the sources

25   that you are drawing on?

1    A.   Yes.  So yes.

2         THE WITNESS:  Judge, we pull our resources from all

3    sorts of different medical sources that are not specifically

4    pro-life.  We want to be as measured and as objective as

5    possible.  So the brochures that we hand out there are heavily

6    footnoted with all of those sources.

7    BY MR. GILLEN:

8    Q.   So that's the medical information that you are sharing?

9    A.   Correct.

10   Q.   Is the nurse trying to give medical advice to that woman?

11   A.   No.

12   Q.   Is it your understanding that the nurse can't give medical

13   advice?

14   A.   She can't.

15   Q.   That's right.

16        All right.  So when a nurse has this discussion with

17   the woman and shares the medical information that you have

18   talked about, does she talk about benefits of abortion?

19   A.   No.

20   Q.   And why is that?

21   A.   Well, to my knowledge, there are no benefits to abortion.

22   Q.   And so what do you mean by that?  To your knowledge, in

23   your experience serving at 1st Way, Focus Women's Center, what

24   do you mean when you say "there are no benefits to abortion"?

25   A.   So in the ten years that I have been at 1st Way and Focus

1    Women's Center, I have encountered a number of women who have

2    come to me who are post-abortive, and the regret and despair

3    that I have encountered in these women is difficult to

4    describe.  And also I might mention we have women that

5    volunteer in our center at 1st Way specifically where the

6    volunteers are that are post-abortive, and they are motivated

7    to be there for that very reason.

8    Q.  And I know you are not a doctor, but there has been some

9    questioning about, you know, medical studies, whether there

10    are medical benefits, under what circumstances there might be

11    medical benefits to an elective abortion.

12         Do you have any general sense for the literature

13    based on your discussions with your medical director?

14    A.  Yes.  Well, we have discussed it with our medical

15    director, but I have also searched for it.  I mean, we Google

16    for everything.  I can't find it.  I mean, if you find a list,

17    it is very subjective.  It's dealing -- it's nothing medical.

18    Q.  All right.  And do you understand that the topic is

19    controversial?

20    A.  Yes.

21    Q.  I want you to just take a brief look here at two other

22    documents that have been marked for the purposes of

23    identification as Schroeder Exhibits No. 51 and 52.  I want to

24    take a look at those.

25         Let's take a look at this one first.  I take it it is

SA-212

1    51.

2              Do you recognize that form?

3    A.   I do.

4    Q.   What is the purpose -- what is the purpose of the form?

5    A.   This is one of the forms that we give to a woman at the

6    end of her appointment.  If she's pregnant, we will give her

7    this form.  It is just general information about miscarriages.

8    Q.   And you said "give to a woman."  Is it some women, all

9    women?

10   A.   All women that are pregnant.

11   Q.   Okay.  And why do you do that?

12   A.   Well, it is just general good information to have.  She

13   may not be showing any symptoms now, but it is just good

14   information.

15   Q.   Safe to say you don't want the women to have trouble down

16   the road?

17   A.   Exactly.

18   Q.   Okay.  So let's look at 52.  And do you recognize that

19   document?

20   A.   I do.

21   Q.   Okay.  And what's that or the purpose of that document?

22   A.   That's also an informational document about ectopic

23   pregnancies.

24   Q.   And who do you give it to?

25   A.   I give -- we give that to pregnant women.

1    Q.  And why do you give it to them?

2    A.  Again, it is just good general information to have.

3    Q.  I understand.

4         So let me ask you a few questions about your medical

5    director.

6         Who is your medical director?

7    A.  Our medical director is Dr. Richard Persino.

8    Q.  Is he a licensed doctor?

9    A.  Yes.  He is a licensed OB/GYN.

10   Q.  And licensed to practice in the state of Michigan -- in

11   Illinois?

12   A.  In Illinois, yes.

13   Q.  Does Dr. Persino get paid for serving as your medical

14   director?

15   A.  No, he does not.

16   Q.  Does Dr. Persino personally meet with the women who come

17   to focus women's health?

18   A.  No.  No.  He does not.

19   Q.  All right.  Then what does he do?

20   A.  So he, initially, as I've mentioned before, is involved in

21   the establishment of our policies and procedures.  He also

22   provides standing orders to our medical personnel, and then he

23   also is able to read all of our ultrasounds.

24   Q.  Okay.  And you've mentioned a role with medical

25   literature.  What is his role with respect to the medical

1    literature or medical information that you hand out?

2    A.   Right.  So I thought of that as policies and procedures,

3    but, yes, additionally, the information, the medical

4    information that we hand out, he is fully aware of and has

5    reviewed it.

6    Q.   All right.  Forgive me because I talked over you and

7    that's a no-no.

8           Does Dr. Persino control Women's Help Services?

9    A.   No.

10   Q.   Does he control Focus Women's health center?

11   A.   No.

12   Q.   Is Focus Women's health center a part of his private

13   practice?

14   A.   No.

15   Q.   Does he provide OB/GYN care to women who come to Focus

16   Women's health center?

17   A.   No.

18   Q.   Does Focus Women's health center provide OB/GYN care?

19   A.   No.

20   Q.   Does 1st Way, or Focus for that matter, do they recommend,

21   provide, or refer for elective abortions?

22   A.   Absolutely not.

23   Q.   Do they offer, recommend, provide, or refer for elective

24   contraception?

25   A.   No.

1   Q.  And why is that?

2   A.  That's just not a part of our mission with regards to

3   contraception.  And with regards to abortion, it is totally

4   against our mission.

5   Q.  Okay.  And what about would, you know, facilitating access

6   to elective contraception sort of go against your religious

7   convictions as well?

8   A.  It would, but it is not specified in our mission.

9   Q.  How about elective sterilization.  Do you offer it,

10  recommend it, refer for it?

11  A.  No.

12  Q.  And why is that?

13  A.  It's just not part of anything that we do.

14  Q.  Okay.  And is that in part informed by your religious

15  convictions?

16  A.  Yes.

17  Q.  Okay.  And is that in part because you think chastity is

18  the way for these women to go?

19  A.  That would be the best way.

20  Q.  Okay.  Let's see.  I'm going to show you -- let me briefly

21  show you a document that has been marked for purposes of

22  identification as Schroeder Exhibit No. 43.

23          Do you recognize that document?

24  A.  Yes.

25  Q.  And what's the purpose of that policy and procedure?

1  A.   The policy and procedure were established to allow us to

2  have uniformity in the information that we hand out to our

3  clients.

4  Q.   Okay.  And that uniformity, what is sort of the general

5  criteria for uniformity?  What are you looking for when you

6  provide information?  What are you trying to do?

7  A.   Well, we want it to be factual.  We want it to be, you

8  know, unbiased.

9  Q.   And are you trying to meet the needs of the women?

10  A.   Absolutely.

11  Q.   Fair to say a wide variety of needs that they may have?

12  A.   Yes.

13  Q.   All right.  Good enough.

14        Now let's turn our attention briefly to how Women's

15  Help Services tries to reach the women that it seeks to serve.

16  All right?

17        How do you do that?  How does Women's Help Services

18  try to get its message out, its offerings out to its -- you

19  can call it target audience, you can call it constituency,

20  whatever.

21  A.   Uh-huh.  Well, we advertise, just like every other

22  organization or business.  We advertise through flyers.  We

23  advertise at local sports events.  We advertise through

24  billboards and bathroom stall advertising.  Of course, we are

25  on the Internet with our website.  And that's what we do.

SA-217

1    Q.  And just for the purposes of moving us along, I'm going to

2    ask my colleague to drag up a series of exhibits that have

3    been marked for the purposes of identification as 157-1,

4    et seq.

5            Let's look at the home page there, if you would.

6            Do you recognize that, Judy?

7    A.  Yes, I do.

8    Q.  And what is it?

9    A.  That is the landing page for our Focus Women's website.

10   Q.  All right.  And I'm just going to see if this page --

11   let's stop here at the testimonials.  I just want to get an

12   idea for where you get the testimonials from.  What's the

13   purpose of the testimonials on the website page?

14   A.  Well, the testimonials are from our clients, and we get

15   those -- there is some feedback.  Sorry.

16           We get those after we have completed an appointment.

17   Now, they may submit those online or they may leave them in a

18   box that we have at our office.

19   Q.  And that's kind of my point here, is they are not made up?

20   A.  They are not made up.  We are happy with these reviews.

21   Q.  Okay.

22           MR. GILLEN:  Let's scroll down a little further and

23   see if we can find -- on that document, if you would, Tom, see

24   if we can find -- let's go to 157-2.

