Nos. 25-1603, 25-1655, 25-1657 & 25-1659

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

RONALD L SCHROEDER, et al.
and
NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al.,
*Plaintiffs-Appellants / Cross-Appellees*,

v.

MARIO TRETO, JR.,
*Defendant-Appellee / Cross-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of Illinois
Case Nos. 1:17-cv-04663 & 3:16-cv-50310
Hon. Iain D. Johnston

---

## BRIEF OF *AMICI CURIAE*
## AMERICAN COLLEGE OF OBSTETRICIANS AND
## GYNECOLOGISTS, ET AL.,
## IN SUPPORT OF DEFENDANT-APPELLEE/CROSS-
## APPELLANT MARIO TRETO, JR.
## AND REVERSAL IN PART

---

Emily Werth
Rebecca K. Glenberg
Allison Siebeneck
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 N. Michigan Ave., Suite 600

Chicago, IL 60601
312-201-9740 ext. 333
ewerth@aclu-il.org

Molly A. Meegan
Francisco M. Negrón, Jr.
Meaghan Hannan Davant
AMERICAN COLLEGE OF OBSTETRICIANS
& GYNECOLOGISTS
409 12th Street, SW
Washington, DC 20024

*Counsel for Amici Curiae*

[ Save As ]    [ Clear Form ]

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1603, 25-1655,</u> 25-1657 & 25-1659

Short Caption: <u>SCHROEDER, et al., & NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al., v. MARIO TRETO</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The American College of Obstetrics and Gynecology, American Medical Women's Association, and

    Society for Maternal-Fetal Medicine as Amici Curiae

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Roger Baldwin Foundation of ACLU, Inc.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: _Emily Werth_    Date: 11/3/2025

Attorney's Printed Name: Emily Werth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: 150 N. Michigan Ave., Ste. 600, Chicago, IL 60601

Phone Number: 312-201-9740 ext. 333    Fax Number: 312-288-5225

E-Mail Address: ewerth@aclu-il.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1603, 25-1655,</u> 25-1657 & 25-1659

Short Caption: <u>SCHROEDER, et al., & NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al., v. MARIO TRETO</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>The American College of Obstetrics and Gynecology, American Medical Women's Association, and</u>

    <u>Society for Maternal-Fetal Medicine as Amici Curiae</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Roger Baldwin Foundation of ACLU, Inc.</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>n/a</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>n/a</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>n/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>n/a</u>

Attorney's Signature: _____  Date: <u>11/3/2025</u>

Attorney's Printed Name: <u>Rebecca Glenberg</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address: <u>150 N. Michigan Ave., Ste. 600, Chicago, IL 60601</u>

Phone Number: <u>312.201.9740 x 316</u>     Fax Number: <u>312-288-5225</u>

E-Mail Address: <u>rglenberg@aclu-il.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1603, 25-1655,</u> 25-1657 & 25-1659

Short Caption: <u>SCHROEDER, et al., & NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al., v. MARIO TRETO</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The American College of Obstetrics and Gynecology, American Medical Women's Association, and

    Society for Maternal-Fetal Medicine as Amici Curiae

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Roger Baldwin Foundation of ACLU, Inc.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: _Allison Siebeneck_    Date: 11/3/2025

Attorney's Printed Name: Allison Siebeneck

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 150 N. Michigan Ave., Ste. 600, Chicago, IL 60601

Phone Number: 312.201.9740 x 361    Fax Number: 312-288-5225

E-Mail Address: asiebeneck@aclu-il.org

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1603, 25-1655,</u> 25-1657 & 25-1659

Short Caption: <u>National Institute of Family and Life Advocates v. Treto</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>The American College of Obstetrics and Gynecology as Amicus Curiae</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>ROGER BALDWIN FOUNDATION OF ACLU, INC.</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        <u>n/a</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>n/a</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>n/a</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>n/a</u>

---

Attorney's Signature: <u>/s/ Molly A. Meegan</u>      Date: <u>10/29/25</u>

Attorney's Printed Name: <u>Molly A. Meegan</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>409 12th Street SW</u>

        <u>Washington, DC 20024</u>

Phone Number: <u>(202) 638-5577</u>      Fax Number: _____

E-Mail Address: <u>mmeegan@acog.org</u>

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1603, 25-1655,</u> 25-1657 & 25-1659

Short Caption: <u>National Institute of Family and Life Advocates v. Treto</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>The American College of Obstetrics and Gynecology as Amicus Curiae</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>ROGER BALDWIN FOUNDATION OF ACLU, INC.</u>

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

   <u>n/a</u>

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>n/a</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>n/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>n/a</u>

Attorney's Signature: <u>*Francisco Negron*</u>    Date: <u>10/30/25</u>

Attorney's Printed Name: <u>Francisco M. Negron, Jr.</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>409 12th Street SW</u>

<u>Washington, DC 20024</u>

Phone Number: <u>(202) 863-2432</u>    Fax Number: _____

E-Mail Address: <u>fnegron@acog.org</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1603, 25-1655,</u> 25-1657 & 25-1659

