Nos. 25-1657, 25-1659

# In the United States Court of Appeals for the Seventh Circuit

RONALD L. SCHROEDER, ET AL.

and

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, ET AL.,
*Plaintiffs-Appellants-Cross-Appellees,*

v.

MARIO TRETO, JR.,
*Defendant-Appellee-Cross-Appellant.*

On Appeal from the United States District Court for the
Northern District of Illinois, Western Division
Case No. 3:16-cv-50310, Hon. Iain D. Johnston

**BRIEF *AMICI CURIAE* OF THE CATHOLIC CONFERENCE OF
ILLINOIS, THE ILLINOIS CATHOLIC HEALTH ASSOCIATION,
THE ORTHODOX CHURCH IN AMERICA,
AND THE SERBIAN ORTHODOX DIOCESE OF NEW
GRAČANICA-MIDWESTERN AMERICA IN SUPPORT OF
PLAINTIFFS–APPELLANTS–CROSS-APPELLEES AND
AFFIRMANCE IN DEFENDANT'S CROSS-APPEAL**

Eric C. Rassbach
Richard C. Osborne
   *Counsel of Record*
Timothy P. Kowalczyk
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
   Suite 400
Washington, DC 20006
(202) 955-0095
*rosborne@becketfund.org*

*Counsel for Amici Curiae*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1657; 25-1659

Short Caption: National Institute of Family and Life Advocates v. Treto

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Catholic Conference of Illinois; Illinois Catholic Health Association; Orthodox Church in America;

Serbian Orthodox Diocese of New Gracanica-Midwestern America

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Becket Fund for Religious Liberty

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s Richard Osborne    Date: 12/16/2025

Attorney's Printed Name: Richard Osborne

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 1919 Pennsylvania Ave. N.W., Suite 400, Washington, DC 20006

Phone Number: 202-955-0095    Fax Number:

E-Mail Address: rosborne@becketfund.org

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1657; 25-1659</u>

Short Caption: <u>National Institute of Family and Life Advocates v. Treto</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Catholic Conference of Illinois; Illinois Catholic Health Association; Orthodox Church in America;</u>

<u>Serbian Orthodox Diocese of New Gracanica-Midwestern America</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>The Becket Fund for Religious Liberty</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s Eric Rassbach</u>    Date: <u>12/16/2025</u>

Attorney's Printed Name: <u>Eric Rassbach</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✔]

Address: <u>1919 Pennsylvania Ave. N.W., Suite 400, Washington, DC 20006</u>

Phone Number: <u>202-955-0095</u>    Fax Number: _____

E-Mail Address: <u>erassbach@becketfund.org</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1657; 25-1659</u>

Short Caption: <u>National Institute of Family and Life Advocates v. Treto</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Illinois Catholic Conference; Illinois Catholic Health Association; Orthodox Church in America;</u>

<u>Serbian Orthodox Diocese of New Gracanica-Midwestern America</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>The Becket Fund for Religious Liberty</u>

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

<u>N/A</u>

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

<u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s Timothy Kowalczyk</u>    Date: <u>12/16/2025</u>

Attorney's Printed Name: <u>Timothy Kowalczyk</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>1919 Pennsylvania Ave. N.W., Suite 400, Washington, DC 20006</u>

Phone Number: <u>202-955-0095</u>    Fax Number: _____

E-Mail Address: <u>tkowalczyk@becketfund.org</u>

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

INTEREST OF *AMICI CURIAE* ............................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................. 3

ARGUMENT ........................................................................... 5

  I.  History and tradition teach that religious speech is
entitled to the highest level of protection available
under the First Amendment. ............................................. 5

    A. In the Anglo-American tradition, religious speech
lay at the origins and core of freedom of speech............................ 5

      1.  Freedom of speech in post-Conquest England. .......................... 5

      2.  Freedom of speech after the English Reformation. ................... 6

      3.  Freedom of speech in the American colonies. ........................... 10

    B. At the founding, the Framers adopted broad
protections for religious speech....................................... 12

      1.  The Revolution was fought to secure freedom
of religious speech....................................................... 12

      2.  The Founders ensured that religious speech
received robust protection. ........................................... 14

    C. Since the founding, religious speech has consistently
been treated as core speech that enjoys the highest
level of protection. ......................................................... 16

      1.  Early American courts understood that religious
speech enjoyed a preferred position. ........................................ 16

      2.  The Fourteenth Amendment's framers established
that religious speech is entitled to special solicitude. .............. 17

3.  The Supreme Court has given religious speech
    the highest level of protection. .................................... 19

II. Illinois's benefits-discussion requirement violates
    the Free Speech Clause because it burdens core
    religious speech. ......................................................... 24

A. Plaintiffs are religious pregnancy centers engaged
   in core religious speech. .............................................. 24

B. The benefits-discussion requirement burdens
   Plaintiffs' core religious speech. .................................. 25

C. Illinois's benefits-discussion requirement fails
   strict scrutiny. ............................................................ 26

III. Giving religious entities the highest level of First
     Amendment protection offers predictability to
     litigants and courts ..................................................... 28

A. Heightened protection gives predictability to litigants. ............... 28

B. Heightened protection gives predictability to the courts. ............ 30

CONCLUSION ............................................................... 31

CERTIFICATE OF COMPLIANCE ........................................ 33

CERTIFICATE OF SERVICE ............................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)................................................................23, 26

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986)....................................................................23

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)....................................................................27

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940)....................................................................20

*Capitol Square Rev. & Advisory Bd. v. Pinette*,
    515 U.S. 753 (1995)..................................................................21-22

*Commonwealth v. Cronin*,
    2 Va. Cir. 488 (Va. Cir. 1855) ...................................................17

*Connick v. Myers*,
    461 U.S. 138 (1983)....................................................................22

*Corp. of the Presiding Bishop v. Amos*,
    483 U.S. 327 (1987)....................................................................29

*FEC v. Cruz*,
    596 U.S. 289 (2022)........................................................23, 24, 31

*Free Speech Coal. v. Paxton*,
    606 U.S. 461 (2025)....................................................................27

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)....................................................................17

*Gitlow v. New York*,
    268 U.S. 652 (1925)....................................................................19

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) .................................................................. 22

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................... 30

*Ill. Republican Party v. Pritzker*,
973 F.3d 760 (7th Cir. 2020) ................................... 23-24, 27

*Janus v. AFSCME*,
585 U.S. 878 (2018) ................................................................ 26

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ................................................................ 23

