Nos. 25-1659 & 25-1657

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

RONALD L. SCHROEDER, et al.

and

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al.,

Plaintiffs-Appellants/Cross-Appellees,

v.

MARIO TRETO, JR,

Defendant-Appellee/Cross-Appellants

---

On Appeal from the United States District Court

for the Northern District of Illinois

Case Nos. 1:17-cv-04663 & 3:16-cv-50310

---

**BRIEF OF AMICUS CURIAE CARE NET
IN SUPPORT OF
PLAINTIFFS-APPELLANTS-CROSS-APPELLEES,
AND AFFIRMANCE IN DEFENDANT'S CROSS-APPEAL**

Rita Martin Peters
CITIZENS FOR SELF-GOVERNANCE
5850 San Felipe, Suite 575A
Houston, TX. 77057
(540) 830-1229
rpeters@selfgovern.com
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus has no parent corporations and no stock.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ........................................................ ii

**TABLE OF AUTHORITIES** ................................................................................iv

**INTEREST OF AMICUS CURIAE** ........................................................................ 1

**SUMMARY OF THE ARGUMENT** ........................................................................ 4

**ARGUMENT** ............................................................................................................ 6

A.   The district court's narrow definition of "informed consent" should be affirmed in order to protect the marketplace of ideas and the unique contribution made to it by speakers like Care Net. ................................................................................. 6

B.   Outside the context of a medical procedure being sought or performed, mandated disclosures do not serve the best interests of the woman seeking care... 12

C.   To uphold the State's required benefits discussion would be to turn the Supreme Court's rulings on abortion-related informed consent on their head. ....... 16

**CONCLUSION** ...................................................................................................... 21

**CERTIFICATE OF COMPLIANCE** ...................................................................... 22

**CERTIFICATE OF SERVICE** .............................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*303 Creative, L.L.C., v. Elenis*, 600 U.S. 570 (2023). .......................................................... 8

*Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416 (1983). ........................... 17, 19, 20

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). ...................................... 5

*McCullen v. Coakley*, 573 U. S. 464 (2014). ......................................................... 8

*Nat'l Inst of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). ...................... passim

*NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294 ..................... 5, 6, 12, 16

*Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976). .......... 16, 17

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ................................................. passim

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) ............................................ 8

*Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985) ............................................ 7, 12

*Thornburgh v. Amer. Coll. of Obstetricians*, 476 U.S. 747 (1986). .............. 14, 17, 19, 20

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ................................... 9

*West Virginia Bd. of Ed. v. Barnette*, 319 U. S. 624 (1943) ............................................ 8

**Statutes**

745 Ill. Comp. Stat. 70/6.1(1). ...................................................................... passim

**Other Authorities**

Care Net Commitment of Care & Competence, chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/https://367552.fs1.hubspotusercontent-
na1.net/hubfs/367552/Commitment%20of%20Care%20and%20Competence_2024.pdf. ........ 2

https://care-net.org/what-is-a-pregnancy-center/. ........................................................ 2

Paula Berg, *Toward a First Amendment Theory of Doctor-patient Discourse and the
Right to Receive Unbiased Medical Advice*, 74 B. U. L. Rev. 201 (March, 1994)... 12,
13, 16

Peter J. Ferrara and Carlos S. Ramirez, *The Constitutional Freedom to Listen*, 6
Liberty U. L. Rev. 1 (Fall, 2011). .................................................................... 8

The Declaration of Independence para. 2 (U.S. 1776). ............................................ 21

## INTEREST OF AMICUS CURIAE[1]

Founded in 1975, Care Net is a faith-based, Christian ministry. It offers compassion, hope, and help to anyone considering abortion by presenting them with realistic alternatives and Christ-centered support through a life-affirming network of pregnancy centers, mobile medical units, churches, organizations, and individuals. In light of the Biblical teaching that every human life begins at conception and is worthy of protection, Care Net empowers women and men considering abortion to choose life for their unborn children and to find abundant life in Christ.

Care Net's network of pregnancy centers is one of the largest in North America, comprising more than 1,300 centers. Forty-six of these centers are in Illinois. While each center offers pregnancy decision coaching and material resources, they vary by location in terms of the exact scope of services provided. Examples of other services include pregnancy tests, fatherhood training and family educational resources, post-decision support (including parenting education and abortion recovery groups), consultation with licensed medical professionals, a limited ultrasound for pregnancy confirmation, and testing for sexually transmitted infections and diseases. Care Net also works with churches, training them to provide long-term support for pregnancy center patients through a number of free resources.