25

1    BY MR. GILLEN:

2    Q.  All right.  Now, Judy, do you recognize that?

3    A.  Yes.  That's one of our pages from our website regarding

4    abortion.

5    Q.  And just looking at this page where it says "Purpose"?

6    A.  Well, it's simply to provide good information for women

7    who are seeking information about abortion.

8    Q.  And let's scroll down here and see what you got.  Here is

9    your offerings.

10           MR. GILLEN:  Scroll down, if you would, to the

11    bottom, Tom.

12    BY MR. GILLEN:

13    Q.  So we will stop here at Form 5, and you have got

14    information about types of abortions.

15           What's your purpose in providing that kind of

16    information there?

17    A.  Well, it's important if a woman is considering an abortion

18    to know about the types of abortion that are available to her

19    depending on how far along she is in her pregnancy.

20    Q.  Okay.  And then you have got this discussion of options.

21    What's your point there?

22    A.  Well, if a woman is in a place where she is thinking that

23    she just cannot parent and carry this -- carry this child and

24    then parent it, adoption is also a good option.

25    Q.  Okay.  And if you look -- I know -- are you responsible

1  for the text that appears here on the website page?

2  A.  I have reviewed all of the text, yes.

3  Q.  Okay.  And do you have disclaimers on your website pages

4  that demonstrate that you don't provide abortions or refer for

5  them?

6  A.  We do.

7  Q.  All right.  I'm not going to take up the judge's time with

8  that.  Let's --

9  A.  And I might mention also, they are very highly footnoted

10  in the website for all of our information.

11  Q.  Yes.  And we have got them in the record, and the Judge

12  will have a chance to look at them.  So I don't want to burn

13  daylight on that.

14      Let me ask you just a few questions here by way

15  of -- kind of wrap up, frankly.

16      Are the women who come to 1st Way or Focus Women's

17  health center, are they forced to come to you?

18  A.  No.

19  Q.  And once they arrive, are they compelled to stay?

20  A.  Not at all.

21  Q.  If they start the process with you, say, take the

22  pregnancy test and so on, do you try and make them stay to get

23  through the whole process?

24  A.  We do not.

25  Q.  Are they free to leave at any time?

1    A.   Absolutely.

2    Q.   Are they free to reject the services that you have to

3    offer at any time?

4    A.   Absolutely.  And I might mention that everything that we

5    do at Focus is permission based.  We don't give a woman a

6    brochure unless she accepts it.  We offer it to her.  If she

7    accepts it, fine.  If she doesn't want a brochure about

8    parenting, we don't push it on her.

9    Q.   Do you know -- do you try and hide who you are from the

10   women who come to 1st Way Life Center, or for that matter,

11   Focus Women's health center?

12   A.   Not at all.

13   Q.   Do you try to hide that you have a position on abortion,

14   elective abortion, for the women who come to either 1st Way

15   Life Center or Focus Women's Center?

16   A.   No.

17   Q.   Are you trying to manipulate these women who come to 1st

18   Way Life Center or Focus Women's health center --

19   A.   No.

20   Q.   -- try to use them?

21   A.   No, absolutely not.  And I will tell you, if we could

22   coerce a woman or guilt her or make her feel badly or hug her

23   and pat her and say, "Oh, you know, you are going to be all

24   right.  This pregnancy" --  you know, if we did all that and

25   we convinced her, she would walk out of our office.  And if

1   she was being -- if she had a mom or a boyfriend that, say,

2   wanted her to have an abortion, they could push her the other

3   way because she would be easily manipulated.

4        So our intent at Focus is to provide them information

5   so that they can own that decision, that they know what they

6   are making the decision about.  It is not us saying, You

7   should do this.

8   Q.  That's fair enough.

9        Now, I have got a few just kind of wrap-up questions

10  on why you are here, right?  So let's just get that out on the

11  record.

12       Are you familiar with the amendments to the Illinois

13  Health Care Right of Conscience Act that were enacted in 2017?

14  2016.  Forgive me.

15  A.  December 2016, yes.

16  Q.  And was it that law that asked you to file suit, for you

17  to challenge it?

18  A.  Yes.

19  Q.  All right.  And in your own words, why?  Why did you come

20  to us, why did you ask for our help when that law was enacted?

21  A.  Well, as soon as the law was passed, we had an emergency

22  board meeting in January of 2017, what are we going to do, how

23  are we going to handle this.  Because it's my understanding

24  that we were going to have to be referring for abortions,

25  which, indeed, goes against our mission and why we were

1    established, and that it would also have us speak to the

2    advantages of abortion, which, again, we can't think of any.

3          So we were really up against it.  We didn't know how

4    we were going to be able to function.

5    Q.  All right.  And is what you just said as it relates to

6    elective abortion, does it also apply to other things that you

7    don't want to recommend or refer for, such as, as you have

8    discussed, elective contraception or elective sterilization?

9    A.  Yes, it could refer to that.  But that's not what this --

10   I don't know if the bill extends that far, but I know it does

11   speak specifically.

12   Q.  Well, let me represent to you that the --

13          MS. BASS-EHLER:  Objection, Your Honor.

14          MR. GILLEN:  What's the objection?

15          THE COURT:  Let me do this.

16          MR. GILLEN:  I'm sorry to interrupt.

17          THE COURT:  That's why they gave me this.

18          What's the basis?

19          MS. BASS-EHLER:  Well, it sounds like counsel is

20   about to testify for his client.

21          THE COURT:  Let me just clear this up.

22          MS. BASS-EHLER:  It is an open-ended question.

23          THE COURT:  Obviously you know it applies to

24   abortions.

25          THE WITNESS:  Yes.

1          THE COURT:  I think you said you weren't quite sure

2   whether it applies to contraception; is that right?

3          THE WITNESS:  Correct.

4          THE COURT:  If you saw the amendment to the bill,

5   would that -- we use the phrase "refresh your recollection."

6   Would that help?

7          THE WITNESS:  It might.

8          THE COURT:  All right.  Have we got the bill?

9          MR. GILLEN:  Yes.

10          THE COURT:  Why don't you provide it to the witness.

11          MR. GILLEN:  What I need to know is if I can get it

12   on this ELMO.

13          Lord, help me.  Let's see.

14   BY MR. GILLEN:

15   Q.  All right.  It is a little marked up.  You can discount

16   that.  I just want to -- if you would, Judy, I want to direct

17   your attention down here to this Section 6.  And you will see,

18   for reasons you and I have discussed, that I have highlighted

19   there and circled what the law would require you to do.

20          So you have just told us that you are going to

21   provide a limited diagnosis through the ultrasound to let a

22   women know she is pregnant.  Now, if you look at Section 6,

23   the way that reads is that you have got to, consistent -- what

24   you have got to do consistent with current standards of

25   medical practice of care, which I understand you don't know

1    and we will have experts testify, is to inform this patient of

2    their prognosis, legal treatment options, and the risk and

3    benefits of those options.  Okay?

4    A.  Okay.

5    Q.  All right.  So one of those legal treatment options, the

6    chief one, as you have mentioned, that's at issue here would

7    be if the woman is pregnant and elected abortion, right?

8    A.  Yes.

9    Q.  And you, whether operating through 1st Way Life Center or

10   Focus Women's health center, do you want to advise a woman

11   about that legal treatment option?

12   A.  No.

13   Q.  Okay.  And other legal treatment options for women who

14   wouldn't be pregnant would be elective contraception or

15   elective sterilization.  Would you, operating through either

16   1st Way or Focus Women's health center, want to recommend

17   those treatments?

18   A.  No.

19   Q.  Would you want to refer for any of the treatments we just

20   discussed?

21   A.  No.

22   Q.  So is that why you are here?

23   A.  Yes.

24          MR. GILLEN:  Okay.  That's all I wanted to know.

25          And I think with that, Judge, I'm done with my

1  questions at this time, and I will pass the witness.

2       THE COURT:  Okay.  The same process if there is any

3  questions on cross-examination.

4                    CROSS-EXAMINATION

5  BY MR. HAZINSKI:

6  Q.  Good afternoon, Ms. Cocks.

7  A.  Good afternoon.

8  Q.  My name is John Hazinski.  I'm an attorney for the

9  defendant in this case.  Thank you for being here.

10  A.  Thank you.

11  Q.  I have some questions about, first, some of your testimony

12  that you gave about the policymaking process at 1st Way and

13  Focus Women's Center.

14  A.  Uh-huh.

15  Q.  So to be clear, you are one of the main people responsible

16  for creating the policies and procedures used at both

17  facilities, correct?