Short Caption: <u>National Institute of Family and Life Advocates v. Treto</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> ☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    The American College of Obstetrics and Gynecology as Amicus Curiae

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    ROGER BALDWIN FOUNDATION OF ACLU, INC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: *Meaghan H. Davant*    Date: 10/30/25

Attorney's Printed Name: Meaghan H. Davant

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 409 12th Street SW

    Washington, DC 20024

Phone Number: (202) 549-3299    Fax Number:

E-Mail Address: mdavant@acog.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................i

TABLE OF AUTHORITIES .......................................................ii

INTEREST OF *AMICI CURIAE* ..............................................1

ARGUMENT ........................................................................4

    I.    By its own standards, the District Court's judgment erroneously held Section 6.1(1) of the HCRA unconstitutional on its face and permanently enjoined its enforcement in all its applications ........................................5

        A.  Providing expectant management versus termination of pregnancy to a patient with preterm prelabor rupture of membranes before viability.................................8

        B.  Providing prenatal care versus termination of pregnancy to a patient with a pregnancy that creates a risk to life or health. ..............................................................12

        C.  Providing birth control pills versus an intrauterine device to a patient seeking contraceptive services......................13

        D.  Providing ovulation induction medications versus in vitro fertilization to a patient seeking assistance with reproduction.....................................................15

    II.   As an informed consent provision, Section 6.1(1) satisfies intermediate scrutiny ..........................................18

CONCLUSION ....................................................................22

CERTIFICATE OF COMPLIANCE .........................................24

CERTIFICATE OF SERVICE..................................................25

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Ill. Dep't of Pro. Regulation*,
810 N.E.2d 228 (Ill. Ct. App. 1st Dist. 2004) ................................ 20

*Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025) .......................................................... 18

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682, (2014) ....................................................................... 14

*Doe v. Rokita*,
54 F.4th 518 (7th Cir. 2022). .................................................... 19,20

*Hodgson v. Minnesota*,
497 U.S. 417 (1990) .......................................................................... 2

*June Medical Services v. Russo*,
591 U.S. 299 (2020) ......................................................................... 2

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ........................................................... 3

Memorandum of Decision, *NIFLA v. Treto*,
No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294 ... 6,7,8,9,10,11,19,20

*Morr-Fitz, Inc. v. Quinn*,
976 N.E.2d 1160 (Ill. Ct. App. 4th Dist. 2012) .............................. 11

*National Institute of Family and Life Advocates v. Schneider*,
484 F. Sup. 3d 596 (N.D. Ill. 2020) ................................................ 18

*Purtill v. Hess*,
111 Ill.2nd 229 (Ill. 1986) ............................................................... 20

*Simopoulos v. Virginia*,
    462 U.S. 506 (1983) .......................................................................... 2

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) .......................................................................... 2

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022)........................................................ 18

*Whole Woman's Health v. Hellerstedt*,
    579 U.S. 582 (2016) .......................................................................... 2

## STATUTES

745 ILCS 70/2 ................................................................ ..... 20

745 ILCS 70/6 ................................................................ ..... 11

## OTHER AUTHORITIES

ACOG, *Code of Professional Ethics* (2018), https://www.acog.org/-
    /media/project/acog/acogorg/files/pdfs/acog-policies/code-of-
    professional-ethics-of-the-american-college-of-obstetricians-and-
    gynecologists.pdf.......................................................... ....... 7

ACOG, Comm. on Ethics, *Committee Opinion Number 819: Informed
    Consent and Shared Decision Making in Obstetrics and
    Gynecology* (Feb. 2021), https://www.acog.org/-
    /media/project/acog/acogorg/clinical/files/committee-
    opinion/articles/2021/02/informed-consent-and-shared-decision-
    making-in-obstetrics-and-gynecology.pdf.................................. ..7,13

ACOG, Comm. on Health Care for Underserved Women and Committee
    on Ethics, *Patient-Centered Contraceptive Counseling*, Obstetrics
    & Gynecology, Vol. 139, No. 2 (Feb. 2022), https://www.acog.org/-
    /media/project/acog/acogorg/clinical/files/committee-
    statement/articles/2022/02/patient-centered-contraceptive-

counseling.pdf?rev=3f06f012b34f429eb8036f32ed0e4639&hash=A 7B76E27F93501C9E30FEE79C24BD7EC .................................... 15

ACOG, *Effectiveness of Birth Control Methods*, https://www.acog.org/womens-health/infographics/effectiveness-of-birth-control-methods...................................................................... 14

ACOG, Practice Advisory, *Increased Risk of Maternal Morbidity Associated with Previable and Periviable Preterm Prelabor Rupture of Membranes* (June 2025), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2025/05/increased-risk-of-maternal-morbidity-associated-with-previable-and-periviable-preterm-prelabor-rupture-of-membranes ...................................................... 9,10,11,12

ACOG, Practice Bulletin No. 186, *Long-Acting Reversible Contraception Implants and Intrauterine Devices* (Nov. 2017), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2017/11/long-acting-reversible-contraception-implants-and-intrauterine-devices ................................................. 14