*Lamb's Chapel v. Ctr. Moriches Union
Free Sch. Dist.*,
508 U.S. 384 (1993) ................................................................ 22

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
594 U.S. 180 (2021) ................................................................ 23

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ................................................................ 25

*Morse v. Frederick*,
551 U.S. 393 (2007) ................................................................ 23

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943) ........................................................... 20-21

*NIFLA v. Becerra*,
585 U.S. 755 (2018) .......................................................... 26, 31

*Our Lady of Guadalupe v. Morrissey-Berru*,
591 U.S. 732 (2020) .......................................................... 29, 30

*People v. Phillips*,
1 W.L.J. 109 (N.Y. Ct. Gen. Sess. June 14, 1813) ........ 16, 17

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015).................................................24, 26-27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)................................................22

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022)................................................22

*Village of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980)................................................20

*Watchtower Bible & Tract Soc'y of*
   *N.Y., Inc. v. Village of Stratton*,
   536 U.S. 150 (2002)................................................20

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)...............................................21, 23

*Widmar v. Vincent*,
   454 U.S. 263 (1981)................................................22

*Wooley v. Maynard*,
   430 U.S. 705 (1977)................................................22

## Statutes & Constitutions

745 Ill. Comp. Stat. 70/6.1.................................................26, 30

N.Y. Const. of 1777.....................................................27-28

U.S. Const. art. VI......................................................15

## Other Authorities

4 Annals of Cong. 934 (1794) .................................................16

Peter Ackroyd, *The Life of Thomas More* (1998) ......................................8

Act of Supremacy, 26 Hen.VIII c.1 (1534) ...............................7

John Adams, Letter to Thomas Boylston Adams (Mar. 18, 1794) .........13

Akhil Reed Amar, *How America's
   Constitution Affirmed Freedom of
   Speech Even Before the First Amendment*,
   38 Cap. U. L. Rev. 503 (2010) ............................................................ 16

An Act Respecting the Oath to the Succession,
   26 Hen.VIII c.2 (1534) ......................................................................... 7

Frank Barlow, *Thomas Becket* (1986) ...................................................... 6

Edmund Burke, Speech on Conciliation with the Colonies
   (Mar. 22, 1775) .................................................................................. 13

Wendell Bird, *The Revolution in Freedoms of
   Press and Speech* (2020) .............................................................. 9, 10

*Catechism of the Catholic Church* ...................................................... 1, 29

*Cong. Globe*, 35th Cong., 2d Sess. (1859) ............................................ 18

*Cong. Globe*, 38th Cong., 2d Sess. (1864) ............................................ 19

*Cong. Globe*, 42d Cong., 1st Sess. (1871) ......................................... 18-19

Constitutions of Clarendon (1164), *reproduced
   and translated in* Ernest F. Henderson,
   *Select Historical Documents of the Middle Ages* (1892) .................. 5-6

Conventicle Act 1664, 16 Car.II c.4 ........................................................ 9

Jonathan Elliot, 2 *The Debates in the Several
   State Conventions on the Adoption of the
   Federal Constitution* (2d ed. 1941) ..................................................... 15

Robert A. Ferguson, *Reading the Early Republic* (2004) ...................... 13

David Hackett Fischer, *Albion's Seed* (1989) ....................................... 11

John Foxe, 2 *Actes and Monuments* (1610) ............................................. 8

James H. Hutson, "The Emergence of the Modern
    Concept of a Right in America," in *The Nature of*
    *Rights at the American Founding and Beyond* 48
    (Barry Alan Shain, ed. 2007) ............................................................ 13

John D. Inazu, *Liberty's Refuge: The Forgotten*
    *Freedom of Assembly* (2012) ...................................................... 9, 11-12

Douglas Laycock, *Continuity and Change in the*
    *Threat to Religious Liberty: The Reformation*
    *Era and the Late Twentieth Century,*
    80 Minn. L. Rev. 1047 (1996)............................................................ 7, 8

Douglas Laycock, *High-Value Speech and the*
    *Basic Educational Mission of A Public School:*
    *Some Preliminary Thoughts,*
    12 Lewis & Clark L. Rev. 111 (2008)...................................................... 7

Kurt T. Lash, *The Second Adoption of the Free*
    *Exercise Clause: Religious Exemptions Under*
    *the Fourteenth Amendment,*
    88 Nw. U. L. Rev. 1106 (1994)...................................................... 17-18

James Madison, *Memorial and Remonstrance*
    *Against Religious Assessments* (1785)........................................ 24-25

Magna Carta (1215) .......................................................................... 6

Michael W. McConnell, *Establishment and*
    *Disestablishment at the Founding, Part I:*
    *Establishment of Religion,*
    44 Wm. & Mary L. Rev. 2105 (2003) ................................................. 11

Michael W. McConnell, *The Origins and*
    *Historical Understanding of Free Exercise of Religion,*
    103 Harv. L. Rev. 1409 (1990) .................................................... *passim*

Michael W. McConnell, *Tradition and*
    *Constitutionalism Before the Constitution,*
    1998 U. Ill. L. Rev. 173 (1998).......................................................... 14

*Overview*, Catholic Conference of Illinois ...............................................28

*Parliament*, 2 *Compact Edition of the Oxford*
  *English Dictionary* 2080 (1971)...........................................................6

Jason Peacey, Robert G. Ingram, & Alex W. Barber,
  "Freedom of speech in England and the anglophone world,
  1500-1850," in Freedom of Speech,
  1500-1850 (Ingram, et al., eds.)........................................................6-7

Philip Hamburger, *Natural Rights, Natural Law,*
  *and American Constitutions*,
  102 Yale L.J. 907 (1993) ............................................................. 13, 14

Popish Recusants Act 1605, 3 & 4 Jac. ..................................................8-9

Popish Recusants Act 1592, 35 Eliz.I, c.2 ..............................................8

Religion Act 1592, 35 Eliz.I, c.1 ............................................................8

*Religious Landscape Study*, Pew Research Center
  (Feb. 26, 2025)...................................................................................30

Ezra Stiles, *A Discourse on the Christian Union* (1760) ........................13

Jeffrey S. Sutton, Barnette*, Frankfurter, and*
  *Judicial Review*, 96 Marq. L. Rev. 133 (2012) ..............................19-20

Test Act 1673, 25 Car.II c.2.....................................................................9

Toleration Act 1688, 1 Will. & Mary c.18 (1688) ..................................10

*The Trial of the Seven Bishops for Publishing a Libel* (1688)
  12 How. St. Tr. 183, *reprinted in*
  5 The Founders' Constitution 189
  (Philip B. Kurland & Ralph Lerner eds., 1987) ................................10

Susan Wyly-Jones, *The 1835 Anti-Abolition Meetings*
  *in the South: A New Look at the Controversy over*
  *the Abolition Postal Campaign*,
  47 Civil War History 289 (2001).......................................................18

Virginia Statute for Religious Freedom (1786) ...................................... 15

## INTEREST OF *AMICI CURIAE*[1]

Amici curiae are the Catholic Conference of Illinois, the Illinois Catholic Health Association, the Orthodox Church in America, and the Serbian Orthodox Diocese of New Gračanica-Midwestern America.