---

[1] No counsel to any party authored this brief in whole or in part, nor has any party, counsel to any party, or any person other than the amicus curiae, its members, or its counsel, contributed money for the preparing or submitting of this brief.

Affiliate pregnancy centers are local, nonprofit organizations that operate according to the highest standards of care and integrity and adhere to Care Net's Standards of Affiliation and a nationally-supported Commitment of Care and Competence, which includes commitments to:

- Serving clients without regard to age, race, income, nationality, religious affiliation, disability, or other arbitrary circumstances,

- Treating clients with kindness and compassion, in a caring manner, and

- Providing honest answers and accurate information about pregnancy and fetal development.[2]

In other words, Care Net's affiliated pregnancy centers are carefully designed and operated to offer pregnant women emotional safety, support, and compassion.

At the same time, Care Net-supported pregnancy centers are unabashedly pro-life, and do not hide that fact from clients. As Care Net clearly states on its website, its affiliated pregnancy centers "do not perform or refer for abortion and do not profit from any client's decision."[3] All Care Net affiliated pregnancy centers are required to provide a written disclaimer informing clients that they do not perform or refer for abortion, and all are prohibited from using any language that has the potential to

---

[2] Care Net Commitment of Care & Competence, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://367552.fs1.hubspotusercontent-na1.net/hubfs/367552/Commitment%20of%20Care%20and%20Competence_2024.pdf.
[3] https://care-net.org/what-is-a-pregnancy-center/.

mislead clients or potential clients into thinking the center will perform or refer for abortion.[4]

The outcome of this case has the potential to devastate Care Net's 46 Illinois-based centers. If 745 Ill. Comp. Stat. 70/6.1(1) (hereinafter "Section 6.1(1)") is upheld, requiring pregnancy centers to recite to their clients what the state believes are "benefits" of abortion, those centers can no longer operate according to Care Net's Mission or Standards of Affiliation, for the following reasons:

1. Care Net's Mission[5] is explicitly based on an acknowledgement "that every human life begins at conception and is worthy of protection…" Having acknowledged that fact, it would be unconscionable—and confusing—for pregnancy center staff to then recite "benefits" of destroying that human life.

2. Care Net's Standards of Affiliation for pregnancy centers requires them to adopt policies and procedures "to ensure that all abortion education is presented in a caring and compassionate manner with due respect for the emotional sensibilities and desires of each client." By requiring centers to recite to a client what the state believes are "benefits" of elective abortion, even when that client may have expressed the desire to carry the pregnancy to term or a moral objection to abortion, the statute would force centers to violate their mandate to respect clients' emotional sensibilities and desires.

---

[4] Care Net Pregnancy Center Standards of Affiliation (January, 2025), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://367552.fs1.hubspotusercontent-na1.net/hubfs/367552/Affiliate%20Standards_2025%20(2).pdf.
[5] http://care-net.org/about.

3

3. The pregnancy centers within Care Net's network are staffed by individuals who do not believe that there are "benefits" of elective abortion, so the compelled discussion of alleged benefits would require them to convey information they believe to be misleading and untruthful. This would violate the Commitment of Care & Competence, which requires that "Clients always receive honest and open answers" and that all communications be "truthful and honest."[6]

Clearly, the challenged provision presents an existential threat to Care Net's 46 affiliate pregnancy centers' operations in Illinois.

Amicus files this brief in conjunction with its motion for leave of this Court to file.

## SUMMARY OF THE ARGUMENT

On this Cross-Appeal, the State asks this Court to reverse the ruling below to the extent that it struck down 745 Ill. Comp. Stat. 70/6.1(1). This provision requires pregnancy centers to engage clients in a discussion about the ostensible benefits of abortion, as well as childbirth, in order to fall within a statutory liability shield.

In finding Section 6.1(1) unconstitutional, the court below relied upon the Supreme Court's decisions in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (*overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215

---

[6] *Supra*, n. 2.