18  A.  Correct.

19  Q.  And I believe you testified the medical director,

20  Dr. Persino, also helped set those policies?

21  A.  Yes.

22  Q.  And Dr. Persino, I believe you testified he is a licensed

23  medical doctor in practice as an OB/GYN, correct?

24  A.  Yes.

25  Q.  Now, you testified in response to Mr. Gillen's question,

1    you said that Dr. Persino doesn't control 1st Way or Focus.

2         Do you recall that testimony?

3    A.  Yes, that is correct.

4    Q.  But Dr. Persino is directly involved in creating and

5    revising policies at 1st Way and Focus Women's Center,

6    correct?

7    A.  Yes, specifically for Focus because that's where the

8    medical activities lie.

9    Q.  Thank you.

10        Ms. Cocks, you are not a medical professional,

11   correct?

12   A.  That is correct.

13   Q.  And your testimony here today isn't in the capacity as a

14   doctor or other medical provider?

15   A.  Correct.

16   Q.  And you are also not a legal expert, correct?

17   A.  Correct.

18   Q.  So you are just, at the risk of being redundant, your

19   testimony here today isn't to give legal opinions in any form,

20   correct?

21   A.  Correct.

22   Q.  I want to turn now to the relationship between 1st Way and

23   Focus Women's Center.

24        So 1st Way -- I'm sorry -- 1st Way Life Center

25   primarily serves women that have already decided to carry the

1    pregnancy to term; is that correct?

2    A.   That's correct.

3    Q.   And by contrast, Focus Women's Center was established for

4    women who are considering having an abortion or unsure about

5    what to do; is that fair?

6    A.   That's fair.

7    Q.   And you testified in response to Mr. Gillen's questions

8    about some of the reasons for the name change or the different

9    name given to Focus Women's Center.

10        Do you recall that testimony?

11   A.   Yes.

12   Q.   And the name of Focus Women's Center avoids using the word

13   "life" in its name so that it won't be as clear that it is a

14   pro-life organization; is that correct?

15   A.   Yes.

16   Q.   When a new patient comes to Focus Women's Center, one of

17   the first things that Focus Women's Center does is determine

18   how likely that new patient is to obtain an abortion; is that

19   correct?

20   A.   That's correct.

21   Q.   Okay.  I would like to show you a document now.

22        MR. HAZINSKI:  Your Honor, if I may use the ELMO.

23        THE COURT:  Sure.

24        MR. HAZINSKI:  This, for the record, is Defendant's

25   Exhibit No. 23.

1   BY MR. HAZINSKI:

2   Q.  Ms. Cocks, do you recognize this document to be the intake

3   form used at Focus Women's Center?

4   A.  Yes.

5   Q.  I'm going to turn to the fourth page of this document,

6   which for the record is FMed 035.

7        Ms. Cocks, do you see the table on this document that

8   says "Abortion Vulnerability Rating"?

9   A.  Yes.

10  Q.  And the purpose of this part of the intake form is to

11  allow Focus Women's Center to generate a numerical score,

12  correct?

13  A.  Correct.

14  Q.  And that score, in turn, is used to assess how likely the

15  patient is to obtain an abortion; is that correct?

16  A.  Yes.

17        MR. HAZINSKI:  I will take that off the screen.

18  BY MR. HAZINSKI:

19  Q.  And, Ms. Cocks, returning to the question, the topic of

20  1st Way versus Focus, you testified that Focus Women's Center

21  is the medical center of the two.

22        Is that fair to say?

23  A.  Yes.

24  Q.  And so Focus Women's Center offers more types of medical

25  services than 1st Way does; is that right?

1    A.   Yes.  As 1st Way offers none, Focus does offer medical

2    services.

3    Q.   Okay.  Fair enough.

4            So Focus Women's Center offers more medical services

5    than 1st Way in order to serve its mission of catering to

6    women who are contemplating having an abortion; is that

7    correct?

8    A.   Yes.

9    Q.   And there was a time in the past when 1st Way did provide

10   ultrasounds; is that correct?

11   A.   Yes, briefly, yes.

12   Q.   Okay.  And the rationale for why 1st Way originally

13   started providing ultrasounds was to provide a picture of an

14   unborn child that would help convince a woman not to have an

15   abortion; is that right?

16   A.   Yes.

17   Q.   Now, all ultrasounds within these two facilities are

18   performed at Focus Women's Center and none are performed at

19   1st Way; is that correct?

20   A.   That is correct.

21   Q.   Ms. Cocks, some of the medical services offered at Focus

22   Women's Center are available to a patient only if that patient

23   is considering having an abortion; is that correct?

24   A.   That is incorrect.

25   Q.   Well, isn't it true under your -- under the policies that

1  the availability of an ultrasound at certain gestational ages

2  might depend on whether a woman is having an abortion?

3  A.   Some centers determine that that way; however, we do not.

4  We will -- if a woman is pregnant, regardless of her intent,

5  we will offer her an ultrasound, and regardless to the

6  gestational age that we are guessing at before she has an

7  ultrasound, we will offer her an ultrasound.

8  Q.   Was there a point in the past where either 1st Way or

9  Focus Women's Center conditioned the availability of an

10 ultrasound in any respect on whether a woman was deemed

11 abortion-minded?

12 A.   No.

13 Q.   Ms. Cocks, I would like to show you what has been marked

14 as Defendant's Exhibit 32.

15         Do you recognize this document?

16 A.   Yes.

17         MR. HAZINSKI:  And for the record, this is with the

18 stamp FW 058.

19 BY MR. HAZINSKI:

20 Q.   I would like to draw your attention -- and I will zoom in

21 on the second paragraph.

22         Do you see where the second paragraph says:  "Any

23 patient whose gestational age is six weeks by LMP" -- I will

24 pause.

25         Do you know what "LMP" stands for?

1  A.  Yes, last menstrual period.

2  Q.  Okay.  Thank you.  "Any patient whose gestational age is

3  six weeks by LMP or over and up to 15 weeks' pregnant is

4  qualified to receive a limited ultrasound exam.  If the

5  patient is abortion-minded, however, and is past the 15-week

6  cutoff point, she may receive a limited ultrasound scan up to

7  24 weeks' pregnant."

8        Do you see that?

9  A.  I do.

10 Q.  Was this a document in existence, in use at 1st Way at one

11 time?

12 A.  It was, and I'm hard-pressed here because I'm thinking

13 that this has been edited since we provided the documents,

14 which was in 20- -- I did my deposition in 2019.  I think we

15 provided documents in 2017 -- no, it couldn't have been.

16 2018?  I don't know.  It has been a while; I do know that.

17 Q.  Is it fair to say --

18 A.  So I do remember this.  I do remember this, uh-huh.

19 Q.  Is it fair to say that this policy accurately described

20 the practice of 1st Way at some point in time?

21 A.  At some, yes.

22 Q.  Focus Women's Center had a similar policy in place; is

23 that correct?

24 A.  Not simultaneously.  So when -- I would definitely have to

25 go back into my records to look.  I know that this was a topic

SA-232

1    of discussion for us and our board.

2    Q.  So the policies may not have existed simultaneously at

3    1st Way and Focus, but Focus did at some time have a similar

4    policy?

5    A.  Yes.  Well, the policy -- the only policy that would be in

6    place for determining when to have an ultrasound would be for

7    Focus Women's Center as that is the only place that we are

8    having medical services provided.

9    Q.  Thank you.

10             At the time that policy was in place, the reason that

11   ultrasounds would be performed up to 24 weeks for

12   abortion-minded women specifically was because the ultrasound

13   was a tool to help persuade that type of patient not to have

14   an abortion; is that correct?

15   A.  That's correct.

16   Q.  Focus Women's Center also offers STD testing to a patient

17   only if she is considering having an abortion; is that

18   correct?

19   A.  No.  If she is pregnant, we offer STD testing and

20   treatment.

21   Q.  Okay.  Ms. Cocks, do you remember giving a deposition in

22   this case?

23   A.  I did.

24   Q.  Yes.

25   A.  I do.

1    Q.  And you recall being sworn in and answering questions

2    under oath?

3    A.  Yes.

4    Q.  Okay.  I would like to show you your deposition.  This

5    will be page 99.  And I will put it on the screen for everyone

6    to see.

7         And I would like to begin, if I can, looking at line

8    2, page 99.

9         "Q.  Okay.  STD testing for gonorrhea and chlamydia

10   for eligible clients at Focus Women's Center; is that correct?

11        "A.  Yes.

12        "Q.  What does 'eligible clients' mean?

13        "A.  Okay.  First of all, they have to agree to the

14   testing.  We offer that to them.  They have to agree to it,

15   and we are offering it to only clients that are pregnant that

16   are considering an abortion."