ACOG, Practice Bulletin No. 217, *Prelabor Rupture of Membranes* (Mar. 2020), https://www.nccwebsite.org/content/documents/courses/Prelabor%20Rupture%20of%20Membranes.pdf ......................................... 9,10

Am. Acad. of Physician Assistants, *Guidelines for Ethical Conduct for the Physician Assistant Profession* (2013), https://www.aapa.org/wp-content/uploads/2017/02/16-EthicalConduct.pdf............................................................................ 7

Am. Coll. of Nurse-Midwives, *Code of Ethics with Explanatory Statements* (June 2015), https://midwife.org/wp-content/uploads/2024/10/Code-of-Ethics-with-Explanatory-Statements.pdf ............................................................................ 7,8

iv

Am. Med. Ass'n, *Code of Medical Ethics, 2.1.1 Informed Consent* (2016), https://code-medical-ethics.ama-assn.org/sites/amacoedb/files/2022-08/2.1.1.pdf .............................. 7

Am. Nurses Ass'n, *Code of Ethics for Nurses*, §§ 1.4, 2.1 (2015), http://nursingworld.org/DocumentVault/Ethics-1/Code-of-Ethics-for Nurses.html ................................................................ 7

Am. Soc'y for Reprod. Med., *Informed consent in assisted reproduction: an Ethics Committee opinion* (2023), https://www.asrm.org/globalassets/_asrm/practice-guidance/ethics-opinions/pdf/informed_consent_in_assisted_reproduction.pdf ..........
............................................................................ 17

Elizabeth A. Duthie et al., *A conceptual framework for patient-centered fertility treatment*, Reproductive Health, Vol. 14, No. 114 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5590184/pdf/12978_2017_Article_375.pdf ................................................................ 16

Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119:2-1 Obstet. & Gynecol. 215 (2012) ............................................ 13

James McTavish, *Why the Church Says "Yes" to Life and "No" to IVF*, The Linacre Quarterly, Vo. 89(4) (2022) ........................................ 16

Kathryn M. Curtis et al., *U.S. Selected Practice Recommendations for Contraceptive Use, 2024*, Center for Disease Control and Prevention Morbidity and Mortality Weekly Report, Vol. 73, No.3 (Aug. 8, 2024), https://www.cdc.gov/mmwr/volumes/73/rr/pdfs/rr7303a1-H.pdf
.................................................................. 14,15

Plaintiffs' Statement of Undisputed Facts, Ex. C, Illinois State House: Human Services Committee Hearing on SB 1564, May 13, 2015 at 4–5, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 92-4 ................................................................ 10

Rebecca Johnson, "Senator Tammy Duckworth on the Attack That Took Her Legs – And Having a Baby at 50", *Vogue*, Oct. 2018, https://www.vogue.com/article/tammy-duckworth-interview-vogue-october-2018-issue ........................................................................... 17

Sandra Ann Carson & Amanda N. Kallen, *Diagnosis and Management of Infertility: A Review*, JAMA, Vol. 326, No. 1 (July 6, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9302705/pdf/nihms-1804691.pdf .................................................................................. 15,16

Senate Floor Debate Transcript, 99th Gen. Assemb., Reg. Sess. (Ill. Apr. 22, 2015), http://www.ilga.gov/Senate/transcripts/Strans99/09900031.pdf .. 10

Society for Maternal-Fetal Medicine, *Consult Series #54: Assessing the risk of maternal morbidity and mortality*, (Apr. 2021), https://s3.amazonaws.com/cdn.smfm.org/attachments/884/dac6bca e79c7a6be67b04ec66a322f9a.pdf. .................................................. 12

Society for Maternal-Fetal Medicine, *Consult Series #55: Counseling women at increased risk of maternal morbidity and mortality*, (Apr. 2021), https://www.ajog.org/action/showPdf?pii=S0002-9378%2820%2931382-X. ................................................................ 13

Society for Maternal-Fetal Medicine, *Consult Series #71: Management of previable and periviable preterm prelabor rupture of membranes*, (Oct. 2024), https://www.ajog.org/action/showPdf?pii=S0002-9378%2824%2900759-2 ........................................................ 9,10,11

## INTEREST OF *AMICI CURIAE*[1]

The **American College of Obstetricians and Gynecologists ("ACOG")** is the nation's leading group of physicians providing evidence-based obstetric and gynecologic care. As a private, voluntary nonprofit membership organization of more than 60,000 members, ACOG strongly advocates for equitable, exceptional, and respectful care for all women and people in need of obstetric and gynecologic care; maintains the highest standards of clinical practice and continuing education of its members; promotes patient education; and increases awareness among its members and the public of the changing issues facing patients and their families and communities. ACOG's Illinois section has over 2,300 members who, together with their patients, are directly affected by laws impacting access to abortion care and other reproductive health care. ACOG has appeared as *amicus curiae* in courts throughout the country,