The Catholic Conference of Illinois serves as the public-policy voice and coordinating body for the bishops and lay faithful of the six Catholic dioceses in Illinois. The Conference advocates for Catholic Social Teaching in matters of public policy for all Catholics in Illinois, which includes 46 hospitals and 21 healthcare centers. The Conference serves as liaison between the Catholic Church in Illinois and national Catholic groups with respect to public policy. The Conference has a significant interest in defending Catholic doctrine in this cross-appeal, as the Church maintains that "[h]uman life must be respected and protected absolutely from the moment of conception." *Catechism of the Catholic Church* § 2270. Because Catholic doctrine further provides that "[f]ormal cooperation in an abortion constitutes a grave offense," *id.* § 2272, the Conference seeks to ensure that no Catholic healthcare provider in Illinois will be forced to speak against the Church's true teachings on abortion.

The Illinois Catholic Health Association is a statewide non-profit association connecting Catholic organizations in the health and social

---

[1]  No person other than Amici and their counsel assisted with or made a monetary contribution for preparing or submitting this brief. Amici have sought leave to file this brief.

service ministries in the Roman Catholic Church, including dioceses, religious congregations, hospitals, nursing homes, health systems, elderly housing, and medical clinics. Its mission is to help build community among Catholic health and social service organizations and their leaders in the areas of missions, ministry, ethics, public policy, and areas affecting Catholic identity.

The Orthodox Church in America traces its historical origins to the arrival in Kodiak, Alaska, of a small number of Russian Orthodox missionaries who were dispatched to North America in 1794. Today, the Orthodox Church in America counts some 700 parishes, missions, communities, monasteries, and institutions throughout the United States, Canada, and Mexico. The Orthodox Church in America is one of the autocephalous, self-governing, Orthodox Churches throughout the world.

The Serbian Orthodox Diocese of New Gračanica-Midwestern America, governed by its Ruling Bishop, the Most Reverend Archbishop and Metropolitan Longin Krčo, has territorial jurisdiction over the States of Illinois, Indiana, Wisconsin, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, Oklahoma, Arkansas, Louisiana, Texas, Alabama, Mississippi, Kentucky and Tennessee. The diocese is headquartered in Libertyville, Illinois, and presently is comprised of over 52 parishes, five monasteries and sketes, a School of Theology, three parochial schools and other institutions, which administer the Holy Mysteries/Sacraments, educate, and minister to the more than

500,000 persons of Serbian descent who live in these States and to the Orthodox Christians who have chosen to accept the omophorion/jurisdiction of the Serbian Orthodox Church.

Although Amici belong to different religious traditions, they are united in their concern that allowing Illinois to force religious groups and individuals to speak and promote the State's preferred viewpoint on an issue of public and moral concern would threaten their ability to communicate with the faithful and weaken their public witness. Amici therefore stand firmly against laws that burden religious speech like the one at issue in this cross-appeal.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

For nearly 40 years, Illinois protected the consciences of healthcare providers with religious objections to providing abortion services, giving them absolute immunity from any suit or disciplinary action based on their refusal to provide such services. But that all changed when the Illinois Legislature amended the state's conscience-protection statute by imposing eligibility requirements that defeat the statute's purpose. Under the new law, healthcare providers can no longer receive *any* conscience-based protections unless they're first willing to violate their consciences by explaining to their patients the "benefits" of abortion. This means that religious healthcare providers will now be exposed to civil and criminal

liability simply for maintaining their sincerely held religious beliefs and for refusing to endorse and promote the State's views on abortion.

As the district court correctly held, Illinois's attempt to force pro-life religious pregnancy centers to explain the "benefits" of abortion violates the First Amendment's compelled-speech doctrine. But there's an even simpler, and narrower, way to resolve this cross-appeal—one that reflects the history and tradition of freedom of speech in Anglo-American law. Freedom of speech first emerged within the Anglo-American tradition as freedom of *religious* speech, and religious speech has retained a special role in our law ever since. Today, this history means that religious speech—like political speech—is core speech that cannot be burdened unless the regulation furthers a historically recognized compelling interest. And history and tradition show that such interests existed only in very limited circumstances, such as when speech threatened "peace and safety" or promoted "licentiousness." Here, Illinois's asserted interest in healthcare access doesn't pass muster.

Giving religious entities the highest level of First Amendment protection also offers predictability to litigants and courts. It offers predictability to litigants because it will ensure that religious groups cannot be forced to violate their consciences outside of a limited and defined set of historically recognized compelling interests. And it offers predictability

to courts because these historical interests will make other religious-speech cases easier to decide.

## ARGUMENT

## I. History and tradition teach that religious speech is entitled to the highest level of protection available under the First Amendment.

The Free Speech Clause stands in a long tradition of protection for religious speech that stretches back from well before the founding until today. In the Anglo-American tradition, freedom of speech began as freedom of religious speech, and it has retained a preferred position in our constitutional order ever since.

### A. In the Anglo-American tradition, religious speech lay at the origins and core of freedom of speech.

#### 1. Freedom of speech in post-Conquest England.

In English law, freedom of speech began as freedom of *religious* speech, and specifically as institutional religious speech. Indeed, in post-Conquest England, the only entity with a kind of nascent freedom of speech as against the King was the Church. It was thus between King and Church where the first conflicts over freedom of speech arose. For example, the Constitutions of Clarendon, which eventually led to Archbishop Thomas Becket's murder, forbade church officials from excommunicating the King's vassals without first asking the King to "do justice" with respect to those vassals, and from ordaining peasants without consent of the relevant lord. Constitutions of Clarendon ¶¶ 7, 16 (1164),

*reproduced and translated in* Ernest F. Henderson, *Select Historical Documents of the Middle Ages* 13-15 (1892). In fact, it was Becket's excommunication of three bishops—an act of pure institutional religious speech—that reportedly so enraged the King that he nudged his knights to act against Becket. *See* Frank Barlow, *Thomas Becket* 235 (1986).