4

(2022)) and *Nat'l Inst of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). The district court found that in *Casey*, the Supreme Court upheld the compelled speech in question there because it was properly viewed as an "informed consent" requirement, more akin to professional conduct than speech. Mem. of Decision at 21-22, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294 (*citing Casey*, 505 U.S. at 881-82.). However, the district court believed dicta in the subsequent *Becerra* ruling "revealed the Court's dim view of compelled speech, even when it occurs in a medical context." *Id.* at 23. In that case, the Court struck down California's requirement that pregnancy centers display a notice regarding the availability of abortion. The Court ruled that the required notice was "neither an informed consent requirement nor any other regulation of professional conduct," but simply a regulation of "speech as speech." *Id.*, at 22 (*quoting Becerra*, 558 U.S. 770).

With that foundation, the district court below first developed a detailed analysis for determining whether particular compelled speech is properly classified as "informed consent" and therefore excepted from the First Amendment's strict scrutiny analysis because it is "incidental to conduct." Applying this analysis, the court ruled that the speech compelled under Section 6.1(1) is not properly categorized as "informed consent," so it does not fall within the exception. The court went on to find that the viewpoint-based compelled speech in Section 6.1(1) could not survive strict scrutiny, and therefore the provision violated the First Amendment's free speech clause.

The district court's narrow definition of "informed consent" should be affirmed because it protects the integrity of the marketplace of ideas for the benefit of speakers and seekers alike, and preserves the unique contribution made to that marketplace by speakers like Care Net. Amicus will explain why, outside the context of a specific medical procedure being sought or performed, state-mandated disclosures do not serve the best interest of the patients. Finally, Amicus will demonstrate that to uphold the state's required benefits discussion would be to turn the Supreme Court's rulings on abortion-related informed consent on their head.

## ARGUMENT

### A. The district court's narrow definition of "informed consent" should be affirmed in order to protect the marketplace of ideas and the unique contribution made to it by speakers like Care Net.

In *Becerra*, the Supreme Court rejected the argument that the reasoning of *Casey* could be extended to uphold the State's compulsion of pregnancy centers to promote abortion. The Court reasoned that while the required disclosure in *Casey* was an "informed consent" requirement, and thus more akin to medical professional conduct than speech, the law challenged in *Becerra* compelled "speech as speech." Mem. of Decision at 22, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294 Dist. Ct., 22 (*citing Becerra*, 585 U.S. at 770). However, because neither *Becerra* nor *Casey* offer a precise definition of "informed consent," the court below took pains to develop its own analysis. In doing so, the court explained that it could not blindly rely on the medical community's own classification of speech as "informed consent."

Rather, courts must determine whether the challenged compelled speech is properly excepted from strict scrutiny by reference to the *Becerra* Court's rationale: "informed consent provisions are acceptable *because they're incidental to professional conduct*." *Id.* at 25 (emphasis in original).

The district court proceeded to describe four requirements that must be met for compelled speech labeled "informed consent" to be truly incidental to conduct and therefore outside the scope of the First Amendment's strict scrutiny standard:

1. Informed consent necessarily requires a "medical procedure." *Id.* at 25.

2. The informed consent provision must afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive. *Id.* at 26 (*citing Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985)).

3. It must substantively relate to the impending medical procedure. *Id.* at 27.

4. It must apply to the health care provider performing the identified medical procedure. *Id.* at 28.

This framework strikes the proper balance between the two interests at stake: the government's interest in ensuring that patients are given the information necessary to make an informed decision about medical procedures, and the interests of individuals and society at large in prohibiting the government from compelling speech that is *not* necessary to that end. This balance is important because government-compelled speech poses significant threats to core First Amendment values.

The First Amendment's protection of free speech is both an end in itself, because freedom of expression is an unalienable human right, and a means to an end, because it is indispensable to the discovery and spread of truth. *See 303 Creative, L.L.C., v. Elenis*, 600 U.S. 570, 584 (2023) (citations omitted). Therefore, "[I]f there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *Id.* at 584-85 (*quoting West Virginia Bd. of Ed. v. Barnette*, 319 U. S. 624, 642 (1943); *McCullen v. Coakley*, 573 U. S. 464, 476 (2014) (internal citations omitted).

The marketplace of ideas concept reflects the dual role of the First Amendment in protecting the speaker's unalienable right to expression and in protecting the right of all members of society to explore the marketplace in seeking out truth. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market…"). The First Amendment's free speech clause thus can be said to protect not only the speakers, but also the seekers—those individuals seeking to learn more about certain ideas or viewpoints. *See* Peter J. Ferrara and Carlos S. Ramirez, *The Constitutional Freedom to Listen*, 6 LIBERTY U. L. REV. 1, 5 (Fall, 2011) ("[T]he Constitution goes further than merely protecting speech from government inhibition and works to secure a citizen's right to unfettered access to the speech of others.").