17   A.  Yes.

18   Q.  (Continuing)

19        "Q.  And why is that?

20        "A.  Because if the client that we have is not

21   considering an abortion, she is going to go obtain continuing

22   care with an OB/GYN, and so then it would be best that that

23   was all done, you know, under his purview."

24        Did I read that correctly?

25   A.  Yes, you did.

1  Q.  And, Ms. Cocks, does that testimony accurately describe

2  the policy at Focus Women's Center regarding STD testing?

3  A.  At that time, yes.

4  Q.  And when that was the policy in place regarding the

5  availability of STD testing, the reason that Focus Women's

6  Center offered STD testing only to women considering an

7  abortion was so that focus could discuss the medical risks of

8  having an abortion while you had an STD; is that correct?

9  A.  That's correct.

10  Q.  I would like to ask you now about the role of volunteers

11  at Focus Women's Center.

12        Volunteers have only very limited interactions with

13  the patients who come to Focus, correct?

14  A.  Actually, we only have paid staff now at Focus Women's

15  Center, and that's a difference from when I gave my deposition

16  in 2019.

17  Q.  When you gave your deposition at that earlier time, the

18  only patient interactions that volunteers would have would be

19  limited to administrative tasks like scheduling appointments;

20  is that correct?

21  A.  That is correct.

22  Q.  And your testimony is that today, all those people are

23  professional staff employed by and paid by Focus; is that

24  right?

25  A.  Correct.

1  Q.  Thank you.

2         I would like to turn now to the topic of medical

3  options counseling.

4         In conducting counseling about pregnancy options,

5  1st Way discusses the risks of abortion with pregnant women,

6  correct?

7  A.  No.

8  Q.  Was it ever the case that 1st Way discussed the risks of

9  abortion during options counseling?

10 A.  Yes.  Before we separated and had an established Focus

11 Women's Center, when we did everything at 1st Way, we did

12 discuss those options at 1st Way.

13 Q.  Similarly, in the pregnancy options counseling that now

14 happens at Focus Women's Center, Focus will similarly tell

15 pregnant women about medical risks of abortion during that

16 counseling, correct?

17 A.  No, because the women that come to -- I'm sorry, did you

18 say 1st Way or Focus?

19 Q.  This question now is about Focus.

20 A.  Got it.  Sorry.

21        Could you ask it again?

22 Q.  Of course.

23        Focus Women's Center, similar to the practice

24 formerly at 1st Way, tells pregnant women about medical risks

25 of abortion during pregnancy options counseling; is that

1  correct?

2  A.  That is correct.

3  Q.  But Focus Women's Center doesn't discuss any benefits of

4  abortion, that abortion might have for that particular

5  patient; is that correct?

6  A.  That would be correct.

7  Q.  So if a patient comes into Focus Women's Center and asks

8  about both medical risks and medical benefits of an abortion,

9  the policy of Focus Women's Center is to give information

10  about the risks but to say that there are no benefits to

11  abortion at all; is that correct?

12  A.  Well, yes, because we don't -- there are no medical

13  benefits to abortion.

14  Q.  Focus Women's Center does not counsel women about any

15  medical risks of carrying a pregnancy to term; is that

16  correct?

17  A.  No.

18  Q.  You were asked in the questioning by Mr. Gillen about

19  whether the options counseling was specific.  Do you remember

20  that question?

21  A.  Yes.

22  Q.  And you testified that it wasn't specific, correct?

23  A.  Correct.

24  Q.  By the time the options counseling begins, that happens

25  after the pregnant person has come in to the Focus Women's

1  Center facility, correct?

2  A.  Yes.

3  Q.  And when she arrives, she provides personal information to

4  you, correct?

5  A.  Correct.

6  Q.  And she provides information about her particular

7  circumstances related to her pregnancy, correct?

8  A.  Correct.

9  Q.  Okay.  You describe the counseling as person-to-person.

10  Was that your testimony?

11  A.  Yes.  We do peer-to-peer counseling at 1st Way.  So I

12  could see how that would carry over to thinking that that is

13  going on at Focus.  You know, it is pretty strictly following

14  a script at Focus.

15  Q.  Does the counseling at Focus involve exchanging any

16  information between the patient and the person performing the

17  counseling?

18  A.  Yes.

19  Q.  Ms. Cocks, I would like to now show you what has been

20  marked as Defendant's Exhibit No. 25.

21          MR. HAZINSKI:  If I can use the ELMO, Your Honor.

22          For the record, FW-001.

23  BY MR. HAZINSKI:

24  Q.  Ms. Cocks, this document is titled "The Abortion Phone

25  Call."

1          Do you recognize it?

2   A.  Yes.

3   Q.  Is this document used by people working at 1st Way when

4   they receive a call from a client who is asking about

5   abortions?

6   A.  No.

7   Q.  I would like to show you your deposition again.

8   A.  This is used at Focus.  You said 1st Way?

9   Q.  I did.

10          At the time you gave your deposition, was this used

11  at 1st Way for that purpose?

12  A.  Because I'm also looking at the notation up here, "FW,"

13  and that would have been Focus Women's Center.  So I'm

14  thinking that this is used at Focus.

15  Q.  Could the FW also be 1st Way?

16  A.  No, because it is a number 1-S-T.  I mean, it's -- we

17  always use a "1," so there wouldn't be a confusion that we

18  don't.

19  Q.  I will represent that I think the way the stamps exist on

20  the documents may not mirror that exactly.

21          But just for purposes of clarifying, I would like to

22  show you your deposition, and this is page 68.

23  A.  Okay.

24  Q.  I would like to begin reading at line 2.

25          "Q.  And it's titled 'The Abortion Phone Call.'  When

1  do volunteers use this document?

2      "A.  When they would receive a call from a client

3  that is inquiring about abortions.

4      "Q.  It is currently in use at 1st Way?

5      "A.  It is."

6      Did I read that correctly, Ms. Cocks?

7  A.  Yes.  Yes.  You have refreshed my memory.  Thank you.

8  Q.  All right.  Thank you.

9      I will put that document back up.  This is

10  Defendant's Exhibit 25 again.

11      Ms. Cocks, I would like to direct your attention to

12  the second bullet point on the page, and this bullet point

13  suggests that the person who is handling a phone call like

14  this should offer to help the caller thoroughly investigate

15  all of her choices, correct?

16  A.  Correct.

17  Q.  And when it says "their choices," that's referring to the

18  options of parenting, adoption, or abortion; is that correct?

19  A.  Correct.

20  Q.  This document also encourages the person who handles the

21  call from someone asking about abortions to bring up the

22  medical aspects of abortion; is that correct?

23  A.  Yes.  So what I need to clarify here, though, is, indeed,

24  as you refreshed my memory with this, with the deposition,

25  this was being used at that time at 1st Way.  And as we were

1    in a transition to spinning off and having -- establishing

2    Focus Women's Center, we no longer use this form.

3         And I can tell you that if we get a call at 1st Way

4    from a caller who is abortion-minded, we simply state to her

5    that that is not something that we have any information or can

6    deal with, but we refer her to Focus.  And we give her that

7    phone number, and then it's handled there with the script.

8    Q.  And the script at Focus would be similar to the script

9    like this one that we are looking at here; is that fair?

10   A.  It's pretty altered, I would say.  I mean, I think -- I

11   know that the form that we use to make an appointment is what

12   guides the appointment maker through that call, whether the

13   person is abortion-minded or not.  I think I mentioned if they

14   say they are abortion-minded, then we clarify with them that

15   we don't provide or refer for abortions.

16        So, unfortunately, this is obsolete now.  Or

17   fortunately.  It's changed.  It's different.

18   Q.  Well, speaking, then, just about this document and when it

19   was in use at 1st Way, this document encouraged the person

20   handling a call asking about abortion to bring up possible

21   complications of abortion, correct?

22   A.  Uh-huh.

23        THE COURT:  Is that a "yes"?

24        THE WITNESS:  Yes.  Yes.

25

SA-241

1    BY MR. HAZINSKI:

2    Q.  And it also suggests making an appointment to come in to

3    discuss medical risks, correct?

4    A.  Yes.

5    Q.  Okay.  All right.  I will set that to the side.

6           Ms. Cocks, I believe you testified a bit about this

7    on direct, but Focus Women's Center also gives women written

8    information or written materials about the medical risks of

9    abortion, correct?

10    A.  Correct.

11    Q.  Okay.  So I would like to show you next what has been

12    marked as Defendant's Exhibit No. 22.