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No party, party's counsel, or person, other than the *amici*, their members, or their counsel, contributed money that was intended to fund preparation or submission of this brief. Counsel for Defendant-Appellee/Cross-Appellant Mario Treto, Jr. and for Plaintiffs-Appellants/Cross-Appellees Ronald L. Schroeder, et al., and National Institute of Family & Life Advocates, et al., have all consented to the filing of this amicus brief.

including three times previously during the proceedings in the District Court in these consolidated cases. ACOG's briefs and practice guidelines have been cited by numerous courts as an authoritative voice of science and medicine relating to obstetric and gynecologic health care.[2]

The **American Medical Women's Association (AMWA)** is an organization of women physicians, medical students and other persons dedicated to serving as the unique voice for women's health and the advancement of women in medicine. For the past century, AMWA has worked to ensure excellence in healthcare and endorses evidence-based, medically sound management of reproductive health.

The **Society for Maternal-Fetal Medicine (SMFM)** is the medical professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies. SMFM was founded in 1977, and it represents more than 6,500 members caring for high-risk pregnant people. SMFM provides education, promotes research, and engages in advocacy to advance

---

[2] *See, e.g.*, *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 340-42 (2020); *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 613 (2016); *Stenberg v. Carhart*, 530 U.S. 914, 932-36 (2000); *Hodgson v. Minnesota*, 497 U.S. 417, 454 n.38 (1990); *Simopoulos v. Virginia*, 462 U.S. 506, 517 (1983).

optimal and equitable perinatal outcomes for all people who desire and experience pregnancy. SMFM and its members are dedicated to ensuring that all medically appropriate treatment options are available for individuals experiencing high-risk pregnancies. SMFM's *amicus* briefs also have been cited by multiple courts.[3]

---

[3] *See, e.g.*, *Mayor of Baltimore v. Azar*, 973 F.3d 258, 285 & n.19 (4th Cir. 2020).

## ARGUMENT

Illinois law holds health care providers to standards of care, and health care professionals that fail to meet these standards may be subject to malpractice suits and/or professional discipline. However, since 1977, the Health Care Right of Conscience Act ("HCRCA") has shielded just one category of health care providers from liability—those who refuse to provide certain health care services due to religious objections. Unfortunately, some religious health care facilities, physicians, and other medical professionals took the HCRCA as a license to withhold relevant information about patients' medical circumstances and treatment options, and patients suffered actual harm as a result.

In response, in 2016, the Illinois General Assembly amended the HCRCA with a narrow set of protections for patients ("HCRCA Amendments" or "the Amendments"). In particular, the Amendments added Section 6.1(1) to the HCRCA to ensure that when health care facilities rely on the HCRCA to deny treatment on conscience grounds, their patients will nevertheless learn about their condition, prognosis,

and legal treatment options consistent with the standards that apply to all health care professionals.

The District Court's judgment declared that Section 6.1(1) violates the First Amendment's Free Speech Clause and permanently enjoined its enforcement by the Defendants in all of its applications. *Amici* respectfully submit this brief to illustrate some of the many situations involving reproductive health care where Section 6.1(1) plainly operates as the kind of "informed consent" statute permitted by the First Amendment, even under the District Court's articulated standard.  This Court must reverse the District Court's judgment to the extent that it declares Section 6.1(1) unconstitutional on its face.[4]

## I.    By its own standards, the District Court's judgment erroneously held Section 6.1(1) of the HCRCA unconstitutional on its face and permanently enjoined its enforcement in all its applications.

The District Court recognized that regulations of speech incidental to regulation of professional conduct, including "informed consent"

---

[4] The HCRCA Amendments also added Section 6.1(3), ensuring that patients who are denied a treatment based on conscience receive information about where else they can receive the treatment, which was upheld by the District Court. While *amici* strongly support affirmance of that portion of the District Court's decision, the focus of the discussion in this brief is Section 6.1(1).

statutes, receive more deferential First Amendment analysis than the
ordinary speech regulation that must survive strict scrutiny. Mem. of
Decision at 18-20, 23, 31, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill.
2019), ECF No. 294. In the medical context, the Court held that a
statute qualifies as an "informed consent" provision or other regulation
of the practice of medicine that is incidental to professional conduct for
freedom of speech purposes "when it requires a health care professional,
before she performs a medical procedure, to discuss the nature or
consequences of the impending medical procedure," or otherwise
"facilitates patients' choices directly linked to procedures that have been
or may be performed." *Id.* at 31, 33 (internal quotation omitted).