Becket's murder in 1170, and the societal condemnation of the King that followed, shook the English polity to its foundations. But the incident ultimately resulted in society-wide recognition that the Church had a limited form of freedom of religious institutional speech. It was thus no accident that the first freedom granted in Magna Carta was King John's promise "that the English Church shall be free, and shall have its rights undiminished, and its liberties unimpaired." Magna Carta (1215).

In time, this nascent freedom of speech spread beyond church bodies to Parliament, whose very name reflected the body's focus on speech. *See Parliament*, 2 *Compact Edition of the Oxford English Dictionary* 2080 (1971) (derived from French "parler"). But even with this development of what later became the freedom of speech and debate, the freedom of speech remained focused on institutions rather than individuals.

**2. Freedom of speech after the English Reformation.**

It was only during the religious conflicts that erupted in the 1500s with the English Reformation that individuals began to invoke freedom of speech. Still, this freedom remained a *religious* concept: "Early debates about free speech were fundamentally debates about the freedom of

*religious* speech." Jason Peacey, Robert G. Ingram, & Alex W. Barber, "Freedom of speech in England and the anglophone world, 1500-1850," in *Freedom of Speech, 1500-1850* (Ingram, *et al.*, eds.); *see also* Douglas Laycock, *High-Value Speech and the Basic Educational Mission of A Public School: Some Preliminary Thoughts*, 12 Lewis & Clark L. Rev. 111, 124 (2008) ("In the early modern era … the speech that governments most wanted to suppress was very often religious speech.").

When King Henry VIII broke from Rome in 1534, he quickly moved to suppress "both Roman Catholicism and extreme Protestantism (of which Puritanism was the most prominent element)." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1421 (1990) (*Origins*). This was done through a series of statutes adopted under Henry and his successors. *See* Act of Supremacy, 26 Hen.VIII c.1 (1534) (recognizing Henry VIII as "Supreme Head" of the Church of England); An Act Respecting the Oath to the Succession, 26 Hen.VIII c.2 (1534) (requiring all subjects to swear an oath recognizing Anne Boleyn as Henry's lawful wife and their children as legitimate heirs); Douglas Laycock, *Continuity and Change in the Threat to Religious Liberty: The Reformation Era and the Late Twentieth Century*, 80 Minn. L. Rev. 1047, 1057 (1996) (collecting examples).

These statutes immediately produced conflicts over freedom of religious speech, including both the right to speak and the right to remain silent. For example, Sir Thomas More sought to remain true to his

Catholic religious beliefs by staying silent about whether he agreed with the King's supremacy over the Church. *See* Peter Ackroyd, *The Life of Thomas More* 353-54 (1998). More claimed that his duty to comply with his religious conscience ought to excuse him from punishment, but he was executed in 1535. *Id.* While More's assertion of both a right to conscientious silence and conscientious speech wasn't enough to save his life, his claim to freedom of *religious* speech would echo through the centuries to come.

As the Reformation unfolded, Henry's successors continued to punish speech by religious opponents. Under Edward VI, the Church of England "promulgated the Book of Common Prayer, and the Acts of Uniformity required all persons to worship at services conducted in that form and no other." Laycock, *Continuity and Change*, 80 Minn. L. Rev. at 1057-58. During Queen Mary's brief reign, she sought to reestablish Catholicism, and so Parliament reenacted pre-Reformation religious-speech restrictions, resulting in mass executions of Protestant dissenters. *See, e.g.*, John Foxe, 2 *Actes and Monuments* 1355 (1610). And the reign of Queen Elizabeth I also saw suppression of religious speech of both Catholics and non-conforming Protestants. *See* The Religion Act 1592, 35 Eliz.I, c.1 (suppressing Protestant nonconformists); The Popish Recusants Act 1592, 35 Eliz.I, c.2 (suppressing Catholics).

In the run-up to the English Civil War, the Stuart kings intensified attempts to induce conformity. In 1605, Parliament enacted the Popish

Recusants Act 1605, 3 & 4 Jac., which effectively prohibited religious speech by Catholics. And under King Charles I, the Archbishop of Canterbury "brought six show cases in the Star Chamber," all against Puritans who published religious critiques of the Church of England. Wendell Bird, *The Revolution in Freedoms of Press and Speech* 83-87 (2020). The defendants had their ears cropped, noses slit, and faces branded simply for engaging in religious speech.

Once the English Civil War broke out in 1642, Protestant dissenters took power, freeing Puritans who had been imprisoned for publication of their religious views, deposing Charles I, and restricting religious speech according to their own beliefs. They "rewr[ote] the prayer book and confession of faith" to conform to Calvinist and Presbyterian beliefs, while also banning religious freedoms for religious dissenters. McConnell, *Origins* at 1421. These new rules were all enforced by the death penalty and other punishments.

After the monarchy was restored in 1660, the Church of England was reconstituted and new statutes were enacted to restrict religious speech, including the Conventicle Act 1664, 16 Car.II c.4, and the Test Act 1673, 25 Car.II c.2. The Conventicle Act forbade unofficial church assemblies. John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly* 24 (2012). And the Test Act compelled religious speech, "requir[ing] office-holders to swear an oath in court denying transubstantiation and

acknowledging the King's supremacy over the Church." McConnell, *Origins* at 1421-22.

The Glorious Revolution of 1688 marked another milestone for freedom of religious speech. The *Trial of the Seven Bishops* was one of the Glorious Revolution's main precipitating events. *See The Trial of the Seven Bishops for Publishing a Libel* [1688] 12 How. St. Tr. 183, 415, reprinted in 5 *The Founders' Constitution* 189, 191 (Philip B. Kurland & Ralph Lerner eds., 1987). The trial involved the prosecution of seven Anglican bishops for seditious libel after they had petitioned King James II to be exempt from reading a government-prescribed proclamation from the pulpits, on the grounds that it violated their consciences. Bird, *Revolution in Freedoms* at 40. The jury acquitted the bishops. *Id.*

The Glorious Revolution itself brought further reductions in restrictions on religious speech in its wake. Parliament passed the Toleration Act 1688, which lifted restrictions on worship and education for nonconformist Protestants (albeit only Trinitarian ones). *See* 1 Will. & Mary c.18 (1688). The Act tracked the logic of John Locke's *Letter Concerning Toleration*. While it limited freedom of religious speech to only Trinitarian Protestants, the Act was fundamentally an expansion of the concept of freedom of religious speech.