Forcing speakers like Care Net pregnancy center staff to recite an official message about abortion that is contrary to their own viewpoint taints the

marketplace of ideas, using the heavy hand of government to force the message of the political majority through the mouths of individuals who find it abhorrent. In so doing, the State not only violates the right of speakers to clearly articulate their own message, but also interferes with the freedom of those seeking out that message by visiting the pregnancy center in the first place. *See id.* ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here."); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000)("The citizen is entitled to seek out or reject certain ideas or influences without Government interference or control.").

Care Net's Standards of Affiliation provide as follows:

> The pregnancy center does not perform or refer for abortion and provides a written disclaimer to this effect to clients requesting services. Additionally, the center will not use language that has the potential to mislead clients or potential clients into thinking your center will perform or refer for an abortion. This applies to the language the center itself uses and to the language any contracted vendor and/or marketing agency uses on the center's websites, advertisements, promotional materials, or elsewhere on behalf of the center.[7]

Most women and men who enter Care Net's supported pregnancy centers do so knowing full well that the center does not provide abortion services. Many choose to visit the pregnancy center, as opposed to the nearest Planned Parenthood clinic, precisely *because* they want to hear about alternatives to abortion. Some visit because they have heard that the center offers free resources like an ultrasound or diapers. It is awkward and intrusive for the State to force its "benefits" discussion into this

---

[7] Care Net Pregnancy Center Standards of Affiliation (January, 2025), *supra*, n. 4.

environment. The requirement taints the marketplace of ideas, forcing pregnancy center personnel to recite information they believe is false and misleading—and to women and men who do not want to hear it.

Care Net's pregnancy centers exist to offer willing clients a very specific message: that life begins at conception and is worthy of protection. The First Amendment requires that these centers be left free to espouse *that* message to willing listeners, undiluted by the State's own views about abortion.

There is absolutely no justification for the State's intrusion into the private interactions between the pregnancy centers and the women who seek their services, because those services do not include abortion. If a woman is to obtain an abortion, she must do so elsewhere. It is only at that point that the State has any legitimate interest in compelling an informed consent discussion about abortion.

The district court's informed consent analysis properly distinguishes between situations where the State may be justified in compelling certain statements to ensure proper patient education and informed decision-making, and situations where there is no such justification for forcing one private citizen to express State viewpoints to another. In linking acceptable informed consent requirements to an impending medical procedure, the lower court effectuates the Supreme Court's guidance on this issue. The Court allows compelled speech in this context when it is "incidental to conduct"—the conduct being an abortion.

If Section 6.1(1) were upheld, allowing the State to compel individuals who do not provide abortions to tout the "benefits" of abortion, it would provide the State an

opportunity to flood the marketplace of ideas with its own message, commandeering private citizens to propagate official dogma. If the State can compel abortion non-providers to express its abortion message simply because they are speaking to pregnant women, the State would presumably be free to force counselors, adoption agencies, social service workers, women's shelter volunteers, and others to recite the State's abortion messaging to pregnant women seeking other services related to their pregnancy.

In fact, if courts do not hold the line on compelled speech by limiting the "informed consent" exception to the context of an impending medical procedure, what prevents the State from expanding its commandeering of private citizens to push other State-favored positions on issues? Will the State next be permitted to force marriage counselors to recite the "benefits" of divorce to their clients? Could primary care physicians be forced to recite the "benefits" of plastic surgery to teenage girls who have low self-esteem due to a poor body image?

To allow the State to intrude upon the decisions of individuals concerning what messages to convey, when and how to convey them, and to whom, is to allow the State to monopolize the marketplace of ideas, violating the First Amendment rights of both speakers and seekers. Maintaining a free marketplace of ideas—which the First Amendment requires—means leaving individuals free to seek the counsel of those who hold a particular viewpoint, even when it differs from that of the State.

**B. Outside the context of a medical procedure being sought or performed, mandated disclosures do not serve the best interests of the woman seeking care.**

The basis for the First Amendment exception for compelled speech by medical professionals that is properly considered "informed consent" is the State's legitimate interest in ensuring that a patient is empowered "to make an informed, intelligent decision regarding medical treatment he is to receive." Mem. of Decision, 26, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294 Dist. Ct. at 26. (*citing Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985)).