13           MR. HAZINSKI:  For the record, with the stamp FMed

14    001 to 002.

15    BY MR. HAZINSKI:

16    Q.  Ms. Cocks, do you recognize this document?

17    A.  I do.

18    Q.  Okay.  And this is a document that's given to patients at

19    Focus Women's Center; is that right?

20    A.  Correct.

21    Q.  And it is a brochure that provides medical information

22    about different types of abortion procedures; is that correct?

23    A.  Correct.

24    Q.  I will flip to the second side.

25           Each of these columns describes abortion procedures

1  at different gestational ranges; is that a fair description?

2  A.  That's correct.

3  Q.  So for each of the types of abortion procedure, the

4  brochure also lists the risks and possible side effects of

5  that procedure, correct?

6  A.  Correct.

7  Q.  For example, the document lists side effects like

8  infections, blood clots, perforation of the uterus, and

9  infertility all as possible risks, correct?

10  A.  Correct.

11  Q.  Does this document provide any information about why any

12  of these specific abortion procedures could be medically

13  beneficial?

14  A.  No.

15  Q.  Does this document provide any information describing that

16  abortion procedures are a generally safe treatment option for

17  pregnant patients?

18  A.  No.

19  Q.  And does this document provide any information about

20  medical risks that can arise if a pregnant patient chooses not

21  to have an abortion?

22  A.  No.

23      MR. HAZINSKI:  I will take that exhibit down.

24  BY MR. HAZINSKI:

25  Q.  You testified earlier about some of the advertising and

1    marketing used by both 1st Way and Focus Women's Center.

2        Do you remember that?

3    A.  Yes.

4    Q.  And some of the advertising by these facilities is

5    designed to reach women who are in difficult or traumatic

6    situations; is that correct?

7    A.  Yes.

8    Q.  Some of the advertising by these facilities includes

9    working with a local agency that helps women who are homeless,

10   correct?

11   A.  I don't know if the agency that we work with is helping

12   homeless women.  Did I understand you correctly?

13   Q.  Yes.

14        So more specifically, 1st Way Life Center and Focus

15   Women's Center advertised with a local agency called Home of

16   the Sparrow; is that correct?

17   A.  It is possible that we might have had an ad together.

18   Q.  Okay.  I would like to show you your deposition, just one

19   more time, at page 25.

20        Ms. Cocks, I will begin reading at line 18:

21        "Q.  How does 1st Way Life Center and Focus Women's

22   Center market and advertise to women?

23        "A.  We advertise with local agencies that refer to

24   us and we refer to them.  We provide school counselors and

25   nurses with our brochures.  Currently, we are doing some

1    bathroom stall advertising, and we have websites for both of

2    our centers and Facebook pages for both of our centers.

3        "Q.  When you say 'local agencies' that you refer to

4    and they refer to, what kinds of agencies are you speaking of?

5        "A.  With the health department, for example, or Home

6    of the Sparrow, they deal with women that are homeless.  We

7    will deal with Turning Point.  They are dealing with women in

8    abusive situations."

9        Did I read that correctly?

10   A.  Yes, yes.

11   Q.  Does that refresh your recollection about --

12   A.  It does.

13   Q.  -- that subject?

14   A.  May I clarify on that?

15   Q.  Please.

16   A.  So when I was speaking about advertising with them, I

17   should have been more specific.  As we distribute literature

18   about once a year, we go out to schools and to other agencies

19   and we provide them with our literature so that they can use

20   it for women who come to them that might possibly use our

21   services.  We also pick up on their literature and bring it

22   home to us so that we can distribute it as well.  So that's

23   kind of the arrangement we have.

24   Q.  So part of the goal of that type of arrangement is to

25   reach and get the message out to women who might be homeless?

 1  A.  Possibly.

 2  Q.  And another agency that you advertised with or shared

 3  information with deals with women who are in abusive

 4  situations or domestic violence situations; is that right?

 5  A.  It's possible, yes, uh-huh.

 6  Q.  And I believe you testified earlier that Focus has

 7  information about services specifically for women in domestic

 8  violence situations; is that correct?

 9  A.  I'm sorry, say that again.

10  Q.  Earlier, you were asked a question about some of the

11  services that are made available -- strike that question.

12          Earlier, you testified and you were asked about some

13  of the information provided to patients at Focus Women's

14  Center about accessing services.

15  A.  Yes, yes.

16  Q.  Do you recall that generally?

17  A.  Yes.

18  Q.  And some of the information that was -- that is provided

19  at Focus Women's Center is about accessing services geared

20  toward women in domestic violence situations, correct?

21  A.  Yes, also -- yes, yes.

22  Q.  Thank you.

23          You also testified a little bit about the website

24  for -- the websites for these organizations.  You are

25  responsible for overseeing the content of the 1st Way website,

1    correct?

2    A.   Correct.

3    Q.   And you are also responsible for overseeing the content of

4    the Focus Women's Center website; is that correct?

5    A.   Yes, yes.

6    Q.   Do you recall when you were being shown the screenshot of

7    the website by Mr. Gillen being asked questions about -- or do

8    you recall when Mr. Gillen was showing you screenshots of the

9    website seeing information about testimonials that were

10   published?

11   A.   Yes.

12   Q.   Okay.  Those testimonials are on your website partly to

13   promote the image and the reputation of your center.

14        Is that fair to say?

15   A.   Yes.

16   Q.   Okay.  I would like to show you now what's been marked as

17   Defendant's Exhibit 71, I believe.

18        MR. HAZINSKI:  My apologies, Your Honor.  I just need

19   one moment to grab the document.

20        THE COURT:  Okay.

21   BY MR. HAZINSKI:

22   Q.   All right.  Ms. Cocks, I'm showing you now Defendant's

23   Exhibit 71.  For the record, IDFPR 009450, and I will turn

24   ahead to page 9460.

25        Ms. Cocks, the format may look different as a

1  printout, but do you recognize this page?

2  A.  I do, uh-huh.

3  Q.  And this is part of the Focus website, correct?

4  A.  Correct.

5  Q.  And this is specifically the part of the Focus website

6  that lists the medical services that Focus provides, correct?

7  A.  Correct.

8  Q.  And one of those listed services is abortion education,

9  correct?

10  A.  Correct.

11  Q.  I would like you now to look down at the text at the

12  bottom of the page, and I will try to enlarge it.

13          Are you able to read that?

14  A.  I am.

15  Q.  Would you please read that text and let me know when you

16  are done?

17  A.  "At Focus Women's Center, we believe in empowering our

18  patients by offering comprehensive services free of charge, no

19  insurance necessary.  When you come to FWC, Focus Women's

20  Center, you will find a calm, professional environment where

21  you can safely learn about your pregnancy" --

22          THE COURT:  Slow down just a little bit.

23          THE WITNESS:  Sorry.

24          -- "where you can safely learn about your pregnancy

25  and all your options free from pressure and judgment.  Our

SA-248

1    licensed medical staff will provide you with accurate

2    information and medical services to help confirm your

3    pregnancy and explore your legal options.  Our goal is to make

4    sure that you are fully informed so that you can make the

5    decision that is best for your situation."

6            MR. HAZINSKI:  Thank you.

7    BY MR. HAZINSKI:

8    Q.  Is it fair to say that this text provides information

9    about what a patient should expect when she comes to Focus

10   Women's Center?

11   A.  That's correct.

12   Q.  And this text you read specifically says that licensed

13   medical staff will provide the woman with accurate information

14   and medical services to help confirm the pregnancy and explore

15   legal options, correct?

16   A.  Correct.

17   Q.  And this text conveys that the goal of Focus Women's

18   Center is to help each woman make her own decision based on

19   full information; is that correct?

20   A.  Correct.

21   Q.  You testified on direct that it's important to notify

22   women about what to expect and not what [sic] to expect; is

23   that correct?

24   A.  Correct.

25   Q.  Okay.  I'm going to turn ahead now to a later page in the

1    same exhibit, IDFPR 9474.

2              Ms. Cocks, do you recognize this page?

3    A.   I do.

4    Q.   This is a "Frequently Asked Questions" page on the Focus

5    website, correct?

6    A.   Correct.

7    Q.   Is it fair to say that the purpose of the information on

8    this page is to advise women about what they can expect if

9    they make an appointment at Focus Women's Center?

10   A.   Correct.

11   Q.   There are a number of boxes with text in them on this

12   page.  The boxes at the top list medical services that Focus

13   Women's Center provides, correct?

14   A.   Correct.

15   Q.   And those listed medical services are lab quality

16   pregnancy testing, verification of pregnancy, ultrasound,

17   STD/STI education and testing, and options consultation,

18   correct?