The District Court's actual analysis of whether Section 6.1(1) is an
informed consent statute narrowly focused on the application of its
articulated standard to the particular medical services offered by the
Plaintiff-Appellant crisis pregnancy centers in these specific cases. *See
id.* at 34-39. For example, the Court observed that the Plaintiffs-
Appellants do not offer or perform any further medical procedures
following the provision of pregnancy tests and ultrasounds. *Id.* at 35.
And the Court stated only that it was not able to find that the specific

6

"medical options counseling" offered by the Plaintiffs-Appellants would

qualify as a medical procedure, without reaching any conclusion as to

whether counseling by medical professionals categorically constitutes

speech or conduct. *Id*. at 38-39.[5]

---

[5] *Amici* strongly support the arguments of the Illinois Attorney General for reversing this portion of the District Court's decision, as the District Court's articulated standard for a constitutional regulation of the practice of medicine that impacts speech only incidentally to professional conduct—and thus, the Court's application of that standard to Section 6.1(1)—was demonstrably wrong. Combined Principal and Resp. Br. of Def.-Appellee/Cross-Appellant at 30-35. When crisis pregnancy centers hold themselves out as providers of medical services (as these Plaintiffs-Appellants do), they can and should be held to the same ethical standards for the practice of medicine as all other health care providers, including providing patients with sufficient information to make informed decisions about their health care. *See, e.g.*, ACOG, *Code of Professional Ethics*, at 2 (2018), https://www.acog.org/-/media/project/acog/acogorg/ files/pdfs/acog-policies/code-of-professional-ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf; ACOG, Comm. on Ethics, *Committee Opinion Number 819: Informed Consent and Shared Decision Making in Obstetrics and Gynecology*, at e35-e36 (Feb. 2021), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2021/02/informed-consent-and-shared-decision-making-in-obstetrics-and-gynecology.pdf; Am. Med. Ass'n, *Code of Medical Ethics, 2.1.1 Informed Consent* (2016), https://code-medical-ethics.ama-assn.org/sites/amacoedb/files/2022-08/2.1.1.pdf; Am. Nurses Ass'n, *Code of Ethics for Nurses*, §§ 1.4, 2.1 (2015), http://nursingworld.org/DocumentVault/Ethics-1/Code-of-Ethics-for-Nurses.html; Am. Acad. of Physician Assistants, *Guidelines for Ethical Conduct for the Physician Assistant Profession*, at 5, 7 (2013), https://www.aapa.org/wp-content/uploads/2017/02/16-EthicalConduct.pdf; Am. Coll. of Nurse-Midwives, *Code of Ethics with Explanatory Statements*

Nevertheless, the District Court's judgment order broadly declared Section 6.1(1) unconstitutional and permanently enjoined its enforcement by the Defendant-Appellee in all its applications. *See* Rule 58 Judgment Order, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 295. It did so despite the fact that there are numerous contexts in reproductive health care where the operation of Section 6.1(1) would clearly be well within the scope of the District Court's articulated standard for a qualifying informed consent statute. The following are just some of many examples.

> A. *Providing expectant management versus termination of pregnancy to a patient with preterm prelabor rupture of membranes before viability.*

Preterm prelabor rupture of membranes (PPROM), which occurs in approximately two to three percent of pregnancies, is defined as the

---

(June 2015), https://midwife.org/wp-content/uploads/2024/10/Code-of-Ethics-with-Explanatory-Statements.pdf.

In this brief, however, *amici* seek to draw the Court's attention to many other instances in the provision of reproductive health care—scenarios which make up the vast majority of the actual applications of Section 6.1(1)—where the HCRCA plainly operates as an "informed consent" law, even under the District Court's own articulated standards. This context demonstrates the inherent incorrectness of the District Court's facial judgment.

rupture of a pregnant patient's membranes before the onset of labor that occurs before 37 weeks of gestation.[6] In less than one percent of pregnancies, this rupture of the membranes occurs before the pregnancy has reached viability (i.e., the point at which the fetus is likely to survive outside the uterus).[7] The treatment options for PPROM before viability include expectant management (i.e., close observation without intervention until the pregnancy reaches viability, at which point delivery is offered) or immediate termination of pregnancy through abortion care.[8]

Expectant management of PPROM before viability is associated with significant risks of maternal complications and morbidity.[9]

---

[6] ACOG, Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, e80 (Mar. 2020), https://www.nccwebsite.org/content/documents/courses/Prelabor%20Rupture%20of%20Membranes.pdf

[7] *Id*. at e81.

[8] Society for Maternal-Fetal Medicine, *Consult Series #71: Management of previable and periviable preterm prelabor rupture of membranes*, B3 (Oct. 2024), https://www.ajog.org/action/showPdf?pii=S0002-9378%2824%2900759-2.

[9] ACOG, Practice Advisory, *Increased Risk of Maternal Morbidity Associated with Previable and Periviable Preterm Prelabor Rupture of Membranes* (June 2025), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2025/05/increased-risk-of-maternal-morbidity-associated-with-previable-and-periviable-preterm-prelabor-rupture-of-membranes.

Counseling regarding the less risky alternative of immediate termination through abortion is therefore highly relevant information that a health care professional should provide to a patient being offered expectant management as treatment for PPROM before viability, to enable them to make an informed decision about their course of treatment.[10]

  This exact situation was among the problems that the General Assembly aimed to address when it adopted the HCRCA Amendments. During the legislative process, the General Assembly heard testimony from an Illinois woman named Mindy Swank who experienced PPROM before viability and was repeatedly denied information about and access to abortion care by hospitals following Catholic health care restrictions as she suffered increasingly heavy bleeding over the course of several weeks.[11]

---

[10] *See* ACOG, *supra* n. 6, at e88; ACOG, *supra* n. 9; Society for Maternal-Fetal Medicine, *supra* n. 8, at B5.