### 3. Freedom of speech in the American colonies.

The American colonies took root during, and mainly because of, England's ongoing religious conflicts. Indeed, English colonies were often

founded by groups fleeing England after defeats during the religious wars. *See* David Hackett Fischer, *Albion's Seed* 6-24 (1989).

Some colonies, such as Massachusetts and Virginia, brought English religious censorship with them. For example, Massachusetts banished Roger Williams to Rhode Island, whipped and mutilated other dissenters, and hanged four Quaker preachers on Boston Common. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2162 (2003). And Virginia had a High-Anglican establishment that assiduously suppressed dissenting religious views, making it "the most intolerant … of the colonies." *Id.* at 2128.

By contrast, other colonies did something unprecedented: they embraced comprehensive freedom of religion and freedom of religious speech. Maryland was an early example. "The term 'free exercise' first appeared in an American legal document in 1648, when Lord Baltimore required his new Protestant governor and councilors in Maryland to promise not to disturb Christians ('and in particular no Roman Catholic') in the 'free exercise' of their religion." McConnell, *Origins* at 1425.

Or consider Pennsylvania, which was purposely founded as a haven for religious dissenters. In 1670, William Penn had been arrested and tried for violating the Conventicle Act when delivering a sermon to an unlawful gathering of Quakers in London. Inazu, *Liberty's Refuge* 24-25. "[E]very Quaker in America knew of the ordeal suffered by the founder

11

of Pennsylvania and its bearing on the freedom of religion, of speech, and of the right of assembly." *Id.*

This mixed experience of establishment and disestablishment, orthodoxy and dissent, restriction and expansion, would later be of great consequence at the founding. Indeed, by the time of the founding, almost every religious group in the colonies had suffered from government restrictions on religious speech. But the Founders were also well positioned to consider the prior six centuries and discern a clear arc towards more protection for religious speech.

### B. At the founding, the Framers adopted broad protections for religious speech.

At the founding, the Framers embraced a broad view of freedom of speech, rooted in the experience of 600 years' conflict over religious speech, as well as in expanding theories of natural rights rooted in religious tradition.

### 1. The Revolution was fought to secure freedom of religious speech.

Many Americans fought the Revolution precisely to establish freedom of religion and freedom of religious speech. Contemporary observers like Burke recognized that the "free spirit" in America stemmed from "one main cause," that "[t]he people are Protestants; and of that kind which is the most adverse to all implicit submission of mind and opinion. … [I]t is the dissidence of dissent, and the Protestantism of the Protestant

religion." Edmund Burke, Speech on Conciliation with the Colonies (Mar. 22, 1775).

Prominent colonial Protestant clerics would often advocate for American independence through religious parallels. For example, Ezra Stiles analogized between "the *equality* and *independence* of every congregational apostolic church" and the freedom that "the thirteen provinces on this continent" should possess. Ezra Stiles, *A Discourse on the Christian Union* (1760), quoted in Robert A. Ferguson, *Reading the Early Republic* 60 (2004). This reality prompted John Adams to reject Rousseau's later claim that Americans had invented "the science of the rights of man," stating instead that they "found it in their religion." John Adams, Letter to Thomas Boylston Adams (Mar. 18, 1794), quoted in James H. Hutson, "The Emergence of the Modern Concept of a Right in America," in *The Nature of Rights at the American Founding and Beyond* 48 (Barry Alan Shain, ed. 2007).

This practical interest in obtaining freedom of religious speech was paralleled by then-current theories of liberty that invoked the natural law tradition to justify full protection for natural rights. In the Founders' view, freedom of speech and freedom of religion were "natural rights" as opposed to "civil rights" or "acquired rights," such as the right to trial by jury. *See* Philip Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 Yale L.J. 907, 920-21 (1993).

It was the task of lawgivers to translate natural rights into positive civil law: "Americans said that they should adopt constitutions and, more generally, civil laws that reflected natural law reasoning." *Id.* at 937. Thus, for many Framers, one of their main tasks was to ensure that the Constitution and the Bill of Rights protected the natural rights of freedom of speech and freedom of religion.

The content of these rights would have been readily apparent. "Indeed, reason confirmed what custom established: that the rights and immunities enjoyed by Englishmen under the common law and the British constitution were the very embodiment of natural rights." Michael W. McConnell, *Tradition and Constitutionalism Before the Constitution*, 1998 U. Ill. L. Rev. 173, 193 (1998). Contemporary natural-rights theory thus dovetailed with the practical interest many Americans had in protecting freedom of religious speech.

## 2. The Founders ensured that religious speech received robust protection.

The Founders acted to protect the freedom of religious speech in three phases. First, state constitutional provisions adopted immediately after the Declaration of Independence assiduously protected religious exercise, including religious speech. By 1789, every state except Connecticut (which still operated under royal charter) had adopted protections for freedom of religion. *See* McConnell, *Origins* at 1455. In each provision, religious "[o]pinion, expression of opinion, and practice were all expressly

14

protected." *Id.* at 1459. By contrast, freedom of speech as a more general principle (as opposed to legislative speech and debate) was mentioned only in Pennsylvania's constitution.

Second, the original federal Constitution prohibited religious tests like those required in England and certain states. *See* U.S. Const. art. VI. The No Religious Test Clause protected a religious-speech right to remain silent. During the ratification debates, this Clause was considered an individual right. *See, e.g.*, Jonathan Elliot, 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1941) at 118-19 (Jan. 31, 1788) (statement of Rev. Daniel Shute during Massachusetts's ratification debate). With the No Religious Test Clause, the Founders adopted a provision that rejected compelled speech in violation of religious conscience.

Third, religious speech was protected by the First Amendment's Free Exercise and Free Speech Clauses. The two provisions overlap. Professor McConnell has concluded that the Free Exercise Clause protected "opinions," "profession of religious opinions," and "conduct." McConnell, *Origins* at 1512. That view conforms to near-contemporaneous documents, such as the Virginia Statute for Religious Freedom, which specifically protected religious speech: "all men shall be free to profess, and by argument to maintain, their opinions in matters of religion." Virginia Statute for Religious Freedom (1786).

As for the Free Speech Clause, neither the debates in Congress nor the ratification debates within the states shed great light on the Clause's exact scope, much less to what extent religious speech was covered. However, Madison distilled the general principle: "the censorial power is in the people over the Government, and not in the Government over the people." Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even Before the First Amendment*, 38 Cap. U. L. Rev. 503, 506 (2010) (quoting 4 Annals of Cong. 934 (1794)). And since the "censorial power" wielded in England and the colonies had focused on the topics of politics and religion, both were covered by the Free Speech Clause designed by the Founders. *See id.*

## C. Since the founding, religious speech has consistently been treated as core speech that enjoys the highest level of protection.