To permit the State to infiltrate discussions between health care providers and patients without the justification of an impending medical treatment is to politicize health care. History is replete with atrocious examples, from Chinese doctors dispatched to convince peasants to use contraception during the Cultural Revolution, to Soviet doctors being ordered to reject workers' requests for medical leave. *See* Paula Berg, *Toward a First Amendment Theory of Doctor-patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B. U. L. REV. 201, 201-2 (March, 1994) (providing numerous examples of governments politicizing the practice of medicine).

Requiring patients to be given sufficient information to make an informed decision about an impending treatment they have sought is one thing, but allowing government to more generally manipulate private health care discussions is something else entirely. As Berg explains:

> The practical objective of a First Amendment theory of doctor-patient speech therefore must be to aid courts in distinguishing between regulations that encourage the disclosure of information necessary for

rational, autonomous medical choices, and those that impose official dogma upon medical choices.

*Id.*, at 207.

Where the state compels speech outside the context of an impending medical procedure the patient has sought and the provider may provide, it is injecting its bias into a health care conversation, and doing so in a way that is particularly impactful to the recipient of the compelled speech. Social science research demonstrates that health care providers enjoy "immense authority and power in the eyes of patients." *Id.* at 225. As a result, patients tend to give great weight to what their providers tell them and are unlikely to challenge their assertions. *Id.* at 229. "Once in the presence of a physician, substantial physical and psychological barriers make government-mandated messages extremely difficult, if not impossible, to ignore." *Id.* at 256. "[W]hen uttered by a physician in the context of a doctor-patient relationship, these statements can be coercive." *Id.* at 224 (*citing* "vast" literature on doctor-patient communication in n.123).

Berg points out that the forced assertion of information to a patient or client without regard to the patient's particular needs and interests is antithetical to the proper goal of a doctor-patient relationship, even if the information itself is objectively true. *Id.* at 224-25. In a proper doctor-patient relationship, the doctor's speech is tailored toward meeting the patient's actual needs and addressing his or her concerns. For a health care provider to simply recite information that is unrelated to the patient's condition, concerns, or goals, would be confusing to the patient, at best, and manipulative, at worst.

13

In *Thornburgh v. Amer. Coll. of Obstetricians*, 476 U.S. 747 (1986), the Court expressed concerns over making physicians or counselors, in effect, State agents in conveying specific, State-required information, thus disrupting the organic doctor-patient relationship.

> Forcing the physician or counselor to present the materials and the list to the woman makes him or her in effect an agent of the State in treating the woman and places his or her imprimatur upon both the materials and the list. All this is, or comes close to being, state medicine imposed upon the woman, not the professional medical guidance she seeks, and it officially structures -- as it obviously was intended to do -- the dialogue between the woman and her physician.

476 U.S. at 762-63 (internal citations omitted) (*rev'd by Casey*, *supra*).

In the context of a Care Net affiliated pregnancy center, the effect of the speech compelled by Section 6.1(1) could be profound, indeed. Imagine a pregnant woman who visits the center because she and her husband are poor and are hoping to secure free diapers and baby formula for their yet-to-be-born infant. When a staff member begins reciting to her the "benefits" of abortion, this woman might easily assume that the staff member, or even the pregnancy center as an organization, believes she should consider aborting her baby because of her poverty. Because of the government-compelled speech, she is likely to be hurt and offended, and to lose trust in the staff or the center itself. She might even feel coerced to consider abortion to avoid being viewed as a drain on society.

Alternatively, imagine a pregnant woman who visits the center because she is young, unmarried, worried about how she will care for a child, and eager to learn about available resources or how to initiate adoption services. She is told, pursuant

to Care Net standards,[8] that the center does not perform or refer clients for abortions. She did not come seeking those services. And yet, at some point in her conversation with a staff member, she is informed of various "benefits" to abortion. This woman, who came to the center with no intention of aborting her baby, is now wondering if she should do so. The government has turned the very mission of the center, and Care Net, on its head, commandeering private resources meant to empower the woman to choose life to instead convince the woman to consider abortion.

This cannot be permitted in a society that treasures a free marketplace of ideas and abhors government manipulation of that marketplace. Men and women who seek the counsel and services of a pro-life, Care Net-affiliated pregnancy center are entitled to receive precisely that, free from the State's abortion propaganda. In this context, where no abortions will be performed, the First Amendment does not permit the State to compel a private citizen to recite the government's abortion dogma. A ruling to the contrary would constitute a manipulation and perversion of health care communications by the State.