19   A.   Correct.

20   Q.   Now, just to be clear, on Focus's actual website, it is

21   possible to click on each of these boxes and expand them,

22   right?

23   A.   That is correct.

24   Q.   On this printout, we have only the "options consultation"

25   box expanded, right?

SA-250

1    A.  Right.

2    Q.  Okay.  Looking at this "options consultation" box, the

3    information provided on this web page tells potential patients

4    of Focus Women's Center that they will receive education about

5    all their legal options; is that correct?

6    A.  Correct.

7    Q.  And this page also informs them that they will receive

8    education about those options in an unbiased way that empowers

9    them to make their own choice, correct?

10   A.  That's correct.

11   Q.  All right.  I will take that down.

12          Ms. Cocks, you were asked some questions about

13   whether clients at Focus Women's Center have access to the

14   Internet.

15          Do you recall those questions?

16   A.  I didn't know if I was asked that.  I know everybody has

17   been asked those questions.  But I would have to concur that I

18   think everybody has access to the Internet.

19   Q.  Well, you were asked some general questions about how

20   1st Way and Focus advertise their services, which includes

21   Internet, an Internet presence; is that fair?

22   A.  Yes, that's fair.

23   Q.  But 1st Way and Focus Women's Center don't ask patients

24   when they come in if they have Internet access; is that

25   correct?

SA-251

1    A.   That's correct.

2    Q.   And 1st Way and Focus Women's Center also don't track

3    whether each client is aware of abortion as an option when

4    they arrive; is that correct?

5    A.   That's correct.

6    Q.   1st Way and Focus don't track whether clients are aware of

7    sterilization as a medical option when they arrive, correct?

8    A.   That's correct.

9    Q.   And the same is true about whether they are aware of birth

10   control as a medical option; is that correct?

11   A.   That's correct.

12   Q.   Okay.

13   A.   Though I suspect if they found us, they could find all of

14   those things.

15   Q.   That's not information that you keep any records about, is

16   it?

17   A.   No.

18   Q.   You testified on direct about counseling, and you

19   described it as involving generally available medical

20   information.

21         Do you recall that?

22   A.   I do.

23   Q.   The people providing the counseling, they are staff at

24   Focus, correct?

25   A.   Correct.

1    Q.  And in your description of a typical encounter, this

2    counseling session happens in the aftermath of an ultrasound

3    procedure, correct?

4    A.  Correct.

5    Q.  And that procedure is performed by registered nurses who

6    are qualified to -- medically qualified to perform that

7    procedure?

8    A.  Well, actually, we have an RDMS, which is very --

9    Q.  Explain what that is.

10   A.  Which is a registered diagnostic medical sonographer.

11   Q.  Thank you.

12         And that person is a licensed medical professional?

13   A.  Correct, yes.

14   Q.  The purpose of the counseling session that happens in a

15   typical visit to Focus Women's Center is to help a woman make

16   a decision about what to do about her pregnancy; is that

17   correct?

18   A.  Correct.

19   Q.  And the information that you give her is intended to guide

20   that choice; is that fair to say?

21   A.  Yes.

22         MR. HAZINSKI:  Okay.  Could I just have a moment,

23   Your Honor?

24         THE COURT:  Sure.

25         MR. HAZINSKI:  I would just make a note before

1    concluding, to the extent that there has been updated

2    documents in this case pertinent to the topics we have been

3    discussing today, that those be made available to counsel.

4    But at this time I have no additional questions.

5                THE COURT:  Okay.  Any redirect?

6                MR. GILLEN:  A few questions, Your Honor, as I make a

7    note here, if I can.

8                        REDIRECT EXAMINATION

9    BY MR. GILLEN:

10   Q.  Judy, Mr. Hazinski has asked you a few questions.  I just

11   want to follow up and maybe flesh out your answers.

12              He has asked you about the categorization that you

13   engage in with callers or women who come into the centers

14   about being abortion vulnerable, and, you know, depending on

15   your perspective or where you are coming from, that could be

16   seen as a strange way of describing a woman.

17              What do you mean when you are working at Women's Help

18   Services, either through 1st Way or more likely Focus Women's

19   Center, what do you mean when you classify a woman as abortion

20   vulnerable?

21   A.  Well, there is two things to look at when a woman comes to

22   us, and you probably saw it on the intake form, and that is

23   her stated intention.  And then there are different

24   circumstances in a woman's life that may indicate that she is

25   more disposed to having an abortion; for example, if she has

1   had a prior abortion, if, let's say, she is unemployed, if she

2   is getting pressure to have an abortion, those kind of things.

3   Q.  And, you know, to say "vulnerable," it indicates that you

4   are kind of at risk of a danger.  Is that how you see women in

5   these situations?

6   A.  Well, I certainly -- we certainly believe that if a woman

7   is contemplating an abortion, she is in a vulnerable position

8   because she's contemplating aborting or killing her child.  So

9   yes.

10  Q.  And then Mr. Hazinski asked you a couple of questions

11  about why you provide the ultrasounds, and you link that

12  decision to provide the ultrasounds with, you know, the idea

13  that you want to convince the woman or persuade the woman,

14  so -- and here is the $10,000 question:  What's the

15  connection, in what way -- how does providing the limited

16  ultrasound serve your goal of, you know, helping the woman

17  make a choice, the choice that you think she should make?

18  A.  Well, I think it makes a pregnancy very real, and it makes

19  it very real to that new mom.  It can be easier to be

20  dismissive and be -- and perhaps pursue an abortion if you are

21  thinking that your pregnancy is not a child or a human being.

22  And so if you have a glimmer of that through an ultrasound, I

23  think it is going to change your perspective.  In fact, we

24  know it does.

25  Q.  And do you think, based on your experience, that some

1    women who come in because, you know, information is in the

2    air, so to speak, have -- don't have an adequate appreciation

3    for what their pregnancy means?

4    A.   Absolutely.

5    Q.   Okay.  And are you seeking to address that, if I can call

6    it, information gap through the ultrasound?

7    A.   Well, it certainly is.  I mean, it is certainly

8    information necessary to be shared.

9    Q.   And then Mr. Hazinski asked you a couple of questions that

10   tended to show that if a woman was classified as abortion

11   vulnerable or tending towards abortion, that you might give

12   her priority, so to speak, put her to the top of the list on

13   the ultrasound or at least give her -- I think he had a

14   document up that suggests you might give her a second

15   ultrasound.  There was an exception.

16        Do you recall that portion of the examination?

17   A.   Right.  Right.  So that's one of the documents that we are

18   going to have to, I think, revise.

19        But currently what we are doing with Focus Women's

20   Center is if a woman is abortion-minded, we are going to give

21   her every opportunity to make that decision for life.

22   Q.   I think, you know, that's what I'm getting at, like why?

23   Say that even in the old days, as John said, I don't know if

24   the policy has changed, I don't know if it matters, but say in

25   the old days, you were giving priority to a woman that you

1  thought was abortion vulnerable or more likely to have an

2  abortion, and you gave them priority, as you indicate.

3          Why would you do that?  Like why would you be giving

4  them priority or a second ultrasound?  What's your purpose?

5  A.  Because it's -- this is -- this is a life-changing

6  decision this women is going to make, not only for her but for

7  her child.  It's irrevocable if you make that decision.  So we

8  want to give her all the information possible for her to make

9  the decision that's best for her and her child, and hopefully

10 that will be life.

11 Q.  And you know she has got a decision?

12 A.  Yeah.

13 Q.  So Mr. Hazinski asked you a couple of questions about STD

14 testing and being pregnant.  So that made me think, what is

15 the connection?  Why are you giving that STD testing to women

16 who come back where you have confirmed a pregnancy?

17 A.  Right.  So it is important if a woman is going to follow

18 through and have an abortion that she not have an STD, because

19 that can certainly result in further infection and perhaps

20 permanent damage to her reproductive system.

21 Q.  All right.  And then Mr. Hazinski asked you some questions

22 about advertising to certain, I guess you call them, groups or

23 constituencies, such as women who are homeless, women who are

24 in abusive situations.

25          So my question to you is:  Are those the kind of

1   situations that you have in mind when you are talking about

2   women as abortion vulnerable?

3   A.   They certainly could be.

4   Q.   And is -- why are you trying to advertise to them?  That's

5   my question.  Why are you trying to --

6   A.   Certainly --

7   Q.   Yes.  Okay.

8   A.   Certainly a woman that finds herself in stressful

9   circumstances such as being homeless -- of course, once by the

10  time she hits Home of the Sparrow, she is not homeless any

11  longer, but nonetheless -- and the same with a woman that goes

12  to Turning Point, which serves women in abuse situations, she

13  is in the process of getting out of it, having an abortion

14  isn't going to change any of those circumstances.  Killing

15  your child isn't going to take away any of these challenges

16  that anybody faces in life.  It just adds one more problem,

17  really.