[11] *See generally* Pls.' Stm't of Undisputed Facts, Ex. C, Illinois State House: Human Services Committee Hearing on SB 1564, May 13, 2015 at 4–5, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 92-4; Senate Floor Debate Transcript, 99th Gen. Assemb., Reg. Sess. (Ill. Apr. 22, 2015) at 183-84, 198-200, 207, http://www.ilga.gov/Senate/transcripts/Strans99/09900031.pdf.

The District Court seemed to suggest that a pregnant person in this situation would still be protected because of the HCRCA's provision that "nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care." *See* Mem. of Decision at 3-4, 6 (citing 745 ILCS 70/6). That is not the case. The Illinois Appellate Court has interpreted this emergency exception extremely narrowly—for example, holding that medication that had to be taken within 72 hours in order to be effective did not qualify as "emergency medical care" within the scope of this provision of the HCRCA. *Morr-Fitz, Inc. v. Quinn*, 976 N.E.2d 1160, 1175 (Ill. Ct. App. 4th Dist. 2012). With PPROM before viability, it can take days or even weeks before the associated complications that pose a significant risk of maternal morbidity and mortality materialize, and it is not possible to know how quickly a patient will or will not decompensate.[12] Section 6.1(1) is necessary to ensure that a patient receives information about abortion

---

[12] *See* Society for Maternal-Fetal Medicine, *supra* n. 8, at B7 (citing study of seven cases of maternal death where the median interval between PPROM and the first signs of infection was 5 days, but the median time to death once infection was identified was only 18 hours). *See also* ACOG, *supra* n. 6, at e81.

care as a treatment option before an emergency arises, so that they can make an informed decision about how to respond to a risk that can occur without much warning but may not be presently imminent.[13]

*B. Providing prenatal care versus termination of pregnancy to a patient with a pregnancy that creates a risk to life or health.*

Some medical factors can increase the risk of a pregnant patient experiencing morbidity or even mortality during pregnancy or after labor and delivery. These include chronic health conditions, infectious diseases, substance use, mental health conditions, and obstetrical factors arising from previous pregnancies.[14] For pregnant patients with such preexisting conditions, counseling about the associated risks and the treatment options for managing those risks, including the option of terminating the pregnancy, is crucial. Any health care professional offering prenatal care to such patients should provide this information

---

[13] *See* ACOG, *supra* n. 6, at e81, e88.
[14] Society for Maternal-Fetal Medicine, *Consult Series #54: Assessing the risk of maternal morbidity and mortality*, B3-B4 (Apr. 2021), https://s3.amazonaws.com/cdn.smfm.org/attachments/884/dac6bcae79c7a6be67b04ec66a322f9a.pdf.

to ensure that the patient is able to give informed consent to the care that they will receive from that professional.[15]

Even for individuals without preexisting conditions, pregnancy is not a health-neutral event. The risks of both complications and death are higher across the board for live birth than for abortion.[16] While many pregnant people willingly accept these risks, all prenatal care patients must have access to information about how pregnancy may impact their health, and their options for terminating an undesired pregnancy if they do not want to assume these risks, in order to provide informed consent to their ongoing medical care.[17]

> ### C. Providing birth control pills versus an intrauterine device to a patient seeking contraceptive services.

Patients seeking contraceptive services to prevent pregnancy may consider and prioritize many factors when choosing their contraceptive

---

[15] Society for Maternal-Fetal Medicine, *Consult Series #55: Counseling women at increased risk of maternal morbidity and mortality*, B16 (Apr. 2021), https://www.ajog.org/action/showPdf?pii=S0002-9378%2820%2931382-X.

[16] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119:2-1 Obstet. & Gynecol. 215, 216-17 (2012).

[17] *See* ACOG, *Committee Opinion Number 819: Informed Consent and Shared Decision Making in Obstetrics and Gynecology*, *supra* n. 5, at e35-e36, e39.

method, including safety, effectiveness, accessibility, side effects, user

control, reversibility, and ease of removal or discontinuation.[18] On the

particular question of effectiveness, intrauterine devices are more

effective than birth control pills.[19] However, some health care

professionals have religious objections to providing intrauterine devices,

specifically, because they consider them to be "abortifacients."[20]