### 1. Early American courts understood that religious speech enjoyed a preferred position.

For many decades after the First Amendment was ratified, the Supreme Court had little occasion to interpret the Free Speech Clause. State courts are therefore where the first decisions concerning freedom of religious speech were made—and made in favor of a preferred position for religious speech.

In the first case, *People v. Phillips*, the Court of General Sessions held that New York could not subpoena a Catholic priest for testimony about a confession. 1 W.L.J. 109, 112-13 (N.Y. Ct. Gen. Sess. June 14, 1813).

16

The court recognized that compelling religiously forbidden speech would effectively "declare that there shall be no penance; and this important branch of the Roman Catholic religion would thus be annihilated." *Id.* at 112. And the court confirmed that the decision rested on constitutional grounds: "[a]lthough we differ from the witness and his brethren[] in our religious creed," "[t]hey are protected by the laws and constitution of this country." *Id.* at 113.

*Phillips* was influential, and "knowledge of the decision appears to have spread widely." *Fulton v. City of Philadelphia*, 593 U.S. 522, 588 (2021) (Alito, J., concurring). In *Commonwealth v. Cronin*, for example, the court followed *Phillips*, holding that it could not compel a Catholic priest to testify about a confession even in a criminal trial. 2 Va. Cir. 488 (Va. Cir. 1855). Thus, in the decades following the founding, American courts recognized that the Constitution protected religious speech and that the government could not compel religiously forbidden speech.

### 2. The Fourteenth Amendment's framers established that religious speech is entitled to special solicitude.

Freedom of religious speech also informed disputes about slavery and the Fourteenth Amendment. In the years before the Civil War, abolitionists in the North, including many clergy members, had sent hundreds of anti-slavery religious tracts to Southern clergy and postmasters with instructions to distribute them in Southern communities. Kurt T. Lash, *The Second Adoption of the Free Exercise Clause: Religious Exemptions*

*Under the Fourteenth Amendment*, 88 Nw. U. L. Rev. 1106, 1132 (1994). Southern governments worried that this religious speech would convince white Southerners to oppose slavery and lead to slave insurrections. So Pro-slavery Southerners responded with a wave of repression. For example, in Charleston, pro-slavery vigilantes broke into the post office and stole the tracts, and thousands of people gathered to destroy them publicly. *See* Susan Wyly-Jones, *The 1835 Anti-Abolition Meetings in the South: A New Look at the Controversy over the Abolition Postal Campaign*, 47 Civil War History 289 (2001).

After Reverend Nat Turner led a rebellion in 1831, Southern states began aggressively regulating religious speech. For example, Southern states made it a capital crime to "write, print, publish or distribute" abolitionist literature, and they specifically targeted religious speech advocating for emancipation. Lash, 88 Nw. U. L. Rev. at 1134. "Those who attacked slavery through sermons, speeches, or written documents risked death by law or at the hands of proslavery mobs." *Id.*

Following the Civil War, the Fourteenth Amendment's framers sought to overturn Southern religious censorship. Rep. John Bingham, the author of Section One of the Fourteenth Amendment, "believed slavery violated basic principles of the Constitution, including the right 'to utter, according to conscience.'" *Id.* at 1146 (quoting *Cong. Globe*, 35th Cong., 2d Sess. 985 (1859)). Bingham explained that "by the force of the fourteenth amendment, no State hereafter … can … ever repeat the example

of Georgia and send men to the penitentiary … for teaching the Indian to read the lessons of the New Testament." *Cong. Globe*, 42d Cong., 1st Sess. 84 (1871). And Rep. James Ashley remarked that under slavery, Southern governments had "silenced every free pulpit within [their] control." *Cong. Globe*, 38th Cong., 2d Sess. 138 (1864).

The Congress that adopted the Fourteenth Amendment did so against a historical background where religious speech was both suppressed and yet instrumental in ending slavery. With this history in mind, the Fourteenth Amendment's framers established that religious speech was entitled to special solicitude.

### 3. The Supreme Court has given religious speech the highest level of protection.

The preferred position of religious speech continued in the Supreme Court's decisions. In the century since the Free Speech Clause was incorporated against the states in *Gitlow v. New York*, 268 U.S. 652 (1925), the Supreme Court has repeatedly confirmed that religious speech enjoys the highest level of protection.

Many of the early cases involved religious speech by Jehovah's Witnesses, who "played a remarkable role in developing First Amendment law." Jeffrey S. Sutton, Barnette*, Frankfurter, and Judicial Review*, 96 Marq. L. Rev. 133, 140-41 (2012). Their "objection to the flag salute, their zeal in spreading their faith, their willingness to proceed in the most hostile environments, and their omnipresent distribution of pamphlets laid

19

the groundwork for much of what we now take for granted as first prem-
ises of First Amendment law." *Id.*

In a series of decisions, the Court "emphasize[d] the value of the
speech involved" while striking down ordinances restricting the speech
rights of Jehovah's Witnesses. *Watchtower Bible & Tract Soc'y of N.Y.,
Inc. v. Village of Stratton*, 536 U.S. 150, 161 (2002). For example, in *Cant-
well v. Connecticut*, the Court invalidated an ordinance requiring Jeho-
vah's Witnesses to obtain a license before engaging in door-to-door evan-
gelism. 310 U.S. 296 (1940). In doing so, the Court drew a parallel be-
tween political speech and Cantwell's religious speech, explaining that
"[i]n the realm of religious faith, and in that of political belief, sharp dif-
ferences arise," but that "these liberties are, in the long view, essential to
enlightened opinion and right conduct on the part of the citizens of a de-
mocracy." *Id.* at 310. Later, the Court recognized that *Cantwell* sounded
in both the Free Exercise and Free Speech Clauses. *See Village of
Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 629 (1980).

In *Murdock v. Pennsylvania*, the Court again invalidated a municipal
ordinance that required speakers to pay for a permit to distribute or sell
literature door-to-door. 319 U.S. 105 (1943). And again, the Court high-
lighted religious speech's special value, explaining that the "hand distri-
bution of religious tracts is an age-old form of missionary evangelism—
as old as the history of printing presses" and "has been a potent force in
various religious movements" throughout history. *Id.* at 108. "This form

of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits," and "has the same claim as the others to the guarantees of freedom of speech." *Id.* at 109. Moreover, "[f]reedom of press, freedom of speech, freedom of religion are in a preferred position" within the constitutional hierarchy. *Id.* at 115.