The district court's framework for determining when speech may be compelled as "informed consent"—or speech incidental to conduct—also avoids other problems with requiring individuals who do not perform abortion to engage in a discussion about its "benefits." For instance, if the State's goal is truly to educate pregnant women about what it believes are the benefits of abortion, then surely it can find a better medium for that message than a provider who is so ideologically opposed to

---

[8] *Supra*, n. 4.

the procedure that he or she has vowed not to perform it. If the patient were to raise questions about the so-called "benefits,"[9] this provider's answers would contradict the State's message, resulting in considerable confusion for the patient.

The Court should uphold the district court's narrow definition of "informed consent" to include only speech by a health care provider that affords a patient the ability to make an informed, intelligent decision regarding a medical treatment the provider is about to perform. Mem. of Decision, 25-28, *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill. 2019), ECF No. 294 Dist. Ct., 25-28. By upholding this definition, the Court will comply with the Supreme Court's guidance in *Becerra*, affording proper First Amendment protection to professional speech, while recognizing a narrow exception for speech that is "incidental to conduct." In so doing, the Court can ensure that the marketplace of ideas that is so foundational to our society continues to be free to speakers and seekers as they play their respective roles in mankind's search for truth.

**C. To uphold the State's required benefits discussion would be to turn the Supreme Court's rulings on abortion-related informed consent on their head.**

In a line of holdings dating back at least to 1976, the Supreme Court has evaluated the legitimacy of State-mandated disclosures related to abortion. *See Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976); *Akron v.*

---

[9] As explained earlier, many patients are hesitant to ask questions or challenge information presented to them by health care professionals, due to a perceived power imbalance, etc. *See* Berg, 74 B. U. L. REV. 201, 225.

*Akron Ctr. for Reprod. Health*, 462 U.S. 416 (1983) ("*Akron I*"); *Thornburgh v. Amer. Coll. of Obstetricians*, 476 U.S. 747 (1986); *Casey*, *supra*; *Becerra*, *supra*. The lesson gleaned from considering these holdings collectively is that the Court interprets "informed consent" narrowly, with one exception. Under *Casey*, the Court will allow the State more leeway in compelling speech of medical professionals when the State does so to further its own significant interest in protecting the life of the unborn child.

The chart below summarizes the Court's prior holdings regarding informed consent requirements as applied to the pregnant woman:

| Case | Context of compelled speech | Ruling | Rationale |
|---|---|---|---|
| *Danforth* | Prior to abortion | Upheld | Abortion is significant decision; important that it be made with full knowledge; informed consent prior to any surgery is reasonable[10] |
| *Akron I* | Prior to abortion | Struck down<br><br>(reversed by *Casey*) | Information was designed to dissuade woman from having abortion; imposed rigid requirement that certain information be given in all cases, irrespective of the particular needs of the patient[11] |
| *Thornburgh* | Prior to abortion | Struck down<br><br>(reversed by *Casey*) | Wedges the State's message into physician-patient discussion to discourage abortion; not appropriate to every patient[12] |
| *Casey* | Prior to abortion | Upheld<br><br>(reversed inconsistent holdings | State may require provision of truthful, non-misleading information to further its legitimate goal of protecting the life of the unborn, even when it |

---

[10] *Danforth*, 428 U.S. at 66-67. Note that other aspects of the challenged statute were struck down.
[11] *Casey*, 881-882 (summarizing rationale of *Akron I* holding).
[12] *Thornburgh*, 762-63.

| | | from *Akron I* and *Thornburgh*) | expresses a State preference for childbirth over abortion[13] |
|---|---|---|---|
| *Becerra* | Whenever woman enters pregnancy center | Struck down | Not "informed consent" because not tied to any medical procedure[14] |

It is immediately apparent that in each of these cases except *Becerra*, the compelled speech analyzed as "informed consent" was mandated in the context of a health care provider preparing to perform an abortion on a patient. On the other hand, the Court struck down the compelled speech in *Becerra*, ruling that it was not "informed consent" precisely because it was *not* limited to medical professionals preparing to perform an abortion. *Becerra*, 585 U.S. at 770.

> The licensed notice at issue here is not an informed consent requirement or any other regulation of professional conduct. The notice does not facilitate informed consent to a medical procedure. In fact, it is not tied to a procedure at all. It applies to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed.