18  Q.   All right.  And then Mr. Hazinski asked you about abortion

19  education.  I just want to draw attention to that term,

20  "education."

21        When you, through Women's Help Services, at Focus

22  Women's health center, see yourself engaging in abortion

23  education, what do you mean?  What are you getting at there?

24  A.   Well, we want to explain to the women that come to Focus

25  what the basic risks are of the various abortion procedures,

1  not just medical, but perhaps emotional and even spiritual.

2  Q.  And we talked earlier both on direct and now on this sort

3  of follow-up to Mr. Hazinski's questions about kind of the

4  informing choice, the education -- what should I say --

5  information gap.

6         Is it fair to say that the information that you are

7  providing under the rubric of abortion education is designed

8  to fill an education gap that you're concerned exists?

9  A.  I think there is definitely a gap that exists because --

10  Q.  Why do you think that?

11  A.  Well, just living in today's world and reading and

12  exposing myself to the media, I rarely hear about -- what I

13  hear a lot about is shout my abortion and, you know, all the

14  happy around abortion, you know.  People are proud of it.

15         What I'm not seeing in today's media is what I see in

16  my office, what comes into our centers, is the regret that

17  women have after abortion.  I don't see the 16-year-old that

18  came into my office and said, Nobody ever told me I was going

19  to feel this way, four months after her abortion.

20  Q.  And that last point is kind of what I'm trying to get at

21  here, so Judge Johnston knows, about how you see the

22  information gap in your, whatever, how many years you have

23  been doing this ministry.

24         Do you have the sense, based on your dealing with

25  women who come into the centers, that they do, in fact, suffer

1    from an information gap?

2    A.  I think they do --

3            MR. HAZINSKI:  Your Honor, objection if he is not

4    laying a foundation first to his question.

5            MR. GILLEN:  I just asked her -- I'm sorry, Judge.

6            THE COURT:  Sustained.  I'm looking at the real-time

7    transcript as it is coming up, and there is a block paragraph

8    before a block -- a block paragraph that is a statement before

9    a block paragraph that is a question.

10           How does she know these things?  What is the basis

11   for her belief for these things?  Just ask those simple

12   questions.  She is more than capable of giving you answers.

13           MR. GILLEN:  All right.

14           You should have given me the primer beforehand,

15   Judge, but I do get the point here.  So...

16   BY MR. GILLEN:

17   Q.  How do you have that sense that women who are coming to

18   your centers suffer from an information gap?

19   A.  The women that come to my centers are in challenging

20   situations, and they find it difficult, I think, to think

21   clearly with the information that's currently available to

22   them.

23           We are trying to empower them with information about

24   their bodies, about their pregnancy, about parenting, and how

25   they can move forward with life without having an abortion.

1    And I think we are fighting an uphill battle, as I read, you

2    know, the emails that come to me, you know, listen to

3    podcasts, watch, you know, mainstream TV.  All of that deals

4    with, I don't know, living your truth and living for your

5    autonomy -- your autonomy, not the baby's.  The baby is kind

6    of, "eh," that doesn't mean anything.  It is all focused on

7    how important and central the woman is, and that's an empty

8    life.

9    Q.  All right.  And let me just ask you this question -- and I

10   probably shouldn't, but I can't help it:  Some people would

11   say that it's ironic or oxymoronic for you to, on the one

12   hand, say that you seek to empower women and then to give

13   women information that doesn't include putative benefits of

14   elective abortion.

15          How do you see that?  How do you reconcile the notion

16   that you are seeking to empower women with the fact that has

17   been brought to light and is no secret that you are not

18   talking about benefits of the elective abortion?

19   A.  Well, we didn't talk about this, but I will tell you, if

20   there were benefits to abortion -- if there were factual

21   benefits to abortion, which nobody can seem to list or find --

22   they keep talking about it in theory, but I have never seen

23   that list.  If there truly was a list, then I would have to go

24   to my board and say, Maybe we need to give this to the women.

25   Q.  And to get to that, and the question that the Judge has

SA-261

1  asked -- and I don't want to get ahead of him, but I don't

2  want to get behind him either, is this -- so there are some

3  situations that have been brought up where the woman is in a

4  jam, and she is going to have a procedure to preserve her life

5  and health, and one of the results, as Dr. Lee said today, of

6  that procedure will be that the baby dies.

7       My question to you is:  Do you see that as an

8  elective abortion?

9  A.  No.  No.  No.

10 Q.  And what's the distinction that you draw in your

11 conscience -- or what is the distinction you draw?  Why do you

12 see them as different?

13 A.  Well, it's not just the intent of the women, as I see it,

14 but that's a wholly separate issue that deals with medically

15 meeting the needs of that woman and saving her life.  And, I

16 mean, that's beyond my abilities to --

17 Q.  I understand.  And I just wanted to get that out, that you

18 do see a distinction between the elective and these other

19 situations where it is, I guess you would say, a necessity.

20 Is that --

21 A.  Right.  It's not -- I don't know that Dr. Lee would refer

22 to it, and I certainly wouldn't refer to it as an abortion.

23 Q.  All right.  Well, at least an elective abortion?

24 A.  Right.

25 Q.  Yeah.  Right.

SA-262

```
 1              MR. GILLEN:  I have no further questions, Your Honor.
 2              THE COURT:  So an elective abortion carves out
 3    physical health, safety of the mother; is that right?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Okay.  Let me tell you this, and I have
 6    to do this a lot of times:  It's very difficult to be my
 7    daughter because my questioning can sound very confrontational
 8    and aggressive and accusatory.  It is not designed to be that
 9    way.  Okay?  So if it comes across that way, it is not
10    designed to be that way.
11              All right.  So building on a couple points, and you
12    have talked about this -- and, again, I recognize that you are
13    not a medical professional, but you have a lot of experience
14    that's helpful that's been presented here in court.
15              One of the things you have mentioned a couple of
16    times is the emotional consequences of a woman having an
17    abortion, that regret and that kind of thing, right?
18              THE WITNESS:  Right.
19              THE COURT:  And you have seen that.  You have heard
20    several testimonials about it --
21              THE WITNESS:  Right.
22              THE COURT:  -- throughout your years.
23              So there is this mental -- I'm going to use the
24    phrase "mental health."  You are saying "emotional."  I'm
25    going to say "mental health."  And that would be side effects,
```

SA-263

1    disadvantage, a drawback.  There was something, a specific

2    term you had in your documents, and I'm trying to find it.

3              THE WITNESS:  Risks and side effects.

4              THE COURT:  I think there is side effects and then

5    there is another word right before "side effects."  I will

6    find it for you.  It was shown to you.

7              It was on the website, so I'm going to see if I can

8    find my way there.

9              I don't have the Schroeder exhibits.  I have only got

10   the NIFLA and defendant's exhibits.  So I know there was

11   documents put on the ELMO or provided to the witness,

12   Schroeder 58, 33, 36, 54, 53, 51, 52, 43, 157.  One of them is

13   the websites.  One of them is the websites, and it is a list

14   that talks about abortions, and it goes through -- we saw it

15   in the other -- it is a handout, it is a pamphlet that has

16   been given, and it shows -- it goes through the different

17   stages, gestational stages.

18             THE WITNESS:  So that would be the handout.

19             MR. GILLEN:  Let me see if I can get it for you,

20   Judge.

21             MR. HAZINSKI:  Your Honor, I believe that may be

22   Defendant's Exhibit 25.

23             THE COURT:  The problem is I don't have 25.

24             MR. HAZINSKI:  Not 25, but in the 20s.

25             THE COURT:  In the 20s.  Okay.

1    MR. GILLEN:  I think we have it, Judge.

2    MR. HAZINSKI:  Exhibit 22.

3    THE COURT:  I thought I checked 22.

4    Well, hold on.

5    "Risks and side effects."

6    THE WITNESS:  Risks.

7    THE COURT:  Risks.

8    Thank you.  Thank you, Counsel.

9    Risks and side effects.  I knew it was something and

10 side effects.

11    So it lists out risks and side effects in here of

12 having the abortion, and it breaks it out, as we just

13 mentioned, during different terms of gestation.

14    THE WITNESS:  Right.

15    THE COURT:  So let me back this whole train up.

16    Do you have walk-ins at Focus?

17    THE WITNESS:  Occasionally, yes, uh-huh.

18    THE COURT:  So say you get a walk-in.  You get a

19 16-year-old girl from Wonder Lake.  She heads over to McHenry.