Nevertheless, counseling regarding all available contraceptive methods

and how their respective attributes intersect with the patient's own

experiences, values, and preferences is critical information a health care

professional should provide to any patient being offered a prescription

---

[18] Kathryn M. Curtis et al., *U.S. Selected Practice Recommendations for Contraceptive Use, 2024*, Center for Disease Control and Prevention Morbidity and Mortality Weekly Report, Vol. 73, No.3, at 6 (Aug. 8, 2024), https://www.cdc.gov/mmwr/volumes/73/rr/pdfs/rr7303a1-H.pdf.
[19] ACOG, Effectiveness of Birth Control Methods, https://www.acog.org/womens-health/infographics/effectiveness-of-birth-control-methods.
[20] *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 701-702 (2014). *But see* ACOG, Practice Bulletin No. 186, *Long-Acting Reversible Contraception Implants and Intrauterine Devices* (Nov. 2017), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2017/11/long-acting-reversible-contraception-implants-and-intrauterine-devices (available evidence supports that neither copper or hormonal IUDS disrupt pregnancy and thus are not abortifacients).

for birth control pills so that they can make an informed decision about the treatment that best meets their own needs.[21]

### D. Providing ovulation induction medications versus in vitro fertilization to a patient seeking assistance with reproduction.

In the United States, approximately 12.7 percent of reproductive age women seek treatment for infertility each year.[22] Two common fertility treatments are use of medications to induce ovulation, and in vitro fertilization or IVF (i.e., retrieval of eggs, fertilization in a lab, and transfer of a resulting embryo in the uterus).[23] The effectiveness of both of these treatments declines with the patient's age, but at any age, IVF is a more effective treatment than the use of ovulation inducing medications alone.[24] In addition, IVF can be a preferred course of

---

[21] *See* Curtis, *supra* n. 18, at 6-7; ACOG, Comm. on Health Care for Underserved Women and Committee on Ethics, *Patient-Centered Contraceptive Counseling*, Obstetrics & Gynecology, Vol. 139, No. 2, at 352 (Feb. 2022), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-statement/articles/2022/02/patient-centered-contraceptive-counseling.pdf?rev=3f06f012b34f429eb8036f32ed0e4639&hash=A7B76E27F93501C9E30FEE79C24BD7EC.

[22] Sandra Ann Carson & Amanda N. Kallen, *Diagnosis and Management of Infertility: A Review*, JAMA, Vol. 326, No. 1, at 1 (July 6, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9302705/pdf/nihms-1804691.pdf.

[23] *Id.* at 6-7.

[24] *Id.* at 8.

treatment depending on the cause of a patient's fertility issues, which may not be treatable with medications.[25] However, some health care professionals will not provide IVF because of religious beliefs about the relationship between sexual intercourse and procreation and/or the discarding of unused embryos following fertility treatments.[26]

Patients making decisions about treatment to assist with reproduction weigh a variety of factors including "effectiveness, physical and emotional burden, time, cost, potential risks, and genetic parentage."[27] Counseling regarding all available treatment options, including the relative likelihood of success for different options depending on the patient's age and other circumstances, is relevant information that a health care professional should provide to any patient being offered medication to induce ovulation so that they can

---

[25] *Id.*

[26] *See, e.g.*, James McTavish, *Why the Church Says "Yes" to Life and "No" to IVF*, The Linacre Quarterly, Vo. 89(4), 450-454 (2022).

[27] Elizabeth A. Duthie et al., *A conceptual framework for patient-centered fertility treatment*, Reproductive Health, Vol. 14, No. 114, at 9 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5590184/pdf/12978_2017_Article_375.pdf.

make an informed decision about their course of treatment for their fertility issues.[28]

Failure to provide this information results in concrete harm to a patient's ability to provide informed consent to the treatment that best serves their personal interests. For example, U.S. Senator Tammy Duckworth of Illinois has spoken publicly about how the denial of this critical information caused her material harm, when she was forced to undergo eight years of unsuccessful fertility treatments from a doctor at a facility following Catholic health care restrictions, who never told her that IVF would be an alternative option if she sought care from a different health care provider.[29]

------------

As these examples demonstrate, when analyzed in the broader context of reproductive health care, Section 6.1(1) is plainly an informed

---

[28] *See* Am. Soc'y for Reprod. Med., *Informed consent in assisted reproduction: an Ethics Committee opinion* (2023), https://www.asrm.org/globalassets/_asrm/practice-guidance/ethics-opinions/pdf/informed_consent_in_assisted_reproduction.pdf.
[29] Rebecca Johnson, "Senator Tammy Duckworth on the Attack That Took Her Legs – And Having a Baby at 50", *Vogue*, Oct. 2018, https://www.vogue.com/article/tammy-duckworth-interview-vogue-october-2018-issue.

consent statute, even under the District Court's own articulated

standard.

## II.    As an informed consent provision, Section 6.1(1) satisfies intermediate scrutiny.

There is disagreement among lower courts regarding the level of

scrutiny—rational basis review versus intermediate scrutiny—to be

applied in a First Amendment challenge to an informed consent statute

or other regulation of the practice of medicine that is incidental to

professional conduct. *Compare Tingley v. Ferguson*, 47 F.4th 1055,

1077-79 (9th Cir. 2022) (applying rational basis review to law deemed

regulation of professional conduct) *with Brandt by and through Brandt

v. Griffin*, 147 F.4th 867, 888-90 (8th Cir. 2025) (applying intermediate

scrutiny to law deemed regulation of professional conduct). As Judge

Pallmeyer noted in her decision at the summary judgment stage of this

case, the Supreme Court did not resolve this question in either *National

Institute of Family and Life Advocates v. Becerra* or *Planned Parenthood

of Southeastern Pennsylvania v. Casey. See National Institute of Family

and Life Advocates v. Schneider*, 484 F. Sup. 3d 596, 614-15 (N.D. Ill.