Similarly, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the Court held that Jehovah's Witness children could not be compelled to recite the Pledge of Allegiance. In striking down this requirement, the Court noted that "[o]bjection to this form of communication when coerced is an old one, well known to the framers of the Bill of Rights." *Barnette*, 319 U.S. at 633. Indeed, the Court linked the Jehovah's Witnesses' religious speech to that of the Quakers (and the famous case of Penn's hat) who "suffered punishment rather than uncover their heads in deference to any civil authority." *Id.* at 633 n.13. And the Court concluded by noting that religious speech "touch[es] the heart of the existing order," and that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, [or] religion." *Id.* at 642.

Later cases have consistently recognized that religious speech holds high station under the First Amendment. In fact, the Court has recognized that "in Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that

a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). Put another way, religious speech, given its status as "speech on public issues," "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (collecting cases); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995) (rejecting "refusal to extend free speech rights to religious speakers"); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 n.2 (2001) (rejecting "exclusion of the Club on the basis of its religious perspective"); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (rejecting exclusion of film series because it "dealt with the subject from a religious standpoint"); *Widmar v. Vincent*, 454 U.S. 263, 277 (1981) (rejecting university's "content-based exclusion of religious speech"); *Shurtleff v. City of Boston,* 596 U.S. 243, 258 (2022) (government "may not exclude speech based on 'religious viewpoint'; doing so 'constitutes impermissible viewpoint discrimination.'").

This high level of free-speech protection extends to the right not to foster ideological concepts that run contrary to one's conscience: "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (Jehovah's Witness could refuse to convey the government's slogan).

Government thus violates the First Amendment when it "burdens core … speech without proper justification." *FEC v. Cruz*, 596 U.S. 289, 313 (2022); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) (quoting *Barnette*, 319 U.S. at 634) (government may not "force an individual to 'utter what is not in [her] mind' about a question of political and religious significance"); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022) ("the First Amendment doubly protects religious speech").

Even in cases where political or religious speech hasn't been at issue, the Supreme Court has still carefully distinguished those forms of speech. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (emphasis added) ("fundamental values of 'habits and manners of civility' essential to a democratic society must, of course, include tolerance of divergent *political and religious views*, even when the views expressed may be unpopular"); *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (distinguishing the banner in question by pointing out that it did not "convey[] any sort of political or religious message"); *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021) ("When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention.").

Finally, this Court, too, has recognized that religious speech enjoys "a privileged position under the First Amendment." *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 764 (7th Cir. 2020). Indeed, this Court concluded that "a comparison between … political speech, which all agree

lies at the core of the First Amendment" and "the speech aspect of religious activity reveals something more than an 'apples to apples' matching." *Id.* It shows that religious speech is considered "'speech plus,' where the 'plus' is the protection that the First Amendment guarantees to religious exercise." *Id.*

Thus, as the foregoing history shows, religious speech has been consistently privileged across eight centuries of Anglo-American jurisprudence. Indeed, the freedom of speech specifically grew out of conflicts over religious speech and is the hard-won fruit of centuries of religious dissent.

## II. Illinois's benefits-discussion requirement violates the Free Speech Clause because it burdens core religious speech.

The First Amendment prohibits the government from "burden[ing] core … speech without proper justification." *Cruz*, 596 U.S. at 313. Such a burden can be justified only if the government satisfies strict scrutiny— an inquiry that requires it to show that the law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). Here, Illinois's benefits-discussion requirement violates this command because it burdens Plaintiffs' core religious speech about abortion, and it cannot meet strict scrutiny.

### A. Plaintiffs are religious pregnancy centers engaged in core religious speech.

There can be no dispute that Plaintiffs are engaged in core religious speech. At the time of the founding, "religion" was understood by James

24

Madison to be "the duty which we owe to our Creator and the Manner of discharging it." James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785). This understanding—which requires an invocation of "transcendent" authority and truth—was consistent with the word's ordinary public meaning at the founding, McConnell, *Origins* at 1497-99, and it has been embraced by the Supreme Court, *see, e.g.*, *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025) ("[the parents] all believe they have a 'sacred obligation' or 'God-given responsibility' to raise their children in a way that is consistent with their religious beliefs and practices").

Here, Plaintiffs are religious pregnancy centers and medical professionals who "provide material assistance to pregnant women and engage in 'pregnancy options' and 'post-abortion' counseling." RSA-63, 69. They hold sincere religious beliefs—rooted in transcendent authority and truth—that abortion is immoral, and these religious beliefs dictate what Plaintiffs will (and won't) say about abortion. RSA-69. Indeed, Plaintiffs' religious beliefs prohibit them from "perform[ing] or refer[ring] for an abortion." *Id.* And while Plaintiffs' "counseling includes discussion about the risks of abortion," it doesn't "include a benefits discussion" because Plaintiffs "don't believe that any benefits exist," and they further believe that any discussion of the so-called benefits would "encourage the procedure." *Id.* Thus, Plaintiffs are engaged in core religious speech.

## B. The benefits-discussion requirement burdens Plaintiffs' core religious speech.

Government regulation burdens speech under the First Amendment when it "target[s] speech based on its communicative conduct," *NIFLA v. Becerra*, 585 U.S. 755 (2018), or "compel[s] a person to speak its own preferred messages," *303 Creative*, 600 U.S. at 586. Here, Illinois's benefits-discussion requirement does both: if Plaintiffs wish to receive immunity under the Health Care Right of Conscience Act from any malpractice suit or disciplinary action by the state medical licensing board, they must first inform women about the "benefits" of abortion, 745 Ill. Comp. Stat. 70/6.1(1), which forces them "to speak a particular message" that contradicts their sincerely held religious beliefs (*i.e.*, that abortion has no benefits), *NIFLA*, 585 U.S. at 766. And it "plainly 'alters the content'" of Plaintiffs' religious speech because it requires them to inform women why abortion would be beneficial "at the same time [that they] try to dissuade women from choosing that option." *Id.* Thus, the benefits-discussion requirement burdens Plaintiffs' core religious speech. *Janus v. AFSCME*, 585 U.S. 878, 893 (2018) (government cannot "coerc[e]" Plaintiffs "into betraying their convictions").