*Id.*

In the case at bar, the State endeavors to fit a decidedly square peg into a perfectly round hole by arguing that compelling health care providers who do not perform abortions to convey the State's message about abortion to women who may not even be interested in abortion constitutes a legitimate "informed consent" requirement and therefore escapes strict scrutiny under the First Amendment. *Becerra* forecloses such a broad interpretation of informed consent, particularly when

---

[13] *Casey*, 505 U.S. at 883.
[14] *Becerra*, 585 U.S. at 770.

considered in light of the Court's prior rulings on informed consent in the abortion context.

Even when abortion-related informed consent requirements were placed in the proper context of requiring an abortion provider to convey information to an abortion patient, the Court's holdings set narrow boundaries on what speech may be compelled, emphasizing that it must be tailored to the particular circumstances, needs, and desires of the patient. *See Akron I* (*rev'd, Casey, supra*); *Thornburgh*, 476 U.S. at 762-63 (*rev'd, Casey, supra*). Section 6.1(1) is conspicuously broad, requiring the abortion "benefits" discussion even with women who would never consider abortion an option due to their moral beliefs.

When the *Casey* Court reversed its prior decisions in *Akron I* and *Thornburgh* which had *struck down* abortion-related informed consent requirements as overly intrusive, it did so on the basis of the State's interest in protecting human life—the life of the unborn child.

> [W]e depart from the holdings of *Akron I* and *Thornburgh* to the extent that we permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion.

*Casey*, 505 U.S. at 883.

In overruling *Akron I* and *Thornburgh* on this basis, the Court allowed the State to require a provider to convey a broader range of substantive information to a woman undergoing an abortion, in the interest of protecting life. It gave no indication that, where State-mandated informed consent requirements were *not* aimed at protecting human life but rather at disseminating pro-abortion information, it would construe speech compelled under the rubric of "informed consent" more broadly to permit mandated disclosures unrelated to the particular needs and circumstances of the patient. The justification for construing informed consent more broadly in *Casey* was the State's interest in protecting the life of the unborn baby; no justification exists for such broad construction where the State is not pursuing that interest. *Akron I* and *Thornburgh* were overruled because the informed consent requirements they had struck down were, like those upheld in *Casey*, designed to promote life.

Our Declaration of Independence acknowledges that the very purpose of government is to protect unalienable human rights, the right to life being foremost among them. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). So it is appropriate that a State enjoy greater leeway to compel medical professional speech that aims to protect human life than speech that explains how one might destroy it. As the Supreme Court explained in *Casey*,

> Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted.

*Casey*, 505 U.S. at 852.

The district court's narrow definition of "informed consent" properly harmonizes the Supreme Court's rulings on informed consent requirements in the abortion context. According to those rulings, "informed consent" for abortion is always limited to the context of an impending abortion procedure, but may include a broader range of disclosures when justified by the State's fundamental interest in protecting human life.

If this Court were to uphold the compelled speech at issue here as "informed consent," it would turn the Supreme Court's framework for analyzing informed consent in the abortion context on its head. The compelled speech here is both outside the context of an impending medical procedure and unrelated to the State's interest in protecting unborn human life. It cannot withstand scrutiny under the First Amendment.

## CONCLUSION

Based on the foregoing arguments, Amicus respectfully submits that this Court should uphold the district court's ruling striking down the required abortion "benefits" discussion of 745 Ill. Comp. Stat. 70/6.1(1).

Dated: Dec. 22nd, 2025              /s/ Rita M. Peters

                                            Rita Martin Peters
                                            CITIZENS FOR SELF-GOVERNANCE
                                            5850 San Felipe, Suite 575A
                                            Houston, TX. 77057
                                            (540) 830-1229
                                            rpeters@self-govern.com
                                            *Counsel for Amicus Curiae*

CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Circuit Rule 29 because, excluding the parts of the documents exempted by Fed. R. App. P. 32 (f), it contains 5,270 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 12-point Century Schoolbook font.

Dated:        Dec. 22nd, 2025        /s/ Rita M. Peters

                                     Rita M. Peters

CERTIFICATE OF SERVICE

I hereby certify that on December 22nd, I electronically filed this brief with the

Clerk of Court for the United States Court of Appeals for the Seventh Circuit,

causing notice of such filing to be served upon all parties registered on the CM/ECF

system.


Dated:        Dec. 22nd, 2025        /s/ Rita M. Peters

                                     Rita M. Peters