20 She goes to Front Street.  She thinks she is pregnant, doesn't

21 know; that's why she is coming to you.  She has got suicidal

22 ideations.  She is in a crisis, right?

23    THE WITNESS:  Uh-huh.

24    THE COURT:  And she has been -- she thinks she is

25 pregnant because she has been sexually assaulted.

1          Some might say that a person in that situation might

2   think that an abortion would be beneficial to the mental

3   health of that particular person.

4          What would your response be to that?

5          THE WITNESS:  Okay.  Well, if we had the kind of

6   client walk-in that you have just described, we have a whole

7   protocol set up.

8          THE COURT:  Okay.

9          THE WITNESS:  I just want to put that out there.

10         THE COURT:  That's helpful.

11         THE WITNESS:  That we are going to be referring her.

12  I don't even think that we would probably do any of our

13  services.  We are probably going to --

14         THE COURT:  Because what I have just described --

15         THE WITNESS:  Right.

16         THE COURT:  -- is not some farfetched hypothetical

17  scenario that doesn't exist, right?

18         THE WITNESS:  No, it isn't.  But the other side of

19  that is if, indeed -- oh, God forbid -- but if, indeed, she

20  were pregnant, having an abortion is not necessarily going to

21  be the fast ticket to, you know, mental health and everything

22  goes back to normal.  It doesn't.

23         In fact, there have been testimonies of women who

24  have had abortions after rape and have regretted those

25  abortions because just piling on with an abortion doesn't make

1  everything okay.

2          THE COURT:  And I don't doubt that there.

3          Have you ever seen testimonies where somebody is in

4  that situation -- and, again, I'm not picking on Wonder Lake.

5  It is just because I have got friends from Wonder Lake, and it

6  is not a big deal -- who have been in this situation.  And I'm

7  just wondering if you have heard testimonials from somebody

8  like that saying, Look, I was on a razor's edge.  I was

9  suicidal.  I don't think I can last another day.  After the

10 abortion, I was able to move on with my life.

11         Have you ever heard anything like that?

12         THE WITNESS:  I haven't heard anything like that.

13         THE COURT:  Okay.  All right.  Counsel kind of

14 touched on it.  Look, I have been listening to testimony for a

15 lot of hours today.  I'm not very bright, but after hearing

16 something for hours, I begin to pick up on themes and

17 theories.

18         So there was a lot -- there has been a lot mentioned

19 about, for example, Focus providing full information and "all

20 your options" with the word "all" underlined, and "all legal

21 options" with the word "all" underlined.

22         An abortion is a legal option, right?

23         THE WITNESS:  It is.

24         THE COURT:  Okay.  But the point I assume I'm trying

25 to get at this -- is being provided to me is you say that in

1   the documents, but it's a one-way street.  You are not ever

2   saying, Look, abortion is there.  It's an option.  Here is why

3   you might consider it.  It is all, Abortion is an option, but

4   here are the risks and side effects, and we are going to list

5   them for you.  So hang on to your hat because you are going to

6   get a schooling here.

7          Now, maybe that's because you think it is

8   information --

9          THE WITNESS:  Imbalance?

10         THE COURT:  Yes.  But I think that is the point that

11  is being driven into my head repeatedly today is I should

12  note, I should understand the concept that you are saying it

13  is supposed to be all the information, all the legal options,

14  but you are not giving them the full picture.

15         THE WITNESS:  Well --

16         THE COURT:  How would you respond to that?

17         THE WITNESS:  What I have gathered from today's

18  testimonies is the idea that we should be speaking to the

19  imaginary advantages to abortion if we are going to be full

20  service, except for the fact that I have yet to see that, I

21  have yet to see what those advantages are.

22         THE COURT:  Okay.

23         THE WITNESS:  And as we just engaged with counsel,

24  yeah, if there was a list, I would like to see it.  I can't

25  imagine it.  Given what I have done for ten years, I can't

1    imagine what that list is.

2            THE COURT:  We have carved out the physical safety of

3    the mother by saying we are talking elective abortions, and

4    you are saying that's not elective.

5            THE WITNESS:  Yes, because if we are talking surgical

6    elective abortions, surgical elective abortions generally

7    involve in -- I mean, to be so blunt, I mean, just cutting up

8    the fetus and extracting.  That's not going to happen in the

9    situations that Dr. Lee was proposed with this morning.

10            THE COURT:  That's not going to be evacuation?

11            THE WITNESS:  Right.

12            THE COURT:  How about medical?

13            THE WITNESS:  Well -- I'm sorry?

14            THE COURT:  You have narrowed it to surgical, and you

15    emphasized surgical.

16            THE WITNESS:  Uh-huh.

17            THE COURT:  So there is also medical abortions.  So

18    that's why I follow up with that.

19            THE WITNESS:  Right.  Well, medical abortions are not

20    as simple as one, I think, is led to believe in today's

21    society, just in general information.

22            THE COURT:  Okay.

23            THE WITNESS:  I think it is much more involved and

24    complex, and I'm baffled as to the idea that women can

25    actually get medical abortions through the mail without having

1    had an ultrasound.  I don't understand.  If we are worried

2    about women's health care, I don't understand why ultrasounds

3    aren't required, I mean, just mandated, because if there is an

4    ectopic pregnancy and she is taking RU-486, it could be a

5    disaster.  She could die.  So I don't understand that.

6            THE COURT:  Okay.  For medical abortions, generally

7    two dosages, right --

8            THE WITNESS:  Correct.

9            THE COURT:  -- separated by a period of time?

10            THE WITNESS:  Yes.

11            THE COURT:  How is that more complicated than a

12    surgical abortion from your perspective?

13            THE WITNESS:  Well, I don't know that it is more

14    complicated, but I don't think it's more simple.  I don't

15    think it's -- I don't -- I think -- well, they equally result

16    in a death of a child, but as far as the woman is concerned, I

17    do think that the risks are minimized for a medical abortion.

18            THE COURT:  Okay.  I appreciate that.  That's

19    helpful.

20            It's 4:47.  Any follow-up questions based upon my

21    questioning?

22            MR. GILLEN:  If I could ask one, Judge.

23    BY MR. GILLEN:

24    Q.  You know, the Judge asked a fair question about some

25    people might say there are benefits, and I guess the bottom

SA-270

1  line for me is even if someone came out with a list of

2  benefits, could you, consistent with your conscience,

3  recommend those to a woman?

4  A.  No, I don't think so.  I can't imagine what they would be.

5  Q.  Okay.  But, again, someone might come out with a list, but

6  would you, knowing that the benefit would be -- what should I

7  say? -- secured at the expense of the child's life, could you

8  recommend that to the woman consistent with your religious

9  convictions?

10  A.  No.

11        MR. GILLEN:  No further questions.

12        THE COURT:  Any follow-up?

13        MR. HAZINSKI:  Very brief clarifications, Your Honor.

14                    RECROSS EXAMINATION

15  BY MR. HAZINSKI:

16  Q.  In the questioning from Judge Johnston just now, you

17  testified a little bit about mental health consequences for

18  abortion.

19        Do you remember that questioning?

20  A.  Yes.

21  Q.  I just want to clarify:  When you give that testimony, you

22  are not giving that testimony based on your own medical

23  training or experience; is that correct?

24  A.  That is correct.

25  Q.  And is the same true about the testimony you gave about

1    medication abortions and the issues related to that topic?

2    A.   That's correct.

3    Q.   And, finally, Mr. Gillen asked you questions about

4    pregnancy and sexually transmitted diseases.

5         Do you remember that?

6    A.   Yes.

7    Q.   And, similarly, your answers on that subject are not based

8    on your own medical training or experience that you are

9    bringing to bear today; is that correct?

10   A.   Correct.

11        MR. HAZINSKI:  Thank you.  Nothing further.

12        THE COURT:  Okay.  We will stop for the day.

13    (Witness excused.)

14        THE COURT:  Here is my question:  I'm operating off

15   of the assumption that there is no public document or study

16   regarding women's awareness of the -- of access and the

17   legality of abortion in Illinois.  And I am stunned if my

18   assumption is correct, but if it's correct, I have been

19   stunned before.  But after this 2016 case in 2023, I would

20   have hoped somebody would have looked for something like that.

21   And I would be -- I'm flabbergasted that some egghead

22   somewhere in some university hasn't done a very simple phone

23   survey across Illinois to determine that fact.

24        Is it fair to say you folks have looked for that and

25   that's why we are going through personal experiences with all