2020). And when this Court recently upheld an Indiana law requiring

abortion providers to tell patients about statutory options for

18

disposition of fetal remains against a First Amendment challenge in

*Doe v. Rokita*, it did not specify the level of scrutiny it was applying. 54

F.4th 518, 520-21 (7th Cir. 2022).

It remains unnecessary for this Court to resolve the issue of the

correct level of scrutiny in such cases, because Section 6.1(1) is

constitutional even under an intermediate scrutiny standard of review.

The District Court's passing suggestion in a footnote that applications

of Section 6.1(1) within the scope of an informed consent statute or

other regulation of the practice of medicine incidental to professional

conduct would fail intermediate scrutiny is incorrect. Mem. of Decision

at n.16, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294.

To survive intermediate scrutiny, a law must advance important

governmental interests unrelated to the suppression of speech and not

burden substantially more speech than necessary to further those

interests. *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. ---, 145 S. Ct.

2291, 2317 (2025). Here, Illinois has an important interest in ensuring

that all patients receive complete, timely, and scientifically accurate

information about their health conditions and treatment options in

order to make informed decisions about their medical care, even when

19

their health care providers may have conscience-based objections to providing certain treatments themselves. *See* 745 ILCS 70/2 (declaring the public policy of the State of Illinois to both respect and protect conscience rights and ensure that patients receive timely access to information and medically appropriate care). *Cf. Doe*, 54 F.4th at 520 ("The norm that units of government may require physicians (and other professionals) to provide accurate information to their clients long predates *Casey* and has not been disturbed since.")

Furthermore, the requirements of Section 6.1(1) are tailored to serving that important state interest. By making explicit reference to what "current standards of medical practice or care" require in a specific patient's situation, Section 6.1(1) merely ensures that providers with conscience-based objections who seek to invoke the shield of the HCRCA's protections will follow the same standards as any other health care provider facing the same set of facts, and is therefore neither underinclusive nor overinclusive.

Further, the District Court's conclusion that Section 6.1(1) is overbroad as a matter of strict scrutiny analysis (*see* Mem. of Decision at 42) missed a key point: the HCRCA provides a shield against forms of

20

liability and discipline that are themselves related to what the standard of care requires in the first place. *See, e.g*, *Purtill v. Hess*, 111 Ill.2nd 229, 241-42 (Ill. 1986) ("In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want or skill or care."); *Anderson v. Ill. Dep't of Pro. Regulation*, 810 N.E.2d 228, 560-61 (Ill. Ct. App. 1st Dist. 2004) (upholding decision that doctor committed gross negligence and dishonorable, unethical or unprofessional conduct in violation of the Medical Practice Act that was supported by testimony on the applicable standard of care and a finding that the doctor breached that standard).

If a health care provider with a conscience-based objection fails to provide information to a patient which was not tied directly to the standard of care for that patient's particular circumstances in the first place, they risk no liability or discipline against which they would need to invoke the shield of the HCRCA, and therefore lose no protection or benefit by the operation of Section 6.1(1). And if a health care provider

with a conscience-based objection *does* provide information to a patient that is consistent with the standard of care in that patient's particular circumstances pursuant to Section 6.1(1), then they are directly serving the State's important interest of ensuring that patients can make informed decisions about their medical care. Thus, by tying Section 6.1(1)'s requirements to invoke the protections of the HCRCA to the standard of care in any given situation, the law is tailored to ensure that it does not burden substantially more speech than necessary.

## CONCLUSION

Accordingly, *amici curiae* American College of Obstetricians and Gynecologists, American Medical Women's Association, and Society for Maternal-Fetal Medicine respectfully ask this Court to reverse the District Court's judgment with respect to Section 6.1(1) of the Health Care Right of Conscience Act.

Dated: November 3, 2025          Respectfully submitted,

/s/ Emily Werth
Emily Werth
Rebecca K. Glenberg
Allison Siebeneck
ROGER BALDWIN FOUNDATION OF
ACLU, INC.

150 N. Michigan Ave., Suite 600
Chicago, IL 60601
312-201-9740 ext. 333
ewerth@aclu-il.org

Molly A. Meegan
Francisco M. Negrón, Jr.
Meaghan Hannan Davant
AMERICAN COLLEGE OF OBSTETRICIANS
& GYNECOLOGISTS
409 12th Street, SW
Washington, DC 20024

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 4,063 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Century Schoolbook font.


Dated: November 3, 2025          /s/ Emily Werth
                                 Emily Werth

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2025, I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit, causing notice of such filing to be served upon all parties registered on the CM/ECF system.


Dated: November 3, 2025          /s/ Emily Werth
                                 Emily Werth