## C. Illinois's benefits-discussion requirement fails strict scrutiny.

Illinois cannot show that its benefits-discussion requirement, which forces Plaintiffs to explain the "benefits" of abortion in violation of their sincerely held religious beliefs, survives strict scrutiny. *Reed*, 576 U.S. at

171. Because core religious speech receives the highest level of protection, Illinois must show that its requirement furthers a historically recognized compelling interest. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 791 (2011) (using history to identify those "few limited areas" where, "[f]rom 1791 to the present," "the First Amendment has 'permitted restrictions upon the content of speech'"); *Free Speech Coal. v. Paxton*, 606 U.S. 461, 471-74 (2025) (same). Here, Illinois cannot make such a showing.

When it comes to religious speech, history and tradition offer more guidance than they do with other free-speech claims. That's because the Free Speech and Free Exercise Clauses overlap when it comes to "expression," McConnell, *Origins* at 1459, and there's "a long history and rich literature" regarding freedom of religion, *Ill. Republican Party*, 973 F.3d at 764.

This history shows that religious speech rights were subject to a limited set of compelling interests that might justify interfering with religious speech. Early state constitutional protections contained provisos to religious-speech protections that were subject to maintaining "peace" or "safety" in the relevant state and preventing "licentiousness or immorality." McConnell, *Origins* at 1461-62 (collecting examples). New York's Constitution, for example, protected "the free exercise and enjoyment of religious profession and worship" so long as those actions didn't "excuse

acts of licentiousness, or justify practices inconsistent with the peace or safety of this State." N.Y. Const. of 1777, art. XXXVIII.

Here, Illinois asserts an interest in "ensuring that patients have access to medical treatments." Illinois.Br.52-53. But promoting access to healthcare comes nowhere close to the historically recognized compelling government interests that could justify a burden on core religious speech. Thus, the benefits-discussion requirement fails strict scrutiny and violates the First Amendment.

## III. Giving religious entities the highest level of First Amendment protection offers predictability to litigants and courts.

### A. Heightened protection gives predictability to litigants.

Providing the highest level of First Amendment protection to religious institutions gives them the predictability they need to pursue their religious missions. Take Amici Catholic Conference of Illinois and Illinois Catholic Health Association. The Catholic Conference of Illinois upholds and advocates for Catholic Social Teaching for all Catholics in Illinois, including the 46 hospitals and 21 health-care centers that help serve hundreds of thousands of Illinoisans each year.[2] Serving as the voice of Illinois Catholic bishops and lay faithful, the Conference helps all Illinois Catholic institutions, including the Illinois Catholic Health Association, uniformly apply and advance Church teaching—thereby avoiding the sin

---

[2] *Overview*, Catholic Conference of Illinois, https://perma.cc/N7KN-ANLQ.

of scandal, which the Church defines as "an attitude or behavior which leads another to do evil." *Catechism of the Catholic Church* § 2284. As relevant here, Illinois's law burdens the Catholic Amici's religious speech and exercise because the cooperation of an Illinois Catholic Health Association member with other healthcare entities engaged in immoral activities such as abortion could lead people to believe that such conduct is morally acceptable—causing those people to sin and producing scandal over the Church's true teachings and public witness. Giving religious speech the highest level of protection will thus ensure that the Catholic Amici can clearly define and defend Church teaching for all the faithful in Illinois.

This predictability is also crucial for protecting minority religious groups whose religious beliefs and practices may be unfamiliar or not widely held. Indeed, "[i]n a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of … every religious tradition." *Our Lady of Guadalupe v. Morrissey-Berru*, 591 U.S. 732, 757 (2020). Religious minority groups therefore "might understandably be concerned that a judge would not understand [their] religious tenets and sense of mission." *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987) (Brennan, J., concurring). This concern chills their religious speech because the "[f]ear of potential liability might affect the way an organization carried out what it understood to be its religious mission." *Id.* For example, Orthodox

Christians like Amici can come into conflict with onerous government regulations because they and their beliefs are unfamiliar to many government actors, as they comprise only 1% of the American population.[3]

At bottom, providing religious entities with the highest level of First Amendment protection gives all Amici assurance that just as government cannot force religious groups to retain "wayward minister[s]," *Our Lady*, 591 U.S. at 747, neither can it force religious groups to *create* wayward ministers by compelling speech contrary to their religious beliefs.

## B. Heightened protection gives predictability to the courts.

Giving religious speech the highest level of First Amendment protection also offers predictability to the courts. For example, the abortion-referral requirement at issue here provides that "[i]f requested by the patient," pregnancy centers "shall" "(i) refer the patient to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer" abortion. 745 Ill. Comp. Stat. 70/6.1(3). That language is written broadly enough to create significant questions about its effects on religious institutions. But by applying the highest level of First Amendment protection, there can be no doubt that the abortion-referral requirement burdens core religious speech without proper justification.

---

[3] *Religious Landscape Study*, Pew Research Center (Feb. 26, 2025), https://perma.cc/LJ3T-CVBB.

Indeed, where "the conduct triggering coverage under the statute" "consists of communicating a message," the statute regulates "speech," not conduct. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Moreover, because Illinois's law would compel religious healthcare professionals who believe abortion is immoral to speak a message contrary to their religious beliefs (*i.e.*, to encourage women to seek abortion elsewhere), it burdens Plaintiffs' religious speech. *See NIFLA*, 585 U.S. at 766. And Illinois cannot hope to show that it has the "proper justification" for burdening Plaintiffs' core religious speech. *Cruz*, 596 U.S. at 313. Regardless of whether this Court looks to historically recognized interests such as peace, security, or licentiousness, *see* McConnell, *Origins* at 1461-62, Illinois's claimed interest in "ensuring that patients have access to medical treatments," Illinois.Br.52-53, falls well short.

## CONCLUSION

For these reasons, the district court's decision should be affirmed.

Respectfully submitted,

/s/ *Richard C. Osborne*
Eric C. Rassbach
Richard C. Osborne
   *Counsel of Record*
Timothy P. Kowalczyk
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
   Ste. 400
Washington, DC 20006
(202) 955-0095

rosborne@becketfund.org

*Counsel for Amici Curiae*

December 16, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) and 7th Cir. R. 29 because it contains 6,999 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word.

This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5)-(6) and 7th Cir. R. 32 because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ *Richard C. Osborne*
Richard C. Osborne

Dated: December 16, 2025

## CERTIFICATE OF SERVICE

I certify that on December 16, 2025, the foregoing brief was served on counsel for all parties by means of the Court's ECF system.

/s/ *Richard C. Osborne*
Richard C. Osborne